1   MOLLY M. LENS (S.B. #283867)
      mlens@omm.com
2   DANIEL M. PETROCELLI (S.B. #97802)
      dpetrocelli@omm.com
3   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 8th Floor
4   Los Angeles, California  90067-6035
    Telephone:  +1 310 553 6700
5   Facsimile:    +1 310 246 6779

6   KENDALL TURNER (S.B. #310269)
      kendallturner@omm.com
7   O'MELVENY & MYERS LLP
    1625 I St. NW
8   Washington, DC 20006
    Telephone:  +1 202 383 5300
9   Facsimile:    +1 202 383 5414

10  *Attorneys for Defendant*
    *Paramount Pictures Corporation*
11

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14

| | |
|---|---|
| 15  SHOSH YONAY and YUVAL YONAY, | Case No. 2:22-CV-3846-PA |
| 16          Plaintiffs, | **NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |
| 17          v. | |
| 18  PARAMOUNT PICTURES CORPORATION, a Delaware corporation, | **[DECLARATION OF PATRICK S. MCNALLY, REQUEST FOR JUDICIAL NOTICE, NOTICE OF LODGING, AND [PROPOSED] ORDER FILED CONCURRENTLY HEREWITH]** |
| 19  and DOES 1-10, | |
| 20          Defendants. | |
| 21 | |
| 22 | **Hearing Date:**  September 26, 2022 |
| 23 | **Hearing Time:**  1:30 PM<br>**Place:**  Courtroom 9A |
| 24 | **Judge:**  Hon. Percy Anderson |

25

26

27

28

1       **TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

2       PLEASE TAKE NOTICE that, as soon as the matter may be heard, in

3 Courtroom 9A of this Court, located at 350 West First Street, Los Angeles,

4 California 90012, Defendant Paramount Pictures Corporation ("Paramount

5 Pictures") will and hereby does move pursuant to Federal Rule of Civil Procedure

6 12(b)(6) for an order dismissing with prejudice the complaint filed by Plaintiffs

7 Shosh Yonay and Yuval Yonay ("Plaintiffs"). This Motion is made on the grounds

8 that the complaint fails to allege adequately that Plaintiffs' work is substantially

9 similar in protectable expression to Paramount Pictures' *Top Gun: Maverick*,

10 which is fatal to all three of Plaintiffs' causes of action.

11       This Motion is made following the conference of counsel pursuant to Central

12 District Local Rule 7-3, which took place on August 19, 2022. Declaration of

13 Patrick S. McNally ("McNally Decl.") ¶ 3. This Motion is based on the files,

14 records, and proceedings in this action, this Notice, the Memorandum of Points and

15 Authorities, the Declaration of Patrick S. McNally and exhibits thereto, the Request

16 for Judicial Notice, the reply memorandum that Paramount Pictures intends to file,

17 the arguments of counsel, and such other matters as may be presented at the hearing

18 on this Motion or prior to the Court's decision.

19

20 Dated: August 26, 2022              O'MELVENY & MYERS LLP

21                           By:   /s/ Molly M. Lens

22                                Molly M. Lens

23                       *Attorneys for Defendant*
                               *Paramount Pictures Corporation*

24

25

26

27

28

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

1

**TABLE OF CONTENTS**

2

**Page(s)**

3   I.    INTRODUCTION ........................................................................................... 1

4   II.   BACKGROUND ............................................................................................ 1

5        A.    The Works At Issue................................................................................ 1

6             1.    The Non-Fiction Article .......................................................... 1

7

8             2.    Maverick ................................................................................... 4

9        B.    The Assignment And Termination......................................................... 7

10  III.  ARGUMENT ................................................................................................ 8

11       A.    To State A Claim For Infringement, Plaintiffs Must Demonstrate

12            "Substantial Similarity" Between The Works' *Protected*

13            Elements. ............................................................................................... 8

14       B.    The Court Can Determine Lack Of Substantial Similarity On A

15            Motion To Dismiss............................................................................... 12

16       C.    The Copyright Infringement Claim Fails Because The Article

17            and Maverick Are Not Substantially Similar (Count II). ................... 13

18       D.    Plaintiffs' Remaining Claims Fail (Counts I and III) ......................... 24

19  IV.  CONCLUSION ........................................................................................... 25

20

21

22

23

24

25

26

27

28

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullah v. Walt Disney Co.*,
   714 F. App'x 758 (9th Cir. 2018)..........................................................................12

*Benay v. Warner Bros. Entm't., Inc.*,
   607 F.3d 620 (9th Cir. 2010) ................................................................................20

*Berkic v. Crichton*,
   761 F.2d 1289 (9th Cir. 1985)..............................................................................11

*Bernal v. Paradigm Talent & Literary Agency*,
   788 F. Supp. 2d 1043 (C.D. Cal. 2010)................................................................19

*Braddock v. Jolie*,
   691 F. App'x 318 (9th Cir. 2017).........................................................................12

*Briggs v. Blomkamp*,
   70 F. Supp. 3d 1155 (N.D. Cal. 2014)..................................................................19

*Brown v. Elec. Arts, Inc.*,
   724 F.3d 1235 (9th Cir. 2013)..............................................................................12

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
   683 F.2d 610 (2d Cir. 1982) .................................................................................14

*Campbell v. Walt Disney Co.*,
   718 F. Supp. 2d 1108 (C.D. Cal. 2010)................................................................18

*Carlini v. Paramount Pictures Corp.*,
   2022 WL 614044 (9th Cir. Mar. 2, 2022) ............................................................12

*Cavalier v. Random House, Inc.*,
   297 F.3d 815 (9th Cir. 2002)....................................................................9, 11, 15

*Christianson v. W. Publ'g Co.*,
   149 F.2d 202 (9th Cir. 1945).................................................................................12

*Corbello v. Devito*,
   2015 WL 5768531 (D. Nev. Sept. 30, 2015) .......................................................10

iii

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

1

2

3

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

4

*Corbello v. Valli,*
    974 F.3d 965 (9th Cir. 2020) .........................................................................*passim*

5

*DC Comics v. Towle,*
    802 F.3d 1012 (9th Cir. 2015) ........................................................................21

6

7

*DisputeSuite.com, LLC v. Credit Umbrella Inc.,*
    2015 WL 12750263 (C.D. Cal. Jan. 16, 2015) ...................................................14

8

9

*Esplanade Prods. Inc. v. Walt Disney Co.,*
    2017 WL 5635024 (C.D. Cal. July 11, 2017) ....................................................13

10

11

*Esplanade Prods., Inc. v. Walt Disney Co.,*
    2017 WL 5635027 (C.D. Cal. Nov. 8, 2017) ..................................................9, 12

12

13

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
    499 U.S. 340 (1991) ...............................................................................1, 9, 14

14

15

*Fillmore v. Blumhouse Prods., LLC,*
    771 F. App'x 756 (9th Cir. 2019).....................................................................12

16

17

*Funky Films, Inc. v. Time Warner Entm't Co.,*
    462 F.3d 1072 (9th Cir. 2006) ................................................................8, 11, 13

18

19

*Gest v. Bradbury,*
    443 F.3d 1177 (9th Cir. 2006) .........................................................................25

20

21

*Grosso v. Miramax Film Corp.,*
    383 F.3d 965 (9th Cir. 2004) ...........................................................................19

22

23

*Harper & Row Publishers, Inc. v. Nation Enters.,*
    471 U.S. 539 (1985) .........................................................................................9

24

25

*Hathaway v. Caputo,*
    2021 WL 1862248 (D. Ariz. May 10, 2021)......................................................11

26

27

*Heusey v. Emmerich,*
    692 F. App'x 928 (9th Cir. 2017)......................................................................12

28

iv

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Hightower v. City & Cnty. of S.F.*,
   77 F. Supp. 3d 867 (N.D. Cal. 2014)...................................................................25

*Hist. Truth Prods., Inc. v. Sony Pictures Ent., Inc.*,
   1995 WL 693189 (S.D.N.Y. Nov. 22, 1995) ......................................................17

*Hoehling v. Universal City Studios, Inc.*,
   618 F.2d 972 (2d Cir. 1980) .....................................................................9, 10, 11

*Idema v. Dreamworks, Inc.*,
   162 F. Supp. 2d 1129 (C.D. Cal. 2001).........................................................21, 22

*Jacobsen v. Deseret Book Co.*,
   287 F.3d 936 (10th Cir. 2002) ...........................................................................13

*Karmo v. Morgan Creek Entm't Grp.*,
   2019 WL 3059463 (C.D. Cal. Apr. 12, 2019)....................................................12

*Kouf v. Walt Disney Pictures & Television*,
   16 F.3d 1042 (9th Cir. 1994)..........................................................................9, 16

*Litchfield v. Spielberg*,
   736 F.2d 1352 (9th Cir. 1984) ......................................................................14, 15

*Luftu Murat Uckardesler v. Azteca Int'l Corp.*,
   2010 WL 11515298 (C.D. Cal. May 14, 2010)..................................................18

*Lusson v. Apple, Inc.*,
   2016 WL 10932723 (N.D. Cal. June 20, 2016) .................................................25

*Marshall v. Yates*,
   1983 WL 1148 (C.D. Cal. Oct. 26, 1983) .........................................................11

*Masterson v. Walt Disney Co.*,
   821 F. App'x 779 (9th Cir. 2020)...................................................................1, 12

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) ..........................................................................................25

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

1

**TABLE OF AUTHORITIES**
(continued)

2

3

**Page(s)**

4
*Metcalf v. Bochco,*
  294 F.3d 1069 (9th Cir. 2002)................................................................24

5
*Milano v. NBC Universal, Inc.,*
6
  584 F. Supp. 2d 1288 (C.D. Cal. 2008)................................................18

7
*Musero v. Mosaic Media Group, Inc.,*
8
  2010 WL 11595453 (C.D. Cal. Aug. 9, 2010)..............................11, 12

9
*Narell v. Freeman,*
10
  872 F. 2d 907 (9th Cir. 1989).................................................................10

11
*Newt v. Twentieth Century Fox Film Corp.,*
12
  2016 WL 4059691 (C.D. Cal. July 27, 2016) ......................................12

13
*Olson v. Nat'l Broad. Co.,*
14
  855 F.2d 1446 (9th Cir. 1988)........................................................19, 20

15
*Perry v. Mary Ann Liebert, Inc.,*
  2018 WL 2561029 (S.D.N.Y. June 4, 2018).........................................17
16

17
*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,*
  602 F.3d 57 (2d Cir. 2010) .....................................................................13

18
19
*Rentmeester v. Nike, Inc.,*
  883 F.3d (9th Cir. 2018).................................................................8, 9, 12

20
*Rose v. Connelly,*
21
  38 F. Supp. 54 (S.D.N.Y. 1941) ...........................................................23

22
*Schkeiban v. Cameron,*
23
  566 F. App'x 616 (9th Cir. 2014)..........................................................12

24
*Schwarz v. United States,*
25
  234 F.3d 428 (9th Cir. 2000) .................................................................13

26
*Shame on You Prods., Inc v. Banks,*
  690 F. App'x 519 (9th Cir. 2017)..........................................................12
27

28

vi

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Shame on You Prods., Inc. v. Banks*,
  120 F. Supp. 3d 1123 (N.D. Cal. 2017)...................................................21

*Silas v. HBO, Inc.*,
  713 F. App'x 626 (9th Cir. 2018).................................................8, 12

*Silas v. Home Box Ofice, Inc.*,
  201 F. Supp. 3d 1158 (C.D. Cal. 2016)..................................9, 20, 21

*Skidmore v. Led Zeppelin*,
  952 F.3d 1051 (9th Cir. 2020)...................................................*passim*

*Sobhani v. @radical.media, Inc.*,
  257 F. Supp. 2d 1234 (C.D. Cal. 2003)..............................................13

*Stromback v. New Line Cinema*,
  384 F.3d 283 (6th Cir. 2004) ............................................................19

*Suid v. Newsweek Mag.*,
  503 F. Supp. 146 (D.D.C. 1980) ......................................................19

*Thomas v. Walt Disney Co.*,
  337 F. App'x 694 (9th Cir. 2009)......................................................12

*Tiscareno v. Netflix, Inc.*,
  2014 WL 12558125 (C.D. Cal. Mar. 6, 2014) ...........................17, 22

*White v. Twentieth Century Fox Corp.*,
  572 F. App'x 475 (9th Cir. 2014)......................................................12

*Whitehead v. Paramount Pictures Corp.*,
  53 F. Supp. 2d 38 (D.D.C. 1999) .....................................................22

*Wild v. NBC Universal*,
  513 F. App'x 640 (9th Cir. 2013)......................................................12

*Wild v. NBC Universal, Inc.*,
  2011 WL 13272427 (C.D. Cal. June 28, 2011)...............................14

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Zella v. E.W. Scripps Co.*,
  529 F. Supp. 2d 1124 (C.D. Cal. 2007) ................................................... 12

**Statutes**

17 U.S.C. § 10(b) ......................................................................................... 11

**Other Authorities**

David Nimmer, *Nimmer on Copyright* (rev. ed. 2022) ...................................... 10, 11

H.R. Rep. No. 94-1476 (1976) ........................................................................ 10

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

## I.    **INTRODUCTION**

Plaintiffs claim that Paramount Pictures' 2022 blockbuster movie *Top Gun: Maverick* ("*Maverick*") infringes their copyright in a 1983 magazine article. However, that article—which Plaintiffs tellingly do not attach to the complaint—is a *non-fiction* piece on the Navy Fighter Weapons School, also known as "Top Gun." *Maverick*, in contrast, is a narrative action movie about a fictional veteran pilot, Maverick, who returns to Top Gun to train graduates—including one who blames Maverick for his father's death—for an attack on an enemy installation.

When the Court reviews the article and *Maverick*, as opposed to Plaintiffs' irrelevant and misleading purported comparison of the works, it is clear as a matter of law that *Maverick* does not borrow any of the article's protected expression.  To the contrary, any similarity between these vastly different works derives from the fact that Top Gun is an actual naval training facility.  Plaintiffs do not have a monopoly over works about Top Gun.  To the contrary, "[t]he most fundamental axiom of copyright law [is] that no author may copyright … the facts he narrates." *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344–45 (1991); *Corbello v. Valli*, 974 F.3d 965, 971 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2856 (2021) (factual information "may not … form the basis for a copyright claim").

Where, as here, a review of the works demonstrates no legally cognizable substantial similarity as a matter of law, dismissal is warranted.  In the past decade alone, the Ninth Circuit has "repeatedly" affirmed dismissals of infringement cases involving literary works.  *See Masterson v. Walt Disney Co.*, 821 F. App'x 779 (9th Cir. 2020).  The Court should do so here, and dismiss the complaint with prejudice.

## II.    **BACKGROUND**

### A.    **The Works At Issue.**

#### 1.    *The Non-Fiction Article*

Ehud Yonay was an investigative reporter, who, in early 1983, agreed to write an article for *California Magazine* and "use all reasonable care in reporting

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

and writing the article to make sure that it is factual and accurate."  McNally Decl., Ex. D at 2.[1]  *California Magazine* published Yonay's article, entitled *Top Guns* (the "Article"), as part of its May 1983 issue.  Complaint ("Compl.") ¶¶ 21, 52.[2]

The Article centers on the real-life Navy Fighter Weapons School, founded in 1968.  *See* Compl. ¶ 22; Article at 98.[3]  As the Article explains, despite its formal name, the name that "stuck" was "Top Gun."  Article at 144.  The Article also details how the school has a second nickname, as the "first thing" one sees when entering the base is a "huge red sign" reading:  "Welcome to Fightertown, U.S.A." *Id*. at 97.  The Article explains this title is appropriate because the entire "mission of th[e] sprawling 24,000-acre base … is to primp and fuss over several hundred fighter jocks so that when the time comes and they're staring down the missile racks of a Russian MiG they are primed and ready."  *Id.*

The Article reports that "Top Gun's hotshot aces have virtually revolutionized the fighter pilot business and, with the possible exception of the Israeli Air Force, established themselves as the international masters of the deadly art of air-to-air combat."  *Id.* at 98.[4]  The Article credits the school's success to its training program, which works to "hammer" the two-person F-14 crews into a team.  *Id.* at 145.  Invoking "naval lingo" and "navy jargon," *id.* at 96, 100, such as "hops, that is air combat maneuvers," "bogeys—'enemy' planes," and "dogfighting"—air-to-air combat, the Article outlines the training program.  For

---

[1] Although not necessary for resolution of this Motion, the Court may consider the contract between Yonay and *California Magazine* for the reasons in Paramount's request for judicial notice.  *See* Request for Judicial Notice at 3.

[2]  The other articles in this *California Magazine* issue are similarly facially nonfiction.  *See, e.g*., McNally Decl., Ex. A at 3 (table of contents listing, for example, articles on the construction of San Francisco's skyline and accused murderer Ginny Float).

[3] Citations to the Article throughout are to Exhibit A of the McNally Declaration.

[4] Yonay subsequently wrote a non-fiction book about the Israeli Air Force entitled *No Margin for Error:  The Making of the Israeli Air Force*.  McNally Decl., Ex. C; *see* Request for Judicial Notice at 2.

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

example, the Article explains, in addition to tactical "lectures and briefings," aerial exercises include "one-versus-one hops (one student crew against one instructor), then two-versus-two hops, and then … the tough two-versus-unknown hop, in which two student crews take off not knowing how many [enemy aircraft] are waiting out there or where they'll come from or in what order." *Id.* at 145.

In addition to other Navy planes, the Article describes the F-14 Tomcat, which, at the time, was the Navy's "supreme air war machine" and the aircraft then flown by Top Gun trainees. *Id.* at 100. It reports that the F-14's wings "can sweep back for fast flying or open to the sides … for landing or … cruising around." *Id.* The F-14 can also "haul seven tons of guns and missiles … track 24 targets at once and fire six missiles in six different directions in rapid sequence." *Id.* But "[t]he plane's enormous size is a disadvantage" relative to "the much smaller Russian MiG," it "cost[s] $36 million a piece," and the engine is "stall prone." *Id.*

As a framing device, the Article focuses on two real-life lieutenants, Alex "Yogi" Hnarakis and Dave "Possum" Cully—a pilot and radar intercept officer ("RIO"), respectively—who train together as a fighter crew. *Id.* at 95–102, 144–145. It documents the process by which they become a team, including a simulated training exercise in which they "escorted" attack planes "over 'enemy' land on a bombing mission." *Id.* at 95–96, 147. To add literal color to their true story, the Article includes photographs of Yogi and Possum in action. *Id.* at 96–97.

The Article also recounts Yonay's own flight in the back of an F-5 during a dogfighting exercise—what he calls "[t]he truth behind yanking and banking." *Id.* at 144. Yonay documents the experience of "pulling Gs" and "withstanding several times the force of the earth's gravitational pull." *Id.* During the course of "several classic air moves," including "flying upside down," Yonay notes feeling "sheer nirvana" coupled with the "general feeling of physical torture" stemming from "pressure on your chest … so intense that you can hardly breathe." *Id.*

Yonay structured the Article in a non-linear fashion, repeatedly switching

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

focus between Yogi and Possum's real-life "personal experiences" and the "historical facts" surrounding Top Gun.  Compl. ¶ 22.  The Article begins with the details of the January 1983 training exercise, in which Yogi and Possum are defeated by a mock bogey, Article at 95–96, before transitioning to a description of Naval Air Station Miramar and explaining the specific role for which Yogi and Possum are training, *id.* at 97–98.  It next provides the two trainees' biographical details, such as their hometowns, where they went to college, and their prior experience in the Navy.  *Id.* at 99–100.  The Article then shifts to a description of their plane, the F-14 Tomcat, and how pilots typically learn to fly the aircraft, including the use of realistic flight simulators and training for night landings.  *Id.* at 100–101.  Going back to 1982, the Article recalls how prior to arriving at Top Gun, Yogi and Possum—along with their squadron—went on a six-month tour aboard an aircraft carrier, stopping in Hawaii, the Philippines, Singapore, and Australia before returning to Miramar.  *Id.* at 102.  Jumping further back in time, the Article covers the "dry historical details of [Top Gun]," Compl. ¶ 22—from the school's 1968 genesis to its evolution over the subsequent decade.  *Id.* at 144–145.  Returning to February 1983, the Article then describes Yogi and Possum's final "hop" and concludes by noting that they graduated from Top Gun later that month.  *Id.* at 147.

2.    *Maverick*

*Maverick*, which was released in 2022, is a sequel to the 1986 motion picture *Top Gun*.[5]  Set more than 30 years after the events of *Top Gun*, *Maverick* features Pete "Maverick" Mitchell, the fictional protagonist from the original film, now a Captain and a test pilot who, at the film's outset, is working on the Navy's manned hypersonic scramjet program (which is not located at Top Gun).  After learning that the program is about to be shut down in favor of funding drone technology, Maverick takes one last flight in an attempt to meet the program's goal of reaching

[5] As discussed infra at 7, and as Plaintiffs concede in the Complaint, Compl. ¶ 19, there is no allegation that *Top Gun* infringes the Article.

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

Mach 10.  McNally Decl., Ex. B at 05:11–05:48, 07:55–08:48.  He succeeds, but he pushes the prototype beyond its limits and destroys it.  *Id.* at 12:28–12:45.

Maverick's career has stalled due to similar insubordinate acts, and his superior wants to ground him permanently, but Maverick's friend and former Top Gun rival, Tom "Iceman" Kazansky, now an Admiral and the U.S. Pacific Fleet commander, reassigns him to Top Gun as an instructor.  *Id.* at 15:14–16:02.  Once Maverick arrives, he reunites with Penny Benjamin—the owner of the neighborhood bar and a single mother to a teenage daughter—with whom Maverick had an on-again-off-again relationship years earlier.  *Id.* at 22:09–22:33.

The Navy tasks Maverick with training an elite group of Top Gun graduates for a mission to destroy an unsanctioned uranium enrichment plant located at the bottom of a steep canyon in enemy territory.  *Id.* at 18:01–18:44, 19:46–19:57.  To account for the surface-to-air missiles (SAMs) and fifth-generation fighters defending the plant, Maverick devises an attack strategy premised on fast-paced, low-altitude flying, but both air boss Vice Admiral Beau "Cyclone" Simpson and the trainees express skepticism that the approach is viable.  *Id.* at 18:44–19:57.

Among the trainees is Bradley "Rooster" Bradshaw, the son of Maverick's late best friend and RIO Nick "Goose" Bradshaw, who died during a training accident while Maverick was piloting (an inquiry cleared Maverick of responsibility).  *Id.* at 19:57–20:37.  Maverick reveals that, without Rooster's consent, Maverick pulled Rooster's first Naval Academy application because Rooster's late mother made Maverick promise that Rooster would not become a pilot.  Rooster, unaware of the promise, resents Maverick for impeding his career and blames Maverick for Goose's death.  *Id.* at 56:05–56:28, 1:04:50–1:06:00.

Rooster also clashes with fellow trainee Jake "Hangman" Seresin over their contrasting styles:  Rooster calls Hangman reckless, while Hangman criticizes Rooster as too cautious.  *Id.* at 27:50–28:35, 52:33–53:03.  Other trainees include pilots Natasha "Phoenix" Trace and Reuben "Payback" Fitch, and their weapons

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

systems officers Robert "Bob" Floyd and Mickey "Fanboy" Garcia. *Id.* at 24:50–26:10. Maverick works to earn the trainees' respect and instills teamwork and camaraderie through unconventional training methods. *Id.* at 34:40–35:02, 1:01:22–1:02:24. He also rekindles his relationship with Penny, with indications that both characters have matured since their youth. *Id.* at 45:54–48:20, 1:02:55–1:04:45.

As the mission date draws near, none of the trainees is able to complete the course simulation within Maverick's parameters. *Id.* at 50:25–52:30. Maverick particularly fears sending Rooster on a mission that might result in Rooster's death. But a meeting with Iceman—who is suffering from late-stage cancer—convinces Maverick to release his anxiety and let go of his past guilt. *Id.* at 57:00–59:05.

Iceman soon dies, and without his protection, Maverick is removed as instructor and replaced with Cyclone. *Id.* at 1:18:40. Just as Cyclone announces the new and more dangerous mission parameters, Maverick takes off on an unauthorized run of the simulated course and successfully completes it, stunning everyone. *Id.* at 1:19:16–1:22:27. After Cyclone reluctantly appoints Maverick team leader, Maverick decides that the mission will be carried out by two strike teams—one led by him and the other led by Rooster. *Id.* at 1:26:07–1:26:30.

The strike teams successfully destroy the enemy target, but on the way out of the canyon, they are confronted by SAMs. *Id.* at 1:36:55–1:39:55. Maverick sacrifices his plane to protect Rooster and is shot down. *Id.* at 1:39:55–1:40:15. Thinking Maverick is dead, Cyclone orders the remaining fighters back to the aircraft carrier, but Rooster ignores him and returns to look for Maverick. *Id.* at 1:40:55–1:41:25. On the ground, Maverick is about to be attacked by an enemy helicopter when Rooster arrives and shoots it down. Rooster is then hit by a SAM and ejects. *Id.* at 1:42:00–1:43:00. Stranded, Maverick and Rooster steal an old F-14 from a nearby base, but are intercepted by three fifth-generation enemy fighters. *Id.* at 1:49:00–1:50:50. Maverick manages to take out two of the planes, but he

runs out of ammunition before he can engage the remaining fighter.  *Id.* at 1:54:00.

Resigned to their fate, Maverick apologizes to Rooster for failing to keep him safe.  Just then, Hangman, who had been on standby for the mission, shoots down the enemy fighter, all three return to the carrier in triumph, and Maverick and Rooster emotionally reconcile.  *Id.* at 1:55:17–1:59:14.  The film ends with Rooster reflecting on his renewed relationship with Maverick, his father figure, while Maverick and Penny fly off into the sunset.  *Id.* at 2:00:00–2:01:35.

### B.    The Assignment And Termination.

On May 18, 1983, Yonay assigned his motion picture and associated rights in the Article to Paramount Pictures.  Compl. ¶ 23.  On January 23, 2018, Plaintiffs sent Paramount Pictures a statutory notice of termination (the "Termination Notice"), with a stated termination date of January 24, 2020, and thereafter filed it with the Copyright Office.  *Id.* ¶¶ 3, 25, 26.

Plaintiffs initiated this action on June 6, 2022, after the theatrical release of *Maverick*.  *Id.* ¶ 1.  Plaintiffs concede that they have no claim based on *Top Gun* because, even if *Top Gun* and the Article were substantially similar (which they are not), *Top Gun* was completed decades before Plaintiffs sent their Termination Notice, and even longer before its effective date.  *Id.* ¶ 19.  But the complaint alleges that *Maverick* is derived from and substantially similar to the Article, *id.* ¶¶ 32–33, and that Paramount Pictures infringed Plaintiffs' copyright by exploiting and releasing *Maverick*, *id.* ¶ 53.  In addition to asserting a claim for copyright infringement, *id.* ¶¶ 50–60, Plaintiffs seek a declaration "that Paramount [Pictures] does not have any rights to make, exploit, or distribute [*Maverick*] or any other derivative work based in whole or in part on the [Article], and/or [*Top Gun*] (as derived from the [Article]), in the United States," *id.* ¶ 48, and a preliminary and permanent injunction "enjoining Paramount [Pictures] … from engaging in such further violations of the Copyright Act," *id.* ¶¶ 57–60.

For the reasons explained directly below, Plaintiffs' claims fail as a matter of

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

1  law, and should be dismissed with prejudice.

2  **III.   ARGUMENT**

3        **A.    To State A Claim For Infringement, Plaintiffs Must Demonstrate**
4              **"Substantial Similarity" Between The Works' *Protected* Elements.**

5        To survive a motion to dismiss, a copyright plaintiff must plausibly allege,

6  *inter alia*, a substantial similarity between "*protected* elements" of his copyrighted

7  material and the allegedly infringing work.  *Rentmeester v. Nike, Inc.*, 883 F.3d at

8  1111, 1117 (9th Cir. 2018); *see also Silas v. HBO, Inc.*, 713 F. App'x 626, 627 (9th

9  Cir. 2018) (dismissing copyright infringement claim where plaintiff failed to

10  adequately allege that screenplay and television series were substantially similar in

11  their protected elements).[6]  Indeed, even if a plaintiff could establish that the

12  defendant actually copied his work, this would not be enough to impose liability,

13  because the Copyright Act does not forbid all copying; rather, a plaintiff must

14  demonstrate that the copying in question is unlawful because the defendant copied

15  enough of the plaintiffs' protected "expression … to render the two works

16  'substantially similar.'"  *Rentmeester*, 883 F.3d at 1117; *see also Skidmore v. Led*

17  *Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) ("[O]nly substantial similarity in

18  *protectable* expression may constitute actionable copying that results in

19  infringement liability …").

20        "[D]etermining whether works are substantially similar involves a two-part

21  analysis consisting of the 'extrinsic test' and the 'intrinsic test.'"  *Rentmeester*, 883

22  F.3d at 1118; *see also, e.g., Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d

23  1072, 1077 (9th Cir. 2006).  The extrinsic test "assesses the *objective* similarities of

24  the two works, focusing only on the protectable elements of the plaintiff's

25  expression," *Rentmeester*, 883 F.3d at 1118, whereas the intrinsic test "examines an

26  ordinary person's *subjective* impressions," *Funky Films*, 46 F.3d at 1077.  Although

27  a plaintiff must prove both to establish substantial similarity, *Skidmore*, 952 F.3d at

28  ───────────────
[6] All emphasis is added and internal citations and quotations omitted.

1064, a "finding of substantial similarity under the extrinsic component is a

necessary prerequisite to considering the intrinsic component, which is expressly

reserved for the jury," *Esplanade Prods., Inc. v. Walt Disney Co.*, 2017 WL

5635027, at * 8 (C.D. Cal. Nov. 8, 2017), *aff'd*, 768 F. App'x 732 (9th Cir. 2019).

Accordingly, on a motion to dismiss, only the extrinsic test is relevant; if the works

fail that test, the court must enter judgment for the defendant as a matter of law.

*See, e.g., Rentmeester*, 883 F.3d at 1118; *Silas v. Home Box Office, Inc.*, 201 F.

Supp. 3d 1158, 1171 (C.D. Cal. 2016), *aff'd*, 713 F. App'x 626 (9th Cir. 2018).

      To compare "the objective similarities of specific expressive elements in the

two works," *Skidmore*, 952 F.3d at 1064, the extrinsic test's analysis "focuses on

articulable similarities between the plot, themes, dialogue, mood, setting, pace,

characters, and sequence of events" in the two works, *Kouf v. Walt Disney Pictures*

*& Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). The Ninth Circuit has

emphasized that courts applying the extrinsic test "must take care to inquire only

whether the protectable elements, standing alone, are substantially similar," and

therefore must "filter out and disregard the non-protectable elements." *Cavalier v.*

*Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002); *see also Rentmeester*, 883

F.3d at 1118. Two unprotectable elements in particular are relevant to this Motion.

      **Facts**. It is axiomatic that "'[n]o author may copyright his ideas *or the facts*

*he narrates*,'" and "copyright does not prevent subsequent users from copying from

a prior … work those constituent elements that are not original—for example, …

facts." *Corbello*, 974 F.3d at 973 (quoting *Harper & Row Publishers, Inc. v.*

*Nation Enters.*, 471 U.S. 539, 547–48 (1985)); *see also Hoehling v. Universal City*

*Studios, Inc.*, 618 F.2d 972, 974 (2d Cir. 1980) (copyright protection "has never

extended to history, be it documented fact or explanatory hypothesis"); *Feist*, 499

U.S. at 347 (facts, whether "historical, biographical [or] news of the day," are not

copyrightable). There is a compelling reason for this rule: "the cause of knowledge

is best served when history is the common property of all, and each generation

remains free to draw upon the discoveries and insights of the past." *Hoehling*, 618
F.2d at 974.  Accordingly, copyright "in historical accounts is narrow indeed,
embracing no more than the author's original *expression* of particular facts." *Narell
v. Freeman*, 872 F. 2d 907, 911 (9th Cir. 1989); *Hoehling*, 618 F.2d at 974
("[A]bsent wholesale usurpation of another's expression, claims of copyright
infringement where works of history are at issue are rarely successful.").  "It is thus
a feature of copyright law, not a bug or anomaly, that an author who deals in fact
rather than fiction receives incomplete copyright protection for the fruits of his
labor." *Corbello*, 974 F.3d at 973.

Copyright protection does not extend to facts even where the idea at issue is
an "interpretation" of a historical event.  *Corbello v. Devito*, 2015 WL 5768531, at
*12 (D. Nev. Sept. 30, 2015).  After all, "every relation of a historical fact beyond
direct observation is tainted to some degree by some person's interpretation, so
distinguishing between historical facts and 'interpretations' of those facts … would
destroy the rule that historical facts are unprotected." *Id.*; *see* 1 David Nimmer,
*Nimmer on Copyright* ("Nimmer") § 2.11[A] (rev. ed. 2022) ("[T]he interpretation
of a historical event is not copyrightable in itself (that is, apart from the words used
to evoke the interpretation.")); *cf. Corbello*, 974 F.3d at 976 (author's depiction of
nonfictional character's "cool" personality not protectable).  As a result,
"[h]istorical facts and theories may be copied, as long as the defendant does not
'bodily appropriate' the expression of the plaintiff." *Narell*, 872 F.2d at 910–11.
Similarly, "[c]opyright does not preclude others from using the ideas or information
revealed by the author's work."  H.R. Rep. No. 94-1476, at 56–57 (1976).

Moreover, under the asserted truths doctrine—also called the doctrine of
copyright estoppel—"one who represents his work to be factual may not, in a
subsequent infringement action, prove that part of the work was fictional and
therefore protected."  Nimmer § 2.11[C]; *see also Corbello*, 974 F.3d at 978–79
(adopting the asserted truths doctrine, and stating that "[i]t would hinder, not

10

promote the progress of science and useful arts, to allow a copyright owner to
spring an infringement suit on subsequent authors who built freely on a work held
out as factual …").  The doctrine applies even when "the author does not expressly
make … a representation" that the work is factual, so long as the work "is presented
as news, or history or biography."  Nimmer § 2.11[C]; *see also Marshall v. Yates*,
1983 WL 1148, at \*2 (C.D. Cal. Oct. 26, 1983) ("Any reader … would have
concluded that the book presented a true account of the life of Frances Farmer, the
result of Arnold's investigative journalism."); *Hoehling*, 618 F.2d at 975
("[Plaintiff's] book is presented as a factual account, written in an objective,
reportorial style."); *Hathaway v. Caputo*, 2021 WL 1862248, at \*6 (D. Ariz. May
10, 2021) (dismissing infringement claim where plaintiff's work was "held out as a
work of historical fact").

  **Ideas, *Scènes À Faire*, And Stock Elements.**  It is also axiomatic that
copyright does not protect *ideas*, 17 U.S.C. § 10(b), and in applying the extrinsic
test, the Court compares "not the basic plot ideas for stories, but the actual concrete
elements that make up the total sequence of events and the relationships between
the major characters," *Funky Films*, 462 F.3d at 1077.  Similarly, *scènes à faire*—
"situations and incidents that flow necessarily or naturally from a basic plot
premise"—and "[f]amiliar stock scenes and themes that are staples of literature"
cannot "sustain a finding of infringement," *Cavalier*, 297 F.3d at 823; *see also
Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985) ("General plot ideas are
not protected by copyright law; they remain forever the common property of artistic
mankind.").  Accordingly, ideas, *scènes à faire*, and stock elements are also
"[a]mong the unprotectable elements" which the Court must filter out in comparing
the two works.  *See Musero v. Mosaic Media Group, Inc.*, 2010 WL 11595453, at
\*2 (C.D. Cal. Aug. 9, 2010) (Anderson, J.).

1

**B.    The Court Can Determine Lack Of Substantial Similarity On A Motion To Dismiss.**

2

3    For nearly 80 years, "the Ninth Circuit has noted that … 'when the

4    copyrighted work and the alleged infringement are both before the court, capable of

5    examination and comparison, non-infringement can be determined on a motion to

6    dismiss.'"  *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1130 (C.D. Cal. 2007)

7    (quoting *Christianson v. W. Publ'g Co.*, 149 F.2d 202, 203 (9th Cir. 1945)); *see*

8    *also Rentmeester*, 883 F.3d at 1123 (affirming dismissal where "[n]othing disclosed

9    during discovery could alter the fact that the allegedly infringing works are as a

10   matter of law not substantially similar").  As observed in *Masterson*, 821 F. App'x

11   at 780 n.1, in the past decade alone, the Ninth Circuit has "repeatedly" affirmed

12   dismissals of infringement cases involving literary works where a review of the

13   works revealed no substantial similarity as a matter of law.  *Id.* (affirming dismissal

14   of infringement claim).[7]  So too have the district courts in this Circuit.  *See e.g.*,

15   *Karmo v. Morgan Creek Entm't Grp.*, 2019 WL 3059463, at *6–7 (C.D. Cal. Apr.

16   12, 2019) (Anderson, J.); *Musero*, 2010 WL 11595453, at *4; *Newt v. Twentieth*

17   *Century Fox Film Corp.*, 2016 WL 4059691, at *3–12 (C.D. Cal. July 27, 2016).

18   A plaintiff cannot avoid dismissal by failing to attach copies of the works to

19   the complaint.  Rather, courts routinely take judicial notice of the underlying works

20   through the incorporation by reference doctrine.  *See, e.g., Brown v. Elec. Arts, Inc.*,

21   724 F.3d 1235, 1248 (9th Cir. 2013)  Moreover, a plaintiff's decision not to attach

22

---

23   [7] *See, e.g., Fillmore v. Blumhouse Prods., LLC*, 771 F. App'x 756, 756–57 (9th Cir. 2019); *Esplanade*, 768 F. App'x at 733; *Abdullah v. Walt Disney Co.*, 714 F. App'x 758, 759 (9th Cir. 2018); *Silas*, 713 F. App'x at 627; *Shame on You Prods., Inc v. Banks*, 690 F. App'x 519, 520 (9th Cir. 2017); *Heusey v. Emmerich*, 692 F. App'x 928, 929 (9th Cir. 2017); *Schkeiban v. Cameron*, 566 F. App'x 616, 617 (9th Cir. 2014); *White v. Twentieth Century Fox Corp.*, 572 F. App'x 475, 476–77 (9th Cir. 2014); *Wild v. NBC Universal*, 513 F. App'x 640, 641 (9th Cir. 2013); *Thomas v. Walt Disney Co.*, 337 F. App'x 694, 695 (9th Cir. 2009); *Carlini v. Paramount Pictures Corp.*, 2022 WL 614044 (9th Cir. Mar. 2, 2022); *Braddock v. Jolie*, 691 F. App'x 318, 319 (9th Cir. 2017).

24

25

26

27

28

DEFENDANT'S MOTION TO DISMISS
                                                        CASE NO. 2:22-CV-3846-PA

a copy of the works can suggest that the plaintiff "believed including those details would have been detrimental to its claims." *Esplanade Prods. Inc. v. Walt Disney Co.*, 2017 WL 5635024, at \*10 (C.D. Cal. July 11, 2017).  While the Article and *Maverick* are referenced in the complaint, neither are attached, and Paramount Pictures has requested judicial notice of both.  Request for Judicial Notice at 1–2.

With the works properly before the Court, the Court's extrinsic analysis must focus on "the works themselves" rather than Plaintiffs' self-serving characterizations of them.  *See Funky Films*, 462 F.3d at 1075; *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (on motion to dismiss, "the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings"); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941–42 (10th Cir. 2002) ("When a district court considers the original work and the allegedly copyrighted work in deciding a 12(b)(6) motion, the legal effect of the works are determined by the works themselves …."); *Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000) (a "court need not accept as true … allegations that contradict facts that may be judicially noticed").

## C.    The Copyright Infringement Claim Fails Because The Article and *Maverick* Are Not Substantially Similar (Count II).

Plaintiffs incorrectly ~~claim~~ allege that *Maverick* is an infringing "derivative work" within the meaning of the Copyright Act because it is "plainly derived from" the Article.  *See* Compl. ¶ 53.  "Of course, a work based upon an idea or kernel contained in another work may in some sense be 'derivative' of the first work." *Sobhani v. @radical.media, Inc.*, 257 F. Supp. 2d 1234, 1238 (C.D. Cal. 2003).  To determine whether a work is an *infringing* derivative work within the meaning of the Copyright Act, however, courts must apply the "substantial similarity" test— *i.e.*, they must determine whether the alleged derivative work is substantially similar to the original work's protectable elements.  *Id.* at 1238 ("To determine

1  whether derivative works are within the definition of the statute … the Ninth

2  Circuit has imported the similarity standard used to determine infringement."); *see*

3  *also Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984).  Thus, "[i]t is not

4  enough to show that the defendant … used the plaintiff's material as a model,

5  template, or even inspiration; rather, the question is whether the defendant's work is

6  substantially similar to plaintiff's work such that liability may attach."

7  *DisputeSuite.com, LLC v. Credit Umbrella Inc.*, 2015 WL 12750263, at *3 (C.D.

8  Cal. Jan. 16, 2015); *see Wild v. NBC Universal, Inc.*, 2011 WL 13272427, at *17

9  (C.D. Cal. June 28, 2011) ("[T]he Court concludes that … even if [defendants] read

10  the [prior] work and drew inspiration from it, the two works are not substantially

11  similar within the meaning of Ninth Circuit copyright jurisprudence."), *aff'd* 513 F.

12  App'x 640 (9th Cir. 2013).[8]

13      Applying the Ninth Circuit's actual extrinsic test—that is, filtering out

14  unprotectable elements and comparing the works themselves—confirms as a matter

15  of law that there is no similarity in protectable expression between the Article and

16  *Maverick*, much less a "substantial" one.

17      **Plot and Sequence.**  As explained in greater detail above, *see supra* at 1–7,

18  the plots and sequence of the two works are fundamentally dissimilar.  The Article

19  is a nonfiction piece about the U.S. Navy Fighter Weapons School.  Structured in a

20  non-linear fashion, the Article bounces back and forth between two young pilots'

21  then-current training at the school, the history of the school, an overview of fighter

22

23  [8]  It is likewise irrelevant that Paramount Pictures previously received a license
from Ehud Yonay for certain rights to the Article, *see* Compl. ¶ 23, because

24  licensing history has no impact on whether the works are substantially similar as a
matter of law.  *See Burroughs v. Metro-Goldwyn-Mayer, Inc*., 683 F.2d 610, 623

25  (2d Cir. 1982) (even "[a]ssuming, arguendo, that [plaintiffs'] notice of termination
was effective [to terminate the license] …," their copyright infringement claim

26  "nevertheless fails because … no reasonable jury could find the two works
substantially similar beyond the level of generalized ideas or themes"); *see also*

27  *Feist*, 499 U.S. at 343 (holding that defendant, who had unsuccessfully attempted to
obtain a license from plaintiff prior to the commencement of litigation, did not

28  infringe plaintiff's copyright because plaintiff's work was not sufficiently original).

jets, and a first-hand account by Yonay of what it is like to experience G-force. *Maverick*, by contrast, is a narrative fictional tale about a veteran fighter pilot, Maverick, who returns to Top Gun to train a new generation of pilots—including Rooster, who blames Maverick for the death of Rooster's father—for an attack on an enemy installation. None of the graduates can complete the mission's training course. Maverick takes an unauthorized flight through the training course, proving that it can be done, and is then appointed team leader. Maverick leads his team on a successful mission, then sacrifices his jet to protect Rooster, who in turn saves Maverick. The two steal a plane from an enemy air base, survive an aerial chase, and are saved by Hangman. Any similarity between the works' "plots" stems from the fact that they are both set at Top Gun—a real place that was not invented by Yonay and is not owned by Plaintiffs.

Despite this, Plaintiffs (as copyright claimants often do) proffer a list of supposed "similarities" between the works. McNally Decl., Ex. G.[9] The Ninth Circuit has repeatedly cautioned that such lists are inherently subjective and unreliable, especially when they emphasize "random similarities scattered throughout the works," which are insufficient to support an infringement claim. *See Litchfield*, 736 F.2d at 1356; *Skidmore*, 952 F.3d at 1075 (same); *Cavalier*, 297 F.3d at 825 (same); *Kouf*, 16 F.3d at 1045–46 (same). Indeed, the Court's review of the works will reveal that Plaintiffs' list is riddled with mischaracterizations and false similarities,[10] subjective impressions that are irrelevant to the objective

---

[9] For the Court's convenience, Paramount Pictures has assigned numbers to the rows in the chart attached to Plaintiffs' complaint. McNally Decl., Ex. G. That said, as explained above and below, the works themselves—and not Plaintiffs' misleading chart—govern this Motion.

[10] *See, e.g.,* Rows 19 (claiming, as a similarity, that the Article uses the metaphor of a "bullseye" to describe the aviation caste system, while *Maverick* briefly shows a character playing darts); 49 (claiming that the works are similar because the pilots in both the Article and *Maverick* are "in denial" about safety risks, but *Maverick* repeatedly discusses the dangers of the planned mission); 68 (comparing an entire aircraft carrier squadron getting a surprise ride to shore in Australia on a "glorious

"extrinsic test,"[11] and efforts to compare the Article to the <u>original</u> *Top Gun* film—even though Plaintiffs concede that picture is non-infringing and is not at issue.[12]

But even setting aside those defects, Plaintiffs' list is irrelevant for the simple reason that all of the allegedly similar "plot elements"—such as those involving the history and operations of the "Top Gun" school (Rows 8, 9, 11, 12, 15, 20–23), risky aerial maneuvers, combat training and tactical discussions (Rows 25–27, 31–34, 36–39, 42–47, 54, 56, 58, 67, 69–71, and 73), descriptions and depictions of fighter jets, including their exorbitant cost (Rows 28–30, 52, 57, 72), pilots doing push-up exercises (Row 59), pilots' use of "call signs" as nicknames (Row 13), and depictions of camaraderie amongst pilots, including bar excursions and games (Rows 62, 64–66)—are reported in the Article as factual.[13]  Facts such as these do not receive copyright protection.  *See Corbello*, 974 F.3d at 977 ("Though the creative expression that is in the Work—the 'writing style and presentation'—is protected by copyright, the assertedly historical elements are not."); *Perry v. Mary Ann Liebert, Inc.,* 2018 WL 2561029, at *6 (S.D.N.Y. June 4, 2018) ("scientific facts" are not copyrightable), *aff'd* 765 F. App'x 470 (2d Cir. 2019); *supra* at 9–11.

By way of example only:

- Plaintiffs claim as "similarities" that both works depict Naval aviators as being "enamored with the high-intensity flying of the fastest fighter jets" and dedicated to improving their skills (Rows 5–6, 8) and portray aerial combat training as "very competitive," with pilots "crestfallen"

---

sailing yacht" with Maverick and Penny transporting a two-person sailboat across San Diego Bay).

[11] *See, e.g.,* Rows 10, 14, 24, 41, 55, 74, 75.

[12] *See, e.g.,* Rows 1–3, 5–7, 14, 48–50, 54, 57–58, 60, 71; *see also supra* at 7.

[13] A Senate Report confirms the Article's accuracy.  *See* McNally Decl., Ex. E at 4675 (Top Gun was created to improve training on dogfighting and emphasized "dynamic, realistic [Air Combat Maneuvering] training"); *id*. at 4678 (program endeavored "to develop teamwork and coordination in getting the air crews to work together"); *id*. at 4689 (program used simulators for training).  Although unnecessary to resolve this Motion, the report may be considered by the Court.  *See* Request for Judicial Notice at 3–4.  Moreover, even if the Article were not accurate, the asserted truths doctrine prevents Plaintiffs from disputing its factual nature.  *See supra* at 10–11.

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

when there are defeated (Rows 25–26).  But elite fighter pilots loving to fly, and being dedicated to their craft and competitive, are facts described in the Article.  Plaintiffs do not have a monopoly over these (unremarkable) facts merely because Yonay once reported on them.

- Plaintiffs claim that because the Article described certain fighter jet controls, engine components, and features, *Maverick* infringes their copyright by depicting those elements.  Rows 28–30, 72.  Obviously, the Article's *description* of real-life features of fighter jets does not allow Plaintiffs to preclude others from *depicting* those features.

- Plaintiffs claim that *Maverick* infringes the Article by portraying aerial combat as "edgy," "intense," "rigorous," and "of-life or death importance," where "the slightest mistake can be deadly and cost lives."  Rows 32–33.  These are factual (and obvious) aspects of aerial combat, which Plaintiffs certainly do not and cannot own.

- Plaintiffs claim that both works discuss and depict the effects of gravitational forces on fighter pilots, Rows 38–40, but the effect of G-forces is a fact of physics, and is not subject to copyright protection.

Even if the Court were to ignore that these plot elements are factual (which it should not), these elements would *still* need to be filtered out as common, unprotected *scènes-à-faire*.  *See, e.g.*, *Tiscareno v. Netflix, Inc.*, 2014 WL 12558125, at *8, 9 (C.D. Cal. Mar. 6, 2014) (finding no substantial similarity between two works involving "hotshot young pilots showing off their impressive aviation skills in which they maneuver their aircraft to avoid being shot down by a superior jet aircraft" and the protagonist saved the day after being chased by a more advanced fighter jet because these features were unprotected *scènes-à-faire*, common in action films, as "risky rescue missions, narrow escapes … or protagonists saving the day" are not "unique elements"); *Hist. Truth Prods., Inc. v. Sony Pictures Ent., Inc.*, 1995 WL 693189, at *8-9 (S.D.N.Y. Nov. 22, 1995) (unprotected scènes-à-faire included "military training"); *Luftu Murat Uckardesler v. Azteca Int'l Corp.*, 2010 WL 11515298, at *6 (C.D. Cal. May 14, 2010) (no right to preclude anyone from "depicting physical training or workout").  The works therefore share no protectable similarities in plot.

**Themes.**  *Maverick*'s primary themes are reconciliation and redemption.  The film features an older hero, facing the end of his military career, who finally makes

peace with his past, while also achieving a great victory and proving his doubters wrong.  Along the way, he mends relationships—reconciling and forming a father-son connection with Rooster, and entering into a renewed romantic relationship with Penny.  The need to make peace with one's past to move forward is reinforced in the emotional scene in which Iceman, Maverick's former rival turned friend, advises:  "IT'S TIME TO LET GO."  McNally Decl., Ex. B at 57:00–59:05.

Nothing resembling these themes appears anywhere in the Article, which is a purely nonfiction piece about two pilots at Top Gun, the history of the school, and the features of fighter planes.  To the extent Plaintiffs intend to claim some thematic elements in the behavior of the fighter pilots that Yonay profiled—such as "close camaraderie … despite intense competition," "family"-like relationships, or pilots demonstrating "heroism" (Rows 3, 12, 36, 65, 74), the Article's perception or interpretation of historical events is not protectable.  *See supra* at 10.  And even if they were not based on factual events, such themes would be so generic as to be unprotectable under copyright law.  *See Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1113 (C.D. Cal. 2010) ("Themes of self-reliance and the importance of friendship and teamwork," which "often predominate stories of competition, especially those where the protagonist begins the story as cocky and self-centered, and are … generic and not protectable."); *Milano v. NBC Universal, Inc.*, 584 F. Supp. 2d 1288, 1297 (C.D. Cal. 2008) ("competition" is not a protectable theme); *Briggs v. Blomkamp*, 70 F. Supp. 3d 1155, 1177 (N.D. Cal. 2014) ("heroic sacrifice" is not a protectable theme), *aff'd* 714 F. App'x 712 (9th Cir. 2018); *Stromback v. New Line Cinema*, 384 F.3d 283, 297 (6th Cir. 2004) (common themes "such as saving the world" are "beyond any level of abstraction at which copyright protection might begin to attach").

**Dialogue.**  "[E]xtended similarity of dialogue" [is] needed to support a claim of substantial similarity," *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988), and "[o]rdinary words and phrases are not entitled to copyright protection,"

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

*Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1071 (C.D. Cal. 2010). The Article does not contain ***any*** dialogue.[14] In any case, Plaintiffs do not, and cannot, allege any extended similarity between the words in the Article and the dialogue in *Maverick*. To the extent Plaintiffs allege that a similarity exists based on the use of Navy aviation jargon, this does not suffice because there is no substantial similarity where "the only similarities in dialogue between the two works come from the use of common, unprotectable … jargon." *See Cabello*, 974 F.3d at 977; *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 967 (9th Cir. 2004) (same), *amended on denial of reh'g*, 400 F.3d 658 (9th Cir. 2005).

**Settings.** Plaintiffs allege that both works are primarily based at the Naval Air Station Miramar, fifteen miles north of San Diego, near the Pacific Ocean, where all the pilots are the best or "hot" and the planes are fast and powerful. *See* Rows 9–11, 18–20, 22–24, 28–30, 37–39, 52, 61, 66, 72. But Miramar is where the real-life Top Gun training program was founded, and it is true that Top Gun recruits the best pilots and the planes are fast and powerful. *See supra* 9–10. The setting is thus not protectable, and any similarities between the works' settings "flow naturally from the works' shared unprotected premise" and must be "disregarded for purposes of the extrinsic test." *See Benay v. Warner Bros. Entm't., Inc*., 607 F.3d 620, 628 (9th Cir. 2010).[15] Plaintiffs also claim that both works feature a "WELCOME TO FIGHTERTOWN, U.S.A." sign (Row 9), but this is not true— *Maverick* does include an on-screen title card identifying a location as "Fightertown U.S.A," but there is no physical sign. McNally Decl., Ex. B at 15:14–15:40. In any event, as the Article makes clear, that sign actually existed because "Fightertown"

---

[14] The Article's quotes of individuals other than the author do not constitute dialogue and cannot be copyrighted. *See Suid v. Newsweek Mag.*, 503 F. Supp. 146, 148 (D.D.C. 1980) ("The author of a factual work may not … claim copyright in statements by others … reported in the work since the author may not claim originality as to those statements.").

[15] That the Top Gun program moved to Nevada in 1996 is irrelevant. *See* Row 11. There is no dispute that the program was originally based near San Diego, Article at 97, and therefore that location is not protectable. *See supra* at 9–10.

was Miramar's real nickname, and thus there is no protectable expression. *See supra* at 9–10.[16]

**Pace and Mood.**  The pace and mood of the works are very different: whereas the Article is a non-linear journalistic work that tells the true story of young pilots at Top Gun, provides information on the program's history, and discusses the strengths and weaknesses of the F-14 fighter jet, *Maverick* is a fast-paced and action-packed dramatic film.  To the extent that any of Plaintiffs' alleged "similarities" pertain to the pace or mood inherent in fighter jet combat, such as that flying "is depicted with weightless fluidity" and "ethereal beauty" (Rows 31, 37), that aerial combat is "edgy and intense" and "life-or-death" (Rows 32, 33), or that taking off is a "delight" that is "brutally shattered" with combat (Row 42), they are factual and unprotectable. *See supra* at 9–10.  Moreover, these elements reflect "[a] general mood that flows naturally from unprotectable basic plot premises" inherent to a story about Navy fighter pilot training school, which are "not entitled to protection." *Silas*, 201 F. Supp. 3d at 1180; *see also, e.g.*, *Olson*, 855 F.2d at 1451 (although both works "have similar moods" because they "may be broadly described as comic," this similarity is "common to the genre of action-adventure television series and movies," and thus does not demonstrate substantial similarity).

**Characters.**  Plaintiffs try to claim that characters in *Maverick* resemble pilots profiled in the Article, but all of the pilots described in the Article are *actual people*, and "[a] character based on a historical figure is not protected for copyright purposes." *Corbello*, 974 F.3d at 976; *see also, e.g.*, *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1186 (C.D. Cal. 2001) ("much of this elucidation of the 'character' of Idema depends on 'historical fact' and/or on the allegedly 'true'

---

[16] Plaintiffs ignore that the Article also reports on events in Hawaii, the Philippines, Singapore, and the Indian Ocean, none of which appears in *Maverick*, and that *Maverick* features locations that do not appear in the Article, including the headquarters of the Navy's "scramjet" program and the unnamed country where the film's climax takes place.

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

events of his life, and as such even Idema can claim no exclusive right to these 'facts' of his life"), *aff'd in relevant part, dismissed in part*, 90 F. App'x 496 (9th Cir. 2003), *as amended on denial of reh'g* (Mar. 9, 2004).  That Yonay may have described a real-life pilot's *personality* does not change this result, because each pilot described in the Article "is not a fictional character whose personality was created in the work."  *Corbello*, 974 F.3d at 976 (author's depiction of a nonfictional character's "voice, cool demeanor, and braggadocio" is "not a protectable element").  The analysis thus ends here.

But even if the pilots profiled in the Article were not real-life figures, Plaintiffs' claims would still be baseless.  Fictional characters are only protected when they are "especially distinctive" and "contain some unique elements of expression."  *DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015).  A "stock character or basic character type … is not entitled to copyright protection," *Shame on You Prods., Inc. v. Banks*, 120 F. Supp. 3d 1123, 1164 (N.D. Cal. 2017), *aff'd* 690 F. App'x 519 (9th Cir. 2017), and "[w]hen analyzing whether two protectible characters are substantially similar, courts require a very high degree of similarity between characters," *Silas*, 201 F. Supp. 3d at 1177.

Plaintiffs argue that the title character in *Maverick* is similar to the real-life Alex ("Yogi") Hnarakis, because both are jocular, single and good-looking, close with their RIO, love flying, and are competitive.  Rows 1–7, 25.  Courts have repeatedly rejected alleged character similarities premised on "traits that are so generalized and/or cliché as to be nearly *scènes à faire* of the military/action genre: i.e., the brash, cocky military officer who does things his own way, and who triumphs over the forces of evil through his own guile, wit, and pure physical abilities."  *Idema*, 162 F. Supp. 2d at 1186; *Tiscareno*, 2014 WL 12558125, at *8, 9 (no substantial similarity where works involved "hotshot young pilots showing off their impressive aviation skills," as "hotshot protagonists are certainly not unique elements"); *Whitehead v. Paramount Pictures Corp.*, 53 F. Supp. 2d 38, 50 (D.D.C.

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

1999) ("General characteristics such as black hair, intelligence, patriotism and
slight paranoia, however, are not copyrightable and do not establish substantial
similarity."), *aff'd* 2000 WL 3363291 (D.C. Cir. Apr. 19, 2000).  Moreover, beyond
vague generalities, the characters are completely different.  Yogi, at the time the
Article was written, is a 26-year-old Lieutenant and Top Gun student whose RIO is
alive and well.  Article at 100.  Maverick, by contrast, is a 50-something Captain,
whose best friend and RIO died decades earlier, whose long career has been
hindered by clashes with authority figures, and who returns to teach at Top Gun.
Plaintiffs' efforts to elide these differences by comparing Yogi to the version of
Maverick that appeared in the original *Top Gun*, over thirty-five years ago, *see*
Rows 1–7, are improper; as Plaintiffs acknowledge, the original *Top Gun* is not at
issue in this litigation.  *Supra* at 7.

Plaintiffs also improperly attempt to compare the real-life Dave "Possum"
Cully to the character of Goose from *Top Gun*, Rows 1–3, despite the fact that
Goose *does not even appear* in *Maverick*, apart from photographs and a brief
flashback, *see* McNally Decl., Ex. B at 31:16–32:15.  Obviously, a character who
does not even appear in *Maverick* cannot support a finding of infringement.  And in
any event, even if Goose had appeared in *Maverick* (and even if Possum were a
fictional character rather than a real-life individual), the alleged "similarities"—that
both Possum and Goose both married, have a moustache, and are friends with their
pilot, *see* Rows 1–3—are insufficient to support a claim.[17]

Plaintiffs' remaining claims of character similarities are nonsensical.  For
example, Plaintiffs attempt to concoct a similarity between the film's characters
Maverick and Hangman, and an unnamed marine who is referenced in just two

_____

[17] Plaintiffs also claim similarity between the works' characters by comparing
Maverick to an amalgamation of Yogi *and* Randy Cunningham, as well as Possum
to Goose and Rooster, Rows 2–7, 15–16, 19, but this is impermissible.  *See Rose v.
Connelly*, 38 F. Supp. 54, 56 (S.D.N.Y. 1941) (rejecting plaintiff's attempt to
compare character to "more than one of defendants'" characters).

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

sentences in the Article: "'It's all right, officer, we're from California,' a tanked-up marine hotshot once told a cop who had stopped him. 'This is California,' the cop answered, and wrote him up." *See* Row 63. Plaintiffs claim that this is a "similarity" because, like the "tanked-up marine," Maverick and Hangman are "cocky and sometimes reckless." *Id.* Even setting aside that the Article is factual and describes a stock character (the cocky military man), there is no similarity here aside from Plaintiffs' gloss, which is not entitled to any weight.

**Selection and Arrangement.** The complaint makes a passing reference to the Article's purported "skillful[] select[ion of] accounts of the pilots' personal lives and precise details of their 'hops' (flight maneuvers)," and its "curat[ion]" of "the lives of U.S. Navy fighter pilots." Compl. ¶ 22. To the extent that Plaintiffs claim there is substantial similarity between the Article and *Maverick* based on the "selection and arrangement" of *unprotectable* elements, such argument fails as a matter of law. As the Ninth Circuit recently explained *en banc*, "a selection and arrangement copyright protects … the *particular* way in which the artistic elements form a coherent pattern, synthesis, or design," and is infringed "only where the works share, in substantial amounts, the 'particular,' *i.e.*, the 'same,' combination of unprotectable elements." *Skidmore*, 952 F.3d at 1074–75. Critically, a plaintiff cannot state a "selection and arrangement claim" simply by identifying "random similarities scattered throughout … the works" and "[l]abeling them a 'combination' of unprotectable elements." *Id.* at 1075; *supra* at 15. Without showing how these unprotectable elements were specifically "arranged"—and how such "arrangement" was copied by the defendant—there is no liability. *Id.*

The Article provides a different sequence of events from *Maverick*, which is a fictional action movie culminating in a daring attack on an enemy target. *Supra* at 1–7. That there are some alleged similarities between the works is not enough: a plaintiff cannot "establish substantial similarity by reconstituting the copyrighted work as a combination of unprotectable elements and then claiming that those same

23

1  elements also appear in the defendant's work, in a different aesthetic context."

2  *Skidmore*, 952 F.3d at 1075.  Yet that is precisely what the complaint alleges.

3      Notably, *Skidmore* criticized *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th

4  Cir. 2002), an earlier decision discussing the "selection and arrangement test,"

5  observing that "[c]onfusion followed in *Metcalf*'s wake," resulting in subsequent

6  attempts "to cabin *Metcalf*" or otherwise "side-step[]" the decision altogether.

7  *Skidmore*, 952 F.3d at 1075.  But even under the arguably laxer ruling in *Metcalf*,

8  the "selection and arrangement" of unprotected elements can form the basis for a

9  claim only when there is a "sufficiently concrete" and "particular sequence in

10  which an author strings a significant number of unprotectable elements" together.

11  *Metcalf*, 294 F.3d at 1074.  Because Plaintiffs do not, and cannot, identify any such

12  "concrete" and "particular" *sequencing* of elements between the two works,

13  Plaintiffs cannot state a claim under a "selection and arrangement" theory.

14      **D.    Plaintiffs' Remaining Claims Fail (Counts I and III)**

15      Because there is no substantial similarity between the Article and *Maverick*,

16  Plaintiffs' claims for declaratory relief (Count I) and injunctive relief (Count III)

17  also fail.  A declaratory judgment action is appropriate only where "the facts

18  alleged, under all the circumstances, show that there is a substantial controversy,

19  between the parties having adverse legal interests, of sufficient immediacy and

20  reality to warrant the issuance of a declaratory judgment."  *MedImmune, Inc. v.*

21  *Genentech, Inc.*, 549 U.S. 118, 127 (2007).  Similarly, "[f]or the purposes of

22  requesting injunctive relief, a party does not have standing unless it is able to show

23  a real or immediate threat that it will be wronged again."  *Hightower v. City &*

24  *Cnty. of S.F.*, 77 F. Supp. 3d 867, 886 (N.D. Cal. 2014); *see also Gest v. Bradbury*,

25  443 F.3d 1177, 1181 (9th Cir. 2006).

26      Plaintiffs' requests for declaratory and injunctive relief are premised on the

27  theory that *Maverick* infringes on their alleged copyright in the Article.  *See* Compl.

28  ¶¶ 41–49, 61–65.  Count I seeks a judicial determination that *Maverick* is a work

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA

derivative of the Article, and that Paramount Pictures accordingly does not have the right to exploit *Maverick* (or any other derivative work based on the Article).  *Id.* ¶ 48.[18]  But, as explained above, to establish that *Maverick* is an infringing derivative work of the Article, Plaintiffs must show that the two works are substantially similar, which they cannot do.  *See supra* at 13–23.  And because Plaintiffs cannot show any possibility of success on their claims, much less a probability of success, Count III too necessarily fails.  *See Lusson v. Apple, Inc.*, 2016 WL 10932723, at *3 (N.D. Cal. June 20, 2016) ("It's not unusual for a complaint to allege separate 'claims' for separate remedies—like punitive damages or injunctive relief—that are not independent causes of action.  Courts should let these claims rise and fall with the underlying, substantive claims on which they rely.").

## IV.  **CONCLUSION**

The Court should dismiss Plaintiffs' complaint in its entirety with prejudice.

Dated:  August 26, 2022                  O'MELVENY & MYERS LLP

                                         By:  /s/ Molly M. Lens
                                              Molly M. Lens

                                         *Attorneys for Defendant*
                                         *Paramount Pictures Corporation*

---

[18] To the extent that Plaintiffs seek a judicial determination that theoretical future projects may infringe their copyright in the Article, there is no basis to grant declaratory relief because there is no "substantial controversy" of "sufficient immediacy or reality" to warrant such relief.  *See MedImmune*, 549 U.S. at 127.

DEFENDANT'S MOTION TO DISMISS
CASE NO. 2:22-CV-3846-PA