1  MOLLY M. LENS (S.B. #283867)
     mlens@omm.com
2  DANIEL M. PETROCELLI (S.B. #97802)
     dpetrocelli@omm.com
3  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 8th Floor
4  Los Angeles, California  90067-6035
   Telephone:  +1 310 553 6700
5  Facsimile:   +1 310 246 6779

6
   *Attorneys for Defendant*
7  *Paramount Pictures Corporation*

8
                **UNITED STATES DISTRICT COURT**
9
                **CENTRAL DISTRICT OF CALIFORNIA**
10

11
   SHOSH YONAY and YUVAL YONAY,          Case No. 2:22-CV-3846-PA
12
                        Plaintiffs,      **NOTICE OF MOTION AND
13                                       MOTION TO DISMISS
             v.                          PLAINTIFFS' FIRST
14                                       AMENDED COMPLAINT**
   PARAMOUNT PICTURES
15 CORPORATION, a Delaware corporation,  **[DECLARATION OF PATRICK
   and DOES 1-10,                        S. MCNALLY, REQUEST FOR
16                                       JUDICIAL NOTICE, NOTICE
                        Defendants.      OF LODGING, AND
17                                       [PROPOSED] ORDER FILED
                                         CONCURRENTLY
18                                       HEREWITH]**

19                                       **Hearing Date:** November 7, 2022
                                         **Hearing Time:** 1:30 PM
20                                       **Place:** Courtroom 9A
                                         **Judge:** Hon. Percy Anderson
21

22

23

24

25

26

27

28

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, as soon as the matter may be heard, in Courtroom 9A of this Court, located at 350 West First Street, Los Angeles, California 90012, Defendant Paramount Pictures Corporation ("PPC") will and hereby does move pursuant to Federal Rule of Civil Procedure 12(b)(6) for an order dismissing with prejudice the First Amended Complaint ("Amended Complaint") filed by Plaintiffs Shosh Yonay and Yuval Yonay ("Plaintiffs"), Dkt. 15.  This Motion is made on the grounds that the Amended Complaint fails to allege adequately that Ehud Yonay's work is substantially similar in protectable expression to PPC's *Top Gun: Maverick*, which is fatal to Plaintiffs' causes of action for copyright infringement (Count III) and declaratory judgment (Count II).  The Motion is also made on the grounds that the unambiguous language of the 1983 assignment between Ehud Yonay ("Yonay") and PPC dooms Plaintiffs' breach of contract claim (Count I).

This Motion is made following the Local Rule 7-3 conference of counsel, which took place on September 16, 2022.  Declaration of Patrick S. McNally ("McNally Decl.") ¶ 3.  This Motion is based on the files, records, and proceedings in this action, this Notice, the Memorandum of Points and Authorities, the Declaration of Patrick S. McNally and exhibits thereto, the Request for Judicial Notice, the reply memorandum that PPC intends to file, the arguments of counsel, and such other matters as may be presented at the hearing on this Motion or prior to the Court's decision.

Dated:  September 28, 2022                    O'MELVENY & MYERS LLP

                                                          By:    /s/ Molly M. Lens
                                                                   Molly M. Lens

                                                          *Attorneys for Defendant Paramount
                                                          Pictures Corporation*

# TABLE OF CONTENTS

**Page(s)**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................ 1

    A.     The Works At Issue ................................................................................. 1

        1.     The Non-Fiction Article ............................................................... 1

        2.     *Maverick* ..................................................................................... 4

    B.     The Assignment And Termination ........................................................... 6

    C.     Plaintiffs' Lawsuit ................................................................................... 7

III.    ARGUMENT ..................................................................................................... 8

    A.     The Copyright Infringement Claim Fails Because The Article and *Maverick* Are Not Substantially Similar (Count III). .................. 8

        1.     Plaintiffs Must Plausibly Allege that the Works Are Substantially Similar in their Protected Elements. ..................... 8

        2.     Substantial Similarity May Be Decided on a Motion to Dismiss ...................................................................................... 11

        3.     The Works Are Not Substantially Similar as a Matter of Law. ........................................................................................... 12

    B.     The Declaratory Judgment Claim Fails (Count II) ............................... 23

    C.     The Contract Claim Fails (Count I) ...................................................... 24

IV.     CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullah v. Walt Disney Co.*,
   714 F. App'x 758 (9th Cir. 2018)..........................................................................12

*Bedrosian v. Tenet Healthcare Corp.*,
   208 F.3d 220 (9th Cir. 2000)................................................................................24

*Benay v. Warner Bros. Entm't., Inc.*,
   607 F.3d 620 (9th Cir. 2010).........................................................................17, 18

*Berkic v. Crichton*,
   761 F.2d 1289 (9th Cir. 1985)..............................................................................11

*Bernal v. Paradigm Talent & Literary Agency*,
   788 F. Supp. 2d 1043 (C.D. Cal. 2010)...............................................................18

*Braddock v. Jolie*,
   691 F. App'x 318 (9th Cir. 2017)..........................................................................12

*Briggs v. Blomkamp*,
   70 F. Supp. 3d 1155 (N.D. Cal. 2014), *aff'd* 714 F. App'x 712 (9th
   Cir. 2018)..............................................................................................................17

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
   683 F.2d 610 (2d Cir. 1982) ................................................................................13

*Campbell v. Walt Disney Co.*,
   718 F. Supp. 2d 1108 (C.D. Cal. 2010)...............................................................17

*Carlini v. Paramount Corp.*,
   2022 WL 614044 (9th Cir. Mar. 2, 2022) ...........................................................12

*Carlini v. Paramount Pictures Corp.*,
   2021 WL 911684 (C.D. Cal. Feb. 2, 2021), *aff'd*, 2022 WL 614044
   (9th Cir. Mar. 2, 2022)..........................................................................................19

*Catena v. Capitol Recs., LLC*,
   2012 WL 12942740 (C.D. Cal. July 11, 2012) ....................................................24

iii

1

2

3

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

4

5

*Cavalier v. Random House, Inc.*,
   297 F.3d 815 (9th Cir. 2002) ..................................................................9, 11, 14

6

*Christianson v. W. Publ'g Co.*,
   149 F.2d 202 (9th Cir. 1945) ..............................................................................11

7

8

*Corbello v. Devito*,
   2015 WL 5768531 (D. Nev. Sept. 30, 2015) .....................................................10

9

10

*Corbello v. Valli*,
   974 F.3d 965 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2856 (2021) ............passim

11

12

*DC Comics v. Towle*,
   802 F.3d 1012 (9th Cir. 2015)............................................................................20

13

14

*DisputeSuite.com, LLC v. Credit Umbrella Inc.*,
   2015 WL 12750263 (C.D. Cal. Jan. 16, 2015)...................................................13

15

16

*Esplanade Prods., Inc. v. Walt Disney Co.*,
   2017 WL 5635027 (C.D. Cal. Nov. 8, 2017), *aff'd*, 768 F. App'x
   732 (9th Cir. 2019) .........................................................................................9, 12

17

18

*Fillmore v. Blumhouse Prods., LLC*,
   771 F. App'x 756 (9th Cir. 2019).......................................................................12

19

20

*Funky Films, Inc. v. Time Warner Entm't Co.*,
   462 F.3d 1072 (9th Cir. 2006).....................................................................8, 11, 12

21

22

*Goldberg v. Cameron*,
   787 F. Supp. 2d 1013 (N.D. Cal. 2011)..............................................................17

23

24

*Grosso v. Miramax Film Corp.*,
   383 F.3d 965 (9th Cir. 2004), *amended on denial of reh'g*, 400 F.3d
   658 (9th Cir. 2005) ..............................................................................................18

25

26

*Harper & Row Publishers, Inc. v. Nation Enters.*,
   471 U.S. 539 (1985) ..............................................................................................9

27

28

*Hathaway v. Caputo*,
   2021 WL 1862248 (D. Ariz. May 10, 2021)......................................................11

iv

1

**TABLE OF AUTHORITIES**
(continued)

2

3

**Page(s)**

4

*Heusey v. Emmerich*,
  692 F. App'x 928 (9th Cir. 2017)..........................................................................12

5

*Hist. Truth Prods., Inc. v. Sony Pictures Ent., Inc.*,
  1995 WL 693189 (S.D.N.Y. Nov. 22, 1995) .......................................................16

6

7

*Hoehling v. Universal City Studios, Inc.*,
  618 F.2d 972 (2d Cir. 1980) ............................................................................9, 10

8

9

*Idema v. Dreamworks, Inc.*,
  162 F. Supp. 2d 1129 (C.D. Cal. 2001), *aff'd in relevant part,
  dismissed in part*, 90 F. App'x 496 (9th Cir. 2003), *as amended on
  denial of reh'g* (Mar. 9, 2004)......................................................................20, 21

10

11

12

*Jacobsen v. Deseret Book Co.*,
  287 F.3d 936 (10th Cir. 2002)................................................................................12

13

14

*Kouf v. Walt Disney Pictures & Television*,
  16 F.3d 1042 (9th Cir. 1994) ............................................................................9, 14

15

16

*Litchfield v. Spielberg*,
  736 F.2d 1352 (9th Cir. 1984)..........................................................................13, 14

17

18

*Luftu Murat Uckardesler v. Azteca Int'l Corp.*,
  2010 WL 11515298 (C.D. Cal. May 14, 2010)....................................................16

19

20

*Marshall v. Yates*,
  1983 WL 1148 (C.D. Cal. Oct. 26, 1983) .............................................................10

21

22

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007) ...............................................................................................24

23

24

*Milano v. NBC Universal, Inc.*,
  584 F. Supp. 2d 1288 (C.D. Cal. 2008)................................................................17

25

26

*Monaco v. Bear Stearns Residential Mortg. Corp.*,
  554 F. Supp. 2d 1034 (C.D. Cal. 2008)................................................................24

27

28

*Musero v. Mosaic Media Group, Inc.*,
  2010 WL 11595453 (C.D. Cal. Aug. 9, 2020) ....................................................11

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

1

**TABLE OF AUTHORITIES**
(continued)

2

3

**Page(s)**

4

*Narell v. Freeman*,
    872 F. 2d 907 (9th Cir. 1989) .......................................................................9, 10

5

6

*Olson v. Nat'l Broad. Co.*,
    855 F.2d 1446 (9th Cir. 1988) ......................................................................18, 19

7

8

*Perry v. Mary Ann Liebert, Inc.*,
    2018 WL 2561029 (S.D.N.Y. June 4, 2018), *aff'd* 765 F. App'x
    470 (2d Cir. 2019) ...............................................................................................15

9

10

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
    602 F.3d 57 (2d Cir. 2010) .................................................................................12

11

12

*RBB2, LLC v. CSC ServiceWorks, Inc.*,
    2019 WL 1170484 (E.D. Cal. Mar. 13, 2019) ...................................................24

13

14

*Rentmeester v. Nike, Inc.*,
    883 F.3d 1111 (9th Cir. 2018) ..................................................................8, 9, 11

15

16

*Rose v. Connelly*,
    38 F. Supp. 54 (S.D.N.Y. 1941) .........................................................................22

17

18

*Schkeiban v. Cameron*,
    566 F. App'x 616 (9th Cir. 2014) .......................................................................12

19

20

*Schwartz v. United States*,
    234 F.3d 428 (9th Cir. 2000) ..............................................................................12

21

22

*Shame on You Prods., Inc v. Banks*,
    690 F. App'x 519 (9th Cir. 2017) .......................................................................12

23

24

*Shame on You Prods., Inc. v. Banks*,
    120 F. Supp. 3d 1123 (N.D. Cal. 2017), *aff'd* 690 F. App'x 519 (9th
    Cir. 2017) ............................................................................................................20

25

26

*Silas v. HBO, Inc.*,
    713 F. App'x 626 (9th Cir. 2018) .................................................................8, 12

27

28

*Skidmore v. Led Zeppelin*,
    952 F.3d 1051 (9th Cir. 2020) ........................................................8, 14, 22, 23

vi

1

## TABLE OF AUTHORITIES
(continued)

2

3

**Page(s)**

4

*Sobhani v. @radical.media, Inc.,*
  257 F. Supp. 2d 1234 (C.D. Cal. 2003) .................................................. 12

5

*Suid v. Newsweek Mag.,*
  503 F. Supp. 146 (D.D.C. 1980) ............................................................ 18

6

7

*Thomas v. Walt Disney Co.,*
  337 F. App'x 694 (9th Cir. 2009) .......................................................... 12

8

9

*Tiscareno v. Netflix, Inc.,*
  2014 WL 12558125 (C.D. Cal. Mar. 6, 2014) ............................... 16, 21

10

11

*White v. Twentieth Century Fox Corp.,*
  572 F. App'x 475 (9th Cir. 2014) .......................................................... 12

12

13

*Whitehead v. Paramount Pictures Corp.,*
  53 F. Supp. 2d 38 (D.D.C. 1999), *aff'd* 2000 WL 3363291 (D.C.
  Cir. Apr. 19, 2000) ........................................................................... 17, 21

14

15

*Wild v. NBC Universal,*
  513 F. App'x 640 (9th Cir. 2013) .......................................................... 12

16

17

*Wild v. NBC Universal, Inc.,*
  2011 WL 13272427 (C.D. Cal. June 28, 2011), *aff'd* 513 F. App'x
  640 (9th Cir. 2013) ................................................................................ 13

18

19

20

*Zella v. E.W. Scripps Co.,*
  529 F. Supp. 2d 1124 (C.D. Cal. 2007) ................................................ 11

21

22

**Statutes**

23

17 U.S.C. § 10(b) .......................................................................................... 11

24

**Other Authorities**

25

1 David Nimmer,
  *Nimmer on Copyright* § 2.11[A] (rev. ed. 2022) .................................. 10

26

27

H.R. Rep. No. 94-1476 (1976) ...................................................................... 10

28

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

I.    **INTRODUCTION**

Plaintiffs claim that PPC's 2022 blockbuster hit *Top Gun: Maverick* ("*Maverick*") infringes the copyright in a 1983 magazine article by Ehud Yonay. However, that article is a *non-fiction* piece on the Navy Fighter Weapons School, also known as "Top Gun."  *Maverick*, in contrast, is a narrative action movie about a fictional veteran pilot, Maverick, who returns to Top Gun to train graduates—one of whom blames Maverick for his father's death—for an attack on an enemy plant.

In its motion to dismiss the original complaint, PPC demonstrated that any alleged similarities between the works stem from the factual, and unprotected, elements of the article.  While Plaintiffs amended their complaint to try to avoid PPC's dispositive motion, Plaintiffs do not—and cannot— dispute that the article is a non-fiction work and that factual information "may not … form the basis for a copyright claim."  *Corbello v. Valli*, 974 F.3d 965, 971 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2856 (2021).  No amendment can change that *Maverick* does not borrow any of the article's protected expression.  Put simply, Plaintiffs do not have a monopoly over works about Top Gun.  Nor can Plaintiffs use their newly invented contract claim as a toehold to avoid dismissal.  To the contrary, Plaintiffs' claim that PPC was obligated to provide Yonay with a credit on *Maverick*—even though Plaintiffs allege PPC lacks rights to the article—is refuted by the plain language of the contract.  The Motion should be granted in its entirety.

II.   **BACKGROUND**

A.    **The Works At Issue.**

1.    *The Non-Fiction Article*

Investigative reporter Ehud Yonay contracted to write an article for *California Magazine* and to "use all reasonable care in reporting and writing the article to make sure that it is factual and accurate."  McNally Decl., Ex. D at 2.[1]

_____

[1] Although not necessary for resolution of this Motion, the Court may consider the contract between Yonay and *California Magazine*.  *See* Request for Judicial Notice at 3.

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

*California Magazine*, which specialized in "long-form non-fiction," published that article, *Top Guns* (the "Article"), in the May 1983 issue.  Am. Compl. ¶¶ 21, 69.[2]

The Article centers on the real-life Navy Fighter Weapons School, more commonly called "Top Gun."  *See* Am. Compl. ¶ 22; Article at 98.[3]  The school has a second nickname, as the first thing one sees when entering the base is a "huge red sign" stating "Welcome to Fightertown, U.S.A."—an appropriate nickname because the "mission of th[e] sprawling 24,000-acre base … is to primp and fuss over several hundred fighter jocks so that when the time comes and they're staring down the missile racks of a Russian MiG they are primed and ready."  Article at 97.

The Article reports that "Top Gun's hotshot aces have virtually revolutionized the fighter pilot business and, with the possible exception of the Israeli Air Force, established themselves as the international masters of the deadly art of air-to-air combat."  *Id.* at 98.[4]  The Article credits the school's success to its training program, which works to "hammer" the two-person F-14 crews into a team.  *Id.* at 145.  Invoking "naval lingo" and "navy jargon," *id.* at 96, 100, such as "hops" (air combat maneuvers), "bogeys" (enemy planes), and "dogfighting" (air-to-air combat), the Article outlines the training program.  For example, the Article explains, in addition to tactical "lectures and briefings," aerial exercises include "one-versus-one hops (one student crew against one instructor), then two-versus-two hops, and then … the tough two-versus-unknown hop, in which two student crews take off not knowing how many [enemy aircraft] are waiting out there or where they'll come from or in what order."  *Id.* at 145.

In addition to other Navy planes, the Article describes the F-14 Tomcat, which at the time was the Navy's "supreme air war machine" and the aircraft flown by Top Gun trainees.  *Id.* at 100.  It reports that the F-14's wings "can sweep back

---

[2] The other articles in the issue are also nonfiction.  *See* McNally Decl., Ex. A at 3.

[3] Citations to the Article throughout are to Exhibit A of the McNally Declaration.

[4] Yonay later wrote a non-fiction book about the Israeli Air Force.  McNally Decl., Ex. C.

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

for fast flying or open to the sides … for landing or … cruising around." *Id*.  The F-14 can also "haul seven tons of guns and missiles … track 24 targets at once and fire six missiles in six different directions in rapid sequence." *Id*.  But "[t]he plane's enormous size is a disadvantage" relative to "the much smaller Russian MiG," it costs "$36 million apiece," and the engine is "stall prone." *Id*.

The Article reports on two real-life lieutenants, Alex "Yogi" Hnarakis and Dave "Possum" Cully—a pilot and radar intercept officer ("RIO")—who train together as a fighter crew. *Id.* at 95–102, 144–145.  It documents the process by which they become a team, including a simulated training exercise in which they "escorted" attack planes "over 'enemy' land on a bombing mission." *Id.* at 95–96, 147.  The Article includes photographs of Yogi and Possum in action. *Id.* at 96–97.

Yonay also recounts his own flight in an F-5—what he calls "[t]he truth behind yanking and banking." *Id.* at 144.  Yonay documents the experience of "pulling Gs" and "withstanding several times the force of the earth's gravitational pull." *Id.*  Experiencing "classic air moves," including "flying upside down," Yonay notes feeling "sheer nirvana" coupled with the "physical torture" stemming from "pressure on your chest … so intense that you can hardly breathe." *Id.*

The Article is structured in a non-linear fashion, repeatedly switching focus between Yogi and Possum's real-life "personal experiences" and the "historical details" surrounding Top Gun.  Am. Compl. ¶ 22.  The Article begins with the details of the January 1983 training exercise, in which Yogi and Possum are defeated by a mock bogey, Article at 95–96, before transitioning to a description of Naval Air Station Miramar and explaining the specific role for which Yogi and Possum are training, *id.* at 97–98.  It next provides the two trainees' biographical details, such as their hometowns, where they went to college, and their prior experience in the Navy. *Id.* at 99–100.  The Article then shifts to a description of their plane, the F-14 Tomcat, and how pilots typically learn to fly the aircraft, including the use of realistic flight simulators and training for night landings. *Id.* at

100–101.  Going back to 1982, the Article recalls how prior to arriving at Top Gun, Yogi and Possum—along with their squadron—went on a six-month tour aboard an aircraft carrier, stopping in Hawaii, the Philippines, Singapore, and Australia before returning to Miramar.  *Id.* at 102.  Jumping further back in time, the Article covers the "historical details of [Top Gun]," Am. Compl. ¶ 22—from the school's 1968 genesis to its evolution over the subsequent decade.  *Id.* at 144–145.  Returning to February 1983, the Article then describes Yogi and Possum's final "hop" and concludes by noting that they graduated from Top Gun later that month.  *Id.* at 147.

### 2.    *Maverick*

*Maverick* is the 2022 sequel to the 1986 motion picture *Top Gun*.[5]  Set more than 30 years after the events of *Top Gun*, *Maverick* features Pete "Maverick" Mitchell, the fictional protagonist from the original film, now a Captain and a test pilot who, at the film's outset, is working on the Navy's manned hypersonic scramjet program (which is not located at Top Gun).  After learning that the program is about to be shut down in favor of funding drone technology, Maverick takes one last flight in an attempt to meet the program's goal of reaching Mach 10.  McNally Decl., Ex. B at 05:11–05:48, 07:55–08:48.  He succeeds, but he pushes the prototype beyond its limits and destroys it.  *Id.* at 11:42–12:36.

Maverick's career has stalled due to similar insubordinate acts, and his superior wants to ground him permanently, but Maverick's friend and former Top Gun rival, Tom "Iceman" Kazansky, now an Admiral and the U.S. Pacific Fleet commander, reassigns him to Top Gun as an instructor.  *Id.* at 15:27–15:54.  Once Maverick arrives, he reunites with Penny Benjamin—the owner of the neighborhood bar and a single mother to a teenage daughter—with whom Maverick had an on-again-off-again relationship years earlier.  *Id.* at 22:10–24:23.

The Navy tasks Maverick with training an elite group of Top Gun graduates

---

[5] As discussed *infra* at 14, and as Plaintiffs concede in the Amended Complaint, Am. Compl. ¶ 19, there is no allegation that *Top Gun* infringes the Article.

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

for a mission to destroy an unsanctioned uranium enrichment plant located at the bottom of a steep canyon in enemy territory.  *Id.* at 18:01–18:44, 19:46–20:08.  To account for the surface-to-air missiles (SAMs) and fifth-generation fighters defending the plant, Maverick devises an attack strategy premised on fast-paced, low-altitude flying, but both air boss Vice Admiral Beau "Cyclone" Simpson and the trainees express skepticism that the approach is viable.  *Id.* at 18:44–19:57.

Among the trainees is Bradley "Rooster" Bradshaw, the son of Maverick's late best friend and RIO, "Goose," who died in a training accident with Maverick piloting (an inquiry cleared Maverick of responsibility).  *Id.* at 19:59–20:37.  Maverick reveals that, without Rooster's consent, Maverick pulled Rooster's first Naval Academy application because of a promise Maverick made to Rooster's late mother.  Rooster, unaware of the promise, resents Maverick for impeding his career and blames Maverick for Goose's death.  *Id.* at 56:13–56:28, 1:04:50–1:05:38.

Rooster also clashes with fellow trainee Jake "Hangman" Seresin over their contrasting styles:  Rooster calls Hangman reckless, while Hangman criticizes Rooster as too cautious.  *Id.* at 27:26–28:28, 52:38–53:04.  Other trainees include pilots Natasha "Phoenix" Trace and Reuben "Payback" Fitch, and their weapons systems officers Robert "Bob" Floyd and Mickey "Fanboy" Garcia.  *Id.* at 24:55–25:58.  Maverick works to earn the trainees' respect and instills teamwork and camaraderie through unconventional training methods.  *Id*. at 34:40–35:00, 1:00:23–1:02:23.  He also rekindles his relationship with Penny, with indications that both have matured since their youth.  *Id.* at 45:54–48:20, 1:02:52–1:04:45.

As the mission date draws near, none of the trainees is able to complete the course simulation within Maverick's parameters.  *Id.* at 50:28–52:25.  Maverick particularly fears sending Rooster on a mission that might result in Rooster's death.  But a meeting with Iceman—who is suffering from late-stage cancer—convinces Maverick to release his anxiety and let go of his past guilt.  *Id.* at 56:49–59:03.

Iceman soon dies, and without his protection, Maverick is removed as

5

instructor and replaced with Cyclone. *Id.* at 1:18:43. Just as Cyclone announces the new and more dangerous mission parameters, Maverick takes off on an unauthorized run of the simulated course and successfully completes it, stunning everyone. *Id.* at 1:19:23–1:22:15. After Cyclone reluctantly appoints Maverick team leader, Maverick decides that the mission will be carried out by two strike teams—one led by him and the other led by Rooster. *Id.* at 1:25:20–1:26:27.

The strike teams successfully destroy the enemy target, but on the way out of the canyon, they are confronted by SAMs. *Id.* at 1:37:18–1:39:55. Maverick sacrifices his plane to protect Rooster and is shot down. *Id.* at 1:40:03–1:40:06. Thinking Maverick is dead, Cyclone orders the remaining fighters back to the aircraft carrier, but Rooster ignores him and returns to look for Maverick. *Id.* at 1:40:34–1:42:45. On the ground, Maverick is about to be attacked by an enemy helicopter when Rooster arrives and shoots it down. Rooster is then hit by a SAM and ejects. *Id.* at 1:42:36–1:42:53. Stranded, Maverick and Rooster steal an old F-14 from a nearby base, but are intercepted by three fifth-generation enemy fighters. *Id.* at 1:47:48–1:50:48. Maverick manages to take out two of the planes, but he runs out of ammunition before he can engage the remaining fighter. *Id.* at 1:54:03.

Resigned to their fate, Maverick apologizes to Rooster for failing to keep him safe. Just then, Hangman, who had been on standby for the mission, shoots down the enemy fighter, all three return to the carrier in triumph, and Maverick and Rooster emotionally reconcile. *Id.* at 1:55:28–1:59:13. The film ends with Rooster reflecting on his renewed relationship with Maverick, his father figure, while Maverick and Penny fly off into the sunset. *Id.* at 2:00:55–2:01:29.

### B.   The Assignment And Termination.

On May 18, 1983, Yonay assigned his motion picture rights in the Article to PPC (the "Assignment"). Am. Compl. ¶ 23. In the Assignment, Yonay agreed that PPC *could* use his name "in connection with any use, version or adaptation" of the Article but that PPC would "not be required to announce [Yonay's name] in or in

6

connection with any such use …" unless certain conditions were met.  *Id.*, Ex. 2 ¶ 7(a).  Specifically, Yonay is only entitled to a credit on any movie that is "produced … []under" the Assignment **and** that is "substantially based upon or adapted from [the Article] or any version or adaptation thereof, substantially incorporating the plot, theme, characterizations, motive and treatment of [the Article] or any version or adaptation thereof[.]" *Id.*, Ex. 2 at ¶ 7(b).  Further, Yonay agreed that "[n]o casual or inadvertent failure to comply with any of the provisions of this paragraph … shall be deemed a breach…." *Id.*, Ex. 2 at ¶ 7(c).

On January 23, 2018, Plaintiffs sent PPC a statutory notice of termination (the "Termination Notice"), terminating the U.S. grant under the Assignment as of January 24, 2020.  *Id.* ¶¶ 3, 27.

### C.     Plaintiffs' Lawsuit.

Plaintiffs initiated this action on June 6, 2022, shortly after *Maverick*'s theatrical release, Dkt. 1, asserting claims for declaratory judgment, copyright infringement, and injunctive relief.  PPC moved to dismiss the complaint on August 26, 2022 on the ground that the Article and *Maverick* are not substantially similar as a matter of law, which is fatal to all three claims.  Dkt. 14.

In response, Plaintiffs filed the Amended Complaint, in which they abandoned their injunctive relief claim, kept their copyright infringement and declaratory judgment claims, and added a breach of contract claim.  As before, the Amended Complaint claims that *Maverick* is derived from and substantially similar to the Article, *id.* ¶ 33, that PPC infringed Plaintiffs' copyright by releasing *Maverick*, *id.* ¶ 53, and that the Court should declare "that [PPC] does not have any rights to make, exploit, or distribute [*Maverick*] or any other derivative work based in whole or in part on the [Article], and/or [*Top Gun*] (as derived from the [Article]), in the United States," *id.* ¶ 48.  The new breach of contract claim alleges that Yonay is entitled to a credit on *Maverick*, *id.* ¶ 52, notwithstanding Plaintiffs' termination of the grant of copyright in the Assignment.

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

For the reasons below, all three claims fail and should be dismissed.

## III.   ARGUMENT

### A.   The Copyright Infringement Claim Fails Because The Article and *Maverick* Are Not Substantially Similar (Count III).

#### 1.   *Plaintiffs Must Plausibly Allege that the Works Are Substantially Similar in their Protected Elements.*

A copyright plaintiff must plausibly allege a substantial similarity between "*protected* elements" of his work and the allegedly infringing work.  *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018); *see also Silas v. HBO, Inc.*, 713 F. App'x 626, 627 (9th Cir. 2018) (dismissing infringement claim for failure to adequately allege substantial similarity in works' protected elements).[6]  Indeed, even if a plaintiff can establish that the defendant actually copied his work, that does not establish liability because the Copyright Act does not prohibit all copying, but rather only "unlawful appropriation"—that is, where the defendant copied enough protected "expression … to render the two works 'substantially similar.'" *Rentmeester*, 883 F.3d at 1117; *see also Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) ("[O]nly substantial similarity in *protectable* expression may constitute actionable copying that results in infringement liability …. ").

"[D]etermining whether works are substantially similar involves a two-part analysis consisting of the 'extrinsic test' and the 'intrinsic test.'"  *Rentmeester*, 883 F.3d at 1118.  The extrinsic test "assesses the *objective* similarities of the two works, focusing only on the protectable elements of the plaintiff's expression," *id.*, whereas the intrinsic test "examines an ordinary person's *subjective* impressions*,"* *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006). A plaintiff must prove both to establish substantial similarity, *Skidmore*, 952 F.3d at 1064, but a "finding of substantial similarity under the extrinsic component is a necessary prerequisite to considering the intrinsic component, which is … reserved for the jury," *Esplanade Prods., Inc. v. Walt Disney Co.*, 2017 WL 5635027, at * 8

---

[6] All emphasis is added and internal citations and quotations omitted.

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

(C.D. Cal. Nov. 8, 2017), *aff'd*, 768 F. App'x 732 (9th Cir. 2019).  On a motion to dismiss, only the extrinsic test is relevant; if the works fail that test, the court must enter judgment for the defendant.  *See, e.g., Rentmeester*, 883 F.3d at 1118.

The extrinsic test's objective analysis "focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in the two works.  *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).  The Ninth Circuit has emphasized that courts applying the extrinsic test "must take care to inquire only whether the protectable elements, standing alone, are substantially similar," and therefore must "filter out and disregard the non-protectable elements."  *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002); *see also Rentmeester*, 883 F.3d at 1118.  Three categories of unprotectable elements—facts, ideas, and *scènes à faire*—are relevant here.

**Facts:** It is axiomatic that "'[n]o author may copyright his ideas *or the facts he narrates*,'" and "copyright does not prevent subsequent users from copying from a prior … work those constituent elements that are not original—for example, … facts."  *Corbello*, 974 F.3d at 973 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547–48 (1985)); *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 974 (2d Cir. 1980) (copyright protection "has never extended to history, be it documented fact or explanatory hypothesis"); *Feist Publications Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 347 (1991) (facts, whether "historical, biographical [or] news of the day," are uncopyrightable).  There is a compelling reason for this rule:  "the cause of knowledge is best served when history is the common property of all, and each generation remains free to draw upon the discoveries and insights of the past."  *Hoehling*, 618 F.2d at 974.  Thus, copyright "in historical accounts is narrow indeed, embracing no more than the author's original *expression* of particular facts," *Narell v. Freeman*, 872 F. 2d 907, 911 (9th Cir. 1989), and it is "a feature of copyright law, not a bug or anomaly, that an author who deals in fact rather than fiction receives incomplete copyright …

1   protection for the fruits of his labor," *Corbello*, 974 F.3d at 973.  *See also Hoehling*,

2   618 F.2d at 974 ("[A]bsent wholesale usurpation of another's expression, claims of

3   copyright infringement where works of history are at issue are rarely successful.").

4           Copyright protection does not extend to facts even where the idea at issue is

5   an "interpretation" of a historical event.  *Corbello v. Devito*, 2015 WL 5768531, at

6   *12 (D. Nev. Sept. 30, 2015).  After all, "every relation of a historical fact beyond

7   direct observation is tainted to some degree by some person's interpretation, so

8   distinguishing between historical facts and 'interpretations' of those facts … would

9   destroy the rule that historical facts are unprotected."  *Id.*; *see* 1 David Nimmer,

10  *Nimmer on Copyright* ("Nimmer") § 2.11[A] (rev. ed. 2022) ("[T]he interpretation

11  of a historical event is not copyrightable in itself (that is, apart from the words used

12  to evoke the interpretation."));  *cf. Corbello*, 974 F.3d at 976 (author's depiction of

13  nonfictional character's "cool" personality not protectable).  As a result,

14  "[h]istorical facts and theories may be copied, as long as the defendant does not

15  'bodily appropriate' the expression of the plaintiff."  *Narell*, 872 F.2d at 910–11.

16  Similarly, "[c]opyright does not preclude others from using the ideas or information

17  revealed by the author's work."  H.R. Rep. No. 94-1476, at 56–57 (1976).

18          Moreover, under the asserted truths doctrine—also called the doctrine of

19  copyright estoppel—"one who represents his work to be factual may not, in a

20  subsequent infringement action, prove that part of the work was fictional and

21  therefore protected."  Nimmer § 2.11[C]; *see also Corbello*, 974 F.3d at 978–79

22  (adopting the asserted truths doctrine, and stating that "[i]t would hinder, not

23  promote the progress of science and useful arts, to allow a copyright owner to

24  spring an infringement suit on subsequent authors who built freely on a work held

25  out as factual …").  The doctrine applies even when "the author does not expressly

26  make … a representation" that the work is factual, so long as the work "is presented

27  as news, or history or biography."  Nimmer § 2.11[C]; *see also Marshall v. Yates*,

28  1983 WL 1148, at *2 (C.D. Cal. Oct. 26, 1983) ("Any reader … would have

10

1  concluded that the book presented a true account of the life of Frances Farmer, the
2  result of Arnold's investigative journalism."); *Hathaway v. Caputo*, 2021 WL
3  1862248, at *6 (D. Ariz. May 10, 2021) (dismissing infringement claim where
4  plaintiff's work was "held out as a work of historical fact").

5  **Ideas and Stock Elements:**  It is also axiomatic that copyright does not
6  protect *ideas*, 17 U.S.C. § 10(b), and the extrinsic test examines "not the basic plot
7  ideas for stories, but the actual concrete elements that make up the total sequence of
8  events and the relationships between the major characters," *Funky Films*, 462 F.3d
9  at 1077.  Similarly, *scènes à faire*—"situations and incidents that flow necessarily
10  or naturally from a basic plot premise"—and "[f]amiliar stock scenes and themes
11  that are staples of literature" cannot "sustain a finding of infringement," *Cavalier*,
12  297 F.3d at 823; *see also Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985)
13  ("General plot ideas are not protected ....").  Accordingly, ideas, *scènes à faire*, and
14  stock elements are also "unprotectable elements" which the Court must filter out.
15  *Musero v. Mosaic Media Group, Inc.*, 2010 WL 11595453, at *2 (C.D. Cal. Aug. 9,
16  2020) (Anderson, J.).

17          2.     *Substantial Similarity May Be Decided on a Motion to Dismiss.*

18      "The Ninth Circuit has [long] noted that when the copyrighted work and the
19  alleged infringement are both before the court, capable of examination and
20  comparison, non-infringement can be determined on a motion to dismiss.'"  *Zella v.*
21  *E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1130 (C.D. Cal. 2007) (quoting
22  *Christianson v. W. Publ'g Co.*, 149 F.2d 202, 203 (9th Cir. 1945)); *see also*
23  *Rentmeester*, 883 F.3d at 1123 (affirming dismissal where "[n]othing disclosed
24  during discovery could alter the fact that the allegedly infringing works are as a
25  matter of law not substantially similar").  In the past decade alone, the Ninth Circuit
26  has "repeatedly" affirmed dismissals of infringement cases involving literary works
27  where a review of the works revealed no substantial similarity as a matter of law.

28

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

*Masterson v. Walt Disney Co.*, 821 F. App'x 779, 780 n.1 (9th Cir. Aug. 3, 2020).[7]
With the works properly before the Court, the Court's extrinsic analysis must focus
on "the works themselves" rather than Plaintiffs' self-serving characterizations of
them. *Funky Films*, 462 F.3d at 1075; *Schwartz v. United States*, 234 F.3d 428, 435
(9th Cir. 2000) (a "court need not accept as true … allegations that contradict facts
that may be judicially noticed"); *Peter F. Gaito Architecture, LLC v. Simone Dev.
Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (on motion to dismiss, "the works themselves
supersede and control contrary descriptions of them … contained in the
pleadings"); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941–42 (10th Cir. 2002).
As discussed in below, when the Court reviews the Article and *Maverick*, as
opposed to Plaintiffs' irrelevant and misleading purported comparison of the works,
it is clear as a matter of law that *Maverick* does not borrow any of the Article's
protected expression.

3. <u>*The Works Are Not Substantially Similar as a Matter of Law.*</u>

Plaintiffs incorrectly claim that *Maverick* is an infringing "derivative work"
because it is "plainly derived from" the Article. *See* Am. Compl. ¶ 70. "Of course,
a work based upon an idea or kernel contained in another work may in some sense
be 'derivative' of the first work." *Sobhani v. @radical.media, Inc.*, 257 F. Supp. 2d
1234, 1238 (C.D. Cal. 2003). To determine whether a work is an *infringing*
derivative work within the meaning of the Copyright Act, however, courts must
apply the "substantial similarity" test—*i.e.*, they must determine whether the
alleged derivative work is substantially similar to the original work's protectable
elements. *Id.* at 1238 ("To determine whether derivative works are within the

---

[7] *See, e.g., Fillmore v. Blumhouse Prods., LLC*, 771 F. App'x 756, 756–57 (9th Cir. 2019); *Esplanade*, 768 F. App'x at 733; *Abdullah v. Walt Disney Co.*, 714 F. App'x 758, 759 (9th Cir. 2018); *Silas*, 713 F. App'x at 627; *Shame on You Prods., Inc v. Banks*, 690 F. App'x 519, 520 (9th Cir. 2017); *Heusey v. Emmerich*, 692 F. App'x 928, 929 (9th Cir. 2017); *Schkeiban v. Cameron*, 566 F. App'x 616, 617 (9th Cir. 2014); *White v. Twentieth Century Fox Corp.*, 572 F. App'x 475, 476–77 (9th Cir. 2014); *Wild v. NBC Universal*, 513 F. App'x 640, 641 (9th Cir. 2013); *Thomas v. Walt Disney Co.*, 337 F. App'x 694, 695 (9th Cir. 2009); *Carlini v. Paramount Corp.*, 2022 WL 614044 (9th Cir. Mar. 2, 2022); *Braddock v. Jolie*, 691 F. App'x 318, 319 (9th Cir. 2017).

definition of the statute … the Ninth Circuit has imported the similarity standard used to determine infringement."); *see also Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984).  Thus, "[i]t is not enough to show that the defendant … used the plaintiff's material as a model, template, or even inspiration; rather, the question is whether the defendant's work is substantially similar to plaintiff's work such that liability may attach."  *DisputeSuite.com, LLC v. Credit Umbrella Inc.*, 2015 WL 12750263, at *3 (C.D. Cal. Jan. 16, 2015); *see Wild v. NBC Universal, Inc.*, 2011 WL 13272427, at *17 (C.D. Cal. June 28, 2011) ("[E]ven if [defendants] read the [prior] work and drew inspiration from it, the two works are not substantially similar within the meaning of Ninth Circuit copyright jurisprudence."), *aff'd* 513 F. App'x 640 (9th Cir. 2013).[8]

Applying the Ninth Circuit's actual extrinsic test—that is, filtering out unprotectable elements and comparing the works themselves—confirms as a matter of law that there is no similarity in protectable expression between the Article and *Maverick*, much less a "substantial" one.

**Plot and Sequence.**  As explained in greater detail above, *see supra* at 1–6, the plots and sequence of the two works are fundamentally dissimilar.  The Article is a nonfiction piece about the U.S. Navy Fighter Weapons School.  Structured in a non-linear fashion, the Article bounces back and forth between two young pilots' then-current training at the school, the history of the school, an overview of fighter jets, and a first-hand account by Yonay of what it is like to experience G-force. *Maverick*, by contrast, is a narrative fictional tale about a veteran fighter pilot,

---

[8]  It is likewise irrelevant that Paramount previously received a license from Yonay for rights to the Article, *see* Am. Compl. ¶ 23, because licensing history has no impact on whether the works are substantially similar as a matter of law.  *See Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 623 (2d Cir. 1982) (even "[a]ssuming, arguendo, that [plaintiffs'] notice of termination was effective [to terminate the license] …," their copyright infringement claim "nevertheless fails because … no reasonable jury could find the two works substantially similar beyond the level of generalized ideas or themes"); *see also Feist*, 499 U.S. at 343 (holding that defendant, who had unsuccessfully attempted to obtain a license from plaintiff prior to the commencement of litigation, did not infringe plaintiff's copyright because plaintiff's work was not sufficiently original).

Maverick, who returns to Top Gun to train a new generation of pilots—including Rooster, who blames Maverick for the death of Rooster's father—for an attack on an enemy installation.  None of the graduates can complete the mission's training course.  Maverick takes an unauthorized flight through the training course, proving that it can be done, and is then appointed team leader.  Maverick leads his team on a successful mission, then sacrifices his jet to protect Rooster, who in turn saves Maverick.  The two steal a plane from an enemy air base, survive an aerial chase, and are saved by Hangman.  Any similarity between the works' "plots" stems from the fact that they are both set (in part) at Top Gun—a real place that was not invented by Yonay and is not owned by Plaintiffs.

Plaintiffs nevertheless proffer a list of supposed "similarities" between the works, McNally Decl., Ex. G,[9] but the Ninth Circuit has repeatedly cautioned that such lists are inherently subjective and unreliable, especially when they emphasize "random similarities scattered throughout the works," which are insufficient to support an infringement claim.  *See Litchfield*, 736 F.2d at 1356; *Skidmore*, 952 F.3d at 1075 (same); *Cavalier*, 297 F.3d at 825 (same); *Kouf*, 16 F.3d at 1045–46 (same).  Indeed, Plaintiffs' list is riddled with mischaracterizations and false similarities,[10] subjective impressions that are irrelevant to the objective extrinsic test,[11] and efforts to compare the Article to the <u>original</u> *Top Gun* film—even though Plaintiffs concede that picture is non-infringing and is not at issue.[12]

---

[9] For the Court's convenience, Paramount has assigned numbers to the rows in the chart attached to Plaintiffs' complaint.  McNally Decl., Ex. G.  That said, as explained above and below, the works themselves—and not Plaintiffs' misleading chart—govern.

[10] *See, e.g.,* Rows 19 (claiming, as a similarity, that both works use the metaphor of a "bullseye" to describe the aviation caste system, where *Maverick* only briefly shows a character playing darts); 65 (comparing an entire aircraft carrier squadron getting a surprise ride to shore in Australia on a "glorious sailing yacht" with Maverick and Penny transporting a two-person sailboat across San Diego Bay); 73 (claiming that the Article "jumps between base scenes, classroom scenes," and other locations, where the Article does not depict any classroom scenes, other than describing a briefing room itself).

[11] *See, e.g.,* Rows 10, 14, 24, 38, 52, 71, 72.

[12] *See, e.g.,* Rows 1–3, 5–7, 14, 45–47, 51, 54–55, 57, 68–69.

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

But even setting aside those defects, Plaintiffs' list is irrelevant for the simple reason that all of the allegedly similar "plot elements"—such as those involving the history and operations of the "Top Gun" school (Rows 8, 9, 11, 12, 15, 20–23), risky aerial maneuvers, combat training and tactical discussions (Rows 25–27, 29–31, 33–36, 39–44, 51, 53, 55, 64, 66–68, and 70), descriptions and depictions of fighter jets, including their mechanical features and exorbitant cost (Rows 28, 49, 54, 69), pilots doing push-up exercises (Row 56), pilots being upset when they are shot down (Row 26), "pilots' use of "call signs" as nicknames (Row 13), and depictions of camaraderie amongst pilots, including bar excursions and games (Rows 59, 61–63)—are reported in the Article as factual.[13]  Facts such as these do not receive copyright protection.  *See Corbello*, 974 F.3d at 977 ("Though the creative expression that is in the Work—the 'writing style and presentation'—is protected by copyright, the assertedly historical elements are not."); *Perry v. Mary Ann Liebert, Inc.,* 2018 WL 2561029, at *6 (S.D.N.Y. June 4, 2018) ("scientific facts" are not copyrightable), *aff'd* 765 F. App'x 470 (2d Cir. 2019); *supra* at 9–11.

By way of example only:

- Plaintiffs claim as "similarities" that both works depict Naval aviators as being "enamored with the high-intensity flying of the fastest fighter jets" and dedicated to improving their skills (Rows 5–6, 8) and portray aerial combat training as "very competitive," with pilots "crestfallen" when there are defeated (Rows 25–26).  But elite fighter pilots loving to fly, and being dedicated to their craft and competitive, are facts described in the Article.  Plaintiffs do not have a monopoly over these (unremarkable) facts merely because Yonay once reported on them.

- Plaintiffs claim that because the Article described certain fighter jet controls, engine components, and features, *Maverick* infringes their copyright by depicting those elements.  Rows 28, 69.  Obviously, the Article's *description* of real-life features of fighter jets does not allow Plaintiffs to preclude others from *depicting* those features.

---

[13] A Senate Report confirms much of the Article's accuracy.  *See* McNally Decl., Ex. E at 4675 (Top Gun was created to improve training on dogfighting and emphasized "dynamic, realistic [Air Combat Maneuvering] training"); *id.* at 4678 (program endeavored "to develop teamwork and coordination in getting the air crews to work together"); *id.* at 4689 (program used simulators for training).  Although unnecessary to resolve this Motion, the report may be considered by the Court.  *See* Request for Judicial Notice at 3–4.  Moreover, even if the Article were not accurate, the asserted truths doctrine prevents Plaintiffs from disputing its factual nature.  *See supra* at 10–11.

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

- Plaintiffs claim that *Maverick* infringes the Article by portraying aerial combat as "edgy," "intense," "rigorous," and "of-life or death importance," where "the slightest mistake can be deadly and cost lives." Rows 30–31. These are factual (and obvious) aspects of aerial combat, which Plaintiffs certainly do not and cannot own.

- Plaintiffs claim that both works discuss and depict the effects of gravitational forces on fighter pilots, Rows 35–37, but the effect of G-forces is a fact of physics, and is not subject to copyright protection.

Even if the Court were to ignore that such plot elements are factual (which it should not), these elements would *still* need to be filtered out as common, unprotected *scènes-à-faire*. *See, e.g.*, *Tiscareno v. Netflix, Inc.*, 2014 WL 12558125, at *8, 9 (C.D. Cal. Mar. 6, 2014) (finding no substantial similarity between two works involving "hotshot young pilots showing off their impressive aviation skills in which they maneuver their aircraft to avoid being shot down by a superior jet aircraft" and the protagonist saved the day after being chased by a more advanced fighter jet because these features were unprotected *scènes-à-faire*, common in action films, as "risky rescue missions, narrow escapes … or protagonists saving the day" are not "unique elements"); *Hist. Truth Prods., Inc. v. Sony Pictures Ent., Inc.*, 1995 WL 693189, at *8–9 (S.D.N.Y. Nov. 22, 1995) (unprotected scènes-à-faire included "military training"); *Luftu Murat Uckardesler v. Azteca Int'l Corp.*, 2010 WL 11515298, at *6 (C.D. Cal. May 14, 2010) (no right to preclude anyone from "depicting physical training or workout"). The works therefore share no protectable similarities in plot.

**Themes.** *Maverick*'s primary themes are reconciliation and redemption. The film features an older hero, facing the end of his military career, who finally makes peace with his past, while also achieving a great victory and proving his doubters wrong. Along the way, he mends relationships—reconciling and forming a father-son connection with Rooster, and entering into a renewed romantic relationship with Penny. The need to make peace with one's past to move forward is reinforced in the emotional scene in which Iceman, Maverick's former rival turned friend, advises: "IT'S TIME TO LET GO." McNally Decl., Ex. B at 57:00–59:05.

16

Nothing resembling these themes appears anywhere in the Article, which is a purely nonfiction piece about two pilots at Top Gun, the history of the school, and the features of fighter planes.  While Plaintiffs claim the Article purportedly features thematic elements based on the pilots who Yonay profiled—such as "close camaraderie … despite intense competition," their skills (as opposed to technology) as the primary source of their success, their demonstration of "heroism," "courage," "strength of character," "jocular true grit," and "patriot[ism]," (Rows 3, 12, 14, 33, 62, 71, 76)— the Article's interpretation of historical people and events is not protectable.  *See supra* at 10.   Moreover, even if such themes were not based on facts (and actually appeared in the works), they flow from the unprotectable premise of a story set at Top Gun.  *See Benay v. Warner Bros. Entm't., Inc*., 607 F.3d 620, 627 (9th Cir. 2010) (finding no substantial similarity where allegedly shared themes "arise naturally from the premise of an American war veteran who travels to Japan to fight the samurai").  And, in any event, they are too generic to be protectable.  *See Briggs v. Blomkamp*, 70 F. Supp. 3d 1155, 1177 (N.D. Cal. 2014) ("heroic sacrifice" not a protectable theme), *aff'd* 714 F. App'x 712 (9th Cir. 2018); *Goldberg v. Cameron*, 787 F. Supp. 2d 1013, 1020 (N.D. Cal. 2011) ("man versus machine" a "commonplace" theme); *Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1113 (C.D. Cal. 2010) ("Themes of self-reliance and the importance of friendship and teamwork," which "often predominate stories of competition, especially those where the protagonist begins the story as cocky and self-centered, and are … generic and not protectable."); *Milano v. NBC Universal, Inc.*, 584 F. Supp. 2d 1288, 1297 (C.D. Cal. 2008) ("competition" not a protectable theme); *Whitehead v. Paramount Pictures Corp*., 53 F. Supp. 2d 38, 50 (D.D.C. 1999) ("General characteristics such as … patriotism … are not copyrightable and do not establish substantial similarity.").

**Dialogue.**  "[E]xtended similarity of dialogue" [is] needed to support a claim of substantial similarity," *Olson v. Nat'l Broad. Co*., 855 F.2d 1446, 1450 (9th Cir.

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

1988), and "[o]rdinary words and phrases are not entitled to copyright protection," *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1071 (C.D. Cal. 2010).  The Article does not contain ***any*** dialogue:  it quotes individuals other than the author, but quotes are not dialogue and cannot be copyrighted.  *See Suid v. Newsweek Mag.*, 503 F. Supp. 146, 148 (D.D.C. 1980) ("The author of a factual work may not … claim copyright in statements by others … reported in the work since the author may not claim originality as to those statements.").[14]  In any case, Plaintiffs do not, and cannot, allege any extended similarity between the words in the Article and the dialogue in *Maverick*.  To the extent Plaintiffs allege that a similarity exists based on the use of Navy aviation jargon, this does not suffice because there is no substantial similarity where "the only similarities in dialogue between the two works come from the use of common, unprotectable … jargon." *See Cabello*, 974 F.3d at 977; *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 967 (9th Cir. 2004) (same), *amended on denial of reh'g*, 400 F.3d 658 (9th Cir. 2005).

**Settings.**  Plaintiffs allege that both works are primarily based at the Naval Air Station Miramar, fifteen miles north of San Diego, near the Pacific Ocean.  *See* Rows 9–11, 18–20, 22–24, 28, 34–36, 49, 58, 63, 69.  But Miramar is where the real-life Top Gun training program was founded, and thus setting is not protectable, and any similarities between the works' settings "flow naturally from the works' shared unprotected premise" and must be "disregarded for purposes of the extrinsic test."  *See Benay*, 607 F.3d at 628.[15]  Plaintiffs also claim that both works include the phrase, "WELCOME TO FIGHTERTOWN, U.S.A.," (Row 9), but this is not true—*Maverick* includes an on-screen title card identifying a location as "Fightertown, U.S.A," but the full language of the sign referenced in the Article

---

[14] Plaintiffs' chart of alleged similarities also impermissibly attempts to claim, as Yonay's own expression, certain quotes from the Article.  *See* Row 36.

[15] That the Top Gun program moved to Nevada in 1996 is irrelevant.  *See* Row 11.  There is no dispute that the program was originally based near San Diego, Article at 97, and therefore that location is not protectable.  *See supra* at 9–11.

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

1    appears nowhere in the film.  McNally Decl., Ex. B at 15:14–15:40.  In any case,

2    the Article makes clear that a sign reading "Welcome to Fightertown, U.S.A"

3    actually existed, as "Fightertown" was Miramar's actual nickname.  *See supra* at

4    2.[16]  Nor is there similarity between the works' settings because both include scenes

5    at a bar, since the bar mentioned in the Article is a real place and thus is not

6    protectable, *supra* at 9–10, and, in any event, "[b]ar scenes are too common to carry

7    much significance."  *See Carlini v. Paramount Pictures Corp.*, 2021 WL 911684, at

8    *13 (C.D. Cal. Feb. 2, 2021), *aff'd*, 2022 WL 614044 (9th Cir. Mar. 2, 2022).

9          **Pace and Mood.**  The pace and mood of the works are very different:

10   whereas the Article is a non-linear journalistic work that tells the true story of

11   young pilots at Top Gun, provides information on the program's history, and

12   discusses the strengths and weaknesses of the F-14 fighter jet, *Maverick* is a fast-

13   paced and action-packed dramatic film.  To the extent that any of Plaintiffs' alleged

14   "similarities" pertain to the pace or mood inherent in fighter jet combat, such as that

15   flying "is depicted with weightless fluidity" and "ethereal beauty" (Rows 29, 34),

16   that aerial combat is "edgy and intense" and "life-or-death" (Rows 30, 31), or that

17   taking off is a "delight" that is "brutally shattered" with combat (Row 39), they are

18   factual and unprotectable.  *See supra* at 9–10.  Moreover, these elements reflect "[a]

19   general mood that flows naturally from unprotectable basic plot premises" inherent

20   to a story about Navy fighter pilot training school, which are "not entitled to

21   protection."  *Silas v. HBO, Inc.*, 201 F. Supp. 3d 1158, 1180 (C.D. Cal. 2016); *see*

22   *also, e.g.*, *Olson*, 855 F.2d at 1451 (although both works "have similar moods"

23   because they "may be broadly described as comic," this similarity is "common to

24   the genre of action-adventure television series and movies," and thus does not

25   demonstrate substantial similarity).

26   _____

27   [16] Plaintiffs ignore that the Article also reports on events in Hawaii, the Philippines,
     Singapore, and the Indian Ocean, none of which appears in *Maverick*, and that *Maverick*
     features locations that do not appear in the Article, including the headquarters of the
28   Navy's "scramjet" program and the unnamed country where the film's climax takes place.

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

**Characters.**  Plaintiffs try to claim that characters in *Maverick* resemble pilots profiled in the Article, but all of the pilots described in the Article are *actual people*, and "[a] character based on a historical figure is not protected for copyright purposes."  *Corbello*, 974 F.3d at 976; *see also, e.g.*, *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1186 (C.D. Cal. 2001) ("much of this elucidation of the 'character' of Idema depends on 'historical fact' and/or on the allegedly 'true' events of his life, and as such even Idema can claim no exclusive right to these 'facts' of his life"), *aff'd in relevant part, dismissed in part*, 90 F. App'x 496 (9th Cir. 2003), *as amended on denial of reh'g* (Mar. 9, 2004).  That Yonay may have described a real-life pilot's *personality* does not change this result, because each pilot described in the Article "is not a fictional character whose personality was created in the work."  *Corbello*, 974 F.3d at 976 (author's depiction of a nonfictional character's "voice, cool demeanor, and braggadocio" is "not a protectable element").  The analysis thus ends here.

But even if the pilots profiled in the Article were not real-life figures, Plaintiffs' claims would still be baseless.  Fictional characters are only protected when they are "especially distinctive" and "contain some unique elements of expression."  *DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015).  A "stock character or basic character type … is not entitled to copyright protection," *Shame on You Prods., Inc. v. Banks*, 120 F. Supp. 3d 1123, 1164 (N.D. Cal. 2017), *aff'd* 690 F. App'x 519 (9th Cir. 2017), and "[w]hen analyzing whether two protectible characters are substantially similar, courts require a very high degree of similarity between characters," *Silas*, 201 F. Supp. 3d at 1177.

Plaintiffs argue that the title character in *Maverick* is similar to the real-life Alex ("Yogi") Hnarakis, because both are jocular, single and good-looking, close with their RIO, competitive, and love flying.  Rows 1–7, 25.  Courts repeatedly reject alleged character similarities premised on "traits that are so generalized and/or cliché as to be nearly *scènes à faire* of the military/action genre:  i.e., the

brash, cocky military officer who does things his own way, and who triumphs over the forces of evil through his own guile, wit, and pure physical abilities." *Idema*, 162 F. Supp. 2d at 1186; *Tiscareno*, 2014 WL 12558125, at *8, 9 (no substantial similarity where works involved "hotshot young pilots showing off their impressive aviation skills," as "hotshot protagonists are certainly not unique elements"); *Whitehead v. Paramount Corp.*, 53 F. Supp. 2d 38, 50 (D.D.C. 1999) ("General characteristics such as black hair, intelligence, patriotism and slight paranoia, however, are not copyrightable and do not establish substantial similarity."), *aff'd* 2000 WL 3363291 (D.C. Cir. Apr. 19, 2000).  Moreover, beyond vague generalities, the characters are completely different.  Yogi, at the time the Article was written, is a 26-year-old Lieutenant and Top Gun student whose RIO is alive and well.  Article at 100.  Maverick, by contrast, is a 50-something Captain, whose RIO died decades earlier, whose long career has been hindered by clashes with authority, and who returns to teach at Top Gun.  Plaintiffs' efforts to elide these differences by comparing Yogi to the version of Maverick that appeared in the original *Top Gun*, over thirty-five years ago, *see* Rows 1–7, are improper; as Plaintiffs acknowledge, the original *Top Gun* is not at issue here.  *Supra* at 14.

Plaintiffs also improperly attempt to compare the real-life Dave "Possum" Cully to the character of Goose from *Top Gun*, Rows 1–3, despite the fact that Goose *does not even appear* in *Maverick*, apart from photographs and a brief flashback, *see* McNally Decl., Ex. B at 31:16–32:15.  Obviously, a character who does not even appear in *Maverick* cannot support a finding of infringement.  And in any event, even if Goose had appeared in *Maverick* (and even if Possum were a fictional character rather than a real-life individual), the alleged "similarities"—that both Possum and Goose both married, have a moustache, and are friends with their pilot, *see* Rows 1–3—are insufficient to support a claim.[17]

---

[17] Plaintiffs also claim similarity between the works' characters by comparing Maverick to an amalgamation of Yogi *and* Randy Cunningham, as well as Possum to Goose and

1    Plaintiffs' remaining claims of character similarities are nonsensical.  For

2    example, Plaintiffs attempt to concoct a similarity between the film's characters

3    Maverick and Hangman, and an unnamed marine who is referenced in just two

4    sentences in the Article: "'It's all right, officer, we're from California,' a tanked-up

5    marine hotshot once told a cop who had stopped him.  'This is California,' the cop

6    answered, and wrote him up."  *See* Row 60.  Plaintiffs allege that this is a

7    "similarity" because, like the "tanked-up marine," Maverick and Hangman are

8    "cocky and sometimes reckless."  *Id.*  Even setting aside that the Article is factual

9    and describes a stock character (the cocky military man), there is no similarity here

10   aside from Plaintiffs' gloss, which is not entitled to any weight.

11       **Selection and Arrangement.**  The Amended Complaint makes a passing

12   reference to the Article's purported "skillful[] select[ion of] accounts of the pilots'

13   personal lives and precise details of their 'hops' (flight maneuvers)," and its

14   "curat[ion]" of "the lives of U.S. Navy fighter pilots."  Am. Compl. ¶ 22.  To the

15   extent that Plaintiffs claim there is substantial similarity between the Article and

16   *Maverick* based on the "selection and arrangement" of *unprotectable* elements, such

17   argument fails as a matter of law.  As the Ninth Circuit recently explained *en banc*,

18   "a selection and arrangement copyright protects … the *particular* way in which the

19   artistic elements form a coherent pattern, synthesis, or design," and is infringed

20   "only where the works share, in substantial amounts, the 'particular,' *i.e.*, the

21   'same,' combination of unprotectable elements."  *Skidmore*, 952 F.3d at 1074–75.

22   Critically, a plaintiff cannot state a "selection and arrangement claim" simply by

23   identifying "random similarities scattered throughout … the works" and "[l]abeling

24   them a 'combination' of unprotectable elements."  *Id.* at 1075; *supra* at 14.

25   Without showing how these unprotectable elements were specifically "arranged"—

26   and how such "arrangement" was copied by the defendant—there is no liability.  *Id.*

27   Rooster, Rows 2–7, 15–16, 19, but this is impermissible.  *See Rose v. Connelly*, 38 F.
     Supp. 54, 56 (S.D.N.Y. 1941) (rejecting plaintiff's attempt to compare character to "more
28   than one of defendants'" characters).

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

The Article provides a different sequence of events from *Maverick*, which is a fictional action movie culminating in a daring attack on an enemy target.  *Supra* at 1–6.  That there are some alleged similarities between the works is not enough:  a plaintiff cannot "establish substantial similarity by reconstituting the copyrighted work as a combination of unprotectable elements and then claiming that those same elements also appear in the defendant's work, in a different aesthetic context."  *Skidmore*, 952 F.3d at 1075.  Yet that is precisely what the Amended Complaint alleges.  For example, Plaintiffs claim that both works "jump" between similar locations, including "base scenes, classroom scenes, bar scenes, sailing scenes, [and] mission scenes" (Row 73), but even setting aside that the Article does not actually depict any classroom scenes (*see supra* at 14 n.10), these are factual locations and events that result naturally from a story about a real-life Naval training facility.  *See Corbello*, 974 F.3d at 974 n.2 ("The selection of true stories behind the Band's most popular songs … is not original, and so not protectable by copyright.").  Further, even to the extent that both works include such scenes, they do so in a completely different order and context, resulting in completely different stories; there is thus no conceivable copying of the "particular" arrangement or sequence of events in the Article.  *See Skidmore*, 952 F.3d at 1074-75.

## B.    The Declaratory Judgment Claim Fails (Count II)

The lack of substantial similarity between the Article and *Maverick* is also fatal to Plaintiffs' declaratory judgment claim.  The request for declaratory relief is premised on Plaintiffs' allegation that *Maverick* is an infringing derivative work of the Article.  *See* Am. Compl. ¶ 64.  The claim therefore rises and falls with the copyright infringement claim.  Because there is no substantial similarity between the Article and *Maverick*, *Maverick* is not a derivative work of the Article as a matter of law, *supra* at 12–23, and Plaintiffs' declaratory relief claim also fails.[18]

---

[18] To the extent that Plaintiffs seek a judicial determination that theoretical future projects may infringe their copyright in the Article, there is no basis to grant declaratory relief

1

### C.   The Contract Claim Fails (Count I)[19]

2   Plaintiffs' new contract claim alleges that the Assignment obligated PPC to

3   provide Yonay with credit on *Maverick*.  Am. Compl. ¶ 52.  This claim, however, is

4   belied by the Assignment's unambiguous language.  Accordingly, it should be

5   dismissed.  "'Resolution of contractual claims on a motion to dismiss is proper if

6   the terms of the contract are unambiguous.'"  *Monaco v. Bear Stearns Residential*

7   *Mortg. Corp.*, 554 F. Supp. 2d 1034, 1040 (C.D. Cal. 2008) (quoting *Bedrosian v.*

8   *Tenet Healthcare Corp.*, 208 F.3d 220 (9th Cir. 2000)); *Catena v. Capitol Recs.,*

9   *LLC*, 2012 WL 12942740, at *3 (C.D. Cal. July 11, 2012) (same).

10   Paragraph 7(b) of the Assignment provides that PPC will "announce on the

11   film of any motion picture photoplay that may be ***produced by it hereunder <u>and</u>***

12   substantially based upon or adapted from [the Article] or any version or adaptation

13   thereof, substantially incorporating the plot, theme, characterizations, motive and

14   treatment of [the Article] or any version or adaptation thereof, that said motion

15   picture photoplay is based upon or adapted from or suggested by a work written by

16   the Author, or words to that effect ...."  Am. Compl., Ex. 2 at ¶ 7(b).  The

17   Assignment thus imposes *two* requirements before any credit obligation is

18   triggered:  (1) the film must be produced under the Assignment's copyright grant

19   (i.e. "produced by it hereunder"), *and* (2) the film must be substantially based on or

20   adapted from the Article or an adaptation of the Article, taking into account plot,

21   theme, characterizations, motive, and treatment.  *See RBB2, LLC v. CSC*

22   *ServiceWorks, Inc.*, 2019 WL 1170484, at *5 (E.D. Cal. Mar. 13, 2019) ("The

23   ordinary use of the conjunction 'and' … does not mean 'or.'").

24   Here, as explained above, *see supra* at 12–23, PPC did not *need* any rights

25   under the Assignment because *Maverick* does not use any of the Article's

26   _____

27   because there is no "substantial controversy" of "sufficient immediacy or reality" to
warrant such relief.  *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

28   [19] Plaintiffs assert diversity jurisdiction over this claim, claiming there is diversity
between the parties and the amount in controversy exceeds $75,000.  McNally Decl. ¶ 3.

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

protectible expression.  Moreover, Plaintiffs themselves allege that PPC did not *have* any rights under the Assignment after the termination.  This is no minor point—Plaintiffs' copyright infringement and declaratory judgment causes of action are premised on the allegation that *Maverick* "was not completed until May 8, 2021, more than one year *after* PPC's grant in the Assignment had been statutorily terminated."  Am. Compl. ¶ 37.  Because PPC did not need—or, per Plaintiffs, have—any rights to the Article, *Maverick* necessarily was not made "under" the Assignment, as Section 7(b) requires for Yonay to receive a credit.

While Paragraph 7(b) is dispositive on its own, Paragraph 8 underscores that Yonay is not entitled to a credit.  Paragraph 8 provides

> [n]othing contained in this agreement shall be construed to be or operate in derogation of or prejudicial to any rights, licenses, privileges or property which [PPC] may enjoy or to which [PPC] may be entitled as a member of the public even if this agreement were not in existence, and [PPC] may exercise such rights, licenses, privileges and property which [PPC] may enjoy or to which [PPC] may be entitled as a member of the public as though this agreement were not in existence.

Am. Compl., Ex. 2 at ¶ 8.  Any member of the public can make a movie about the Navy Fighter Weapons School, provided they do not utilize any of Yonay's (or PPC's) protected expression.  Paragraph 8 confirms that PPC, too, can make a movie about the school without the need to provide Yonay a credit, provided it does not utilize the grant of rights from Yonay, as per Paragraph 7(b).[20]

## IV.   CONCLUSION

The Court should dismiss the First Amended Complaint with prejudice.

---

[20] Because *Maverick* was not produced "[]under" the Assignment, Paramount does not address why Plaintiffs similarly cannot satisfy the second element.  *See id.*, Ex. 2 at ¶ 7(b).

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA

1    Dated:  September 28, 2022       O'MELVENY & MYERS LLP

2                                   By:    /s/ Molly M. Lens

3                                            Molly M. Lens

4                                   *Attorneys for Defendant*
                                  *Paramount Pictures Corporation*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS FAC
CASE NO. 2:22-CV-3846-PA