Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. # 318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Alex Kozinski (S.B. # 66473)
*alex@kozinski.com*
719 Yarmouth Rd, Suite 101
Palos Verdes Estates, CA 90274
Telephone: (310) 541-5885
Facsimile: (310) 265-4653

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SHOSH YONAY, an individual, and YUVAL YONAY, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>PARAMOUNT PICTURES CORPORATION, a Delaware corporation, and DOES 1-10,<br><br>Defendants. | Case No. 2:22-CV-3846-PA<br>Assigned to: Hon. Percy Anderson<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>[*Filed with: Plaintiffs' Opposition to Request for Judicial Notice; Declaration of Marc Toberoff; [Proposed] Order*]<br><br>**Hearing Date:** November 7, 2022<br>**Hearing Time:** 1:30 P.M.<br>**Ctrm:** 9A<br>**Complaint Filed:** June 6, 2022 |

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ........................................................................ 1

II.  STATEMENT OF FACTS ........................................................... 2

III. LEGAL STANDARD .................................................................. 3

IV.  ARGUMENT .............................................................................. 4

    A.  "Substantial Similarity" Should Not be Decided on a Motion to Dismiss In Plausible Cases Like This .......................................................... 4

    B.  The Motion Goes Far Beyond the "Four Corners" of the FAC. ............ 6

    C.  The FAC More than Sufficiently Alleges Substantial Similarity. .......... 7

        1.   Because the "Extrinsic Test" Analyzes Objective Literary Criteria, It Is Often Difficult to Apply at the Pleading Stage. ..................... 7

        2.   Yonay's Copyrighted Story Unquestionably Comprises Protectable Expression. ......................................................................... 9

        3.   Yonay's Creative Expression, Selection and Arrangement Must Be Considered in the Extrinsic Analysis. ..................................... 12

        4.   The Extrinsic Factors Demonstrate Substantial Similarity ............... 15

    D.  PPC's Conduct is Inequitable and Contravenes Federal Policy. .......... 21

        1.   PPC Attempts to Circumvent the Copyright Act ............................. 21

        2.   PPC Is Estopped from Challenging the Story's Copyright. ............. 22

    E.  Plaintiffs' Breach of Contract Claim is Properly Pled .......................... 23

V.   CONCLUSION .......................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alfred v. Walt Disney Co.*,
  821 Fed. Appx. 727 (9th Cir. 2020) ........................................................ passim

*Alta Devices, Inc. v. L.G. Elecs., Inc.*,
  343 F. Supp. 3d 868 (N.D. Cal. 2018) ............................................................ 23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................ 4

*Banc of California Nat'l Ass'n v. Fed. Ins. Co.*,
  2020 WL 3655500 (C.D. Cal. Apr. 24, 2020) ............................................... 24

*Baxter v. MCA, Inc.*,
  812 F.2d 421 (9th Cir. 1987) ............................................................. 8, 20, 21

*Bedrosian v. Tenet Healthcare Corp.*,
  208 F.3d 220 (9th Cir. 2000) ........................................................................ 24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................ 3

*Cabell v. Zorro Prods., Inc.*,
  2017 WL 2335597 (N.D. Cal. May 30, 2017) ............................................. 5, 8

*Castle Rock Entm't, Inc. v. Carol Pub. Grp, Inc.*,
  150 F.3d 132 (2d Cir. 1998) ........................................................................... 8

*Consul Ltd. v. Solide Enters., Inc.*,
  802 F.2d 1143 (9th Cir. 1986) ...................................................................... 24

*Corbello v. DeVito*,
  844 F. Supp. 2d 1136 (D. Nev. 2012) ........................................................... 13

*Corbello v. Valli*,
  974 F.3d 965 (9th Cir. 2020) ............................................................ 10, 11, 12

*De Acosta v. Brown*,

    146 F.2d 408 (2d Cir. 1944) ................................................................ 11

*Eckes v. Card Prices Update*,

    736 F.2d 859 (2d Cir. 1984) ................................................................ 13

*Esplanade Prods., Inc. v. Walt Disney Co.*,

    768 Fed. Appx. 732 (9th Cir. 2019) ................................................... 20

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,

    499 U.S. 340 (1991) ............................................................................ 12

*Gilligan v. Jamco Dev. Corp.*,

    108 F.3d 246 (9th Cir. 1997) ................................................................ 3

*Green v. Metro-Goldwyn-Mayer Studios, Inc.*,

    2008 WL 11338272 (C.D. Cal. Nov. 24, 2008) .................................. 6

*Harper & Row v. Nation Enters.*,

    471 U.S. 539 (1985) ............................................................................ 13

*Jackson v. Cap. Mgmt. Servs., LP*,

    2014 WL 12601055 (C.D. Cal. June 18, 2014) .................................. 6

*Jacobsen v. Deseret Book Co.*,

    287 F.3d 936 (10th Cir. 2002) ..................................................... 13, 14

*Jones v. Twentieth Century Studios*,

    2021 WL 6752228 (C.D. Cal. Dec. 7, 2021) ......................... 3, 4, 21

*Keeling v. Hars*,

    809 F.3d 43 (2d Cir. 2015) .................................................................. 13

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,

    676 F.3d 841 (9th Cir. 2012) ................................................... 5, 8, 13

*Lear v. Adkins*,

    395 U.S. 653 (1969) ............................................................................ 23

*Los Angeles Times v. Free Republic*,

    2000 WL 565200 (C.D. Cal. Apr. 4, 2000) ....................................... 13

*Marder v. Lopez,*

    450 F.3d 445 (9th Cir. 2006) ........................................................ 4, 11, 12, 16

*Metcalf v. Bochco,*

    294 F.3d 1069 (9th Cir. 2002) ........................................................... 7, 12, 14

*Mills Music, Inc. v. Snyder,*

    469 U.S. 153 (1985) ................................................................................. 22, 23

*Monaco v. Bear Stearns Resid. Mortg. Corp.,*

    554 F. Supp. 2d 1034 (C.D. Cal. 2008) ...................................................... 24

*Ray Charles Found. v. Robinson,*

    795 F.3d 1109 (9th Cir. 2015) .................................................................... 22

*Rentmeester v. Nike, Inc.,*

    883 F.3d 1111 (9th Cir. 2018) .................................................................... 11

*Rice v. Fox Broadcasting Co.,*

    330 F.3d 1170 (9th Cir. 2003) ...................................................................... 4

*Satava v. Lowry,*

    323 F.3d 805 (9th Cir. 2003) ...................................................................... 12

*Saturday Evening Post Co. v. Rumbleseat Press, Inc.,*

    816 F.2d 1191 (7th Cir. 1987) .................................................................... 23

*Segal v. Segel,*

    2022 WL 198699 (S.D. Cal. Jan. 21, 2022) ................................................ 5

*Shaw v. Lindheim,*

    919 F.2d 1353 (9th Cir. 1990) ............................................................. 8, 16, 21

*Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,*

    562 F.2d 1157 (9th Cir. 1977) .................................................................... 13

*Smith v. AMC Networks, Inc.,*

    2019 WL 402360 (N.D. Cal. Jan. 31, 2019) ........................................... 5, 6, 7

*Soderstrom v. Orange Cnty. Dist. Atty.,*

    2009 WL 3805647 (C.D. Cal. Nov. 12, 2009) .............................................. 6

*Summit Kaiju LLC v. Legend Pictures, LLC*,

    2022 WL 2235460 (C.D. Cal. Apr. 12, 2022).................................................. 5

*Swedberg v. Marotzke*,

    339 F.3d 1139 (9th Cir. 2003) ............................................................................ 6

*Swirsky v. Carey*,

    376 F.3d 841 (9th Cir. 2004)................................................................. passim

*Three Boys Music Corp. v. Bolton*,

    212 F.3d 477 (9th Cir. 2000) ............................................................................. 4

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,

    715 F.2d 1327 (9th Cir. 1983).......................................................................... 8

*Twentieth-Century Fox Film Corp. v. Stonesifer*,

    140 F.2d 579 (9th Cir. 1944)............................................................................ 7

*Twin Books Corp. v. Walt Disney Co.*,

    83 F.3d 1162 (9th Cir. 1996)......................................................................... 23

*Unicolors, Inc. v. H&M Hennes & Mauritz LP*,

    2016 WL 10646311 (C.D. Cal. Aug. 12, 2016) ............................................. 9

*Unicolors, Inc. v. Urban Outfitters, Inc.*,

    853 F.3d 980 (9th Cir. 2017)....................................................................... 5, 7

*Update Art, Inc. v. Modiin Pub., Ltd.*,

    843 F.2d 67 (2d Cir. 1988)........................................................................... 25

*Walt Disney Prods. v. Air Pirates*,

    581 F.2d 751 (9th Cir. 1978)........................................................................ 18

*Williams v. Gaye*,

    895 F.3d 1106 (9th Cir. 2018)........................................................................ 7

*Wilson v. The Walt Disney Company*,

    2014 WL 4477391 (N.D. Cal. July 30, 2014) ............................................... 8

*Zindel v. Fox Searchlight Pictures, Inc.*,

    815 Fed. Appx. 158 (9th Cir. 2020) .................................................. 4, 5, 6, 11

1

<u>**Statutes**</u>

2
17 U.S.C. § 203(a) ......................................................................................... 2, 22

3

<u>**Rules**</u>

4
Fed. R. Civ. P. 8(e) ............................................................................................. 3

5
Fed. R. Civ. P. 12(b)(6) ...................................................................................... 3

6
Fed. R. Civ. P. 12(d) .......................................................................................... 6

7
Fed. R. Civ. P. 50 .............................................................................................. 8

8

<u>**Other Authorities**</u>

9
4 Nimmer on Copyright ("*Nimmer*") § 2.11 (2022) ......................................... 10

10
H.R. Rep. No. 94-1476 (1976) .................................................................. 22, 23

11
*Nimmer* § 11.07 .............................................................................................. 22

12
*Nimmer* § 13.03 ....................................................................................... 13, 18

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

Ehud Yonay's ("Yonay") 1983 story "Top Guns" ("Story") was unquestionably the genesis of the highly successful film *Top Gun* (1986) (the "Film") and thus its blockbuster sequel *Top Gun: Maverick* (2022) ("Sequel"). Defendant Paramount Pictures Corporation ("PPC")—which recognized the originality of Yonay's compelling cinematic Story and swiftly locked up exclusive film rights to it in a 1983 contract—has made more than a billion dollars from the *Top Gun* franchise. On January 24, 2020, Yonay's widow and son, Shosh and Yuval Yonay ("Plaintiffs"), duly recovered the Story's U.S. copyright under the Copyright Act's termination provisions, consistent with their legislative purpose. Yet PPC, with full knowledge that it no longer held U.S. film rights in the Story, steamrolled ahead with its Sequel, thumbing its nose at the Act. Indeed, despite the Sequel's enormous production budget, PPC made no effort to obtain a renewed license to the Story, as contemplated by the Act.

Instead, PPC's Motion to Dismiss ("Motion") Plaintiffs' First Amended Complaint ("FAC") is a study in revisionist history. PPC obtusely denies that its franchise was derived from Yonay's Story, all while ignoring the obvious similarities between the Sequel and Story from which the franchise is derived. The Motion improperly ventures far beyond the FAC, strains to craft around the Act and PPC's need to renew its copyright license by hand-waving away the Story's protectable expression. PPC's disingenuous ploy to reduce Yonay's original Story to a phonebook of "unprotectable facts" contradicts the very position it took for decades, after securing and exploiting exclusive film rights to the Story and crediting Yonay's Story on the Film. But now that the U.S. copyright has reverted to Plaintiffs, PPC pretends that the Story was just a bunch of facts, and that its derivative Sequel, which closely incorporated the Film on which Yonay was credited, had absolutely nothing to do with the Story. PPC's convenient arguments ignore the numerous creative choices Yonay made in

1

crafting his cinematic portrayal, which breathed life into the technical humdrum of a naval air base, birthing PPC's billion-dollar franchise.

PPC's Motion distorts the Ninth Circuit's framework for evaluating copyright infringement. It also ignores this Circuit's increasing recognition that non-frivolous cases like this must *not* be prematurely dismissed without the benefit of a fully developed record, including the vital input of literary experts, more qualified to parse through themes, plots, metaphors, story structures, pacing, and sequencing. Given the copious similarities between the Story and Sequel, the undeveloped posture of this case and PPC's bad faith disavowal of the 1983 grant it rushed to secure, its Motion must be denied.

## II.   **STATEMENT OF FACTS**

The original Story written by Yonay was published on April 21, 1983. FAC (Dkt. 16) ¶ 21. The Story centered around two pilots at a Naval Air Station bootcamp called "Top Gun." *Id*. ¶ 22. In the subjective "New Journalism" literary style, Yonay created an engaging cinematic portrayal of the base from the point of view of the pilots by artfully curating vivid portrayals of their personalities, relationships, and experiences. *Id*. ¶¶ 21-22. Mere weeks after the Story's publication, PPC secured *exclusive* film rights to it from Yonay in an agreement dated May 18, 1983 (*id*., Ex. 2) ("Agreement"). The Agreement, drafted by PPC, references the Story's copyright throughout. FAC ¶ 35, Ex. 2 at 6-8, 11-13. PPC now refers to Yonay's creative work as a mere "Article" of typed-up facts, but PPC's Agreement referred to it as a "wholly original," "published story." *Id*. ¶ 24, Ex. 2 at 3, 6, 11-12. PPC's Film used extensive details of the Story including characters' traits, the mood, pace, setting, and themes, and thus credited Yonay's Story. *Id*. ¶ 49.

On January 23, 2018, the Yonays availed themselves of their rights under 17 U.S.C. § 203(a) ("Section 203") by terminating the 1983 copyright grant to the Story, effective January 24, 2020, and as of said date, Plaintiffs solely own

the U.S. copyright to the Story. *Id.* ¶¶ 3, 29. Ignored by PPC, Plaintiffs sent it a cease and desist letter as to its Sequel. *Id.* ¶ 40. In response, PPC denied the Sequel's clear derivation from the Story, and released it on May 27, 2022. *Id.* ¶¶ 1, 40. The Sequel, referred to as a "legacy sequel," closely follows the Film,[1] and was hugely successful. *Id.* ¶¶ 26, 34. But, unlike the Film, the Sequel conspicuously failed to give Yonay credit. *Id.* ¶ 52. Considering that PPC raced to lock up film rights to the Story, that the Film credited Yonay, that the Sequel closely tracks the Film, and that the Story, Film and Sequel thus unsurprisingly share clear similarities, PPC's Motion must be denied.

## III.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a) requires a plaintiff to "give the defendant fair notice of what the … claim is" and the allegations must simply present a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007). Thus, as this Court has recognized, "[t]he Ninth Circuit is particularly hostile to motions to dismiss under Rule 12(b)(6)." *Jones v. Twentieth Century Studios*, 2021 WL 6752228, at *2 (C.D. Cal. Dec. 7, 2021) (Anderson, J.) (citing *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248-49 (9th Cir. 1997) ("The Rule 8 standard contains a powerful presumption against rejecting pleadings for failure to state a claim.")). To survive a Rule 12(b)(6) motion, plaintiffs "are generally required to give only 'a short and plain statement of the claim showing that the pleader is entitled to relief'[,]"and "[w]hile the Federal Rules allow a court to dismiss a cause of action for 'failure to state a claim,' they also require all pleadings to be 'construed so as to do justice.'" *Id.* (citing Fed. R. Civ. P. 12(b)(6), 8(e)). Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then

---

[1] The Sequel contains flashbacks to the Film, follows the same central characters, takes place in the same setting, provides a similar portrayal of aerial combat training including exact stunts, training exercises, and customs described in the Story, and explores similar themes as the Story and Film. FAC ¶ 35, Ex. 1. The Sequel even credits the same producer and writers as the Film. *Id.* ¶ 33.

determine whether they plausibly give rise to an entitlement to relief[,]" *id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)), and, in so doing, must construe "all facts and inferences in the light most favorable to the nonmoving party." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

## IV.   ARGUMENT

### A.   "Substantial Similarity" Should Not be Decided on a Motion to Dismiss In Plausible Cases Like This.

PPC's Motion conspicuously omits binding Ninth Circuit precedent and other caselaw, including that of this Court, which in recent years has curbed the ability of defendants to prematurely dismiss plausible copyright infringement claims, and have counseled against deciding "substantial similarity" without the benefits of a developed record and expert testimony.

To allege a claim for copyright infringement, a plaintiff "must plausibly allege substantial similarity between the two works." *Zindel v. Fox Searchlight Pictures, Inc.*, 815 Fed. Appx. 158, 159 (9th Cir. 2020). The Ninth Circuit has made clear that a district court errs "by dismissing the action [when], at [the motion to dismiss] stage, reasonable minds could differ on whether there is substantial similarity ... [and] additional evidence, including expert testimony, would aid in the objective literary analysis needed to determine the extent and qualitive importance of the similarities." *Zindel*, 815 Fed. Appx. at 160; *see also Alfred v. Walt Disney Co.*, 821 Fed. Appx. 727, 729 (9th Cir. 2020) (reversing district court's dismissal as "expert testimony would aid in determining whether the similarities Plaintiffs identify are qualitatively significant."). The Ninth Circuit has long recognized that the "extrinsic test [for substantial similarity] *requires* analytical dissection of a work *and expert testimony*." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004) (emphasis added) (citing *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000)); *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1179 (9th Cir. 2003) (same). Indeed, even "'[s]ummary

judgment is 'not highly favored' on questions of substantial similarity'" and courts must be "cautious" before dismissing for lack of substantial similarity. *Zindel*, 815 Fed. Appx. at 159 (quoting *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 848 (9th Cir. 2012); *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 985 (9th Cir. 2017) (As "substantial similarity is usually an extremely close issue of fact ... summary judgment has been disfavored.").

In the wake of these important decisions, district courts in the Ninth Circuit, including this Court, have been rightly disinclined to grant defendants' motions to dismiss which ask the court to decide "substantial similarity" without affording plaintiff the opportunity to take discovery, present evidence, or introduce expert testimony. *See e.g., Summit Kaiju LLC v. Legend Pictures, LLC*, 2022 WL 2235460, at * 5 (C.D. Cal. Apr. 12, 2022) (Anderson, J.) (quoting *Zindel* and *Alfred* and denying defendant's motion to dismiss because "Plaintiff sufficiently pleaded substantial similarity" "which may be fleshed out through expert evidence."); *Segal v. Segel*, 2022 WL 198699, at *13 (S.D. Cal. Jan. 21, 2022) (denying motion to dismiss: "Because analytical dissection and substantial similarity between protected elements of works are 'usually extremely close issue[s] of fact,' the Ninth Circuit disfavors dismissals on the ground of substantial similarity at the Rule 12(b)(6) stage.") (quoting *Zindel*, 815 Fed. Appx. at 159). *See also Smith v. AMC Networks, Inc.,* 2019 WL 402360, at *4-6 (N.D. Cal. Jan. 31, 2019) (declining to apply extrinsic test until further factual development of the record, including expert testimony: "most prudent course of action is to follow Ninth Circuit precedent which clearly states that '[t]he extrinsic test requires expert testimony'") (quoting *Swirsky*, 376 F.3d at 845); *Cabell v. Zorro Prods., Inc.*, 2017 WL 2335597, at *8 (N.D. Cal. May 30, 2017) (denying motion to dismiss because the "case lacks the kind of comprehensive factual record and undisputed facts that would allow the court to apply the 'extrinsic test' at this stage."); *Green v. Metro-Goldwyn-Mayer*

*Studios, Inc.*, 2008 WL 11338272, at *3 (C.D. Cal. Nov. 24, 2008) (Anderson, J.) (expert evidence that extrinsic elements of screenplay and film were substantially similar "create[d] a genuine issue of fact").

Here, the FAC sufficiently alleges substantially similarity to survive a motion to dismiss. FAC, Ex. 1. The Motion must be denied to allow Plaintiffs to develop the record and submit expert evidence before a decision on the merits can be made. *Zindel*, 815 Fed. Appx. at 160; *Alfred*, 821 Fed. Appx. at 729.

### B.   The Motion Goes Far Beyond the "Four Corners" of the FAC.

As an initial matter, PPC's Motion overreaches far beyond the FAC. Replete with extrinsic "evidence," PPC improperly litigates issues of fact under the guise of Rule 12(b)(6). However, motions to dismiss are generally limited to "the four corners of the complaint" and documents referenced therein that are properly before the court. *See Jackson v. Cap. Mgmt. Servs., LP*, 2014 WL 12601055, at *1 (C.D. Cal. June 18, 2014). As stated by this Court, "information outside the pleadings would convert [] Motions to Dismiss into motions for summary judgment." *Soderstrom v. Orange Cnty. Dist. Atty.*, 2009 WL 3805647, at *1 (C.D. Cal. Nov. 12, 2009) (Anderson, J.) (*citing Swedberg v. Marotzke*, 339 F.3d 1139, 1142-43 (9th Cir. 2003)); *see* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion").

The Motion's substantial similarity analysis is so utterly dependent on extrinsic evidence that it must be denied as a premature motion for summary judgement. *See* Plaintiffs' Objections to PPC's Request for Judicial Notice (Dkt. 21-3). In this regard, *Smith*, 2019 WL 402630, is instructive.:

> [W]hat Defendants essentially seek is summary judgment because they stray beyond the four corners of the complaint and into factual disputes over the similarities and differences between *Dead Ahead* and *Fear the*

6

*Walking Dead*, including whether certain elements of *Dead Ahead* are protectable under copyright law. Moreover, AMC Defendants' request for judicial notice that certain concepts are generic further demonstrates that Defendants' motions are essentially motions for summary judgment.

*Id*. at 6. Here, as in *Smith*, the Motion is styled as a 12(b)(6) motion, while shoehorning in a host of extrinsic evidence to purportedly show that elements are "facts" or generic, thereby converting it to a premature summary judgment motion that must be denied. *Id.*

C.   **The FAC More than Sufficiently Alleges Substantial Similarity.**

   1.   *Because the "Extrinsic Test" Analyzes Objective Literary Criteria, It Is Often Difficult to Apply at the Pleading Stage.*

   "In assessing whether particular works are substantially similar ... [the Ninth] Circuit applies a two-part analysis: the extrinsic test and the intrinsic test." *Unicolors,* 853 F.3d at 985. "The extrinsic test requires plaintiffs to show overlap of 'concrete elements based on objective criteria,'" while "the intrinsic test is subjective and asks whether the ordinary, reasonable person would find the total concept and feel of the works to be substantially similar." *Id.* "The intrinsic test is reserved exclusively for the trier of fact." *Williams v. Gaye*, 895 F.3d 1106, 1119 (9th Cir. 2018). In conducting the extrinsic test, a court must objectively analyze the works' similarities in plot, themes, dialogue, mood, setting, pace, characters, sequence of events and other literary elements. *Metcalf v. Bochco*, 294 F.3d 1069, 1073 (9th Cir. 2002). Thus, the Ninth Circuit has consistently recognized the "extrinsic test requires ... expert testimony." *Swirsky*, 376 F.3d at 845; *see* Section IV(A), *supra*. This is especially true when, as here, a court must compare dramatic works in different media, where the comparative meaning, interplay and dramatic impact of creative expression is even more difficult to assess. *See Twentieth-Century Fox Film Corp. v. Stonesifer*, 140 F.2d 579, 583 (9th Cir. 1944) (noting, in finding infringement, that the dissimilarities between the film and play result "principally from the film's enlarged means" of

"express[ion]"); *Castle Rock Entm't, Inc. v. Carol Pub. Grp, Inc.*, 150 F.3d 132, 140 (2d Cir. 1998) ("different genres" do not negate infringement).

The focus of the extrinsic analysis is on *shared* aspects—not on things the defendant chose to add—and similarities are not required as to all the objective criteria. *Shaw v. Lindheim*, 919 F.2d 1353, 1357-61 (9th Cir. 1990) (finding on summary judgment genuine issues as to substantial similarity of certain criteria but not others); *Cabell*, 2017 WL 2335597, at *8 (denying motion to dismiss where "[p]laintiff has alleged sufficient facts to support" infringement of musical based on just four factors). Here, the FAC enumerates a non-exhaustive list of literally dozens of overt similarities between the works. FAC, Ex. 1. As further addressed in Section IV(C)(4) below, the works employ similar character traits, pacing, setting details, tone, sequencing, plot devices and themes. *Id*. As these similarities are more than "*de minimis,*" the extrinsic test implicates issues of fact on which reasonable minds may differ. *Alfred*, 821 Fed. Appx. at 729.

The question of substantial similarity is generally for the jury, unless "no reasonable juror could find that Defendants' [work] is substantially similar" to the Plaintiff's. *L.A.Printex*, 676 F.3d at 851 (given similarities and differences, "there is a genuine dispute of material fact on substantial similarity"); *Swirsky*, 376 F.3d at 844 (Court may decide only if "no reasonable juror could find substantial similarity of ideas and expression[.]"); *Wilson v. The Walt Disney Company*, 2014 WL 4477391, at *1 (N.D. Cal. July 30, 2014).[2] This rule is necessary because "[d]eterminations of substantial similarity of expression are subtle and complex" and jury input on a developed recorded is often needed to fairly make such decisions. *Baxter v. MCA, Inc.*, 812 F.2d 421, 424-25 (9th Cir. 1987). Where "reasonable minds could differ as to … substantially similar[ity]," judgment cannot be granted as a matter of law. *Id*.; *see Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1329 n.6 (9th Cir. 1983) ("substantial

---

[2] This is the same stringent standard that restricts the authority of courts to render judgment notwithstanding the verdict under Fed. R. Civ. P. 50.

similarity is usually an extremely close question of fact;" denying *summary judgment* because "reasonable minds could differ"); *Unicolors, Inc. v. H&M Hennes & Mauritz LP*, 2016 WL 10646311, at *4 (C.D. Cal. Aug. 12, 2016) ("reasonable minds might answer differently th[is] touchstone question").

2.   <u>*Yonay's Copyrighted Story Unquestionably Comprises Protectable Expression.*</u>

The Story, while incorporating some factual elements, is predominantly the original subjective expression of Yonay. Indeed, the Story was valuable to PPC precisely because of its unique expression. It goes without question that PPC would not have rushed to exclusively license and pay for the Story if it were simply a compilation of facts in the public domain. *See* FAC ¶¶ 22-23. Contrary to PPC's about-face here, per the terms of the Agreement *it drafted*, PPC has long referred to and considered Yonay's work an expressive "story." *Id*. ¶ 24, Ex. 2. In fact, PPC's Agreement repeatedly acknowledged Yonay's "copyright," ensured that the Story is "wholly original with the Author," and even insisted that PPC be appointed Yonay's attorney in-fact to secure *copyright* extensions for the Story. *Id*. ¶ 24. All of this was for PPC's exclusive benefit, preventing competing studios from exploiting the Story, while PPC proceeded to do so in the Film and its Sequel. Yet, upon losing the Story, PPC flip-flopped and renounced its long-held legal position from which it benefitted for decades.

PPC's Motion focuses myopically on only the factual aspects underlying the Story without addressing Yonay's creative *expression* of them, which is what copyright is all about. Instead, PPC nihilistically equates Yonay's evocative, cinematic Story to a dull Senate Report, for which it improperly seeks judicial notice. *See* Dkt. 21-3, § II(D). To illustrate the significant expression Yonay contributed to animate the humdrum of a dry regimented naval facility, Plaintiffs added a "fact" column to the FAC's Chart of Similarities (Dkt. 16-1). *See* Declaration of Marc Toberoff, Ex. 1 (Dkt. 21-2) ("Chart"). The Chart compares

9

the unadorned purported "fact" with the Story's literary expression thereof, and its qualitative importance to the Story and Sequel. Needless to say, if PPC were only interested in the facts of the Naval Air Station, it would have drawn inspiration for its blockbuster franchise from the Senate Report. But of course, that contains none of the expressive imagery, startling action, character traits, motivations, or themes so important to the Story, derivative Film and Sequel. Afterall, only Yonay's compelling cinematic Story, not the Senate Report nor any other dull factual recitation, is credited by PPC as having *inspired* the original *Top Gun* film on which the Sequel so heavily relies. FAC ¶ 2.

Moreover, copyright estoppel—the doctrine which estops an author who has expressly represented her work to be entirely factual from later proving it is fictional—does not apply here. 4 Nimmer on Copyright ("*Nimmer*") § 2.11[C] (2022). Indeed, its application is far less tidy than PPC represents. Mot. at 10-11. For instance, courts treat historical works and biographies differently than traditional factual news articles[3] where the author need not specifically represent that she reports "facts." *Nimmer* § 2.11[C]. A history or biography is different because *it is understood* that authors take greater creative license to fictionalize history and create compelling characters out of people to convey a specific "flavor of the period or person depicted," *id.*, just as Yonay obviously did in his Story. In such cases, only an author's *express* representation that the *entire work* is factual will permit the invocation of copyright estoppel. *Nimmer* § 2.11[C]. Indeed, for this reason the Ninth Circuit renamed "copyright estoppel" the "asserted truths" doctrine.[4] Here, the Story, as PPC acknowledges, is in part, a vivid portrayal of Top Gun's history and extensively characterizes selected students and instructors in a very literary fashion. Mot. at 19-20. Nowhere does

---

[3] After decades of referring to Yonay's Story as a "story," FAC, Ex. 2, PPC now conveniently mischaracterizes it as a mere "news article," but such categorization, is itself, a factual issue not properly decided on a motion to dismiss.

[4] *Corbello v. Valli*, 974 F.3d 965, 979 (9th Cir. 2020) ("[W]e will refer to this rule of copyright law as the "asserted truths" doctrine, because it is the *author's* assertions within and concerning the work that … trigger its application.") (emphasis added).

its author assert it is completely factual, and, in any event, this is not properly decided on a motion to dismiss, when all inferences are to be drawn in Plaintiffs' favor. *Marder*, 450 F.3d at 448. Further, were the doctrine to apply, it would not reduce the copyright protection afforded the Story's cinematic expression of any purported facts nor the protection of Yonay's selection and arrangement of those facts. *See Corbello*, 974 F.3d at 972; *De Acosta v. Brown*, 146 F.2d 408, 410 (2d Cir. 1944) ("original treatment of…historic character … entitled to protection").

PPC's Motion further takes for granted that the Story contains *scènes à faire* and stock elements[5] simply because flying scenes and jocular hotshots may be common to the genre today. PPC assumes too much. Proper analysis requires the fact-finder to revisit 1983, when Yonay wrote his Story, and before the 1986 Film popularized the Story's elements, to understand what the *scènes à faire* and stock elements of naval action literature were *at that time*. The iconic stature and ubiquity of the Film, which used the underlying Story, popularized its original elements which later became staples of the genre. To judge the originality of Yonay's Story, expert evidence would be needed to show the progression of the genres in film and literature and to help assess which, if anything that PPC claims in retrospect are "stock elements," were common before 1983. The need for such evidence underscores the impropriety of a decision at this early stage. *See Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1123 (9th Cir. 2018) (To grant a motion to dismiss, it must be true that "[n]othing disclosed during discovery could alter the fact that the allegedly infringing works are as a matter of law not substantially similar."); *accord Zindel*, 815 Fed. Appx. at 160.

On this basis, the Ninth Circuit, in *Alfred,* reversed a district court's grant

---

[5] "*Scènes à faire*" is far more narrowly defined than the Motion suggests, entailing only expressions that "are as a practical matter indispensable" *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980); *Nimmer* § 13.03[B][4] (*scènes à faire* are "scenes which 'must' be done"); *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000) (similarities cannot be disregarded as *scènes à faire* unless they meet narrow exclusion for "indispensable" "stock" elements); "*Scènes à faire*" encompass only the most generalized stock scenes or characters that lack original expression. *Berkic v. Chrichton*, 761 F.2d 1289, 1294 (9th Cir. 1985).

of a motion to dismiss. 821 Fed. Appx. at 729. The lower court "dismissed the action largely because it concluded that many of the elements the two works share are unprotected generic, pirate-movie tropes." *Id*. The Ninth Circuit ruled:

> [E]xpert testimony would aid in determining whether the similarity Plaintiffs identify are qualitatively significant. This would be particularly useful in this circumstance, where the works in question are almost twenty years old and the blockbuster *Pirates of the Caribbean* film franchise may itself have shaped what are now considered pirate-movie tropes.

*Id*. Like *Pirates of the Caribbean*'s influence on *current* pirate-movie tropes, the 1986 Film, exploiting Yonay's Story, pioneered contemporary action films. PPC relies heavily on arguments that the Sequel's similarities to the Story launching *Top Gun* are mere *scènes à faire*, Mot. at 11, 13-16, 20-21, but considering the landscape-altering success of that Film, PPC has no basis to assert that which now may be considered "tropes" was not originally conceived by the Story and Film adapting it. Such decisions require expert evidence and pose questions of fact not properly decided at the pleading stage when "all facts and inferences" must be drawn "in favor of the nonmoving party." *Marder*, 450 F.3d at 448.

### 3. <u>*Yonay's Creative Expression, Selection and Arrangement Must Be Considered in the Extrinsic Analysis.*</u>

While bare facts themselves are not subject to copyright (*see e.g., Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 344-45 (1991) (phone numbers not copyrightable)), the selection and arrangement of facts and the expression of those facts are indisputably protected. *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003). Indeed, PPC acknowledges this, s*ee* Mot. at 15 (citing *Corbello*, 974 F.3d at 977 ("creative expression that is in the Work—the 'writing style and presentation'—is protected")), but then ignores the point.

As recognized in *Metcalf*, "[t]he particular sequence in which an author strings a significant number of unprotectable elements can" itself satisfy the extrinsic test. 294 F.3d at 1073-74. Thus, even where shared elements are "not protectable," a court cannot dismiss if the "original selection, coordination, and

arrangement of such elements is protectable." *L.A.Printex*, 676 F.3d at 850.

The finder of fact must first assess whether a plaintiff's original selection and arrangement of all elements supports substantial similarity *without* preemptively filtering out elements deemed "unprotectable." This step is mandatory in any case where, as here, a plaintiff asserts "a *combination* of many different elements of similarity" as a protectable whole. *Nimmer* § 13.03 n.25 (emphasis original) (citing *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977)). As the Ninth Circuit has explained, "to disregard" elements as unprotected when performing the extrinsic test "is to ignore the fact that substantial similarity can be found in a combination of elements, even if those elements are individually unprotected." *Swirskey*, 376 F.3d at 848; *see also Harper & Row v. Nation Enters.*, 471 U.S. 539, 547 (1985) ("Creation of a nonfiction work, even a compilation of pure fact, entails originality"); *Los Angeles Times v. Free Republic,* 2000 WL 565200, at *15 (C.D. Cal. Apr. 4, 2000) (enforcing copyright of nonfiction work: "a news reporter must determine which facts are significant and recount them in an interesting and appealing manner"); *Keeling v. Hars*, 809 F.3d 43, 50-51 (2d Cir. 2015) ("copyright law protects not only the individual elements themselves, but the creative choices made in selecting and arranging even uncopyrightable elements"); *Corbello v. DeVito*, 844 F. Supp. 2d 1136, 1163 (D. Nev. 2012) ("Non-fiction works are also protected—not the historical facts themselves, but the creative presentation of those facts."); *Eckes v. Card Prices Update*, 736 F.2d 859, 862 (2d Cir. 1984) (finding catalog of baseball cards copyright protected: "[w]e have no doubt that appellants exercised selection, creativity and judgment" when selecting which cards to include).

Nonfiction works require careful extrinsic analysis. For example, the plaintiff in *Jacobsen v. Deseret Book Co.*, 287 F.3d 936 (10th Cir. 2002) authored a memoir detailing his time as a prisoner of war in World War II. *Id.* at

940. The defendant produced a TV series including a story similar to one described in plaintiff's factual memoir. *Id*. In conducting the extrinsic analysis, the Tenth Circuit overturned the district court's grant of a motion to dismiss noting similarities of factual plot points and some dialogue. The court explained that, *despite* being a work of nonfiction, these elements could be "original expression," and that this question was for the trier of fact. *Id.* at 946-47.

Here, proper analysis of the similarities between the Story and the Sequel necessitates detailed analysis of the creative *choices* Yonay made in selecting and arranging his Story—a work that clearly is far more original than a bunch of facts. For instance, rather than offer an encyclopedic narration of naval base operations, Yonay chose to focus on the personal backgrounds and idiosyncrasies of two aspiring trainees, to engage his audience and humanize his Story.[6] Then, by interspersing his Story with exhilarating descriptions of daring flight maneuvers, Yonay transported the reader into the cockpit with the characters they are now invested in, greatly heightening a shared sense of exhilaration and danger.[7] Like the Film, the Sequel uses the same approach. *Id*. Yonay's juxtaposition of ethereal descriptions of the sensation of flying, with intense cinematic action and quiet moments of reflection at the base, which he romanticizes as a place of 1950s, post-war nostalgia[8], rather than a regimented facility, compelled PPC to purchase the film rights to his Story mere weeks after its publication. These elements (and many more) comprise creative selections and arrangements by Yonay in crafting his Story that were later exploited in the Film and its Sequel. That aspects may be factual or may be viewed *today* as *scènes à faire* are of no import under the "selection and arrangement" analysis. *See Metcalf,* 294 F.3d at 1073-74. After purchasing Yonay's Story, PPC made obvious use of his creative selection, arrangement, and expression and the

---

[6] Chart, 1-9, 12-13, 15-16, 18-21, 23-26, 30-33, 36-38, 44, 46-48, 51-52, 56-57, 59-65, 68, 74-76.
[7] *Id*., 29-31, 33-37, 39-47, 52-55, 66-68, 70.
[8] *Id*., 10, 24, 27, 29, 33-36, 39-41, 59, 73; FAC ¶¶ 23, 32.

similarities are far more than *de minimis*. *Alfred*, 821 Fed. Appx. at 729 (motion to dismiss should be denied when the similarities in selection and arrangement of even unprotectable elements between the works is more than "*de minimis*").

### 4.   *The Extrinsic Factors Demonstrate Substantial Similarity.*

A comprehensive comparison of the extrinsic elements of the Story and the Sequel plainly evinces substantial similarity. *See generally*, Chart.

**Plot.** Both the Story and Sequel make the same creative choice to focus on the relationship between two jocular pilots at the "Top Gun" training base.[9] In both works, the relationship between the two primary characters expands when they join a crew which, in preparing for battle, evolves into a close-knit, familial squadron. *Id.*, 12, 62-65. Both introduce a decorated pilot with real combat experience who is asked to serve as an instructor at Top Gun. *Id.*, 16, 18, 20-21. Both use intergenerational conflict between older, more experienced pilots who serve as officers or instructors and restless, up-and-coming fighter pilots to build narrative tension. *Id.*, 8, 14-21, 51. Both portray an Admiral who disapproves of hotshots and use this as an obstacle to be overcome. *Id.*, 21-22.

Further, both works spend an inordinate amount of time depicting the elite pilots' R & R to humanize, make them more relatable, and engage the emotions of the reader/audience. *Id.*, 59, 61-65. Both extensively depict the softer side of macho fighter jocks to examine the profundity and complexity of human beings sent off to war. Indeed, in both works, the intense training is interrupted when the main character (Sequel) and the squadron (Story) is taken for a surprise ride on a "glorious" sailboat. *Id.*, 65. Both works use similar expressive plot devices, including a dartboard as a metaphor for the competitive ranking of pilots. *Id.*, 19. In the Story, the closer a pilot lands to *the bull's-eye*, the greater his ability. *Id.* In the Sequel, a pilot is shown landing in the bull's-eye three darts in a row as a symbol of his elite status. *Id.* In both works, the characters frequent a local bar

---

[9] Chart, 1-9, 12-13, 25, 42-44, 48, 52, 57, 61, 68, 74-76.

that features a good-sized brass bell that is rung only when the "house rules" are broken by a hapless pilot (e.g., Story: walks in with his hat on; Sequel: disrespects a lady or puts his cell phone on the bar) at which point he must pay for *everyone's* drinks. *Id*., 63. In both, the device serves to illustrate the "frat-boy" subculture of Top Gun fighter pilots, and injects levity. Tellingly, while nowhere in the 1986 Film, the 2022 Sequel uses this distinctive icebreaking device *three times*, underscoring that in producing the Sequel, PPC literally returned to the Story—the same Story PPC now conveniently hatchets. *Id*.

The Motion handwaves away all these similarities as "facts" or *scènes à faire*, baldly ignoring Yonay's cinematic expression. The Motion encourages this Court to ignore the FAC's literary analysis, blankly denying, e.g., that the Sequel uses a bull's-eye as a metaphor. *Id*., 19; Mot. at 14. Lost on PPC is that whether a bull's-eye acts as a metaphor is not a question to be decided on a Rule 12(b)(6) motion, particularly as such things are construed in a light most favorable to Plaintiffs. *Marder*, 450 F.3d at 448. Indeed, "plot" is an extrinsic factor which particularly calls for expert opinion. *See Shaw*, 919 F.2d at 1358 (finding substantial similarity in part because "the respective plots do parallel each other," as expert evidence "illustrate[d] how the plots in both scripts share a common sequence and rhythm").

**Themes.** The Story and Sequel share numerous themes of true grit and heroism, "Western" gunslinger themes, patriotic American nostalgia, the bonds that form in war, generational divides, the difficulty in balancing passion, duty and family, man vs. machine, individualism vs. institutional authority, the need for speed, the sheer love of flying, and a freedom that can only be found in the skies. Chart, 14, 52, 75-76. The two works also share a recurring theme that success in warfare comes down to the pilot, to courage and strength of character, not the high-tech jet one flies. *Id*., 14, 76. By their very nature, such themes, their convergence and qualitative value, in furtherance of both works' stories

16

*cannot* be discarded as "facts" and require useful analysis by literary experts.

**Dialogue.** The Sequel employs similar lingo to that in the Story to shape the mood, setting, and establish the tone. For example, quips in the Story such as "Fight's on," "It's Miller time," "shoot off their watches," "You fight like you train, so you'd better train like you're going to fight," and "I like pulling Gs. I like strapping on 25 tons of airplane and hustling around the sky" set the tone which carried through to both the Film and Sequel. Yonay selected such quotes to further his Story's themes. For example, "You're out there supersonic going from deck to 40,000 feet and back down to the deck, simulating killing people and getting yourself killed, handling actual emergencies, and when you finally come in and land you can't even tell your wife about it," and "How do you explain. . . [that] you suddenly weigh more than 1,300? Or how if you pull too many Gs a lot of times you start to black out, … that you were in an airplane flying around and you blacked out?" exemplify the difficulty of balancing duty, passion, and family. Further, Yonay's inclusion of dialogue such as "You wish you could do it over again ... but in the real world you're not going to get a second chance," "getting shot is synonymous with losing … and dying," advances Yonay's portrayal of Top Gun as a place of *intense* competition.

**Setting.** Both the Story and Sequel take place at the Naval Air Station along the beach in Southern California. Chart, 10-11. Tellingly, the Sequel, set in the present, maintains this setting even though in "fact," the *actual* "Top Gun" school moved in 1996 to land-locked Fallon, NV. *Id*., 11. Both works bounce between intense flying from the pilots' POV in the cockpit, to quiet moments of reflection at the base, to the classroom, to R & R at the local bar and at sea.[10]

Both the Story and Sequel portray the culture at the naval air station as ultra-competitive, but jovial and collegiate.[11] Both stories take place in their respective present (Story: 1983; Sequel: 2022), but depict the base with 1950s

---

[10] *Id*., 27, 29-31, 33-36, 39-41, 52-55, 59, 61-68, 70, 73.
[11] *Id*., 3, 5, 7-8, 19, 25-26, 32-33, 56-57, 59-67, 72.

post-war nostalgia. *Id.*, 10 ("At night the darkened base could be mistaken for an old From Here to Eternity set, and even earlier in the day, when the base is bustling, it is enveloped in a time warp of unreality."), 24, 67. Both emphasize "Fightertown USA," which has since become iconic. *Id.*, 9. Both emphasize similar characteristics of the base (e.g., wooden plaques in a room dedicated to squadrons, and again, the big brass bell at the local bar). *Id.*, 9, 58-59, 63.

The Motion challenges the FAC using blatantly flawed analysis. "It is entirely immaterial that, in many respects…works are dissimilar ... If substantial similarity is found, the defendant will not be immunized from liability by reason of the addition in his work of different characters or additional and varied incidents[.]" *Nimmer* § 13.03[B][1][a] (*citing Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 756 (9th Cir. 1978) (characters infringed, even though the stories differed entirely)). PPC finds fault with Plaintiffs' allegations because, while both works share many settings, the Sequel includes two more (the Navy's "scramjet" headquarters and an unnamed enemy territory at the end). Mot. at 19. The Court must not be swayed by the Motion's erroneous analysis.

**Characters.** Both Story and Sequel use characters as tools to tell the story of Top Gun, and explore the themes listed above.[12] Both use characters' playful nicknames (e.g., Story: "Yogi," "Possum," "Heater"; Sequel: "Maverick," "Rooster," "Baby on Board 'Bob'") for comic relief. *Id.*, 13. In both works, the main characters have similar appearances (one, good looking with dark hair, the other with wavy light brown hair and a mustache). *Id.*, 2. Both depict its lead character and others as adrenaline-junkies, undeterred, if not invigorated by danger, to the point of denial.[13] Both feature a character that is touted for having actual combat experience, including famously downing "three MiGs" in one day, for a total of over five jets shot down—a "five-kill line." *Id.*, 16-18. Both portray pilots as audacious cowboys, dueling with slick maneuvers, harkening to

---

[12] Chart, 1, 8-9, 12, 14, 15-21, 23-27, 30-44, 46-48, 50-57, 59-66, 68, 70-76.
[13] *Id.*, 5-6, 25, 30-31, 34-37, 45-47, 51, 54, 60-61, 70.

18

"Western" show-downs (Story: "At Mach 2 and 40,000 feet ... it's always high noon;" "Yogi and Possum ride shot gun"). *Id.*, 52, 72. "Maverick" itself alludes to two famous Westerns (1954 and 1993). Both portray Top Gun pilots as elites with strict codes of honor, but with cool, "macho," personas. Both portray similar character motivations, e.g., to be the best, even at great personal expense, and portray its characters as worthy of admiration and empathy.[14] Both works introduce a rigid Admiral as an antagonist to its hotshot fighter jocks. *Id.*, 20-21.

**Sequence of Events/Pacing.** Both works juxtapose base, bar, classroom, sailing, and mission scenes interspersed with intense dramatic flying scenes throughout.[15] Each work employs a non-linear approach to its narrative in the form of flashbacks and cutaways. *Id.*, 1, 47, 73-74. Such storytelling is used in both as a literary shortcut to deepen the audience's understanding of characters' motivations and to quickly build narrative tension. Notably, the flashbacks in the Sequel take the audience back to the Film, in which Yonay's Story was credited. FAC ¶¶ 2, 33. Both works sequence failed combat maneuvers, portrayed as edgy, intense, and deadly to build dramatic tension, followed by debriefing and tactical analysis in the classroom. Chart, 27, 73. This alternation in sequencing allows each work to maintain an action-packed pace and remain engaging while portraying dryer details necessary to the stories. Similarly, both works feature "dog fights" between the pilots throughout their training, which are portrayed as fierce, but tempered by collegial team spirit. *Id.*, 33, 39-44, 48, 52, 59, 61-65. Both works intersperse high-tension aerial action sequences with R & R scenes at the pilots' favorite bar and elsewhere. *Id.* For instance, in both, the action is interrupted when the squadron (Story) and the main character (Sequel) is taken for a surprise ride on a beautiful sailing yacht. *Id.*, 65. Again, like the tell-tale ringing of a brass bell at the pilots' favorite bar, this unusual Story element appears in the Sequel, but is *not* in the 1986 Film. *Id.* Both works climax with

---

[14] *Id.*, 3-5, 7-8, 14, 25-26, 31, 38, 46-47, 61.
[15] *Id.*, 27, 33-34, 39-44, 58-59, 61-65, 73.

the primary characters departing Top Gun for real-world flight missions.

**Mood.** Both works emphasize and juxtapose the ethereal beauty of blue skies and ocean against jarring, unpredictable action. *Id.*, 29, 34, 39-44, 73. In both, the mood in aerial combat training is portrayed as intensely competitive, with characters crestfallen when they are "shot down" despite it being just a training exercise. *Id.*, 26-27. An urgent tone is also prevalent in both, as each portrays their training as *vital* to American national security. *Id.*, 22. In both, tension is also built by portraying the pilots as under intense time pressures, exacerbated when botched training exercises lead to setbacks. *Id.*, 48. To relieve this tension, the mood in both works is regularly broken by tender, playful, collegiate and jocular scenes. *Id.*, 33, 59-65, 73. In both, even a dangerous encounter with an enemy aircraft is depicted with playful cheekiness. *Id.*, 68.

**Totality of Similarities.** "[T]he totality of the similarities" across the extrinsic factors "goes beyond the necessities of the" works' general ideas, and "extends to elements of protected expression[.]" *Shaw*, 919 F.2d at 1363; *accord Metcalf*, 294 F.3d at 1074 ("cumulative weight" of similar elements precludes judgment as a matter of law under extrinsic test). PPC's mischaracterizes these as "random similarities" to minimize the works' quite substantial similarities. PPC endeavors to shift the analysis away from these similarities by highlighting the works' differences. But, at minimum, the significant overlap between the works, described here and in the FAC, sufficiently pleads substantial similarity.

The law is clear that "[e]ven if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." *Baxter*, 812 F.2d at 425. "[N]o plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Esplanade Prods., Inc. v. Walt Disney Co.*, 768 Fed. Appx. 732, 733 (9th Cir. 2019)). PPC "ignores the fundamental notion that no bright line rule exists as to what quantum of similarity" constitutes "substantial similarity." *Id*. For instance,

*Shaw*'s extrinsic analysis "reveal[ed] significant similarities and differences," yet differences did not justify summary judgment. 919 F.2d at 1357-58. The presence of shared elements meant "reasonable minds might differ as to [] substantial similarity," despite "dissimilarities." *Id*. Courts must not "ma[k]e [such] subjective determination[s]" of similarity, which usurp the role of the "reasonable juror." *Id.* Faced with complex "[d]eterminations of substantial similarity of expression," courts must consider how reasonable minds might differ on myriad points of comparison. *Baxter*, 812 F.2d at 424. Here, the Sequel undeniably borrows from the Story's setting, themes sequencing, aerial action scenes, plot devices, and primary character traits. FAC, Ex. 1. On a 12(b)(6) motion, the Court should resolve such literary disputes in Plaintiffs' favor. *See e.g., Jones*, 2021 WL 6752228, at *2, 6. PPC's attempt to distract from these foundational similarities by focusing on differences must fail.

In short, because the similarities here are far more than *de minimis*, the motion to dismiss must be denied. *Alfred*, 821 Fed. Appx. at 729; *Jones*, 2021 WL 6752228, at *6 (reasoning, in denying 12(b)(6) motion that, considered together, "[t]he plot sequencing of both works revolve around similar character relationships and there are several shared elements of theme, setting, and pace" such that "reasonable minds [can] differ on the issue of substantial similarity").

**D.      PPC's Conduct is Inequitable and Contravenes Federal Policy.**

1.      *PPC Attempts to Circumvent the Copyright Act.*

The 1983 Agreement (drafted by PPC) which assigned to it exclusive film rights to the Story, *repeatedly* refers to and acknowledges its "copyright," and that the "work is wholly original with the Author." FAC ¶ 23, Ex. 2. Under it, PPC acquired that copyright, such that Yonay could no longer exploit it. *Id*. After decades of prospering from exclusive film rights to the Story, PPC should not be heard to complain that it is just a bunch of "unprotectable facts." If that were true why did PPC insist on purchasing the Story and benefit from such

exclusivity for three decades? Moreover, in giving Yonay's Story *credit* on the resulting Film, PPC *admitted* that *Top Gun* "substantially incorporate[ed] the plot, theme, characterizations, motive and treatment of said [Story.]" *Id*., Ex. 2 at ¶ 7(b). As the Sequel, in turn, incorporates these elements from the Film, PPC cannot plausibly argue that the Sequel does not exploit these Story elements.

PPC's two-faced stance and hardball tactics directly flout the legislative purpose of the Act's termination provisions. 17 U.S.C. § 203(a). Section 203 which empowers authors or their families to recover the copyright to their works *after 35 years* "was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985). Section 203 was "designed to 'safeguard[] authors against unremunerative transfers ... needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited.'" *Ray Charles Found. v. Robinson,* 795 F.3d 1109, 1112 (9th Cir. 2015) (quoting H.R. Rep. No. 94-1476, at 124 (1976) and citing 3 *Nimmer* § 11.07[E][4][b] (2014) (Section 203 was intended to protect "authors and their spouses, children, and grandchildren against unremunerative transfers and improve their bargaining position.")). Section 203 reflects a deliberate balance of competing interests determined by Congress.[16] Yet PPC ignored the Yonays, and hired expensive counsel to dismantle the Story's copyright it benefitted from. PPC's conduct, which runs afoul of the Act and equitable notions of fair play, should not be rewarded.

2.      *PPC Is Estopped from Challenging the Story's Copyright.*

Licensee estoppel—the doctrine which prevents a licensee such as PPC,

---

[16] For example, the Act gives terminated grantees, like PPC, an exclusive window of at least *two years* to reacquire a recaptured U.S. copyright. *See* 17 U.S.C. § 203(a)(4)(A), (b)(4); *Nimmer* § 11.08[A], n.6. Moreover, because the terminated grantee, retains all foreign rights to the work, *Nimmer* § 11.02[B][2], such reacquisition on terms which more fairly reflect a work's proven value, is the unsurprising norm.

from challenging the validity of a copyright it licensed—applied broadly to patent, copyright, and trademark until 1969, when the doctrine was overturned as to patents in *Lear v. Adkins*, 395 U.S. 653 (1969). Largely a policy decision, *Lear* held that the policies guiding federal patent law trump estoppel principles. *Id*. at 674. Disagreement ensued as to whether *Lear* applied more broadly to copyright cases. The Seventh Circuit upheld the application of licensee estoppel to copyrights, in part, because policy concerns over an invalid patent monopoly far outweigh those with copyrights. *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1199-1200 (7th Cir. 1987). The Seventh Circuit distinguished *Lear* as "narrowly written" and ruled that licensee estoppel "is apt to have a broader effect." *Id*. at 1200.[17] The Ninth Circuit has specifically reserved judgment on this question, and copyright licensee estoppel is an issue of first impression in this district. *See Twin Books Corp. v. Walt Disney Co.*, 83 F.3d 1162, 1168 (9th Cir. 1996) (in reversing on other grounds, "we do not reach the issue[] of whether … the doctrine of licensee estoppel applies in a copyright case."). Here, given the clear federal policy that terminations under the Act are intended to result in renewed licenses that better reflect a work's value (once it is no longer conjectural), the doctrine of licensee estoppel should be enforced. *Mills Music, Inc.*, 469 U.S. at 172-73; H.R. Rep. No. 94-1476, at 124 (1976). If, in the face of statutory termination, a licensee is permitted to gut the very copyright it coveted, the equitable benefits intended by Congress would vanish.

### E.   Plaintiffs' Breach of Contract Claim is Properly Pled.

Resolution of a contractual dispute on a motion to dismiss is proper only if the terms of the contract are *unambiguous*. *See Alta Devices, Inc. v. L.G. Elecs., Inc.*, 343 F. Supp. 3d 868, 878 (N.D. Cal. 2018) (denying motion to dismiss) (citing *Bedrosian v. Tenet Healthcare Corp.,* 208 F.3d 220 (9th Cir.

---

[17] *See also Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 153 F. Supp. 2d 512, 520 (S.D.N.Y. 2001) ("licensee estoppel is 'equitable in nature' and is 'not subject to rigid application'").

2000)). On a motion to dismiss, the Court must further "strive to resolve any contractual ambiguities in the [non-moving party's] favor." *Banc of California Nat'l Ass'n v. Fed. Ins. Co.,* 2020 WL 3655500, at *4 (C.D. Cal. Apr. 24, 2020) (denying motion to dismiss because "either way, the provision is capable of at least two reasonable interpretations"). "Where the language 'leaves doubt as to the parties' intent,' the motion to dismiss must be denied." *Monaco v. Bear Stearns Resid. Mortg. Corp.,* 554 F. Supp. 2d 1034, 1040 (C.D. Cal. 2008) (quoting *Consul Ltd. v. Solide Enters., Inc.,* 802 F.2d 1143, 1149 (9th Cir. 1986)). At issue is Paragraph 7(b) of the 1983 Agreement requiring PPC:

> to announce on the film of any motion picture photoplay that may be produced by it hereunder and substantially based upon or adapted from said [Story] or any version or adaptation thereof, substantially incorporating the plot, theme, characterizations, motive and treatment of said [Story] *or any version or adaptation thereof*, that said motion picture photoplay is based upon or adapted from or suggested by a work written by the Author, or words to that effect[.]

FAC, Ex. 2 at ¶ 7(b) (emphasis added). The Film was unquestionably "based upon or adapted from the [Story] or any ... adaptation thereof" (i.e., the Film's screenplay), and "substantially incorporat[ed] the plot, theme, characterizations, motive and treatment" thereof. In accordance with Paragraph 7(b) and in acknowledgement of its satisfaction, PPC gave Yonay and his Story credit on the Film. FAC ¶ 33. In turn, because the *Sequel* qualifies as an "adaptation" of the Film, "substantially incorporating" its elements, PPC breached Paragraph 7(b) by failing to accord Yonay credit on the Sequel. *Id*. ¶¶ 51-53.

PPC now argues that Paragraph 7(b)'s credit requirement "on the film of any motion picture photoplay that may be *produced by it hereunder and substantially based upon or adapted from* [the Story] or any version or adaptation thereof" prescribes two independent conditions before PPC's obligation arises. Mot. at 24. PPC asserts that "produced by it hereunder," means *first* the film must be produced under the Agreement and *second*, it must be "substantially based on or adapted from the Story or any version or adaptation

24

thereof." *Id*. PPC indulges in this tortured interpretation to argue that (1) the Sequel was not "produced" under the Agreement, alleging that PPC held no rights under it due to Plaintiffs' statutory termination, and (2) the Sequel did not use any "protectable expression" from the Story. None of this passes muster.

*First*, the phrase "produced ... hereunder and substantially based upon or adapted from [the Story]" does not impose, nor was it intended to impose, two distinct conditions, as the phrase is a hendiadys; the two are part and parcel of the same thing. In other words, if a PPC film were "substantially based upon" the Story, it would have been produced under PPC's Agreement licensing film rights to the Story. The reasonable interpretation is that the conjunctive "and" (doubly bolded in the Motion and on which PPC bases its entire argument) connotes that the second part of the phrase is a descriptive continuation of the first part. At minimum, the differing interpretations of these portions of the Agreement create *an ambiguity* that cannot be decided on a motion to dismiss.

*Second*, even under PPC's erroneous interpretation, its argument fails. Because the Copyright Act has no extraterritorial application, PPC retained its rights under the Agreement to exploit the Story *in all foreign territories* notwithstanding Plaintiffs' statutory termination, and distributes the Sequel overseas. *Update Art, Inc. v. Modiin Pub., Ltd.,* 843 F.2d 67, 72 (2d Cir. 1988) FAC ¶¶ 19-20. PPC also insists the Sequel was "sufficiently completed" before the termination date, such that PPC is estopped from making this argument. FAC ¶ 40. Lastly, the contract questions under Paragraph 7(b) is not whether the Sequel used "protectable expression" from the Story but rather, (a) whether the *Film* is "adapt[ed]" from the Story and (b) whether the Sequel incorporated the *Film's* enumerated elements. Both are readily answered in the affirmative.

## V.   <u>CONCLUSION</u>

For these reasons, PPC's Motion must be denied as to Counts I, II, and III.

DATED: October 12, 2022

Respectfully submitted,

**TOBEROFF & ASSOCIATES, P.C.**

By:  */s/ Marc Toberoff*
        Marc Toberoff

*Attorneys for Plaintiffs*