MOLLY M. LENS (S.B. #283867)
  mlens@omm.com
MATTHEW KAISER (S.B. #304714)
  mkaiser@omm.com
DANIELLE R. FEUER (S.B. #324174)
  dfeuer@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California  90067-6035
Telephone:  +1 310 553 6700
Facsimile:   +1 310 246 6779

*Attorneys for Defendant*
*Paramount Pictures Corporation*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHOSH YONAY and YUVAL YONAY,<br><br>              Plaintiffs,<br><br>        v.<br><br>PARAMOUNT PICTURES CORPORATION, a Delaware corporation, and DOES 1-10,<br><br>              Defendants. | Case No. 2:22-CV-3846-PA<br><br>**PARAMOUNT PICTURES CORPORATION'S NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF HENRY BEAN**<br><br>[Declaration of Matthew Kaiser, Notice of Lodging, and Proposed Order filed concurrently herewith]<br><br>**Hearing Date:** January 8, 2024<br>**Hearing Time:** 1:30 PM<br>**Place:** Courtroom 9A<br>**Judge:** Hon. Percy Anderson |

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, as soon as the matter may be heard, in Courtroom 9A of this Court, located at 350 West First Street, Los Angeles, California 90012, Defendant Paramount Pictures Corporation ("PPC") will and hereby does move for an order excluding the expert report and testimony of Henry Bean.  This Motion is made on the grounds that Bean's report and testimony fail to satisfy the standards set forth in Rule 702 of the Federal Rules of Evidence, namely, that (a) his purported specialized knowledge will not help the trier of fact to understand the evidence or to determine a fact in issue; (b) his report and testimony are not based on sufficient facts or data; (c) his report and testimony are not the product of reliable principles and methods; and (d) he has not reliably applied the principles and methods to the facts of the case.

This Motion is made following the Local Rule 7-3 conference of counsel, which took place on October 13, 2023.  Declaration of Matthew Kaiser ¶¶ 3-4. This Motion is based on the files, records, and proceedings in this action, this Notice, the Memorandum of Points and Authorities, the Declaration of Matthew Kaiser and exhibits thereto, the reply memorandum that PPC intends to file, the arguments of counsel, and such other matters as may be presented at the hearing on this Motion or prior to the Court's decision.


Dated:  November 6, 2023                    **O'MELVENY & MYERS LLP**

                                            By:   */s/ Molly M. Lens*
                                                  Molly M. Lens

                                            *Attorneys for Defendant Paramount*
                                            *Pictures Corporation*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................. 1

II. LEGAL STANDARD ........................................................................................... 2

III. ARGUMENT ....................................................................................................... 2

    A. Bean's Rudimentary Analysis Of Claimed Similarities Is Unhelpful To The Fact-Finder And Employs A Flawed Methodology. ...................................................................................... 3

        1. Bean Failed To Filter Out Unprotectable Elements From His Analysis. ................................................................... 3

        2. Bean Failed To Address The Dissimilarities Between The Works. ............................................................................. 7

        3. Bean Identified Purported Similarities At An Unhelpful Level Of Abstraction. ................................................... 10

    B. Bean's Report Is Unreliable In Its False Findings And Methodology Alike. .......................................................................... 11

        1. Bean's Report Is Riddled With Factual Inaccuracies On The Very Similarity Analysis He Was Retained To Conduct. ...................................................................... 11

        2. Bean's Report Belies A Misunderstanding Of The Literary Elements He Purports To Discuss. ...................... 15

        3. The Unreliability Of Bean's Report Is Magnified By His Failure To Include Citations Or Track, Let Alone Disclose, His Sources. ................................................... 20

    C. Bean Opines On The Intrinsic Test, For Which Expert Testimony Is Not Permissible. .................................................... 21

IV. CONCLUSION ................................................................................................. 23

PPC'S MOTION TO EXCLUDE
CASE NO. 2:22-CV-3846-PA

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Apple Computer, Inc. v. Microsoft Corp.*,

5

35 F.3d 1435 (9th Cir. 1994) ........................................................................ 21

6

*Batts v. Adams*,

2011 WL 13217923 (C.D. Cal. Feb. 8, 2011) ................................................ 8

7

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,

8

683 F.3d 1144 (9th Cir. 2012) ........................................................................ 2

9

*Campbell v. Walt Disney Co.*,

718 F. Supp. 2d 1108 (N.D. Cal. 2010) ....................................................... 19

10

*Cavalier v. Random House, Inc.*,

11

297 F.3d 815 (9th Cir. 2002) ................................................................. passim

12

*Corbello v. Devito*,

13

2015 WL 5768531 (D. Nev. Sept. 30, 2015) ................................................. 5

14

*Corbello v. Valli*,

974 F.3d 965 (9th Cir. 2020) ......................................................................... 5

15

*DuMond v. Reilly*,

16

2021 WL 733311 (C.D. Cal. Jan. 14, 2021) ................................................. 10

17

*Gray v. Hudson*,

28 F.4th 87 (9th Cir. 2022) ........................................................................... 21

18

*Johannsongs-Publ'g Ltd. v. Lovland*,

19

2020 WL 2315805 (C.D. Cal. Apr. 3, 2020) ........................................... 3, 20

20

*Johannsongs-Publ'g, Ltd. v. Lovland*,

21

2021 WL 5564626 (9th Cir. Nov. 29, 2021) .................................................. 3

22

*Knowles v. Spin Master, Inc.*,

2019 WL 4565102 (C.D. Cal. Sept. 17, 2019) .......................................... 3, 10

23

*Marcus v. ABC Signature Studios, Inc.*,

24

279 F. Supp. 3d 1056 (C.D. Cal. 2017) ....................................................... 19

25

*Olson v. Nat'l Broad. Co.*,

855 F.2d 1446 (9th Cir. 1988) ................................................................. 8, 15

26

*Rice v. Fox Broad. Co.*,

27

330 F.3d 1170 (9th Cir. 2003) ...................................................................... 10

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Ricketts v. Berlanti Prods.*,
   2022 WL 1046252 (9th Cir. Apr. 7, 2022) ........................................................... 16

*Ricketts v. CBS Corps.*,
   439 F. Supp. 3d 1199 (C.D. Cal. 2020) ............................................................... 16

*Shaw v. Lindheim*,
   919 F.2d 1353 (9th Cir. 1990) .............................................................................. 21

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
   952 F.3d 1051 (9th Cir. 2020) .............................................................................. 19

*Stilwell v. Smith & Nephew, Inc.*,
   482 F.3d 1187 (9th Cir. 2007) ................................................................................. 2

**Other Authorities**

*Dialogue*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-
   webster.com/dictionary/dialogue ......................................................................... 18

*Mood*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-
   webster.com/dictionary/mood .............................................................................. 20

*Plot*, BRITANNICA DICTIONARY,
   https://www.britannica.com/dictionary/plot ........................................................ 17

*Setting*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-
   webster.com/dictionary/setting ............................................................................ 20

**Rules**

Fed. R. Civ. P. 26(a)(2)(B)(ii) ................................................................................. 22

Fed. R. Evid. 702 ....................................................................................................... 2

## I.      **INTRODUCTION**

In a naked attempt to manufacture an issue of fact where none exists, Plaintiffs proffer Henry Bean as a purported literary expert to opine on claimed similarities between Ehud Yonay's 1983 article entitled "Top Guns" (the "Article") and PPC's 2022 film *Top Gun: Maverick* ("*Maverick*").  Bean has never served as an expert before, has never done a substantial similarity analysis before, does not know how courts evaluate whether one literary work infringes another, and "was not thinking about the Ninth Circuit's definition" of substantial similarity when rendering his opinions.[1]  His lack of experience shows.

Bean's opinions fall short on every dimension:  his opinions fail to assist the trier of fact in the relevant substantial similarity analysis, are neither factually reliable nor methodologically sound, and invade the province of the fact-finder by crossing into the intrinsic test for which expert testimony is prohibited.  Plaintiffs cannot satisfy their burden to demonstrate the admissibility of their proffered expert under Rule 702.  PPC therefore moves this Court for an order excluding the expert report and testimony of Bean.

Bean's report provides a veritable laundry list of purported similarities between the Article and *Maverick*, compiling every potential similarity he could find between the works.  Some of these "similarities" rest on Bean's inaccurate recollection of *Maverick*, many of them are strained, and nearly all of them rest on unprotectable elements such as factual matter, abstract ideas, or scènes-à-faire.  That comes as no surprise, since Bean admits that he did not attempt to filter out unprotectable elements—even though the underlying Article is a work of non-fiction and therefore packed with unprotectable facts.  Because these deficiencies go to the heart of his proffered opinions, and would cause his testimony to

---

[1] Ex. 1, Expert Report of Henry Bean ("Bean Rep.") at 1; Ex. 2, Deposition Transcript of Henry Bean ("Bean Dep.") at 19:15-22, 121:21-24, 123:25-124:13.

PPC'S MOTION TO EXCLUDE
CASE NO. 2:22-CV-3846-PA

confound rather than clarify the issues, Bean's report and testimony have no place in this litigation.

## II.    LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that a qualified witness can provide expert testimony if, and only if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  In short, "Rule 702 embodies the twin concerns of reliability and helpfulness," and exclusion is warranted where expert testimony "falls short of achieving either end." *Stilwell v. Smith & Nephew, Inc*., 482 F.3d 1187, 1192 (9th Cir. 2007) (cleaned up).  The burden to establish admissibility falls on the party offering the expert testimony.  *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012).

## III.    ARGUMENT

Henry Bean's proffered expert testimony falls far short of the standards set forth in Rule 702, triggering this Court's gatekeeping duty to exclude.  Seven core flaws pervade Bean's report.  First, Bean failed to filter out unprotectable elements from his analysis.  Second, he ignored the vast dissimilarities between the works. Third, he identified purported similarities at an unhelpful level of abstraction. Fourth, his report is riddled with factual inaccuracies and false analogues between the works.  Fifth, his report demonstrates a misunderstanding of the literary elements he purports to discuss.  Sixth, the unreliability of his report is magnified by his failure to include any citations or disclose his sources.  And finally, he invades upon the intrinsic test for substantial similarity, on which no expert testimony is allowed.  Any one of these reasons would warrant the exclusion of his report and testimony.  In the aggregate, they demand it.

### A. Bean's Rudimentary Analysis Of Claimed Similarities Is Unhelpful To The Fact-Finder And Employs A Flawed Methodology.

#### 1. Bean Failed To Filter Out Unprotectable Elements From His Analysis.

Bean failed to filter out unprotectable elements from his analysis—or even try to do so. That failure deviates from the standards applicable under copyright law and defeats any potential helpfulness to the fact-finder of his opinions. Because Bean compared protectable and unprotectable elements alike in forming his opinions, and made no effort to differentiate between the two, a fact-finder cannot rely on his analysis to ascertain whether the subject works are substantially similar within the meaning of Ninth Circuit law.

In evaluating an infringement claim, "[a] court must take care to inquire only whether the *protectible elements*, *standing alone*, are substantially similar." *Cavalier v. Random House, Inc*., 297 F.3d 815, 822 (9th Cir. 2002) (cleaned up). Thus, "a court must filter out and disregard the non-protectible elements in making its substantial similarity determination." *Id.* Courts therefore routinely exclude expert testimony that fails to filter out unprotectable elements from its analysis. *E.g.*, *Johannsongs-Publ'g, Ltd. v. Lovland*, 2021 WL 5564626, at *1 (9th Cir. Nov. 29, 2021) (affirming district court's exclusion of expert reports for failure to filter out unprotectable elements); *Johannsongs-Publ'g Ltd. v. Lovland*, 2020 WL 2315805, at *5-6 (C.D. Cal. Apr. 3, 2020) (expert reports' "fail[ure] to filter out unprotectable prior art elements" rendered them "unhelpful and inadmissible"); *Knowles v. Spin Master, Inc.*, 2019 WL 4565102, at *4 (C.D. Cal. Sept. 17, 2019) (Anderson, J.) (finding expert's opinions "not helpful to the Court" under Rule 702 because "she does not attempt to differentiate between protectable and unprotectable elements of the works").

Bean readily admitted that he did not differentiate between protectable and unprotectable elements in his analysis—and instead endeavored to "identif[y] as

many similarities as [he] could." Bean Dep. 126:20-128:4, 130:17-22. In other words, as he testified, he "was not sitting there thinking, well, this goes in the protected bucket and that goes in the unprotected bucket," and he conceded the "similarities" he raised in his report may include both protected and unprotected elements. *Id.* at 128:1-13.

The more Bean testified, the clearer it became that he did not even understand what makes something unprotectable within the meaning of copyright law. For example, he testified that little to none of the content of the Article was a "naked fact" and thus "an unprotectable element" because of Yonay's "distinctive" telling, *id.* at 126:20-127:7—notwithstanding his recognition that the Article was a work of non-fiction, Bean Rep. at 6. Bean also testified that he "experienced" *nothing* in the Article "as an abstract idea," because he "felt the ideas were all embodied." Bean Dep. 267:15-22.

Bean further testified that there were no "stock" elements in the Article, because "[e]ven if it was in every article or every characterization of that world, the [A]rticle in its skill made it feel original." *Id.* at 260:20-25. He reiterated that nothing in the Article "seems to be a scènes à faire," and that "[i]t might be in every article or every characterization of a fighter pilot school, but in [Yonay's] hands, it became distinctive." *Id.* at 261:5-9. Yet of course, if an element is inevitably in every article or characterization of a fighter pilot school, it is definitionally a scène-à-faire. *Cavalier*, 297 F.3d at 823 (defining scènes-à-faire as "situations and incidents that flow necessarily or naturally from a basic plot premise"). Bean went so far as to testify that, in his expert opinion, the fact that planes fly in the sky in both the Article and *Maverick* would not be covered by the scènes-à-faire doctrine, aptly demonstrating that he lacked any understanding of what elements are unprotectable. Bean Dep. 264:9-13.

Because Bean did not attempt any filtering, his report is filled with discussions of unprotectable elements—facts, abstract ideas, stock elements,

4

scènes-à-faire, and the like.  Bean's failure to filter is particularly problematic because of the sheer volume of unprotectable material in the Article, and accordingly, in his report.  That is because the Article is a work of non-fiction, and copyright protection does not extend to facts even where the idea at issue is an "interpretation" of a historical event.  *Corbello v. Devito*, 2015 WL 5768531, at *12 (D. Nev. Sept. 30, 2015); *Corbello v. Valli*, 974 F.3d 965, 973 (9th Cir. 2020) ("It is thus a feature of copyright law, not a bug or anomaly, that an author who deals in fact rather than fiction receives incomplete copyright protection for the results of his labor.").[2]  Rather than aid the fact-finder, Bean's report confounds the issues.

Most critically, Bean did not filter out factual matter from his analysis.  He cited as the basis for purported similarities an array of facts reported in the Article, such as:

- Real-life Rear Admiral Paul "Gator" Gilchrist "com[ing] to the Top Gun school and restor[ing] its lost glory," Bean Rep. at 11;
- The existence of "a Big Brass Bell placed in the pilot's favorite bar," which is rung "when anyone breaks the 'house rules'" to signify that "he must buy a round for everyone in the bar," *id.* at 12;
- The reputation of real-life Randy Cunningham, "who downed three MiGs in one day, and five in his career to become the first official 'ace,'" *id.* at 13;

---

[2] Bean acknowledged during his deposition that "of course [the Article] presents itself as being truthful."  Bean Dep. 51:2-4; *see also* Ex. 3, California Magazine Contract, at ¶ 3 (Yonay "agree[ing] to use all reasonable care in reporting and writing the article to make sure that it is factual and accurate").  Because the Article was billed as a work of non-fiction, Plaintiffs could not now claim that any of its content is fictional.  *See Corbello*, 974 F.3d at 978-79 (discussing the asserted truths doctrine).  Nor do they.  *See* Exs. 4 & 5, Pls.' Am. Resps. and Objs. to PPC's First Set of Interrogs., Interrog. No. 1 (failing to identify any expression in the Article that Plaintiffs contend is fictional).

- The fact that "the Top Gun program [i]s a critical component of U.S. national security," *id.* at 15;

- The "grueling" training program at Top Gun, which requires "more flying than [students] had ever had," with "one-versus-one hops (one student crew against one instructor)…then the tough two-versus-unknown hop, in which two crews take off not knowing...where the bogey [instructor 'enemy' plane] will come from," *id.* at 16;

- The fact that flying fighter jets has "life-or-death stakes" and that "at high angles of flight, not enough air flows into the engines of the top fighter jet, and that this can cause them to loose [sic] control of their craft and die," *id.* at 17;

- The fact that "there is no way to practice using the jet's ejection seat by pulling on the black-and-yellow striped bars," *id.* at 17;

- The reality of G-forces, *i.e.*, that "[w]hen you are pulling Gs–withstanding several times the force of the earth's gravitational pull–the pressure comes from everywhere.  Even your eyelids weigh several times what they normally do, and the pressure on your chest is so intense you can hardly breathe," *id.* at 18;

- The fact that an F-14 fighter jet's wings can "sweep back" or "open to the sides" depending on the pilot's needs, *id.* at 19;

- The existence of the "Blue Angel 'back-to-back'" maneuver "with a pilot flying upside-down" over another jet, *id.* at 19, which in any event is depicted in a photograph taken by C.J. Heatley rather than Yonay's prose.

These examples just scratch the surface.  Because Yonay was writing about real students at the real Top Gun academy, virtually all of Bean's findings concern unprotectable facts rather than protectable expression.

In the same vein, Bean gave improper attention to ostensible similarities in stock elements and scènes-à-faire, such as:

6

- The "plot" elements that fighter pilots drink and carouse when off-duty, and that their "aggression boils over into competition with each other," Bean Rep. at 12;
- The "plot" element that the fighter pilots are "hotshots" who are "macho and cool," *id.* at 12;
- The "plot" element that military men do push-ups as part of their training and conditioning, *id.* at 13;
- The "plot" element that military training is "arduous and demanding," *id.* at 15;
- The theme of "'true grit' and jocular heroism of the American military," *id.* at 20;
- The theme of "camaraderie of brothers in arms," *id.* at 20;
- The theme that success in combat depends on "grit, courage and character," *id.* at 21;
- The trait that "pilots and crews are highly competitive," *id.* at 29;
- The trait of a pilot "continually pushing and improving his fighter jet flying, combat and tactical skills," *id.* at 30;
- The switching of perspectives from scenes on the ground to scenes in the air, and back again, *id.* at 34;
- The pilots' "glorious" mood "when they're triumphant" and "crestfallen" mood "when they have been shot down," *id.* at 34.[3]

Because none of these features are protectable, they cannot factor into the fact-finder's analysis—and they should not have factored into Bean's either.

> 2. Bean Failed To Address The Dissimilarities Between The Works.

Bean's report ignores the many dissimilarities between the Article and *Maverick*, instead providing a simplistic catalogue of their purported similarities.

---

[3] The Rebuttal Report of James McDonald confirms the ubiquity in prior art of many of these elements.  Ex. 6 at 13, 15, 17, 21, 30.

*See generally* Bean Rep.; *see also* Bean Dep. 298:21-299:3 (Q: "[Y]ou would agree with me that you did not address dissimilarities between the article and Top Gun: Maverick in your report; correct?"  A: "I did not…."). As Bean admitted in his deposition, it "wasn't [his] assignment" to address the dissimilarities between the works, and therefore he "did not think it was [his] job to do that." Bean Dep. 121:8-20, 298:21-299:4. In other words, he extracted what he viewed as similarities between the works—identifying "as many similarities as [he] could"—while "ignoring the things that are not similar." *Id.* at 124:20-25, 130:17-22.

But a basic "list[] of similarities," such as Bean's report, is "inherently subjective and unreliable," especially where it is devoid of the broader context of the subject works. *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988). An expert's proffered list of similarities is all the less helpful to the fact-finder—and thus appropriate for exclusion—where it deemphasizes, and certainly where it outright *ignores*, all dissimilarities between the works. *See id.* (district court properly discounted testimony of proffered expert who "deemphasized any dissimilarities between plaintiff's and defendants' works"); *Batts v. Adams*, 2011 WL 13217923, at *5 (C.D. Cal. Feb. 8, 2011) (finding experts' testimony unhelpful where they "fail[ed] to note…any differences between the two works").

For example, Bean likens *Maverick*'s fictional protagonist, Pete "Maverick" Mitchell, to the Article's real-life Yogi and Possum, Bean Rep. at 27-32, ignoring that Maverick is a Captain in his fifties who returns to Top Gun as a reluctant instructor after his long career is marred by clashes with authority, whereas Yogi and Possum are 25- and 26-year-old Lieutenants who are training at Top Gun as promising young students at the start of their careers. Bean similarly deems the "plots" of the Article and *Maverick* analogous, Bean Rep. at 11-20, ignoring that the Article is a non-fiction piece that bounces back and forth between two young pilots' basic training at the Top Gun school, the history of the school, and an overview of fighter jets, whereas *Maverick* is a narrative action film centered on a

PARAMOUNT'S MOTION TO EXCLUDE
CASE NO. 2:22-CV-3846-PA

hand-picked group of elite Top Gun graduates training under Maverick's tutelage for a high-stakes and seemingly-impossible mission in enemy territory to destroy an unsanctioned uranium enrichment plant, which they undertake successfully at the end of the film.  The differences only grow from there, vastly outpacing any ostensible overlap.

Despite Bean's blinders to the differences between *these* works, he quickly changed his tune to profess that differences were a vital part of literary analysis when his *own* work was at issue.  During his deposition, Bean was asked about "The Believer," a film Bean wrote and directed that was inspired by the real-life Daniel Burros, a Jewish member of the Nazi party whose story was previously told in a *New York Times* article and in a book titled *One More Victim*.  Bean Dep. 85:16-88:18.  Bean acknowledged that he read the *New York Time*s article and *One More Victim*, that both works were "important pieces of the puzzle" and "[a]n inspiration" for his film, and that he "drew the crucial moment" in the film from a conversation described in the *New York Times* article.  *Id.* at 87:24-88:2, 90:24-91:25, 92:6-18, 95:16-96:6.  In attempting to justify his own use of non-fiction works in creating "The Believer," Bean repeatedly emphasized the *differences* between those works and his film.  *Id.* at 89:10-15 ("Daniel Burros was a true story…[a]nd it suggested to me a story that grew out of that, but *it's a very different story*.  And I can explain to you exactly how they're different…."); 96:2-5 ("I used the words and they're – they're crucial to the Time[s] article and they're crucial to The Believer.  *Again, the differences are important*…."); 96:18-21 ("[T]he Mr. Burros of the article and the Danny Balint of the movie…have many similarities, *but they're very, very different*.") (all emphases added).  Thus, he recognized that simply cataloguing similarities, without accounting for differences, creates a misleading picture of the relationship between two works.  Yet that is exactly what he did when *Maverick*, rather than his own work, was put before him.  That Bean

applies different standards to *Maverick* than to his own work reinforces that his testimony is not the product of reliable principles and methods.

### 3. Bean Identified Purported Similarities At An Unhelpful Level Of Abstraction.

Bean's report is also rife with abstraction, which is unhelpful to the factfinder who must evaluate the "articulable similarities" in the works' "specific expressive elements." *Cavalier*, 297 F.3d at 822. The factfinder may not "retreat[] to an abstract view of the world from 10,000 feet in order to draw similarities," and neither can an expert, if his testimony is to lend any assistance; rather, comparisons "should be undertaken at a much-more-granular level." *DuMond v. Reilly*, 2021 WL 733311, at *18 (C.D. Cal. Jan. 14, 2021). Thus, the "abstract nature" of an expert's opinion on substantial similarity is grounds for exclusion. *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1180 (9th Cir. 2003) (affirming district court's decision to disregard expert's testimony upon "deem[ing] it unhelpful due to its abstract nature"); *Knowles*, 2019 WL 4565102, at *4 (finding expert's opinions "not helpful to the Court" pursuant to Rule 702(a) where "the similarities [the expert] discusses are at such a general level that they are far too abstract to support copyright infringement claims").

For example, Bean cites as similarities between the Sequel and the Article that:

- The Article and *Maverick* portray combat training as "arduous and demanding," Bean Rep. at 15;
- The Article and *Maverick* depict scenes "cruising through serene skies," broken up by sharp aerial "climb[s]," *id*. at 18-19;
- In both works, pilots are "portrayed as audacious cowboys" and "gunfighters," *id*. at 22;
- The Article's spoken language "set[s] a very palpable tone which informs the dialogue and tone" of *Maverick*, *id*. at 23;

PARAMOUNT'S MOTION TO EXCLUDE
CASE NO. 2:22-CV-3846-PA

- "[A]erial combat training" is portrayed "as an intensely competitive world where the stakes could not be higher," *id*. at 23;
- The Article's descriptions of flying resemble the "dizzying and dazzling aerial footage" of *Maverick*, *id*. at 25;
- The Article's featured pilots "have to overcome" a "problem," and Maverick also has to overcome a problem in *Maverick*, *id*. at 37.

These abstractions offer no insight into whether the works are substantially similar—and for that matter, are virtually impossible to verify from Bean's citation-less report.

At other times, it is Bean's own description that is too abstract to have any real meaning, like the following passage purportedly about the works' "mood":

> The [Article] features cinematic, rather than textbook details of fighter jets. It is hard to convey in mere words, the mood "generated" by the sight of afterburners kicking in, pairs of white-hot flame shooting out the back and lifting 25-ton jets like rockets into the sky. Now *that* is mood. And there is much more of it in the [Article] and [*Maverick*] than in the [1986 *Top Gun* film].

*Id*. at 35. Not only does this passage belie a misunderstanding of "mood," *see infra* Section III.B.2., but it is so abstract and vague as to mean essentially nothing. And Bean certainly does not describe an "articulable similarit[y]" between the works, *Cavalier*, 297 F.3d at 822—he finds himself expressly *unable* to articulate one.

### B. Bean's Report Is Unreliable In Its False Findings And Methodology Alike.

1. Bean's Report Is Riddled With Factual Inaccuracies On The Very Similarity Analysis He Was Retained To Conduct.

For a purported expert, Bean's report is strikingly inaccurate. He points to a series of false similarities that, as a matter of objective fact, do not appear in the Article, *Maverick*, or both. And he repeatedly mischaracterizes what happens in *Maverick*—likely because he prepared his report after watching *Maverick* in full

PARAMOUNT'S MOTION TO EXCLUDE
CASE NO. 2:22-CV-3846-PA

just one time, plus "perhaps" reviewing parts of it later as needed.  Bean Dep. 23:8-24:21.  Bean's false statements are made all the more troubling (and all the less surprising) by his failure to provide citations for any of the similarities he "found." Bean's opinions are fundamentally unreliable, and they have no place in this litigation.

Emblematic of the inaccuracies that plague his report, Bean falsely asserts, *inter alia*, that:

- "In the last scene of [*Maverick*], after the mission has beens [sic] accomplished, we see Marverick [sic] 'just stand[ing] there' by himself, pleased with his success, at peace with himself and -- as always with the cowboy – alone," Bean Rep. at 22, whereas the last scene of *Maverick* actually depicts Rooster and Maverick working on Maverick's old fighter plane together, at which point Penny and her daughter Amelia show up at the hanger, and Penny and Maverick kiss and then fly off into the distance together, *Maverick* Timestamp ("MTS") 2:00:14-2:01:27.[4]

- In *Maverick*, "the Top Gun School is set at the Naval Air Station in Miramar CA," Bean Rep. at 24, whereas Admiral Cain actually sends Maverick to the Top Gun training program at "North Island," MTS 15:26-55.[5]

- *Maverick* "features scenes where engines die in the middle of a vertical flight maneuver" as an illustration of "air flow[]" issues attributable to "high angles of flight," Bean Rep. at 17, whereas the film actually does

---

[4] When Bean was shown the film's true ending at his deposition, he claimed to have "erased it in my head " because "[t]he stuff with Penny seems to me utter bullshit." Bean Dep. 279:7-10.  Even if credible, that is hardly a reliable methodology for analyzing the film.

[5] Naval Air Station North Island is a real naval base—and a different one from Naval Air Station Miramar.  Ex. 7, Rebuttal Expert Report of Andrew Craig ("Craig Rebuttal Rep.") at 2; *see also* Ex. 8, Opening Expert Report of Andrew Craig ("Craig Rep."), at 21-22.

PARAMOUNT'S MOTION TO EXCLUDE
                                                     CASE NO. 2:22-CV-3846-PA

not depict any engines dying during a vertical flight maneuver and certainly not due to air flow issues, Craig Rebuttal Rep. at 11.

- In *Maverick*, two planes perform a "vertical egg" maneuver, Bean Rep. at 19, whereas the film actually includes no "vertical egg," Craig Rep. at 25 n.14, Craig Rebuttal Rep. at 7, and the scene to which Bean appears to refer (he includes no citation) simply depicts two planes locked in a downward spiral, MTS 40:15-41:10.[6]

- In *Maverick*, Maverick "is taken on a beautiful sailing yacht by his love interest," Bean Rep. at 27, whereas the film's sailing scene actually depicts Maverick and Penny manually sailing her broken two-person sailboat through rough seas to get the boat's engine repaired, MTS 45:49-47:27.

- Both the Article and *Maverick* feature "generational conflicts between experienced instructors and the young pilots who are supposed to learn from them," Bean Rep. at 11, whereas Bean admitted in his deposition that no such conflict actually appeared in the Article—he merely *felt* like it did, Bean Dep. 214:1-215:17 ("[I]t's not talking about a conflict between the old and the young.  But it feels like something that's in there.").

- The Article "emphasizes the respect students feel for fighter jet instructors who 'could speak with the authority of actual combat experience,'" Bean Rep. at 13, whereas the Article merely notes that Top Gun is "the greatest fighter-pilot school in the world" *despite* the fact that only "one or two instructors could speak with the authority of actual combat experience," Ex. 9, "Top Guns" Article, at 145.

---

[6] Bean agreed at his deposition that he had no basis to dispute the absence of a vertical egg in *Maverick*.  Bean Dep. 258:1-10.

PARAMOUNT'S MOTION TO EXCLUDE
CASE NO. 2:22-CV-3846-PA

On top of his outright inaccuracies, Bean strains so hard to support his preordained conclusion that he cites as similarities features of the Article and *Maverick* that have virtually nothing in common.  For example, he contends the Article and *Maverick* have similar settings (itself a troubling classification, *see infra* Section III.B.2.) because the Article likens the aviation "caste system" to circles on a gunnery "target," with elite fighter pilots in the center, and *Maverick* includes a scene in which Hangman, a "cock[y]" and "technically skilled" pilot, is "throwing darts" in a bar and "land[s] three out of three in the bullseye."  Bean Rep. at 26-27.  While Hangman's marksmanship and cockiness are shown through his hitting bullseyes (and likewise sinking a pool shot) without looking, it is patently inaccurate to call "similar" these vastly different moments in the respective works, with Bean further ignoring that targets are hardly a surprising element of works about military pilots.

As another example, Bean asserts the Article and *Maverick* have similar plots (the wrong classification, *see infra* Section III.B.2.) because in the Article "Yonay says, as the F-5 he's riding in dives: 'I had never felt so useless in my life.  I had lost control of everything that was happening from one second to the next,'" and in *Maverick* "*Maverick* repeatedly teaches and demonstrates that to succeed in their mission, the young pilots need total focus and control and must act and react instantaneously and instinctually, with no time to think."  Bean Rep. at 15-16.  Once again, Bean brings together two entirely unrelated moments and conclusorily deems them similar.

Bean also asserts the Article and *Maverick* have similar plots because the Article "tells us that there is no way to practice using the jet's ejection seat by pulling on the black-and-yellow striped bars.  Training can teach the required steps, but if a flyer gets in an emergency, he can only hope he remembers them," and in *Maverick* "Rooster's F-14 has been shot, but when he pulls on the black-and-yellow bars, they just don't work."  Bean Rep. at 17.  Yet these scenarios are entirely

PARAMOUNT'S MOTION TO EXCLUDE
CASE NO. 2:22-CV-3846-PA

unrelated.  Rooster did not forget the required steps for how to eject or suffer from lack of practice; he experienced an equipment malfunction whereby, even though he took the right actions, his ejection equipment did not work.

In another false similarity, Bean opines that the works are similar because the Article "describes landing a fighter jet on aircraft carrier in the middle of the ocean as a '*controlled crash...if you're lucky*,'" and *Maverick* "shows Maverick making a death-defying landing on an aircraft carrier deck, even though his F-14's wheels have been blown out from under him."  Bean Rep. at 20.  Not only is Bean wrong to call this a similarity, but he is actually describing *opposite* phenomena.  The "controlled crash" described in the Article is a standard landing for a fighter jet; Maverick's landing, by contrast, was an atypical, actual crash landing, rendered uniquely perilous by the damage to the aircraft.  As these examples reinforce, Bean cannot be entrusted with reliably conveying what happened in *Maverick*, let alone how it compares to the Article.

### 2. Bean's Report Belies A Misunderstanding Of The Literary Elements He Purports To Discuss.

Bean purports to break down the similarities between the literary elements of the Article and *Maverick*, but his analysis demonstrates a fundamental misunderstanding of what those discrete elements refer to.  He classifies character traits as plot elements, passing digressions as themes, background facts as settings, and non-conversational narrative text as dialogue, among other troubling mischaracterizations.  Without a grasp on what constitutes a plot, a theme, a setting, a mood, dialogue, and so forth, Bean lacks any reliable methodology for the literary analysis he ostensibly conducts.  And because the parameters of his analysis are amiss, Bean's report devolves into an uninformative list of "random similarities scattered throughout the works."  *Olson*, 855 F.2d at 1450.

Bean's analysis begins with a section on plot, but the scattershot list of features he includes thereunder often bears no resemblance to what a plot actually

is.  A work's "plot" is the "series of events that form [its] story."  *Plot*, BRITANNICA DICTIONARY, https://www.britannica.com/dictionary/plot.  But Bean appears either unconcerned with or unaware of the definition of a plot.  For example, Bean includes as ostensible plot points his observations that:

- The Article and *Maverick* spend "considerable screen time" on "showing the human side of the fighter pilots," Bean Rep. at 12;

- The Article and *Maverick* use "a bullseye…as a metaphor for a pilot's skill and ability" (also incorrect), *id.* at 12;

- The Article and *Maverick* both feature a "Big Brass Bell" in the "pilot[s'] favorite bar," *id.* at 12;

- The Article and *Maverick* both portray fighter pilots "as elite 'hotshots,' both macho and cool," *id.* at 12-13;

- The Article mentions that a squadron leader does 200 push-ups each day, *id.* at 13, which the Article cites to explain why his build is "wiry," Ex. 9 at 98;

- The Article explains "there is no way to *practice* using the jet's ejection seat," *id.* at 17.

Bean's discussion of themes is often similarly unmoored from what a theme is.  "A theme is an overarching message, such as 'celebrat[ing] family values' or 'the triumph of good over evil'…."  *Ricketts v. CBS Corps.*, 439 F. Supp. 3d 1199, 1214 (C.D. Cal. 2020) (citation omitted), *aff'd sub nom. Ricketts v. Berlanti Prods.*, 2022 WL 1046252 (9th Cir. Apr. 7, 2022).  Yet Bean classifies as themes such diffuse observations as:

- The Article's passing reference to a new Admiral "assum[ing] command and 'set[ting] out to restore discipline and naval decorum'" to Top Gun, Bean Rep. at 21;

PARAMOUNT'S MOTION TO EXCLUDE
CASE NO. 2:22-CV-3846-PA

- That the Article and *Maverick* ostensibly portray fighter pilots "as audacious cowboys" engaging in "aerial showdowns" or "slick combat maneuvers," *id*. at 22;

- That "everybody knows" who the "[r]eally great fighter pilots are," *id*. at 22.

These, of course, are not themes.

Bean's misunderstanding of literary elements comes through sharply in his analysis of dialogue.  The definition of "dialogue" is "a written composition in which two or more characters are represented as conversing" or "the conversational element of literary or dramatic composition." *Dialogue*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/dialogue.  Yet Bean's report classifies as dialogue the narration of the Article, such as Yonay's authorial observation about flying that "[t]here are no ups or downs up here, no rights or lefts, just a barely perceptible line separating one blue from another, and that line is spinning and racing like mad in the distance."  Bean Rep. at 23.  Bean also erroneously classifies non-conversational quotations from Yonay's interviewees as dialogue, such as Heatley's explanation about being "out there supersonic" when flying a fighter jet and experiencing life-or-death situations without being able to talk to his family about it. *Id.* at 23-24.

Bean's discussion of dialogue only gets stranger from there.  As Bean admits, his report does not identify a single instance in which any of the words or spoken language appearing in the Article also appear in *Maverick.*  Bean Dep. 189:6-190:3, 192:16-19.  Instead, he cites Yonay's description of the sensation of flying, and argues that while "[t]hose exact words may not appear in [*Maverick*]…one *feels* them informing" the film's aerial footage.  Bean Rep. at 23 (emphasis added).  He similarly references Yonay's quotation of one pilot's regret after being "shot down" during training ("You wish you could do it over again…but in the real world you're not going to get a second chance") and argues that while "[n]one of this is 'said'

verbatim" in *Maverick*, "it is *felt* in…the powerful intimacy among the pilots, and the distance between them and their civilian lives." *Id.* at 23-24.  In addition to not constituting a similarity in "dialogue," Bean's repeated reference to subjective "feelings" impermissibly intrudes on the *intrinsic* test, for which expert testimony is not permissible.  *See infra* Section III.C.

In fact, although Bean recognizes that *Maverick* is comprised entirely of dialogue, Bean Rep. at 23, he does not discuss a single spoken word from *Maverick* in his dialogue analysis.  Without comparing any actual dialogue, Bean cannot claim to have employed a reliable methodology for evaluating the similarity of dialogue between the works.

Bean's analysis of the works' settings is no more appropriate.  A "setting" is "the time and place of the action of a literary, dramatic, or cinematic work." *Setting*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/setting.  Once again, Bean's "setting" analysis diverges from what a setting actually is.  For example, he cites as analogous settings that:

- The Article and *Maverick* "portray the culture at the naval air station as ultra-competitive, often jovial and collegiate -- but with an edge of rancor," Bean Rep. at 26;

- The Article "portrays an aviation 'caste system' organized like a target," and, in *Maverick*, Hangman throws three consecutive darts in a bullseye, *id*. at 26-27;

- The Article and *Maverick* both reference the high cost of fighter jets, *id*. at 27.

Not only are these comparisons dubious at best, but none of them concerns the works' respective settings.

Bean also does not adhere to any reliable definition of "mood."  He cryptically defines mood as "a matter of pacing, of lighting, of sound, storytelling and, sometimes, even of character," Bean Rep. at 34, and his findings mirror that

jumbled understanding of the term.  "Mood" refers to the "predominant emotion" evoked by a work.  *Mood*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/mood.  For example, a work may be characterized by a "serious mood" or a "light-hearted" one, *Marcus v. ABC Signature Studios, Inc*., 279 F. Supp. 3d 1056, 1071 (C.D. Cal. 2017); it may be "happy and upbeat," or somber and laced with "violent overtones," *Campbell v. Walt Disney Co*., 718 F. Supp. 2d 1108, 1114 (N.D. Cal. 2010).  What is *not* a mood is Bean's observation that the Article and *Maverick* are "continually shifting between the mundane concerns of earthbound life…and the clear realms of the sky," Bean Rep. at 34; or his descriptions of the mechanics of flight, *id*. at 35; or his view that Maverick "rewrites the rules about how low to the ground the jets can fly or how many Gs a pilot can pull on a steep ascent," *id*. at 36.

Nor does Bean grasp the meaning of selection and arrangement, though he purports to opine on it.  A "selection and arrangement copyright" refers to "the *particular* way in which the artistic elements form a coherent pattern, synthesis, or design," and it can be "infringed only where the works share, in substantial amounts, the 'particular,' *i.e.*, the 'same,' combination of unprotectable elements." *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1074-75 (9th Cir. 2020) (en banc).  Yet Bean suggests that the very idea of writing about the real-life Top Gun school was somehow protectable under a "selection and arrangement" theory.  Bean Dep. 74:19-75:8 ("Mr. Yonay made a lot of selection and a lot of arrangement.  But the first and most important piece of selection he made and did was he decided to write about this school.").  That dovetails with Bean's equally flawed theory that the Article's subject is somehow protected because "Yonay was the first person to come along" and write about Top Gun for public consumption.  *Id.* at 73:8-75:8.  Bean further highlights such basic narrative features as the protagonists facing a "problem" to "overcome," or being shaped by

their respective "backstor[ies]," Bean Rep. at 37-38—a far cry from the particularity demanded by a true selection and arrangement analysis.

To opine on the similarities between the works' plots, themes, dialogue, settings, characters, sequence of events and pacing, mood, and selection and arrangement, an expert must know that those literary elements are—and how to reliably break down a work into those elements.  Bean does neither.

### 3.   The Unreliability Of Bean's Report Is Magnified By His Failure To Include Citations Or Track, Let Alone Disclose, His Sources.

On top of its many other deficiencies, Bean's report fails to include a single citation to a page of the Article or a timestamp of *Maverick*, or any of the other sources he purportedly referenced.  Particularly given the pervasive inaccuracies in Bean's report, and the abstract or subjective nature of many of his purported "similarities," the wholesale absence of citations further undermines the report's reliability and helpfulness to the fact-finder.  Many of the similarities Bean cites in the works are simply not there, and because Bean provides nothing more than his *ipse dixit* to support his findings, his report is unreliable and difficult to verify.  *See Johannsongs-Publ'g*, 2020 WL 2315805, at *6 (excluding expert report that failed to "include[] sufficient supporting evidence…for the Court to assess the validity and accuracy of her analysis" on substantial similarity).

Further still, Bean did not track the sources he considered in forming his opinions—let alone disclose those sources.  Bean testified that he "didn't keep a list" of the sources he used and did not recall receiving an instruction to do so.  Bean Dep. 297:25-298:6.  Upon referencing undisclosed source after source in his deposition, Bean testified that he "[p]robably" reviewed "tons of others too" to form his opinions—though he could not recall them.  *Id.* at 297:19-298:1.  That runs directly contrary to an expert's obligations under Rule 26, which requires an expert witness to disclose in his report "the facts or data considered by the witness

in forming" his opinions.  Fed. R. Civ. P. 26(a)(2)(B)(ii).  These defects in Bean's report and testimony bolster the already-strong basis for his exclusion.

### C. Bean Opines On The Intrinsic Test, For Which Expert Testimony Is Not Permissible.

Bean's report and testimony should be excluded for the further reason that he opines on the *intrinsic* test for substantial similarity, for which expert testimony is prohibited.  Unlike the extrinsic test—which "considers whether two works share a similarity of ideas and expression as measured by external, objective criteria," *Gray v. Hudson*, 28 F.4th 87, 96 (9th Cir. 2022)—the intrinsic test "is a subjective comparison that focuses on whether the ordinary, reasonable audience would find the works substantially similar in the total concept and feel of the works." *Cavalier*, 297 F.3d at 822 (cleaned up).

As the Ninth Circuit has pronounced time and time again, the intrinsic test is performed "with no expert assistance."  *Gray*, 28 F.4th at 96 (quoting *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994)); *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir. 1990) ("expert testimony [is] not appropriate" on the intrinsic test).  An expert who opines on the intrinsic test invades the purview of the fact-finder, and his opinions must be excluded.

Bean's report does exactly that.  He explains in the "Overview" section that "in trying to assess the relevance and similarities of source material to a finished film, it is important to note not only the concrete elements of the former as used by the latter -- the plot, characters, settings, themes and so on -- but how these elements contribute to and determine (or do not) the feeling of the derivative film." Bean Rep. at 5-6.  That is because, in his view, "what audiences *experience* when they watch a film, what they remember (long after the story, the words and even the actors' faces have been forgotten) is a *feeling*, the sense of a world."  *Id.* at 5.  And so Bean proceeds to opine that *Maverick* "takes its entire 'world' from the Story," which "result[s] in what [he has] called the ultimate 'feeling' of the works, which is

PARAMOUNT'S MOTION TO EXCLUDE
CASE NO. 2:22-CV-3846-PA

extremely similar." *Id.* at 40; *see also, e.g.*, *id.* at 6 ("When one reads Ehud
Yonay's *California Magazine* Story 'Top Guns,' as I did, long after having watched
the 1986 Film, one feels at once how completely the Story generated the film."); *id.*
at 7 ("[T]the world of the movie -- and the feeling one experiences in that world --
is so well developed in the Story that the fleshing out and weaving together of a
movie is easy to imagine when reading it.").

What Bean is describing is the intrinsic test, *i.e.*, "a subjective comparison"
of "the total concept and feel of the works." *Cavalier*, 297 F.3d at 822.
Throughout his report and deposition, Bean further confirms that his opinions are
based not on objective similarities between the works, but rather his subjective
"feelings." *See, e.g.*, Bean Rep. at 23 ("Those exact words may not appear in either
film, yet one feels them informing a lot of the dizzying and dazzling aerial
footage"); *id.* at 23-24 ("None of this is 'said' verbatim in [*Maverick*], but it is
*felt*"); *id.* at 25 ("we feel the link between Story and Sequel"); Bean Dep. 166:21-
167:13 (Bean "felt" that *Maverick* was hearkening back to an older time); *id.* at
178:13-15 ("the article conveys a spirit that helped to generate the movie").

It is unsurprising that Bean veers into such proscribed territory, because he
admittedly "was not thinking about the Ninth Circuit's definition" of substantial
similarity in preparing his report, Bean Dep. 124:11-13, and had at most a "vague
understanding" of the intrinsic test, *id.* at 122:20-123:10. Regardless of his
intention, Bean's proffered expert testimony on the intrinsic test is strictly verboten
and must be excluded.

*          *          *

Any of these defects, on its own, would suffice to warrant exclusion of
Bean's opinions. Together, their weight is insurmountable. Plaintiffs cannot meet
their burden to establish the admissibility of Bean's opinions, and his report and
testimony should be excluded in full.

PARAMOUNT'S MOTION TO EXCLUDE
CASE NO. 2:22-CV-3846-PA

## IV.    **<u>CONCLUSION</u>**

The Court should exclude the expert report and testimony of Henry Bean.

Dated:  November 6, 2023                     **O'MELVENY & MYERS LLP**

By:    */s/ Molly M. Lens*
       Molly M. Lens

*Attorneys for Defendant*
*Paramount Pictures Corporation*

PARAMOUNT'S MOTION TO EXCLUDE
CASE NO. 2:22-CV-3846-PA

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Defendant Paramount Pictures Corporation, certifies that this brief contains 7,000 words, which complies with the word limit of L.R. 11-6.1.

Dated: November 6, 2023

**O'MELVENY & MYERS LLP**

By:   */s/ Molly M. Lens*
Molly M. Lens

*Attorneys for Defendant*
*Paramount Pictures Corporation*

PARAMOUNT'S MOTION TO EXCLUDE
CASE NO. 2:22-CV-3846-PA