MOLLY M. LENS (S.B. #283867)
  mlens@omm.com
MATTHEW KAISER (S.B. #304714)
  mkaiser@omm.com
DANIELLE R. FEUER (S.B. #324174)
  dfeuer@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California  90067-6035
Telephone:  +1 310 553 6700
Facsimile:   +1 310 246 6779

*Attorneys for Defendant*
*Paramount Pictures Corporation*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHOSH YONAY and YUVAL YONAY, <br><br> Plaintiffs, <br><br> v. <br><br> PARAMOUNT PICTURES CORPORATION, a Delaware corporation, and DOES 1-10, <br><br> Defendants. | Case No. 2:22-CV-3846-PA <br><br> **PARAMOUNT PICTURES CORPORATION'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** <br><br> [Statement of Uncontroverted Facts, Supporting Declarations, Notice of Lodging, and Proposed Judgment filed concurrently herewith] <br><br> **Hearing Date:** January 8, 2024 <br> **Hearing Time:** 1:30 PM <br> **Place:** Courtroom 9A <br> **Judge:** Hon. Percy Anderson |

1

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

2       PLEASE TAKE NOTICE that, as soon as the matter may be heard, in

3   Courtroom 9A of this Court, located at 350 West First Street, Los Angeles,

4   California 90012, Defendant Paramount Pictures Corporation ("PPC") will and

5   hereby does move pursuant to Federal Rule of Civil Procedure 56 for an order

6   granting summary judgment in favor of PPC and against Plaintiffs Shosh Yonay

7   and Yuval Yonay on all claims presented in this action.  This Motion is made on

8   the grounds that Ehud Yonay's 1983 article entitled "Top Guns" is not substantially

9   similar in protectable expression to PPC's 2022 film *Top Gun: Maverick*, which is

10  fatal to Plaintiffs' causes of action for copyright infringement (Count III) and

11  declaratory judgment (Count II).  The Motion is also made on the grounds that the

12  unambiguous language of the 1983 assignment between Ehud Yonay and PPC,

13  coupled with the lack of substantial similarity between the subject works, dooms

14  Plaintiffs' breach of contract claim (Count I).

15      This Motion is made following the Local Rule 7-3 conference of counsel,

16  which took place on October 13, 2023.  Declaration of Matthew Kaiser ¶¶ 3-4.

17  This Motion is based on the files, records, and proceedings in this action, this

18  Notice, the Memorandum of Points and Authorities, the Statement of

19  Uncontroverted Facts, the Declaration of Matthew Kaiser and exhibits thereto, the

20  Declaration of Jerry Bruckheimer and exhibit thereto, the Declaration of Andrew

21  Craig and exhibits thereto, the Declaration of Peter Craig, the Declaration of Joseph

22  Kosinski and exhibits thereto, the Declaration of Ehren Kruger, the Declaration of

23  James McDonald and exhibit thereto, the Declaration of Chris McQuarrie, the

24  Declaration of Justin Marks, the Declaration of Ralph Bertelle and exhibit thereto,

25  the Declaration of Eric Singer, the reply memorandum that PPC intends to file, the

26  arguments of counsel, and such other matters as may be presented at the hearing on

27  this Motion or prior to the Court's decision.

28

i

1   Dated:  November 6, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

O'MELVENY & MYERS LLP

By:   */s/ Molly M. Lens*
       Molly M. Lens

*Attorneys for Defendant Paramount
Pictures Corporation*

# TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ........................................................................................... 1

II.  STATEMENT OF FACTS ............................................................................ 2

    A.   The Works At Issue ........................................................................... 2

    B.   The Assignment And Termination ..................................................... 6

    C.   Plaintiffs' Lawsuit ............................................................................. 6

III. ARGUMENT ................................................................................................. 7

    A.   The Copyright Infringement Claim Fails Because The Article
        And *Maverick* Are Not Substantially Similar (Count III). .................. 7

        1.   Discovery Confirmed That Plaintiffs Have No Basis For
            Their Copyright Infringement Claim ........................................... 7

        2.   Plaintiffs Must Prove That The Works Are Substantially
            Similar In Their Protected Elements. ......................................... 9

        3.   The Works Are Not Substantially Similar As A Matter of
            Law. ........................................................................................ 12

    B.   The Declaratory Judgment Claim Fails (Count II) ............................ 22

    C.   The Contract Claim Fails (Count I) .................................................. 22

IV.  CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfaro v. Cmty. Hous. Improvement Sys. & Plan. Assn., Inc.*,
  171 Cal. App. 4th 1356 (2009) ................................................................ 23

*Benay v. Warner Bros. Entm't., Inc.*,
  607 F.3d 620 (9th Cir. 2010) ................................................. 16, 18, 22

*Berkic v. Crichton*,
  761 F.2d 1289 (9th Cir. 1985) ............................................................ 12

*Bernal v. Paradigm Talent & Literary Agency*,
  788 F. Supp. 2d 1043 (C.D. Cal. 2010) ............................................. 17

*Briggs v. Blomkamp*,
  70 F. Supp. 3d 1155 (N.D. Cal. 2014) ............................................... 16

*Buniatyan v. Volkswagen Grp. of Am., Inc.*,
  2016 WL 6916824 (C.D. Cal. Apr. 25, 2016) .................................... 25

*Campbell v. Walt Disney Co.*,
  718 F. Supp. 2d 1108 (C.D. Cal. 2010) ............................................. 16

*Carlini v. Paramount Pictures Corp.*,
  2021 WL 911684 (C.D. Cal. Feb. 2, 2021) ........................................ 18

*Cavalier v. Random House, Inc.*,
  297 F.3d 815 (9th Cir. 2002) ......................................................... 10, 12

*Corbello v. Devito*,
  2015 WL 5768531 (D. Nev. Sept. 30, 2015) ..................................... 11

*Corbello v. Valli*,
  974 F.3d 965 (9th Cir. 2020) ...................................................... passim

*DC Comics v. Towle*,
  802 F.3d 1012 (9th Cir. 2015) ............................................................ 19

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) ............................................................................. 1

*Funky Films, Inc. v. Time Warner Entm't Co.*,
  462 F.3d 1072 (9th Cir. 2006) .................................................. 10, 12, 22

*Goldberg v. Cameron*,
  787 F. Supp. 2d 1013 (N.D. Cal. 2011) ............................................. 16

iv

1

## TABLE OF AUTHORITIES
(continued)

2

3

**Page(s)**

4
*Harper & Row Publishers, Inc. v. Nation Enters.*,
   471 U.S. 539 (1985) ............................................................... 8

5
*Hist. Truth Prods., Inc. v. Sony Pictures Ent., Inc.*,
6
   1995 WL 693189 (S.D.N.Y. Nov. 22, 1995) ..................................... 15

7
*Hoehling v. Universal City Studios, Inc.*,
   618 F.2d 972 (2d Cir. 1980) ........................................... 10, 11
8

9
*Idema v. Dreamworks, Inc.*,
   162 F. Supp. 2d 1129 (C.D. Cal. 2001) .......................................... 19

10
*In re Marriage of Nassimi*,
11
   3 Cal. App. 5th 667 (2016) ...................................................... 24

12
*Kouf v. Walt Disney Pictures & Television*,
   16 F.3d 1042 (9th Cir. 1994) .................................................... 10

13
*Litchfield v. Spielberg*,
14
   736 F.2d 1352 (9th Cir. 1984) ........................................... 12, 13

15
*Marshall v. Yates*,
   1983 WL 1148 (C.D. Cal. Oct. 26, 1983 ......................................... 11

16
*Musero v. Mosaic Media Group, Inc.*,
17
   2010 WL 11595453 (C.D. Cal. Aug. 9, 2020) ..................................... 12

18
*Narell v. Freeman*,
19
   872 F. 2d 907 (9th Cir. 1989) .................................................. 11

20
*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.*,
   701 F.2d 95 (9th Cir. 1983) .................................................... 24

21
*Olson v. Nat'l Broad. Co.*,
22
   855 F.2d 1446 (9th Cir. 1988) .................................................. 17

23
*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*,
   107 Cal. App. 4th 516 (2003) ................................................... 23

24
*RBB2, LLC v. CSC ServiceWorks, Inc.*,
25
   2019 WL 1170484 (E.D. Cal. Mar. 13, 2019) ..................................... 23

26
*Rentmeester v. Nike, Inc.*,
27
   883 F.3d 1111 (9th Cir. 2018) ............................................. 9, 10

28

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Shame on You Prods., Inc. v. Banks*,
  120 F. Supp. 3d 1123 (N.D. Cal. 2017)..........................................................19, 22

*Silas v. HBO, Inc.*,
  201 F. Supp. 3d 1158 (C.D. Cal. 2016)..........................................................18, 19

*Skidmore v. Led Zeppelin*,
  952 F.3d 1051 (9th Cir. 2020) ........................................................................9, 21

*Sobhani v. @radical.media, Inc.*,
  257 F. Supp. 2d 1234 (C.D. Cal. 2003)..............................................................12

*Suid v. Newsweek Mag.*,
  503 F. Supp. 146 (D.D.C. 1980) ........................................................................17

*Tiscareno v. Netflix, Inc.*,
  2014 WL 12558125 (C.D. Cal. Mar. 6, 2014) ...............................................15, 19

*Whitehead v. Paramount Pictures Corp.*,
  53 F. Supp. 2d 38 (D.D.C. 1999) ..................................................................16, 20

**Statutes**

17 U.S.C. § 102(b)..................................................................................................13

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8 .......................................................................................1

## I. **INTRODUCTION**

Plaintiffs seek a ruling antithetical to copyright law—that they be awarded an effective monopoly over stories about the U.S. Navy's real-life Fighter Weapons School, known as Top Gun, because journalist Ehud Yonay wrote one of the first accounts of the school in his 1983 non-fiction article "Top Guns" (the "Article"). But copyright law does not protect facts or ideas, and it certainly does not allow an author to stake out an exclusive claim to a subject, simply because he came first. To the contrary, copyright law "encourages others to build freely upon the ideas and information conveyed by a work," as part of its constitutional charge "[t]o promote the Progress" of the "useful Arts." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349-50 (1991); U.S. Const. art. I, § 8, cl. 8.

Plaintiffs claim that PPC's 2022 blockbuster film *Top Gun: Maverick* ("*Maverick*") infringes the copyright in the Article based on a hodgepodge of purported similarities, many of which are imagined and virtually all of which distill to unprotectable facts, ideas, or *scènes-à-faire*. The only resemblance between *Maverick* and the Article is their shared subject of Top Gun and the fighter pilots who teach and train there, to which Plaintiffs have no special right. Even then, *Maverick* derives its hyper-realistic portrayal of Top Gun not from the forty-year-old Article but rather from the years of painstaking research, conversations with pilots, and direct consultation with naval advisors that went into the making of the film—not to mention its use of real military aircraft and flight sequences, which Plaintiffs still somehow contend encroach on their intellectual property. In short, Plaintiffs can come nowhere close to establishing the *substantial* similarity of *protectable* expression required to make out a claim for copyright infringement.

Left with no viable copyright count, Plaintiffs tacked on a claim that PPC breached its decades-old contract with Yonay—which Plaintiffs unilaterally terminated in January 2020, years before *Maverick*'s release—because Yonay did not receive credit on the film. But even if the contract were live, its plain language

PPC'S MOT. FOR SUMM. JUDGMENT
CASE NO. 2:22-CV-3846-PA

would not entitle Yonay to credit for a film like *Maverick* that is not based on any rights granted by the contract.  Plaintiffs' contract claim is thus dead on arrival.

Last year, Plaintiffs staved off an early dismissal of their claims by pleading for discovery.  Over and over, they warned against a "premature[] dismiss[al] without the benefit of a fully developed record, including the vital input of literary experts."  Pls.' Opp. to Mot. to Dismiss, Dkt. 21, at 2; *see also id.* at 4-7, 11-12, 16-17.  So this Court gave them a chance.  But discovery and a developed record have only confirmed that, as a matter of law, Plaintiffs cannot prevail on a single claim they advance.  This Court should grant summary judgment for PPC in full.

## II.  STATEMENT OF FACTS

### A.  The Works At Issue.

**The Article**.  Investigative reporter Ehud Yonay contracted to write an article for *California Magazine* and to "use all reasonable care in reporting and writing the article to make sure that it is factual and accurate."  Statement of Uncontroverted Facts ("SUF") ¶¶ 1, 4-5.  *California Magazine*, which specialized in "long-form non-fiction," published that article, *Top Guns*, in 1983.  *Id.* ¶¶ 3-6.

The Article centers on the real-life Navy Fighter Weapons School, commonly called "Top Gun," whose "mission" is to prepare the best young fighter pilots for combat.  *Id.* ¶¶ 8, 11, 157.  The Article reports that "Top Gun's hotshot aces have virtually revolutionized the fighter pilot business and...established themselves as the international masters of the deadly art of air-to-air combat."  *Id.* ¶ 11.  The Article credits the school's success to its training program, which works to "hammer[]" two-person F-14 crews into a team.  *Id.* ¶¶ 10, 52.  Invoking "navy jargon," such as "hops" (air combat maneuvers), "dogfighting" (air-to-air combat), and "bogeys" (enemy planes), the Article outlines that program.  *Id.* ¶¶ 15-16.  For example, it explains, on top of tactical "lectures and briefings," aerial exercises include "one-versus-one hops (one student crew against one instructor), then two-versus-two hops, and then...the tough two-versus-unknown hop."  *Id.* ¶ 16.

PPC'S MOT. FOR SUMM.  JUDGMENT
CASE NO. 2:22-CV-3846-PA

The Article describes the F-14 Tomcat (among other planes), which at the time was the Navy's "supreme air war machine" and the aircraft flown by Top Gun trainees.  *Id.* ¶ 33.  It details the F-14's core features, including its flexible wings, haul capacity, and shooting capabilities—it can "track 24 targets at once and fire six missiles in six different directions in rapid sequence."  *Id.* ¶ 48.  And the pitfalls too, such as the plane's "enormous size," exorbitant cost, and "stall prone" engine.  *Id.*

The Article reports on two real-life lieutenants, Alex "Yogi" Hnarakis and Dave "Possum" Cully—a pilot and radar intercept officer ("RIO")—who train together as a fighter crew.  *Id.* ¶¶ 9-10, 42.  It documents the process by which they become a team, including a simulated training exercise in which they "escorted" attack planes "over 'enemy' land on a bombing mission."  *Id.* ¶¶ 10, 52.

Yonay also recounts his own flight in an F-5, documenting the experience of "pulling Gs" and "withstanding several times the force of the earth's gravitational pull."  *Id.* ¶ 25.  Experiencing "classic air moves," including "flying upside down," Yonay notes feeling "sheer nirvana" coupled with the "physical torture" from "pressure on your chest…so intense that you can hardly breathe."  *Id.*

The Article is structured in a non-linear fashion, switching between narrating Yogi and Possum's personal experiences and the history of Top Gun.  *Id.* ¶¶ 41-53.  It begins with the details of a Top Gun training exercise in which Yogi and Possum are defeated by a mock bogey, *id.* ¶¶ 42-43, before transitioning to a description of Naval Air Station ("NAS") Miramar and explaining the role for which Yogi and Possum are training, *id.* ¶¶ 8, 44.  It next provides the two trainees' biographical details, such as their hometowns, education, and prior Navy experience.  *Id.* ¶¶ 45, 47.  The Article then shifts to a description of their plane and how pilots learn to fly the aircraft, including the use of flight simulators and training for night landings.  *Id.* ¶¶ 48-49.  It recalls how prior to arriving at Top Gun, Yogi and Possum—along with their squadron—went on a six-month tour aboard an aircraft carrier.  *Id.* ¶ 50.  Jumping further back in time, the Article covers the history of Top Gun, from the

PPC'S MOT. FOR SUMM.  JUDGMENT
CASE NO. 2:22-CV-3846-PA

school's 1968 genesis. *Id.* ¶ 51. Returning to 1983, the Article describes Yogi and Possum's final "hop" and concludes with their graduation from Top Gun. *Id.* ¶ 53.

***Top Gun: Maverick***. *Maverick* is the 2022 sequel to the 1986 motion picture *Top Gun. Id.* ¶ 56. Set more than 30 years after the events of *Top Gun*, *Maverick* features Pete "Maverick" Mitchell, the fictional protagonist from the original film, now a Captain and a test pilot who, at the film's outset, is working on the Navy's hypersonic scramjet program (not located at Top Gun). *Id.* ¶¶ 56, 162. After learning Vice Admiral Chester "Hammer" Cain plans to shut down the program in favor of funding drone technology, Maverick takes one last flight in an attempt to meet the program's goal of reaching Mach 10. *Id.* ¶ 56. He succeeds, but he pushes the prototype beyond its limits and destroys it. *Id.* ¶¶ 57, 162.

Maverick's career has stalled due to similar insubordinate acts, and Admiral Cain wants to ground him permanently, but Maverick's friend and former Top Gun rival, Tom "Iceman" Kazansky, now an Admiral and the U.S. Pacific Fleet Commander, sends him to North Island to serve as a Top Gun instructor. *Id.* ¶¶ 54, 59, 118, 135. Once Maverick arrives, he reunites with Penny Benjamin—the owner of the neighborhood bar and a single mother to a teenage daughter—with whom Maverick had an on-again-off-again relationship years earlier. *Id.* ¶ 64.

The Navy tasks Maverick with training an elite group of Top Gun graduates for a mission to destroy an unsanctioned uranium enrichment plant located at the bottom of a steep canyon in enemy territory. *Id.* ¶ 61. To account for the surface-to-air missiles ("SAMs") and fifth-generation fighters defending the plant, Maverick devises an attack strategy premised on fast-paced, low-altitude flying, but both air boss Vice Admiral Beau "Cyclone" Simpson and the trainees express skepticism that the approach is viable. *Id.* ¶¶ 60, 63, 108.

Among the trainees is Bradley "Rooster" Bradshaw, the son of Maverick's late best friend and RIO, "Goose," who died in a training accident with Maverick piloting. *Id.* ¶¶ 62, 116. Maverick reveals that he pulled Rooster's first Naval

Academy application because of a promise Maverick made to Rooster's late mother. *Id.* ¶¶ 72, 127. Rooster, unaware of the promise, resents Maverick for impeding his career and blames Maverick for Goose's death. *Id.* ¶¶ 62, 72, 116.

Rooster also clashes with fellow trainee Jake "Hangman" Seresin over their contrasting styles: Rooster calls Hangman reckless, and Hangman criticizes Rooster as too cautious. *Id.* ¶ 120. Other trainees include pilots Natasha "Phoenix" Trace and Reuben "Payback" Fitch, and weapons systems officers Robert "Bob" Floyd and Mickey "Fanboy" Garcia. *Id.* ¶¶ 121-22. Maverick works to earn the trainees' respect and instills teamwork and camaraderie through unconventional training. *Id.* ¶¶ 71, 73, 93. He also rekindles his relationship with Penny. *Id.* ¶¶ 64, 74, 89.

As the mission date draws near, none of the trainees is able to complete the course simulation within Maverick's parameters. *Id.* ¶ 69. Maverick particularly fears sending Rooster on a mission that might result in Rooster's death. *Id*. But a meeting with Iceman—who is suffering from late-stage cancer—convinces Maverick to release his anxiety and let go of his past guilt. *Id*. ¶¶ 70-71, 118.

Iceman soon dies, and Cyclone removes Maverick as instructor. *Id.* ¶ 73. Cyclone announces new and more dangerous mission parameters, but then Maverick takes off on an unauthorized run of the course and successfully completes it, stunning everyone. *Id*. Cyclone reluctantly appoints Maverick team leader, and Maverick decides the mission will be carried out by two strike teams—one led by him and the other led by Rooster. *Id.* ¶¶ 74, 76.

The strike teams successfully destroy the enemy target, but on the way out of the canyon, they are confronted by SAMs. *Id.* ¶¶ 77-80. Maverick sacrifices his plane to protect Rooster and is shot down. *Id.* ¶ 79. Cyclone orders the remaining fighters back to the aircraft carrier, but Rooster ignores him and returns to look for Maverick. *Id*. On the ground, Maverick is about to be attacked by an enemy helicopter when Rooster arrives and shoots it down. *Id.* ¶ 80. Rooster is then hit by a SAM and ejects. *Id*. Stranded, Maverick and Rooster steal an F-14 from a nearby

1   base, but are intercepted by fifth-generation enemy fighters.  *Id.* ¶¶ 81-83.

2   Maverick takes out two enemy planes, but then runs out of ammunition.  *Id.*

3       Resigned to their fate, Maverick apologizes for failing to keep Rooster safe.

4   *Id.* ¶ 83.  Just then, Hangman, who had been on standby for the mission, shoots

5   down the enemy fighter, all three return to the carrier in triumph, and Maverick and

6   Rooster emotionally reconcile.  *Id.* ¶¶ 84-86.  The film ends with Rooster reflecting

7   on his renewed relationship with Maverick, his father figure, while Maverick and

8   Penny fly off into the sunset.  *Id.* ¶¶ 87-89.

9       **B.  The Assignment And Termination.**

10      On May 18, 1983, Yonay assigned motion picture rights in the Article to

11  PPC (the "Assignment").  *Id.* ¶ 199.  As contemporaneous records demonstrate,

12  PPC viewed the Assignment as gratuitous—it felt it "d[id]n't need this article to do

13  our movie as all the facts are public domain"—but nonetheless pursued the rights

14  for "p[ea]ce of mind."  *Id.* ¶ 35.

15      In the Assignment, Yonay agreed that PPC could use his name "in

16  connection with any use, version or adaptation" of the Article, but would "not be

17  required to announce [Yonay's name] in or in connection with any such use" unless

18  certain conditions were met.  *Id.* ¶ 200.  Specifically, Yonay is only entitled to a

19  credit on any movie that is "produced…[]under" the Assignment <u>and</u> that is

20  "substantially based upon or adapted from [the Article] or any version or adaptation

21  thereof, substantially incorporating the plot, theme, characterizations, motive and

22  treatment of [the Article] or any version or adaptation thereof."  *Id.* ¶ 201.

23      On January 23, 2018, Plaintiffs sent PPC a notice of termination, terminating

24  the Assignment's grant of copyright rights effective January 24, 2020.  *Id.* ¶ 204.

25      **C.  Plaintiffs' Lawsuit.**

26      Plaintiffs assert claims for copyright infringement, declaratory judgment, and

27  breach of contract, claiming that *Maverick* is derived from and substantially similar

28  to the Article, First Am. Compl. ("FAC") ¶¶ 35-36, that PPC infringed Plaintiffs'

PPC'S MOT. FOR SUMM.  JUDGMENT
CASE NO. 2:22-CV-3846-PA

copyright by releasing *Maverick*, *id.* ¶ 70, and that the Court should declare that PPC cannot exploit *Maverick* or "any other derivative work" based on the Article or *Top Gun*, *id.* ¶ 65. Their contract claim further alleges that Yonay is entitled to a credit on *Maverick*, *id.* ¶ 52, notwithstanding Plaintiffs' termination of the grant of copyright in the Assignment.

For the reasons set forth below, all three claims fail as a matter of law.

## III.  ARGUMENT

### A.  The Copyright Infringement Claim Fails Because The Article And *Maverick* Are Not Substantially Similar (Count III).

#### 1.  *Discovery Confirmed That Plaintiffs Have No Basis For Their Copyright Infringement Claim.*

Plaintiffs dodged a dismissal on the pleadings by claiming that discovery and a developed record would reveal the merit to their infringement claim. Plaintiffs asserted the input of literary experts was "vital," as was broader factual development—and that it would be error to rule on substantial similarity on the pleadings alone. Pls.' Opp. to Mot. to Dismiss, Dkt. 21, at 2, 4-6. But one year later, Plaintiffs have nothing more to show for their claims. They proffered an inadmissible expert whose opinions fall short on every metric embedded within Rule 702[1] and fail to provide insight into the extrinsic analysis before the Court.[2] They furnished no evidence in discovery, and obtained none from PPC, that could support their strained claim of substantial similarity. To the contrary, fact discovery only reinforced that *Maverick* did not infringe on the Article. The Court should now put Plaintiffs' unsupported infringement claim to rest.

Discovery confirmed that the Article is—and was intended to be—a factual

---

[1] The inadmissibility of Plaintiffs' proffered expert, Henry Bean, is addressed in PPC's concurrently filed Motion to Exclude ("Mot. to Excl."). The many flaws in Bean's report are also discussed in greater detail in the rebuttal report of James McDonald.

[2] Plaintiffs also contended that "expert evidence would be needed" to assess "the progression of the genres" and evaluate whether the tropes that appear in *Maverick* were attributable to the Article or prior art, Dkt. 21 at 11-12, yet their proffered expert does not cite prior art (or any other sources, for that matter) even once in his report.

PPC'S MOT. FOR SUMM. JUDGMENT
CASE NO. 2:22-CV-3846-PA

work.  Yonay was a self-described "investigative reporter."  SUF ¶ 1.  When he contracted with California Magazine, Yonay "agree[d] to use all reasonable care in reporting and writing the article to make sure that it is factual and accurate."  *Id.* ¶¶ 4-5.  Plaintiffs' proffered expert agreed the Article is a work of non-fiction and "presents itself as truthful."  *Id.* ¶ 7.  Plaintiffs also admitted the Article is based in fact, and were unable to identify a single purported fictional element in it.  *Id.*

Discovery also confirmed the factual accuracy of Yonay's reporting on his indisputably real-life topic: Top Gun.[3]  For example, as Yonay reported, Top Gun was founded in the late 1960s and housed at NAS Miramar in San Diego, where it remained at the time of the Article and for a decade thereafter.  *Id.* ¶¶ 8, 157.  Yonay followed two real-life lieutenants, Alex Hnarakis and Dave Cully, whose Top Gun class photo still hangs in the present-day Top Gun schoolhouse.  *Id.* ¶¶ 9, 17.  Yonay accurately narrated the rigors of Top Gun training, with its intense flying regimen, including dogfighting, and classroom-style briefing sessions.  *Id.* ¶¶ 16, 18, 27.  He portrayed the real-life strain that G-forces put on pilots' bodies, the mechanics of the aircraft, and the "call signs" pilots use to refer to one another.  *Id.* ¶¶ 9, 15, 24-26.  He described the bond that inherently forms between a two-person "crew" of a pilot and RIO, and the reality that a crew will spend more time together than with their spouses.  *Id.* ¶¶ 13-14, 52.  Yonay accurately depicted the social side of Top Gun, too, with an officer's club where pilots could decompress and have a beer, and where club rules were enforced with a bell.  *Id.* ¶¶ 30-31, 102.  Over and over, the details reported in the Article were shown to be factual.  *Id.* ¶¶ 7-34.

That the Article is factual dramatically constrains the scope of Plaintiffs' copyright—and, in turn, the basis for any infringement claim.  After all, "[n]o author may copyright his ideas or the facts he narrates."  *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 556 (1985).  Thus, others remain free to copy

---

[3] The initial and rebuttal expert reports of Andrew Craig provide a more fulsome breakdown of the factual accuracy of the Article.

facts even from a copyrighted work. *Corbello v. Valli*, 974 F.3d 965, 973 (9th Cir. 2020). Accordingly, in *Corbello*, the Ninth Circuit held that the creators of a play about the musical quartet the Four Seasons did not infringe one band member's nonfiction autobiography, "even if the writers of the Play appropriated [plaintiff's] historical research." *Id.* at 984. Yet with *Maverick*, PPC did not even do *that*.

Discovery has shown the great lengths that PPC went to ensure the film's accuracy, consulting directly with the U.S. Navy throughout the project. SUF ¶¶ 36-39. *Maverick*'s director and writers visited naval air stations, including the current location of the Top Gun school and NAS North Island (where *Maverick* is set), and interviewed naval aviators. *Id*. ¶¶ 36, 39, 166. Navy personnel reviewed draft scripts, consulted on plotlines, and vetted the accuracy of the technical feats and equipment depicted. *Id.* ¶ 37. And the film used real Navy planes in real flight. *Id*. ¶¶ 36, 94. With the Navy's partnership, the film hewed as closely as possible to the realities of Top Gun. What Plaintiffs claim PPC derived from the Article, it actually took from real life. *Id.* ¶¶ 36-40.

### 2. *Plaintiffs Must Prove That The Works Are Substantially Similar In Their Protected Elements.*

A copyright plaintiff must prove substantial similarity between "*protected* elements" of his work and the allegedly infringing work. *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018).[4] Even if a plaintiff can establish that the defendant actually copied his work, that does not establish liability because the Copyright Act does not prohibit all copying, but only "unlawful appropriation"— that is, where the defendant copied enough protected "expression…to render the two works 'substantially similar.'" *Id*; *see also Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (en banc) ("only substantial similarity in *protectable* expression may constitute actionable copying that results in infringement liability").

"[D]etermining whether works are substantially similar involves a two-part

---

[4] All emphasis is added and internal citations and quotations omitted.

PPC'S MOT. FOR SUMM. JUDGMENT
CASE NO. 2:22-CV-3846-PA

analysis consisting of the 'extrinsic test' and the 'intrinsic test.'" *Rentmeester*, 883 F.3d at 1118. The extrinsic test "assesses the *objective* similarities of the two works, focusing only on the protectable elements of the plaintiff's expression," *id.*, whereas the intrinsic test "examines an ordinary person's *subjective* impressions," *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006). On a motion for summary judgment, only the extrinsic test is relevant; if the works fail that test, the court must enter judgment for the defendant. *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).

The extrinsic test's objective analysis "focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in the two works. *Id.* The Ninth Circuit has emphasized that courts applying the extrinsic test "must take care to inquire only whether the *protectible elements, standing alone*, are substantially similar," and therefore must "filter out and disregard the non-protectible elements." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) (emphasis in original). Three categories of unprotectable elements—facts, ideas, and *scènes-à-faire*—are relevant here.

**Facts**. It is axiomatic that "[n]o author may copyright his ideas *or the facts he narrates*," and "copyright does not prevent subsequent users from copying from a prior…work those constituent elements that are not original—for example… facts." *Corbello*, 974 F.3d at 973; *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 974 (2d Cir. 1980) (copyright protection "has never extended to history, be it documented fact or explanatory hypothesis"). There is a compelling reason for this rule: "the cause of knowledge is best served when history is the common property of all, and each generation remains free to draw upon the discoveries and insights of the past," and "[t]o avoid a chilling effect on authors who contemplate tackling an historical issue or event, broad latitude must be granted to subsequent authors who make use of historical subject matter, including theories or plots." *Hoehling*, 618 F.2d at 974, 978. Thus, copyright "in historical accounts is narrow

PPC'S MOT. FOR SUMM. JUDGMENT
CASE NO. 2:22-CV-3846-PA

indeed, embracing no more than the author's original *expression* of particular facts," *Narell v. Freeman*, 872 F. 2d 907, 911 (9th Cir. 1989), and it is "a feature of copyright law, not a bug or anomaly, that an author who deals in fact rather than fiction receives incomplete copyright protection for the results of his labor," *Corbello*, 974 F.3d at 973.

Copyright protection does not extend to facts even where the idea at issue is an "interpretation" of a historical event. *Corbello v. Devito*, 2015 WL 5768531, at *12 (D. Nev. Sept. 30, 2015). After all, "every relation of a historical fact beyond direct observation is tainted to some degree by some person's interpretation, so distinguishing between historical facts and 'interpretations' of those facts…would destroy the rule that historical facts are unprotected." *Id.*; *see also Corbello*, 974 F.3d at 976 (depiction of non-fiction character's "cool" personality not protectable); *Hoehling*, 618 F.2d at 978 ("[W]here, as here, the idea at issue is an interpretation of an historical event, our cases hold that such interpretations are not copyrightable as a matter of law."). Thus, "[h]istorical facts and theories may be copied, as long as the defendant does not 'bodily appropriate' the expression of the plaintiff." *Narell*, 872 F.2d at 910-11.

Not only does the evidence confirm that the Article is factual, SUF ¶¶ 1-35, but the asserted truths doctrine would preclude Plaintiffs from claiming otherwise. (And they do not—Plaintiffs were unable to identify a single element in the Article they contend is fictional. *Id.* ¶ 7.) "Under the doctrine, elements of a work presented as fact are treated as fact, even if the party claiming infringement contends that the elements are actually fictional." *Corbello*, 974 F.3d at 978; *see also, e.g.*, *Marshall v. Yates*, 1983 WL 1148, at *2 (C.D. Cal. Oct. 26, 1983) ("Any reader…would have concluded that the book presented a true account of the life of Frances Farmer, the result of Arnold's investigative journalism.").

**Ideas and Stock Elements**. It is also axiomatic that copyright does not protect *ideas*, 17 U.S.C. § 102(b), and the extrinsic test examines "not the basic plot

ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters," *Funky Films*, 462 F.3d at 1077.  Similarly, *scènes-à-faire*—"situations and incidents that flow necessarily or naturally from a basic plot premise"—and "[f]amiliar stock scenes and themes that are staples of literature" cannot "sustain a finding of infringement," *Cavalier*, 297 F.3d at 823; *see also Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985) ("General plot ideas are not protected…."). Accordingly, ideas, *scènes-à-faire*, and stock elements are "unprotectable elements" that the Court must filter out.  *Musero v. Mosaic Media Group, Inc.*, 2010 WL 11595453, at *2 (C.D. Cal. Aug. 9, 2020).

### 3. *The Works Are Not Substantially Similar As A Matter of Law*.

Plaintiffs incorrectly claim that *Maverick* is an infringing derivative work because it is "plainly derived from" the Article.  *See* FAC ¶ 70.  "Of course, a work based upon an idea or kernel contained in another work may in some sense be 'derivative' of the first work." *Sobhani v. @radical.media, Inc.*, 257 F. Supp. 2d 1234, 1238 (C.D. Cal. 2003).  But to be an infringing derivative work *within the meaning of the Copyright Act*, a work must be substantially similar to the original work's protectable elements.  *Id.*; *see Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984).  Applying the Ninth Circuit's actual extrinsic test—filtering out unprotected elements and comparing the works' plots, themes, dialogue, characters, setting, mood, pace, sequence, and arrangement—confirms there is no similarity in protected expression between the Article and *Maverick*, much less a substantial one.

**Plot and Sequence (SUF ¶¶ 41-109)**.  As explained above, *see supra* Section II.A., the plots and sequence of the two works are fundamentally dissimilar. The Article is a non-fiction piece about the U.S. Navy Fighter Weapons School. SUF ¶¶ 7-8, 42, 44.  Structured in a non-linear fashion, the Article bounces back and forth between two young pilots' then-current training at the school, the history of the school, an overview of fighter jets, and a first-hand account by Yonay of what it is like to experience G-force.  *Id.* ¶¶ 25, 41-53.  *Maverick*, by contrast, is a

narrative fictional tale about a veteran fighter pilot, Maverick, who returns to Top Gun to train a new generation of pilots—including Rooster, who blames Maverick for the death of Rooster's father—for an attack on an enemy installation. *Id.* ¶¶ 54, 61-62, 115-116.  None of the graduates can complete the mission's training course. *Id.* ¶ 69.  Maverick takes an unauthorized flight through the course, proving that it can be done, and is then appointed team leader. *Id.* ¶¶ 73-74.  Maverick leads his team on a successful mission, then sacrifices his jet to protect Rooster, who in turn saves Maverick. *Id.* ¶¶ 77-80.  The two steal a plane from an enemy air base, survive an aerial chase, and are saved by Hangman. *Id.* ¶¶ 81-84.  Any similarity between the works' "plots" stems from the fact that both are set (in part) at Top Gun—a real naval academy not invented by Yonay and not owned by Plaintiffs.

Indeed, Plaintiffs' proffered expert does not identify *any* similarity, much less a substantial one, between the works' actual narratives or storylines.  Instead, he provides a hodgepodge list of supposed "similarities," Kaiser Decl., Ex. 10, Expert Report of Henry Bean ("Bean Rep."), but the Ninth Circuit has repeatedly cautioned that such lists are inherently subjective and unreliable, especially when they emphasize "random similarities scattered throughout the works," which are insufficient to support an infringement claim. *Litchfield*, 736 F.2d at 1356.  Worse yet, their expert's report is riddled with mischaracterizations and false similarities.[5] *See* Mot. to Excl. at 11-15.  And it improperly attempts to elide the lack of similarity between the Article and *Maverick* by comparing the Article to the <u>original</u> *Top Gun* film—even though that picture is indisputably non-infringing and is not at issue.[6]

But even setting aside those defects, all of the allegedly similar "plot

---

[5] *E.g.*, Bean Rep. at 12 (claiming both works include "surprising interludes on 'glorious' sailing yachts," whereas *Maverick* includes a single scene with Maverick and Penny manually sailing her broken two-person sailboat through rough seas to get the boat's engine repaired); *id.* at 15-16 (claiming Yonay's description of the loss of control he felt as a fighter jet passenger is similar to Maverick instructing trainees to act instinctively).

[6] *E.g.*, Bean Rep. at 11 (claiming the Article's Yogi and Possum "get reproduced in" the 1986 *Top Gun* film's Maverick and Goose).

elements"—such as those involving the history and operations of the "Top Gun" school, Bean Rep. at 11-15, risky aerial maneuvers, *id.* at 17-20, combat training, *id.* at 15-17, descriptions and depictions of fighter jets, *id.* at 15, 17-20, pilots doing push-up exercises, *id.* at 13, pilots being upset when they are shot down, *id.* at 15, and depictions of pilots' social lives and bar outings, *id.* at 12, 14—are reported in the Article as factual.  Facts such as these do not receive copyright protection, *see Corbello*, 974 F.3d at 977 ("Though the creative expression that is in the Work—the 'writing style and presentation'—is protected by copyright, the assertedly historical elements are not."), and must be extracted from consideration for the substantial similarity analysis (a task that Plaintiffs' expert did not even attempt).

By way of example only:

- Plaintiffs' expert claims as a similarity that both works feature a brass bell that is rung when someone violates a bar's house rules.  Bean Rep. at 12. But not only does the Article describe a real bell that exists to this day, similar bells and house rules exist at Navy Officer's Clubs across the country and the world.  SUF ¶¶ 30-31, 102, 179.  Indeed, *Maverick*'s director visited several such Officer's Clubs—and was required to buy a round after violating bar rules, just as in *Maverick*.  *Id.* ¶ 102.

- Plaintiffs' expert claims as "similarities" that both works depict Top Gun training as being "extremely arduous and demanding," that only the best pilots are chosen for Top Gun (and only the best of those are invited back as instructors), that pilots are "crestfallen" when shot down in training, and that the Top Gun program is a critical component of national security.  Bean Rep. at 12, 14-16.  But these are all facts described in the Article about the nature of Top Gun and its pilots; Plaintiffs do not have a monopoly over these facts merely because Yonay once reported on them.  SUF ¶¶ 11, 16, 43, 103-04.

- Plaintiffs' expert claims that because the Article described certain fighter jet controls and features (such as a targeting system, an ejection seat, and wings on an F-14 that can "sweep back" depending on the needs of the pilot), *Maverick* infringes their copyright by depicting those elements.  Bean Rep. at 15, 17, 19.  Obviously, the Article's *description* of real-life features of fighter jets does not allow Plaintiffs to stop others from *depicting* those features (much less with real jets).

- Plaintiffs' expert claims that both works discuss and depict the effects of gravitational forces on fighter pilots, *id.* at 18, but the effect of G-forces is a fact of physics, and is not subject to copyright protection.

Even if the Court were to ignore that such "plot" elements are factual (which it should not), these elements would *still* need to be filtered out as common,

14

unprotected *scènes-à-faire*.  *See, e.g.*, *Tiscareno v. Netflix, Inc.*, 2014 WL 12558125, at *8, *9 (C.D. Cal. Mar. 6, 2014) (finding no substantial similarity between two works involving "hotshot young pilots showing off their impressive aviation skills in which they maneuver their aircraft to avoid being shot down by a superior jet aircraft" and the protagonist saved the day after being chased by a more advanced fighter jet because these features were unprotected *scènes-à-faire*, common in action films, as "risky rescue missions, narrow escapes…or protagonists saving the day" are not "unique elements"); *Hist. Truth Prods., Inc. v. Sony Pictures Ent., Inc.*, 1995 WL 693189, at *8-9 (S.D.N.Y. Nov. 22, 1995) (unprotected scènes-à-faire included "military training"); *see also* SUF ¶¶ 105-09, 123-24.  For all these reasons, the works share no protectable similarities in plot.

**Themes (SUF ¶¶ 125-56)**.  The Parties agree that *Maverick*'s primary themes are guilt, reconciliation, and redemption.  SUF ¶¶ 125, 130, 134.  The film features an older hero, facing the end of his military career, who makes peace with his past, while also achieving a great victory and disproving his doubters.  *Id.* ¶¶ 54, 115, 131-32, 135-39.  Along the way, he mends relationships—reconciling and forming a father-son connection with Rooster, and entering into a renewed romantic relationship with Penny.  *Id.* ¶¶ 88-89, 131-32, 142-44.  The need to make peace with one's past to move forward is reinforced in the emotional scene in which Iceman advises:  "IT'S TIME TO LET GO."  *Id.* ¶¶ 70, 118.

Nothing resembling these themes appears in the Article, which is a non-fiction piece about two pilots at Top Gun, the history of the school, and the features of fighter planes.  Plaintiffs' expert argues that a "gentler" version of a "redemption" theme appears in the Article, in that Yogi and Possum are shot down in their initial "hop" but later successfully outmaneuver their opponents.  Bean Rep. at 20.  But that is not redemption, it is *improvement*—and to the extent this is even a "theme" of the Article, it flows from the unprotectable premise of a story set at Top Gun, the very purpose of which is to train great fighter pilots.  *See Benay v. Warner Bros.*

PPC'S MOT. FOR SUMM.  JUDGMENT
CASE NO. 2:22-CV-3846-PA

*Entm't., Inc.*, 607 F.3d 620, 627 (9th Cir. 2010) (no substantial similarity where allegedly shared themes "arise naturally from the premise of an American war veteran who travels to Japan to fight the samurai").  And it bears no resemblance to *Maverick*, in which redemption comes not from Maverick improving his skills, but from his personal growth and redeeming himself to Penny, Rooster, and those in the Navy that doubted there was a place for him.  SUF ¶¶ 132, 134-39.

Plaintiffs' expert also argues that the Article features thematic elements based on the pilots who Yonay profiled—such as "'true grit' and jocular heroism," "the camaraderie of brothers in arms," "man vs. technology" and "the sheer love of...flying," Bean Rep. at 20—but the Article's interpretation of historical people and events is not protectable.  Moreover, even if such themes were not based on facts, and even if such themes actually appeared in the works (and many of them do not),[7] they flow from the unprotectable premise of a story set at Top Gun.  *See Benay*, 607 F.3d at 627.  And, in any event, they are too generic to be protectable. *See, e.g.*, *Briggs v. Blomkamp*, 70 F. Supp. 3d 1155, 1177 (N.D. Cal. 2014) ("heroic sacrifice" not a protectable theme), *aff'd* 714 F. App'x 712 (9th Cir. 2018); *Goldberg v. Cameron*, 787 F. Supp. 2d 1013, 1020 (N.D. Cal. 2011) (man-versus-machine a "commonplace" theme); *Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1113 (C.D. Cal. 2010) ("Themes of self-reliance and the importance of friendship and teamwork," which "often predominate stories of competition" are "generic and not protectable."); *Whitehead v. Paramount Pictures Corp.*, 53 F. Supp. 2d 38, 50 (D.D.C. 1999) ("patriotism" not a protectable theme).

**<u>Dialogue (SUF ¶¶ 196-97)</u>**.  "[E]xtended similarity of dialogue" is "needed

---

[7] For example, Plaintiffs' expert's purported "themes" of "the stoicism of the Western gunslinger," "nostalgia for an earlier, simpler America," and "the difficulty in balancing one's personal passions with duty and family," Bean Rep. at 20, do not appear anywhere in *Maverick*.  And his "theme" of "individualism against institutional authority," *id.*, appears to derive from a single, briefly-mentioned historical fact in the Article regarding the real-life Admiral Fellowes, who set out to restore decorum during his brief tenure at Top Gun in the 1970s.  SUF ¶¶ 110, 114.  This is not a "theme" of the Article in any sense.

PPC'S MOT. FOR SUMM.  JUDGMENT
CASE NO. 2:22-CV-3846-PA

to support a claim of substantial similarity," *Olson v. Nat'l Broad. Co*., 855 F.2d 1446, 1450 (9th Cir. 1988), and "[o]rdinary words and phrases are not entitled to copyright protection," *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1071 (C.D. Cal. 2010). The Article does not contain dialogue: it quotes individuals other than the author, SUF ¶ 196, but quotes are not dialogue and cannot be copyrighted. *See Suid v. Newsweek Mag*., 503 F. Supp. 146, 148 (D.D.C. 1980) ("The author of a factual work may not…claim copyright in statements by others…reported in the work since the author may not claim originality as to those statements."). In any case, Plaintiffs do not, and cannot, allege any similarity between the words in the Article and the dialogue in *Maverick*—let alone *extended* similarity. SUF ¶ 197. Plaintiffs' own proffered expert concedes that the words of the Article—spoken or otherwise—do not actually appear in *Maverick*. *Id*.

**Settings (SUF ¶¶ 157-80)**. Plaintiffs' expert contends both works are set at NAS Miramar, "near the beach and the Pacific Ocean." Bean Rep. at 24. That is problematic on three levels. First and foremost, *Maverick* is not set at Miramar, but rather at NAS North Island, a real (and different) naval base. SUF ¶¶ 39, 166, 169-70. The settings are further differentiated by the fact that the Article is set in the early 1980s (and even earlier for its historical detours), whereas *Maverick* is set in the 2020s. *Id*. ¶¶ 8, 157, 159, 161. Second, Miramar is where the real-life Top Gun training program was founded, so that setting is not protectable. *Id*. ¶¶ 8, 44, 157. Third, while the real-life Miramar (like North Island) is located near the beach, beaches are not mentioned or depicted anywhere in the Article. *Id*. ¶ 176. Thus, that *Maverick* sets scenes at a beach is not a similarity in setting, much less a protectable one.

Plaintiffs' expert also claims similarities in that both works depict "cockpits," "the pilots' favorite bar," "briefing rooms and [] aircraft carriers," and (most absurdly) "the sky," Bean Rep. at 25, but any similarities between these "settings" "flow naturally from the works' shared unprotected premise" and must be

"disregarded for purposes of the extrinsic test." *Benay*, 607 F.3d at 628; *see also* SUF ¶ 180. As to the bar in particular, bars with bells that are rung when house rules are broken are a real-life feature at Navy Officer's Clubs the world over, including at Miramar and North Island. *Id.* ¶¶ 30-31, 102. In any event, "[b]ar scenes are too common to carry much significance." *See Carlini v. Paramount Pictures Corp.*, 2021 WL 911684, at *13 (C.D. Cal. Feb. 2, 2021), *aff'd*, 2022 WL 614044 (9th Cir. Mar. 2, 2022).[8]

**Pace (SUF ¶¶ 192-95) and Mood (SUF ¶¶ 181-91)**. The pace and mood of the works are very different: whereas the Article is a non-linear journalistic work that tells the true story of young pilots at Top Gun, provides information on the program's history, and discusses the strengths and weaknesses of the F-14 fighter jet, SUF ¶¶ 1-34, 192-93, *Maverick* is a fast-paced, action-packed dramatic film, *id.* ¶¶ 194-95. And *Maverick* embodies a serious and intense mood, *id.* ¶¶ 183-86, whereas the Article is upbeat and lighthearted, *id.* ¶ 181. To the extent Plaintiffs allege similarities based on the pace or mood inherent in aerial combat, they are factual and unprotectable. *Id.* ¶ 188. These elements also reflect "[a] general mood that flows naturally from unprotectible basic plot premises" inherent to a story about fighter pilot training school, so are "not entitled to protection." *Silas v. HBO, Inc.*, 201 F. Supp. 3d 1158, 1180 (C.D. Cal. 2016).

**Characters (SUF ¶¶ 110-24)**. Plaintiffs try to claim that characters in *Maverick* resemble pilots profiled in the Article, but all of the pilots described in the Article are *actual people*, SUF ¶¶ 12, 110-11, 114, and "[a] character based on a historical figure is not protected for copyright purposes." *Corbello*, 974 F.3d at 976; *see also, e.g.*, *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1186 (C.D.

---

[8] Plaintiffs ignore that the Article reports on events in Hawaii, the Philippines, Singapore, and the Indian Ocean, none of which appears in *Maverick*, SUF ¶¶ 159-60, and that *Maverick* features locations that do not appear in the Article, including the desert headquarters of the scramjet program, a diner in the desert, NAS North Island, Penny and Iceman's homes, beach football settings, a small sailboat, scenes of Maverick riding his motorcycle, and the unnamed country where the climax takes place, *id.* ¶¶ 76, 161-78.

PPC'S MOT. FOR SUMM. JUDGMENT
CASE NO. 2:22-CV-3846-PA

Cal. 2001) ("much of this elucidation of the 'character' of Idema depends on 'historical fact' and/or on the allegedly 'true' events of his life, and as such even Idema can claim no exclusive right to these 'facts' of his life"), *aff'd in relevant part*, 90 F. App'x 496 (9th Cir. 2003).  That Yonay may have described a real-life pilot's *personality* does not change this result; each pilot described in the Article "is not a fictional character whose personality was created in the work."  *Corbello*, 974 F.3d at 976 (author's depiction of non-fiction character's "voice, cool demeanor, and braggadocio" is "not a protectable element").  The analysis thus ends here.

But even if the pilots profiled in the Article were not real-life figures, Plaintiffs' claims would still be baseless.  Fictional characters are only protected when they are "especially distinctive" and "contain some unique elements of expression."  *DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015).  A "stock character or basic character type…is not entitled to copyright protection," *Shame on You Prods., Inc. v. Banks*, 120 F. Supp. 3d 1123, 1164 (N.D. Cal. 2017), *aff'd* 690 F. App'x 519 (9th Cir. 2017), and "[w]hen analyzing whether two protectible characters are substantially similar, courts require a very high degree of similarity between characters," *Silas*, 201 F. Supp. 3d at 1177.

Plaintiffs' expert argues that the title character in *Maverick* is similar to the real-life Alex "Yogi" Hnarakis, because both are "jocular, confident, competitive, good-humored and deeply committed," "good looking with dark hair," and close with their RIO.  Bean Rep. at 27-29.  But courts routinely reject alleged character similarities premised on "traits that are so generalized and/or cliché as to be nearly *scenes a faire* of the military/action genre: i.e., the brash, cocky military officer who does things his own way, and who triumphs over the forces of evil through his own guile, wit, and pure physical abilities."  *Idema*, 162 F. Supp. 2d at 1186; *Tiscareno*, 2014 WL 12558125, at *8, 9 (no substantial similarity where works involved "hotshot young pilots showing off their impressive aviation skills," as "hotshot protagonists are certainly not unique elements"); *Whitehead v. Paramount*

*Corp.*, 53 F. Supp. 2d 38, 50 (D.D.C. 1999) ("General characteristics such as black hair, intelligence, patriotism and slight paranoia, however, are not copyrightable and do not establish substantial similarity."), *aff'd* 2000 WL 3363291 (D.C. Cir. Apr. 19, 2000).  Moreover, beyond vague generalities, the characters are wholly different.  Yogi, at the time of the Article, is a 26-year-old Lieutenant and Top Gun student whose RIO is alive and well.  SUF ¶¶ 112-13.  Maverick, by contrast, is a 50-something Captain, whose RIO died decades earlier, whose long career has been hindered by clashes with authority, and who returns to teach at Top Gun.  *Id.* ¶¶ 59, 115.  Plaintiffs' expert's efforts to elide these differences by comparing Yogi to the version of Maverick in the original *Top Gun*, over thirty-five years ago, *see* Bean Rep. at 27-29, are improper; the original *Top Gun* is not at issue here.

Plaintiffs' expert also improperly attempts to compare the real-life Dave "Possum" Cully to the character of Goose from *Top Gun*, *id.* at 27-29, though Goose *does not even appear* in *Maverick*, apart from photographs and a brief flashback, SUF ¶ 115.  Obviously, a character who does not appear in *Maverick* cannot support a finding of infringement.  Regardless, the alleged "similarities"— that both Possum and Goose are married, have a moustache, and are friends with their pilot, *see* Bean Rep. at 28-29—would be insufficient to support a claim.

His remaining claims of character similarities are nonsensical.  They involve generic and factual features of fighter pilots,[9] or are completely invented and/or depend on subjective impressions, rather than objective expression in the works.[10]

**Selection and Arrangement (SUF ¶ 198)**.  To the extent that Plaintiffs claim there is substantial similarity between the Article and *Maverick* based on the "selection and arrangement" of *unprotectable* elements, such argument also fails as

---

[9] *E.g.*, Bean Rep. at 28 (listing as similarity that pilots are portrayed as "elites with strict codes of honor"); *id.* at 29 (similarity that "pilots and crews are highly competitive").

[10] *E.g.*, Bean Rep. at 27 ("All of them…we feel, are 'men's men,' more comfortable with each other than with women…."); *id.* at 28 (claiming that both works "portray pilots as courageous cowboys"); *id.* at 30 (claiming as character similarity that "[t]hey all wanted to fly since they were boys," although that is never stated or even implied in *Maverick*).

PPC'S MOT. FOR SUMM.  JUDGMENT
CASE NO. 2:22-CV-3846-PA

a matter of law.  As the Ninth Circuit recently explained *en banc*, "a selection and arrangement copyright protects…the *particular* way in which the artistic elements form a coherent pattern, synthesis, or design," and is infringed "only where the works share, in substantial amounts, the 'particular,' *i.e.*, the 'same,' combination of unprotectable elements."  *Skidmore*, 952 F.3d at 1074-75 (emphasis in original).  Critically, a plaintiff cannot state a "selection and arrangement claim" simply by identifying "random similarities scattered throughout…the works" and "[l]abeling them a 'combination' of unprotectable elements."  *Id.* at 1075.  Without showing how these unprotectable elements were specifically "arranged"—and how such "arrangement" was copied by the defendant—there is no liability.  *Id.*

The Article provides a different sequence of events from *Maverick*, which is a fictional action movie culminating in a daring attack on an enemy target.  SUF ¶¶ 54-55, 76-86, 198.  That there are some alleged similarities between the works is not enough:  a plaintiff cannot "establish substantial similarity by reconstituting the copyrighted work as a combination of unprotectable elements and then claiming that those same elements also appear in the defendant's work, in a different aesthetic context."  *Skidmore*, 952 F.3d at 1075.

Indeed, even Plaintiffs' proffered expert does not seriously attempt to assert a "selection and arrangement" claim.  Although he describes some of Yonay's basic creative choices, he does not begin to explain how *Maverick* supposedly copies Yonay's "particular" selection or arrangement of elements.  The best he musters is to point out that the Article and *Maverick* share a (general) subject in Top Gun, "give[]" their protagonists a "problem" to "overcome," highlight those protagonists' respective "backstor[ies]," and feature a mix of scenes in the sky and on the ground.  *See* Bean Rep. at 36-38.  Those generalities come nowhere close to showing a "substantial" overlap in the "same" combination of elements.  And while Plaintiffs' expert contends that, in both works, aerial training is followed by tactical discussions in the briefing room, *id.* at 37-38, this real-life sequence is how Top

Gun actually operates, SUF ¶¶ 16, 158, and cannot support a selection and arrangement claim.  *Corbello*, 974 F.3d at 974 n.2 ("The selection of the true stories behind the Band's most popular songs and the arrangement of those stories in roughly chronological order is not original, and so not protectable by copyright.").

For two works about Top Gun, the Article and *Maverick* are remarkably *different*.  And the little they share is unprotectable.  Courts in this Circuit routinely toss out claims premised on far more similar *fictional* works.[11]  As a matter of law, the works here are not substantially similar, and Plaintiffs' infringement claim fails.

## B.  The Declaratory Judgment Claim Fails (Count II)

The lack of substantial similarity between the Article and *Maverick* is also fatal to Plaintiffs' declaratory judgment claim.  Because the request for declaratory relief is premised on Plaintiffs' allegation that *Maverick* is an infringing derivative work of the Article, this claim rises and falls with the copyright infringement claim.

## C.  The Contract Claim Fails (Count I)

Plaintiffs' breach of contract claim fails because PPC was not obligated to credit Yonay on *Maverick* under the plain language of the Assignment.  A credit obligation attaches only if a film is both produced under the Assignment and

---

[11] *E.g.*, *Benay*, 607 F.3d at 625 (no substantial similarity between film *The Last Samurai* and screenplay of the same name, even though "both share the historically unfounded premise of an American war veteran going to Japan to help the Imperial Army by training it in the methods of modern Western warfare for its fight against a samurai uprising; both have protagonists who are authors of non-fiction studies on war and who have flashbacks to battles in America; both include meetings with the Emperor and numerous battle scenes; both are reverential toward Japanese culture; [] both feature the leader of the samurai rebellion as an important foil to the protagonist"; and in both "the American protagonist is spiritually transformed by his experience in Japan"); *Shame on You*, 120 F. Supp. 3d at 1152 (no substantial similarity between film *Walk of Shame* and screenplay of the same name, even though "both works feature a female lead character living in a big city, who breaks up with her boyfriend, gets drunk, spends a 'one-nighter' with a man she just met who works as a busboy/bartender, wakes up disoriented the next morning at his place, puts on the bright dress she was wearing the night before, and embarks on a walk of shame through the city to get to an important event"); *Funky Films*, 462 F.3d at 1075-78 (no substantial similarity between funeral-home screenplay and television mini-series even though "[a]t first blush, the[] apparent similarities in plot appear significant").

PPC'S MOT. FOR SUMM.  JUDGMENT
CASE NO. 2:22-CV-3846-PA

1    substantially based upon or adapted from the Article—yet *Maverick* is neither.

2         Paragraph 7(b) of the Assignment provides that PPC will "announce on the

3    film of any motion picture photoplay that may be *produced by it hereunder **and***

4    *substantially based upon or adapted from [the Article] or any version or adaptation*

5    *thereof*, substantially incorporating the plot, theme, characterizations, motive and

6    treatment of [the Article] or any version or adaptation thereof, that said motion

7    picture photoplay is based upon or adapted from or suggested by a work written by

8    [Yonay], or words to that effect."  SUF ¶ 201.  This language is unambiguous—

9    "and" means "and," providing two conditions that must both be satisfied—and the

10   Court is therefore "bound to give effect to the plain and ordinary meaning of the

11   language used by the parties."  *People ex rel. Lockyer v. R.J. Reynolds Tobacco*

12   *Co*., 107 Cal. App. 4th 516, 524 (2003).

13        "The English Oxford Dictionary defines 'and' as a conjunction 'used to

14   connect words of the same part of speech, clauses, or sentences that are to be taken

15   jointly.'"  *RBB2, LLC v. CSC ServiceWorks, Inc.*, 2019 WL 1170484, at *5 (E.D.

16   Cal. Mar. 13, 2019).  Consistent with that common understanding, California courts

17   have repeatedly interpreted "and" as a conjunctive term used to connect distinct

18   contractual requirements.  *See id.*; *see also, e.g.*, *Alfaro v. Cmty. Hous.*

19   *Improvement Sys. & Plan. Assn., Inc*., 171 Cal. App. 4th 1356, 1379 (2009) (no

20   "uncertain[ty]" in deed restriction because "[a]nd" does not mean "or").

21        Giving the word "and" its common and ordinary meaning, Paragraph 7(b)

22   clearly imposes two distinct requirements.  To trigger PPC's credit obligation, a

23   film must be (1) produced under the Assignment's copyright grant; and (2)

24   substantially based on or adapted from the Article or an adaptation of the Article,

25   including substantially incorporating its plot, theme, characterizations, motive, and

26   treatment.  Plaintiffs nevertheless contend Paragraph 7(b)'s two subparts are not

27   distinct requirements but rather "part and parcel of the same thing"—a so-called

28   "hendiadys"—so they need not prove both conditions are satisfied.  Dkt. 21 at 25.

PPC'S MOT. FOR SUMM.  JUDGMENT
                                    CASE NO. 2:22-CV-3846-PA

Plaintiffs' argument runs afoul of basic contract principles.  First, a "contract term should not be construed to render some of its provisions meaningless or irrelevant."  *In re Marriage of Nassimi*, 3 Cal. App. 5th 667, 688 (2016).  Plaintiffs' proposed interpretation does just that.  It would strip the "produced…hereunder" language straight out of Paragraph 7(b).  Second, even if California law permitted the Court to look beyond the contract's "clear and explicit" language, discovery confirmed there is *no evidence* to support this untenable interpretation.  Yet to indulge Plaintiffs' argument, there must be "at least *some* evidentiary support for [the] competing interpretation[] of the contract's language."  *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co*., 701 F.2d 95, 97 (9th Cir. 1983).

### 1. Maverick *Was Not "Produced Hereunder."*

At the outset, *Maverick* was not produced under the Assignment of rights in the Article, because *Maverick* does not use any protectable expression from the Article.  *See supra* Section III.A.  Thus, for the same reasons that Plaintiffs' infringement claim fails, their contract claim fails too.

Plaintiffs' own allegations further confirm there is no material dispute that *Maverick* was not "produced by [PPC] hereunder"—i.e., it was not produced under the Assignment's copyright grant.  SUF ¶ 205.  As Plaintiffs repeatedly allege, "[o]n January 24, 2020, the copyright to the [Article]…reverted to [Plaintiffs] under the Copyright Act."  FAC ¶¶ 4, 27, 29.  According to Plaintiffs, *Maverick* "was not completed until May 8, 2021, more than one year *after* Paramount's grant in the 1983 Agreement had been statutorily terminated."  *Id.* ¶ 37.  Plaintiffs further label PPC's argument that *Maverick* was substantially complete *before* Plaintiffs' termination was effective on January 24, 2020 as "disingenuous," and seek a declaration that *Maverick* "was not completed until long after January 24, 2020," when the Assignment's copyright grant reverted to Plaintiffs.  *Id.* ¶¶ 40, 61.

Plaintiffs cannot have it both ways—alleging that *Maverick* was produced under the Assignment's copyright grant for purposes of their contract claim, but

1    disclaiming that fact to support their assertion of infringement.  As this Court has

2    recognized, "[w]hile it is permissible for a plaintiff to plead legal theories in the

3    alternative, a plaintiff may not plead inconsistent facts."  *Buniatyan v. Volkswagen*

4    *Grp. of Am., Inc*., 2016 WL 6916824, at *5 (C.D. Cal. Apr. 25, 2016) (Anderson,

5    J.).  Plaintiffs cannot dispute that *Maverick* was *not* produced under the grant in the

6    Assignment, and the Court should grant summary judgment in PPC's favor.

7                    2.  Maverick *Is Not "Substantially Based Upon Or Adapted From" The*
8                        *Article.*

9            Plaintiffs likewise have no basis to claim that *Maverick* was "substantially

10   based upon or adapted from" the Article—defined to require "substantially

11   incorporating the plot, theme, characterizations, motive and treatment of said

12   work"—because it does not use any of the Article's protectable expression (and in

13   fact has a very different plot, theme, etc.), *see supra* Section III.A.

14           Plaintiffs alternatively argue that since Yonay received a "suggested by"

15   credit on the 1983 Top Gun film, and *Maverick* is an "adaptation" of that film

16   "substantially incorporating" its elements, Paragraph 7(b) required PPC to credit

17   Yonay on *Maverick* even if it did not use any protected expression from the Article.

18   That argument, however, is belied by Paragraph 8, which provides:  "Nothing

19   contained in this agreement shall be construed to be or operate in derogation of or

20   prejudicial to any rights, licenses, privileges or property which [PPC] may enjoy or

21   to which [PPC] may be entitled as a member of the public even if this agreement

22   were not in existence."  SUF ¶ 203.  Any member of the public can make a movie

23   about Top Gun (the Navy Fighter Weapons School), provided they do not use the

24   Article's (or PPC's) protected expression.  *Id*.  Paragraph 8 thus confirms that PPC

25   was entitled to make *Maverick* without doling out a credit.  For this reason, too, the

26   Court should grant summary judgment for PPC on the contract claim.

27   **IV.  CONCLUSION**

28           Summary judgment should be granted in PPC's favor on all claims.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  November 6, 2023

O'MELVENY & MYERS LLP

By:    */s/ Molly M. Lens*
   Molly M. Lens

*Attorneys for Defendant*
*Paramount Pictures Corporation*

26

1

## <u>CERTIFICATE OF COMPLIANCE</u>

2

The undersigned, counsel of record for Defendant Paramount Pictures

3   Corporation, certifies that this brief complies with the Court's October 23, 2023

4   Order, Dkt. 51, in that it is 25 pages in length.

5

Dated:  November 6, 2023            **O'MELVENY & MYERS LLP**

6

7   By:    */s/ Molly M. Lens*
                    Molly M. Lens

8
     *Attorneys for Defendant*
9    *Paramount Pictures Corporation*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PPC'S MOT. FOR SUMM.  JUDGMENT
CASE NO. 2:22-CV-3846-PA