# Exhibit 4

1              UNITED STATES DISTRICT COURT
2              CENTRAL DISTRICT OF CALIFORNIA
3

SHOSH YONAY, an individual, and     )
4    YUVAL YONAY, an individual,         )
                                         )
5              Plaintiffs,               )
                                         )Case No.
6         vs.                            )2:22-CV-03846-PA-GJS
                                         )
7    PARAMOUNT PICTURES CORPORATION, a   )
     Delaware corporation, and           )
8    DOES 1-10,                          )
                                         )
9              Defendants.               )
     _____)
10
11
12
13         DEPOSITION OF JAMES McDONALD
14              Los Angeles, California
15           Tuesday, September 19, 2023
16                   VOLUME I
17
18                 CONFIDENTIAL
19
20   Stenographically Reported by:
     RENEE D. ZEPEZAUER, RPR, CRR
21   CSR No. 6275
     JOB No. 6108374
22   PAGES 1 - 236
23
24
25

                                      Page  1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

    SHOSH YONAY, an individual, and        )
4   YUVAL YONAY, an individual,            )
                                           )
5                    Plaintiffs,           )
                                           )Case No.
6            vs.                           )2:22-CV-03846-PA-GJS
                                           )
7   PARAMOUNT PICTURES CORPORATION, a      )
    Delaware corporation, and             )
8   DOES 1-10,                             )
                                           )
9                    Defendants.           )
    _____)

10

11                   Deposition of JAMES McDONALD,

12           VOLUME I, taken on behalf of Plaintiffs,

13           at 1999 Avenue of the Stars, Suite 800,

14           Los Angeles, California, beginning at

15           10:04 a.m. and ending at 5:59 p.m.,

16           Tuesday, September 19, 2023, before

17           RENEE D. ZEPEZAUER, Certified Shorthand

18           Reporter No. 6275.

19

20

21

22

23

24

25

                                              Page 2

```
 1      APPEARANCES:

 2

 3      For Plaintiffs:

 4              TOBEROFF & ASSOCIATES, P.C.

 5              BY:  MARC TOBEROFF and SPENCER GIBBS

 6              Attorneys at Law

 7              23823 Malibu Road, Suite 50-363

 8              Malibu, California  90265

 9              (310)246-3333

10              mtoberoff@toberoffandassociates.com

11              sgibbs@toberoffandassociates.com

12

        For Defendant Paramount Pictures Corporation:

13

                O'MELVENY & MYERS LLP

14

                BY:  MOLLY M. LENS and MATTHEW KAISER

15

                Attorneys at Law

16

                1999 Avenue of the Stars, 8th Floor

17

                Los Angeles, California  90067-6035

18

                (310)553-6700

19

                mlens@omm.com

20

                mkaiser@omm.com

21

22

23

24

25

                                            Page  3
```

```
 1        A    That's because every time I was in -- well, the
 2   one time I was in court, it was a federal court.
 3        Q    Do you know whether Disney submitted your
 4   expert report in connection with a motion for summary
 5   judgment?
 6             MS. LENS:  Objection.  To the extent that it
 7   lacks foundation or calls for speculation.
 8             THE WITNESS:  Yes.  They did submit it.
 9   BY MR. TOBEROFF:
10        Q    And the Court denied that summary judgment
11   motion; correct?
12             MS. LENS:  Objection.  Same objection.
13             If you know, you can answer.
14             Objection.  It's been asked and answered.
15   Calls for speculation.  Lacks foundation.
16             MR. TOBEROFF:  Please stop coaching the
17   witness.  Of course he's going to answer if he knows.
18             THE WITNESS:  I don't know why the judge ruled
19   the way the judge ruled.  I was not privy to any of
20   that.  It's not my area.
21   BY MR. TOBEROFF:
22        Q    That's not my question.
23             Are you aware that the judge denied Disney's
24   summary judgment motion?
25             MS. LENS:  Objection.  It's been asked and
```

Page 33

```
 1    answered.  I think this is now the fourth or the fifth
 2    time.  Objection.  Asked and answered.  Calls for
 3    speculation.  Lacks foundation.
 4    BY MR. TOBEROFF:
 5         Q    You can answer.
 6         A    I assume that the judge denied it because we
 7    went on into rebuttal arguments.
 8         Q    You were also retained by Disney in the Wilson
 9    case involving a trailer for the movie "Frozen"; is that
10    right?
11         A    Correct.
12         Q    And your deposition was also taken in that
13    case?
14         A    Yes.
15         Q    How many times was it taken?
16         A    Once.
17         Q    And to your knowledge was a transcript of that
18    deposition prepared?
19         A    I don't remember.
20         Q    If a transcript was prepared, do you believe
21    you would have it in your possession or access to the
22    transcript?
23              MS. LENS:  Objection to form.  Calls for
24    speculation.  Lacks foundation.  Incomplete
25    hypothetical.
```

Page 34

```
 1              THE WITNESS:  Repeat the question, please.
 2     BY MR. TOBEROFF:
 3         Q    If a transcript was prepared, do you believe
 4     you would have a copy of it in your possession?
 5              MS. LENS:  Same objections.
 6              THE WITNESS:  I probably would.  But I don't
 7     know for sure.
 8     BY MR. TOBEROFF:
 9         Q    In that case you again concluded after
10     filtering out the unprotectable elements of the
11     plaintiff's work there was no substantial similarity
12     between the plaintiff's worked and Disney's "Frozen"
13     trailer; correct?
14         A    Correct.
15         Q    Are you aware that the Court in the Wilson case
16     also ruled against Disney on its motion for summary
17     judgment?
18              MS. LENS:  Objection to the extent it lacks
19     foundation or calls for speculation.  Assumes facts not
20     in evidence.
21              You can answer.
22              THE WITNESS:  I don't know the specifics of
23     what happened.  The -- I wrote an expert witness report
24     that was -- actually the judge had dismissed all of the
25     elements except sequence of events in the case.  And I
```

Page 35

1    district court's decision?

2         A    Which decision?

3         Q    Regarding summary -- any decision.

4         A    The one that I read was when I got hired that

5    he had -- the judge had limited the scope to sequence of

6    events.  That document I did read because otherwise I

7    would have gone ahead and broken down -- done an

8    extrinsic test on all the other things.

9         Q    Did you read any decisions in that case after

10   you submitted your -- had submitted your expert report?

11        A    I don't think so.

12        Q    Is it your general practice to read decisions

13   in cases for which you submitted your expert report?

14             MS. LENS:  Assumes facts not in evidence.

15             You can answer.

16             THE WITNESS:  Would you repeat the question?

17   BY MR. TOBEROFF:

18        Q    Actually I will rephrase that.

19             Is it your practice to read decisions in cases

20   that are rendered after you submit -- had submitted your

21   expert report in the case?

22             MS. LENS:  Same objection.

23             THE WITNESS:  It is not my practice to be

24   reading, you know, after I have submitted my report

25   unless I am continuing to work on the case for some

                                              Page 38

1    ==reason.  But once my work is done, what happens after==

2    ==that I don't pay too much attention.==

3    BY MR. TOBEROFF:

4        Q    Have you ever offered your opinion in any other

5    copyright infringement cases on the issue of substantial

6    similarity?

7             MS. LENS:  Objection to form.

8             THE WITNESS:  Please repeat the question.

9    BY MR. TOBEROFF:

10       Q    Have you ever offered your expert -- other than

11   the Alfred and Wilson case, have you ever offered your

12   expert opinion on substantial similarity in a copyright

13   infringement case?

14       A    Yes.

15       Q    Can you describe to me those cases?

16            MS. LENS:  Objection to form.

17            THE WITNESS:  I can give you an example.  There

18   was a copyright infringement case on "Finding Nemo" back

19   in the early 2000s.  And I was hired to write an expert

20   witness report.  Since the case was in Europe, I wasn't

21   deposed.  I don't know what the deals were with the

22   foreign courts or whatever it was, and I was hired

23   directly by the general counsel at Disney for the case.

24   I wrote an expert witness report and later heard from

25   Andrew Stanton, by the way, that they won the case.

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

```
 1                 THE WITNESS:  Yes.  There is certainly overlap.
 2     BY MR. TOBEROFF:
 3          Q    Okay.  In each of those cases you submitted an
 4     expert report?
 5          A    Yes.
 6          Q    And do you believe you still have copies of
 7     those expert reports?
 8                 MS. LENS:  Objection to form.
 9                 THE WITNESS:  I -- I believe I probably do
10     still have them because I tend to be a pack rat with my
11     notes and documents.
12     BY MR. TOBEROFF:
13          Q    And in each of those copyright cases were you
14     asked to do a substantial similarity comparison?
15          A    Yes.
16          Q    And in each of those cases did you filter out
17     unprotectable elements?
18          A    Yes.
19          Q    And after filtering out what you believe were
20     unprotectable elements, did you conclude there was no
21     substantial similarity in each of those cases?
22                 MS. LENS:  Objection to form.
23                 THE WITNESS:  I believe I probably did, yes.  I
24     don't -- I can't give you specifics, but, yes, I believe
25     the expert witness reports I found no substantial
```

                                              Page 47

1    similarities.

2    BY MR. TOBEROFF:

3        Q    Was your deposition taken in each of those

4    cases to the best of your recollection?

5             MS. LENS:  Objection to form.

6             THE WITNESS:  No.  The Butzel Long case I was

7    not deposed.  Actually in the "Sister Act" case I was

8    not deposed.  I simply was asked to testify in court.

9    BY MR. TOBEROFF:

10       Q    Any other cases you believe you were deposed?

11            MS. LENS:  Objection to form.

12            THE WITNESS:  I was deposed on the "Pirates"

13   case.  I was deposed on the "Frozen" trailer case.  And

14   other than the cross-examinations I got in the

15   arbitrations, those are the only times I have actually

16   testified, that plus the "Sister Act" case.

17   BY MR. TOBEROFF:

18       Q    When you list in your CV serving as an expert

19   witness in a copyright case, you're not referring to

20   arbitrations, are you?

21            MS. LENS:  Objection to form.

22            THE WITNESS:  Yes.  Actually, I include that in

23   as an expert because the idea is substantial

24   similarities, and it runs the same thing as an extrinsic

25   test.

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

1    preparing the report?

2        A    Other than some basic formatting and framework.

3    This was a little unusual for me in the sense that I had

4    to do both the extrinsic report and the rebuttal report

5    at the same time and combine them.

6            In the past I've always -- I have done either

7    the expert witness report first and then come back and

8    done rebuttal reports, but in this particular case, I

9    had to combine them, so, yes, I got -- I discussed

10   framework and formatting, things like that.

11       Q    Why didn't you submit an initial report?

12           MS. LENS:  Objection.  Hold on.  Calls for

13   speculation.  Lacks foundation.

14           If you know, you can answer.

15           THE WITNESS:  I wasn't asked to.  I was -- as I

16   said in the beginning of my report, I was asked to be a

17   rebuttal witness.

18   BY MR. TOBEROFF:

19       Q    Did you use any support staff in drafting your

20   report?

21       A    No.

22       Q    When I asked did you have any assistance from

23   anyone preparing your report, you answered no; correct?

24           MS. LENS:  His answer stands for itself.  If

25   you'd like his answer read back, Marc, you can have it

                                                  Page 76

1    how I wanted to frame it or format it.  And so I asked

2    if that was the way they wanted it done.  My format in

3    particular -- because it's very similar -- I was using

4    the format that I had used in the previous cases, in the

5    previous case, and I wanted to make sure that my client

6    wanted the same format.

7    BY MR. TOBEROFF:

8        Q    So when you were speaking of format, you're

9    speaking of substance, you're not speaking about like

10   computer, you know, typographical formatting; is that

11   correct?

12           MS. LENS:  Objection.  That misstates his

13   testimony.  It's argumentative.

14           THE WITNESS:  Actually it's -- I wanted to know

15   if the format that I used was the correct format, the

16   format being that I would state what I felt and then get

17   involved in what Mr. Bean claimed and then respond to

18   those claims.

19   BY MR. TOBEROFF:

20       Q    I understand.  My question is:  When I speak

21   about a document not being properly formatted, I'm

22   speaking about the margins or the typeface or the

23   font -- or the font.  You're not speaking about that

24   type of formatting; correct?

25           MS. LENS:  Objection to form.

Page 78

CONFIDENTIAL
September 19, 2023

```
 1    references I was using.
 2         Q    Other than "Dambusters" and "Wings of Eagles,"
 3    do you recall any other films that you viewed in
 4    connection with your report that you decided not to
 5    include in your report?
 6         A    "Battle of Britain."  "Midway."  I may have
 7    used "Midway" in the report.  I'm blanking at the moment
 8    on that.
 9         Q    Any others?
10         A    Not that I recall at the moment.
11         Q    And what is the -- what is the reason you
12    didn't include "Dambusters"?
13         A    If I remember correctly, it was because I
14    didn't need it as a reference.
15         Q    Why did you feel you didn't need it?
16         A    I don't remember.
17         Q    Why didn't you include "Wings of Eagles"?
18              MS. LENS:  Objection.  Asked and answered.
19              THE WITNESS:  I didn't need it.  I was already
20    using "The Flying Fleet."
21    BY MR. TOBEROFF:
22         Q    And "Battle of Britain," what is the specific
23    reason you didn't include that?
24         A    It wasn't needed to make a point or as a
25    reference for a point.  I don't remember -- you know, I
```

Page 88

CONFIDENTIAL
September 19, 2023

```
1    was going through quickly and getting -- looking at all
2    aerial combat films.  In fact, there was a list of 87 of
3    them.  And I picked and chose the ones that worked for
4    and supported the points that I was trying to make.
5         Q    Where was the list of 87 aerial combat films?
6         A    It was on Wikipedia.
7         Q    So of those 87 aerial combat films, how many
8    did you watch before preparing your report?
9         A    Well, the films that I've already told you I've
10   watched.  The other films I -- you know, I don't
11   remember.  The other films on the list I do not
12   remember.
13        Q    Did you -- of those 87 aerial combat films, did
14   you research summaries of each of those films?
15        A    No.
16        Q    And with respect to "Dambusters" and "Battle of
17   Britain," when I asked you why those were not included
18   and you responded in effect because I felt they weren't
19   needed, could you elaborate on that, what you mean by
20   "weren't needed"?
21             MS. LENS:  Objection.  Asked and answered.
22             You can answer.
23             THE WITNESS:  They were either -- whatever the
24   elements in them were either redundant to what I was
25   already using or they didn't apply.
```

```
 1                  (Recess.)
 2                  MR. TOBEROFF:  We can go back on the record.
 3          Q    Can you just put that exhibit aside for now.
 4                  MS. LENS:  What time did we go back on, Madam
 5      Court Reporter?
 6                  THE REPORTER:  1:18.
 7                  MS. LENS:  Thank you.
 8      BY MR. TOBEROFF:
 9          Q    Going back to page 2 of Exhibit 10 where it
10      says, "My analysis in this report assumes the following
11      principles guide the filtration analysis."
12                  Did anyone provide you with these assumptions?
13          A    Not recently.  Years ago, yes, when I first
14      started doing expert witness work, the attorneys
15      schooled me in what the specific extrinsic test
16      guidelines were.
17          Q    When was that approximately?
18          A    The specifics, I don't remember.  I've been
19      doing this for about 25 years to some degree.
20          Q    Did you conduct your own legal research to
21      arrive at these assumptions?
22                  MS. LENS:  Objection to form.
23                  THE WITNESS:  Have I gone back and looked at
24      references to some of these?  Yes.  But mainly to find
25      out definitions of them.  Initially the attorneys that I
```

Page 108

1    was working with way back when said this is what the

2    legal definition of scenes a faire is and this is what

3    the legal definition of merger is and how it's applied.

4    BY MR. TOBEROFF:

5        Q    Could you go to the third bullet point in your

6    report on page 2 and read to me -- read into the record

7    the last sentence.

8        A    You're talking about the bullet point that

9    starts, "I understand that scenes a faire"?

10       Q    Correct.

11       A    You want the last sentence.

12       Q    Correct.

13       A    "For example, I understand that in a work whose

14   basic idea is a dinosaur zoo, elements such as

15   electrified fences, automated tours, dinosaur nurseries

16   and uniformed workers have been deemed scenes a faire."

17       Q    Now, in what you just read, is that from a

18   particular legal decision?  Does that give you the

19   interpretation of a particular legal decision?

20       A    I don't know what legal decision it is from.

21   It was an example that was given to me by an attorney

22   back when.

23       Q    Okay.  But you didn't read -- is it your

24   understanding that that's an example from a specific

25   legal decision?

```
 1        A     I don't know if it's an exact thing from a
 2   legal decision.  But it wouldn't surprise me if it was.
 3        Q     Also, could you please go to the last sentence
 4   of the next bulleted paragraph which says, "I understand
 5   that the merger doctrine is similar ..."
 6              Do you see that bulleted paragraph?
 7        A     Uh-huh.
 8        Q     Could you read that into the record, the last
 9   sentence, please.
10        A     Last sentence, "For example, I understand that
11   courts have held that a mood of secrecy and mystery
12   merges with the idea of a show about the mystery of
13   magic."
14        Q     Is it your understanding that that last
15   sentence refers to a particular legal decision also?
16        A     I suspect it does.
17        Q     Do you know what decision that is?
18        A     No, I don't.
19        Q     And you didn't read the legal decision
20   corresponding to that?
21        A     No, I didn't.
22        Q     Also -- and if you go to the last bulleted
23   paragraph on page 2, could you read that, the second
24   sentence into the record in that bulleted paragraph?
25        A     "For example, I understand that courts have
```

Page 110

CONFIDENTIAL
September 19, 2023

```
 1    concluded that, because the process of visualizing the
 2    sport of karate in a video game is constrained by the
 3    nature and rules of the sport itself the elements that
 4    flow from those constraints must be filtered out."
 5         Q    In that sentence what courts are you referring
 6    to?
 7         A    I'm not referring to any specific court.  I was
 8    told that this was -- this was an example that was given
 9    to me in conversations with lawyers in the past.
10    Probably because -- okay.  Probably because the first
11    time I actually had to put it down in an expert witness
12    report, I needed examples of what they felt were scenes
13    a faire or what they felt were merger, "they" being the
14    attorneys that I was working for, and they gave me
15    examples.  We discussed -- I've discussed other examples
16    with other people and, so, those were examples that were
17    given to me and they said that the court -- courts had
18    concluded in one of them.  They referenced a case.
19    Okay.
20         Q    But your understanding was that these examples
21    were for particular decisions; correct?
22              MS. LENS:  Objection to form.
23              THE WITNESS:  I suspect yes, they were from
24    particular decisions.
25    //
```

Page 111

CONFIDENTIAL
September 19, 2023

```
 1    Beyond the scope.  Objection to form.
 2            THE WITNESS:  You're getting into areas that I
 3    am -- it's not -- I'm not a lawyer.  It's not part of
 4    what I was asked to do or what I -- what I am an expert
 5    in.
 6    BY MR. TOBEROFF:
 7        Q    Is it your opinion that there's no copyright in
 8    Yonay's story?
 9            MS. LENS:  Objection.  Beyond the scope.  Calls
10    for a legal -- you can answer.
11            THE WITNESS:  No.  I believe there's a
12    copyright there, yes.
13    BY MR. TOBEROFF:
14        Q    And that copyright protects certain contents in
15    the story; correct?
16            MS. LENS:  Objection.  Calls for a legal
17    conclusion.
18            THE WITNESS:  No.
19            MS. LENS:  It's beyond the scope.  Just give me
20    a moment.
21            THE WITNESS:  Sorry.
22            MS. LENS:  That's okay.
23            THE WITNESS:  It is my understanding -- again,
24    I'm not a lawyer -- but it's my understanding that
25    copyright -- his copyright protection in the article is
```

Page 135

1     the way he expresses, the expression of the elements

2     that he is reporting about, not necessarily the elements

3     themselves, especially since this is a nonfiction work

4     that is basically all facts and would be unprotectable

5     under the extrinsic test.  So his expression of those

6     unprotectable elements and how he puts them together and

7     how he tells them, those are protectable -- that's where

8     his protection lies.

9     BY MR. TOBEROFF:

10         Q    Did you consider what Yonay's expression in the

11    story was protectable?

12         A    Yes.

13         Q    Can you identify for me that expression in the

14    story that is protectable?

15         A    The expression in the story that's protectable

16    is the way that he puts together the unprotectable

17    elements in it, the ones that he selected and the

18    specific combination and the particular way he did it.

19         Q    Is there anything else?

20              MS. LENS:  Objection to form.  Interpose an

21    objection to the last question as well.

22              THE WITNESS:  His -- you know, his literary

23    expression, how he wrote it.  But -- yeah.

24    BY MR. TOBEROFF:

25         Q    So when would you say the copyright in the

1    story protects that?

2              MS. LENS:  Objection.  Calls for a legal

3    conclusion.  It's beyond the scope.

4              You can answer.

5              THE WITNESS:  To the best of my knowledge, yes.

6    His -- how he writes it as well as how it's expressed

7    are the two things that fit into what would be

8    copyrightable.  Because this is a nonfiction work.  All

9    of these elements in his work are facts or real people,

10   real things, real places, and those are all

11   unprotectable under the extrinsic test.

12   BY MR. TOBEROFF:

13       Q    What standard do you use in determining whether

14   a certain combination of elements qualifies for -- in

15   Yonay's story qualifies for copyright protection?

16             MS. LENS:  Objection.  Calls for a legal

17   conclusion.  Assumes facts not in evidence.

18             You can answer.

19             THE WITNESS:  I don't really know what you mean

20   by a "standard."  Other than the fact that the specific

21   particular combination of what he is and -- if there was

22   another work that was substantially similar in the use

23   of his particular specific combination, then, you know,

24   there might be an infringement.  But in this particular

25   case, that's not true.  He has a very specific

Page 137

1   combination of elements and that combination, you know,

2   is what I believe, I'm under the impression -- again,

3   I'm not a lawyer -- but under the impression that that's

4   what is protectable.

5   BY MR. TOBEROFF:

6        Q    So in your report you speak sometimes about

7   novelty.  Is novelty required for the selection and

8   arrangement of elements to be protected?

9            MS. LENS:  Objection.  Calls for a legal

10  conclusion.

11           You can answer.

12           THE WITNESS:  I'm under the impression that

13  some creativity is needed, not necessarily originality,

14  but some creativity.  It can't be just a laundry list of

15  elements.  And that's creativity in the arrangement.

16  BY MR. TOBEROFF:

17       Q    So some minimal level of creativity; is that

18  correct?

19           MS. LENS:  Same objection.  Calls for a legal

20  conclusion.

21           THE WITNESS:  I don't know whether it's minimal

22  or maximal or what.  There's no scale.  It's just that

23  I've been led to believe under the impression that some

24  creativity must be used.

25  //

Page 138

1    I may be off on this, that it's a statement that he

2    makes in describing the character that is being

3    developed in these pilots.

4         Q    I see.  How about the following:

5    "Individualism against institutional authority."

6              Would you say that qualifies as a theme?

7              MS. LENS:  Same objection.  Objection to form.

8              THE WITNESS:  On an abstract level, yes.  That

9    goes back to Ayn Rand.

10   BY MR. TOBEROFF:

11        Q    And what do you mean when you say -- you keep

12   repeating on an abstract level?  Why are you saying on

13   an "abstract level"?

14        A    Because it's not -- it's not spelled out within

15   a context of a story.  It's a generic sort of statement.

16   Individualism against authority, was it?  I'm sorry.

17        Q    Individualism against institutional authority.

18        A    Institutional authority.  Yeah.  That's vague,

19   general.  Can apply to any story, any movie, any

20   business.

21        Q    It doesn't apply to everyone, every movie;

22   correct?

23        A    No.

24        Q    So I'm just asking you without questioning

25   whether or not it appears in a particular work, whether

Page 178

CONFIDENTIAL
September 19, 2023

1    that qualifies in general as a theme.

2            MS. LENS:  Same objection.  It's vague.  Object

3    to the extent that it calls for a legal conclusion.

4    BY MR. TOBEROFF:

5        Q    Is that what you mean by in the abstract?  You

6    mean in general it qualifies as a theme, but you'd have

7    to look at the particular work to see if that is a theme

8    of that work?  Is that what you mean by "in the

9    abstract"?

10           MS. LENS:  Objection to form.

11           THE WITNESS:  It's a highly abstract very

12   general theme that is basically just an idea until you

13   see it in the context and how it's expressed within a

14   story.

15   BY MR. TOBEROFF:

16       Q    Isn't that true for everything in a story, it

17   starts with an idea until it's expressed?

18           MS. LENS:  Objection to form.  It's

19   argumentative.  It's overly broad.  It's vague.

20           THE WITNESS:  Ideas are not protectable.  The

21   expression of ideas can be protectable.

22   BY MR. TOBEROFF:

23       Q    That wasn't my question.

24       A    I know.  But you're just saying the idea --

25   that -- yeah, ideas are just floating out there.  Okay.

Page 179

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.