Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. #318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Alex Kozinski (S.B. # 66473)
*alex@kozinski.com*
33 Marguerite Drive
Palos Verdes Estates, CA 90275
Telephone: (310) 541-5885
Facsimile: (310) 265-4653

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHOSH YONAY, an individual, and YUVAL YONAY, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>PARAMOUNT PICTURES CORPORATION, a Delaware corporation, and DOES 1-10,<br><br>Defendants. | Case No. 2:22-CV-3846-PA-GJS<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>[*Filed with: Plaintiffs' Rule 56-1 Statement; Declaration of Marc Toberoff; [Proposed] Order*]; *Notices of Lodging*,<br><br>**Hearing Date:** January 8, 2024<br>**Hearing Time:** 1:30 P.M.<br>**Place:** Courtroom 9A<br>**Judge:** Hon. Percy Anderson<br><br>Oral Argument Requested |

**TO DEFENDANT AND ITS ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on January 8, 2024 at 1:30 PM, or as soon thereafter as the matter may be heard before the Honorable Percy Anderson in Courtroom 9A of the above-captioned Court located at 350 West First Street, Los Angeles, California 90012, Plaintiffs Shosh Yonay and Yuval Yonay ("Plaintiffs") will and hereby do move this Court for summary judgment against Defendant Paramount Pictures Corporation ("PPC") on Plaintiffs' claims for declaratory relief, copyright infringement and breach of contract.

This Motion is made on the grounds that Plaintiffs are entitled to summary judgment on their claims as a matter of law because, after considering all evidence in the light most favorable to PPC, no reasonable fact-finder could deny that Plaintiffs own the copyright in the literary work at issue in this case and that PPC has engaged in the unauthorized copying of such work, infringing Plaintiffs' rights under the Copyright Act. Further, Plaintiffs are entitled to summary judgment as a matter of law on their claim for breach of contract on the grounds that there is no genuine issue of material fact that PPC willfully breached Paragraph 7(b) of its 1983 agreement with Plaintiffs' predecessor in interest Ehud Yonay by failing to credit him and his story, "Top Guns," in its derivative motion picture, "Top Gun: Maverick."

Pursuant to Local Rule 7-3, this Motion is made following the conference of counsel which took place on October 13, 2023. Declaration of Marc Toberoff ("Tob. Decl."), ¶ 2.  The Motion is based on this Notice, the Memorandum of Points and Authorities, Statement of Uncontroverted Facts, and the Declaration of Marc Toberoff and the exhibits thereto, filed concurrently herewith, all papers and files on record with the Court, the reply memorandum that Plaintiffs intend to file, the arguments of counsel, and such other matters as may be presented at the hearing on this Motion or prior to the Court's decision. To that end, Plaintiffs respectfully request that the Court conduct the hearing on this Motion in person.

Date: November 6, 2023

TOBEROFF & ASSOCIATES, P.C.

By: _____/s/ Marc Toberoff_____
            Marc Toberoff

*Attorneys for Plaintiffs*

ii

# **TABLE OF CONTENTS**

**Pages**

I.    INTRODUCTION ....................................................................................1

II.   STATEMENT OF FACTS .......................................................................2

III.  LEGAL STANDARD ..............................................................................3

IV.   ARGUMENT............................................................................................4

      A.   Plaintiffs' Recovered The U.S. Copyright to Yonay's Story............4

      B.   The Story and the Sequel are Substantially Similar..........................4

           1.   The Extrinsic Factors Demonstrate Substantial Similarity......5

           2.   Yonay's Copyrighted Story Unquestionably Comprises
                Protectable Expression; PPC Attacks a Strawman ...............13

           3.   Yonay's Creative Selection and Arrangement of Even
                Unprotected Elements Is Also Protected ...............................17

      C.   PPC's Substantial Completion Defense Has No Statutory Basis.....21

      D.   PPC's Conduct is Inequitable and Contravenes Federal Policy.......22

           1.   PPC Attempts to Circumvent the Copyright Act...................22

      E.   Plaintiffs are Entitled to Summary Judgment on
           Their Breach of Contract Claim ......................................................24

           1.   PPC's Defenses are Frivolous................................................24

V.    CONCLUSION .......................................................................................25

# **TABLE OF AUTHORITIES**

## **Cases**

**Pages**

*Aalmuhammed v. Lee*,
202 F.3d 1227 (9th Cir. 2000) ...................................................................22

*Alfred v. Walt Disney Co.*,
821 F. App'x 727 (9th Cir. 2020) ..............................................................17

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .....................................................................................4

*Authors Guild v. Google*,
804 F.3d 202 (2d Cir. 2015) .......................................................................15

*Baxter v. MCA, Inc.*,
812 F.2d 421 (9th Cir. 1987) ...............................................................5, 13

*Berkic v. Chrichton*,
761 F.2d 1289 (9th Cir. 1985) ...................................................................17

*Blizzard Ent., Inc. v. Lilith Games (Shanghai) Co.*,
No. CV 15-4084 CRB, 2017 WL 2118342 (N.D. Cal. May 16, 2017) ..........22

*Cavalier v. Random House, Inc.*,
297 F.3d 815 (9th Cir. 2002) .....................................................................18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .....................................................................................4

*Clancy v. Jack Ryan Enters.*,
No. CV 17-3371, 2021 WL 488683 (D. Md. Feb. 10, 2021) ..........................21

*Corbello v. DeVito*,
844 F. Supp. 2d 1136 (D. Nev. 2012) ........................................................16

*Corbello v. Valli*,
974 F.3d 965 (9th Cir. 2020) ................................................................14-15

*De Acosta v. Brown*,
146 F.2d 408 (2d Cir. 1944) .......................................................................15

# TABLE OF AUTHORITIES

## <u>Cases</u>

**Pages**

*Eckes v. Card Prices Update,*
  736 F.2d 859 (2d Cir. 1984 .................................................................18

*Ets-Hokin v. Skyy Spirits, Inc.,*
  225 F.3d 1068 (9th Cir. 2000) ...........................................................17

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991) ............................................................... *Passim*

*Gennie Shifter, LLC. v. Lokar, Inc.,*
  No. CV 07-1121, 2010 WL 126181 (D. Colo. Jan. 12, 2010) ........................17

*Hanagami v. Epic Games, Inc.,*
  No. 22-55890, 2023 WL 7174242 (9th Cir. Nov. 1, 2023).................... *Passim*

*Harper & Row v. Nation Enters.,*
  471 U.S. 539 (1985) .........................................................................16

*Hoehling v. Universal City Studios, Inc.,*
  618 F.2d 972 (2d Cir. 1980) ..............................................................17

*Honeywell Int'l, Inc. v. W. Support Grp., Inc.,*
  947 F. Supp. 2d 1077 (D. Ariz. 2013) .................................................17

*Horgan v. MacMillan Inc.,*
  789 F.2d 157 (2d Cir. 1986) ..............................................................13

*ICC Eval'n Serv., LLC v. Int'l Ass'n of Plumb'g & Mech. Offs., Inc.,*
  No. CV 16-054, 2022 WL 3025241 (D.D.C. Apr. 27, 2022) ........................14

*Jacobsen v. Deseret Book Co.,*
  287 F.3d 936 (10th Cir. 2002) ...........................................................16

*Jurado v. Eleven-Fifty Corp.,*
  813 F.2d 1406 (9th Cir. 1987) ...........................................................25

# TABLE OF AUTHORITIES

## <u>Cases</u>

**Pages**

*Keeling v. Hars*,
809 F.3d 43 (2d Cir. 2015) ................................................................. 18

*Kouf v. Walt Disney Pictures & TV*,
16 F.3d 1042 (9th Cir. 1994) ............................................................. 19

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
676 F.3d 841 (9th Cir. 2012),
*as amended on denial of reh'g and reh'g en banc* (June 13, 2012) ................ 19

*Maljack Prods. v. UAV Corp.*,
964 F. Supp. 1416 (C.D. Cal. 1997) .................................................... 22

*Mattel, Inc. v. MGA Ent., Inc.*,
616 F.3d 904 (9th Cir. 2010) ............................................................. 16

*Med. Educ. Dev. Servs., Inc. v. Reed Elsevier Grp., PLC*,
No. CV 05-8665, 2008 WL 4449412 (S.D.N.Y. Sept. 30, 2008) .................... 17

*Metcalf v. Bochco*,
294 F.3d 1069 (9th Cir. 2002) ................................................. *Passim*

*Mills Music, Inc. v. Snyder*,
469 U.S. 153 (1985) ............................................................... 21-23

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
166 F.3d 65 (2d Cir. 1999) ............................................................... 16

*Ray Charles Found. v. Robinson*,
795 F.3d 1109 (9th Cir. 2015) ........................................................... 23

*Rentmeester v. Nike, Inc.*,
883 F.3d 1111 (9th Cir. 2018) ..................................................... 16, 18

*Richlin v. Metro-Goldwyn-Mayer Pics., Inc.*,
531 F.3d 962 (9th Cir. 2007) ............................................................. 22

# TABLE OF AUTHORITIES

<u>**Cases**</u>

**Pages**

*SecureInfo Corp. v. Telos Corp.,*
   387 F. Supp. 2d 593 (E.D. Va. 2005) .................................................................. 17

*Shaw v. Lindheim,*
   919 F.2d 1353 (9th Cir. 1990) ................................................................. *Passim*

*Sheldon v. Metro-Goldwyn Pictures Corp.,*
   81 F.2d 49 (2d Cir. 1936) ......................................................................... 13

*Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,*
   562 F.2d 1157 (9th Cir. 1977) ................................................................... 18

*Skidmore v. Zeppelin,*
   952 F.3d 1051 (9th Cir. 2020) ..................................................................... 4

*Three Boys Music Corp. v. Bolton,*
   212 F.3d 477 (9th Cir. 2000) .................................................................... 18

*Unicolors, Inc. v. Urban Outfitters, Inc.,*
   853 F.3d 980 (9th Cir. 2017) ................................................................... 4-5

*Update Art, Inc. v. Modiin Pub., Ltd.,*
   843 F.2d 67 (2d Cir. 1988) ...................................................................... 25

*Wainwright Sec. Inc. v. Wall St. Transcript Corp.,*
   558 F.2d 91 (2d Cir. 1977) ...................................................................... 13

*Walt Disney Prods. v. Air Pirates,*
   581 F.2d 751 (9th Cir. 1978) ..................................................................... 5

*Woods v. Bourne Co.,*
   60 F.3d 978 (2d Cir. 1995) ...................................................................... 21

*///*

*///*

# TABLE OF AUTHORITIES

## Federal Statutes, Rules and Regulations

**Pages**

17 U.S.C.

§ 101 ................................................................................ *Passim*

§ 102(b) ........................................................................... 14

§ 106 ................................................................................ 22

§ 203(a) ........................................................................... *Passim*

§ 203(b) ........................................................................... 21

37 C.F.R.

§ 202.1 ............................................................................. 14

§ 201.10 ........................................................................... 4

§ 202.3 ............................................................................. 4

Fed. R. Civ. P. 56 ............................................................ 3-4

## Other Authorities

H.R. Rep. No. 94-1476 (1976) ........................................ 21, 23

Mark S. Lee, *Entertainment & I.P. Law* § 11:12 (Mar. 2023 rev. ed.) .............. 21

1, 3, 4 Melville Nimmer & David Nimmer, *Nimmer on Copyright* (2023 rev. ed)

§ 2.11 ............................................................................... 15

§ 11.02 ............................................................................. 23

§ 11.07 ............................................................................. 23

§ 11.08 ............................................................................. 23

§ 13.03 ............................................................................. 5, 13, 18

# TABLE OF AUTHORITIES

**Pages**

U.S. Copyright Office, *Compendium of U.S. Copyright Office Pracs.* (3d ed. 2021)

§ 709.2................................................................................21

§ 808.3................................................................................22

§ 1107.2 ...............................................................................4

2 William F. Patry, *Patry on Copyright* § 4:7 (Sept. 2023 rev. ed.) ...............9, 15

I.    **INTRODUCTION**

Ehud Yonay's ("Yonay") compelling 1983 story "Top Guns" ("Story") was unquestionably the literary genesis of the successful *Top Gun* (1986) film ("Film") and thus its blockbuster sequel *Top Gun: Maverick* (2022) ("Sequel"). Defendant Paramount Pictures Corporation ("PPC") was quick to see the originality of Yonay's highly cinematic Story and, in a 1983 contract, swiftly locked up exclusive film rights. PPC has made over a billion dollars from the ensuing *Top Gun* franchise Yonay initiated. On January 24, 2020, Yonay's widow and son, Shosh and Yuval Yonay, recovered the Story's copyright under 17 U.S.C. § 203(a), consistent with its legislative purpose. Yet PPC, with full knowledge that it no longer owned Yonay's Story, steamrolled ahead with its Sequel, thumbing its nose at the statute, PPC's own chain-of-title, and Plaintiffs. Indeed, despite the Sequel's enormous budget, PPC made no effort whatsoever to obtain a renewed license to the Story, as contemplated by the Copyright Act.

Instead, PPC engages in revisionist history and tries to reduce Yonay's highly original Story to an oil slick. PPC obtusely denies that its franchise was based on the Story, and ignores the plain similarities between its *Top Gun* movies and the Story from which the films were *literally* derived. Rather than simply re-license the Story in what should have been a gracious act of homage, PPC chose to spend a fortune on lawyers to circumvent the Act's termination right and the pro-authorial policies behind it. PPC's ploy to diminish Yonay's engaging Story to a phonebook of "unprotectable facts" contradicts the very position it took for decades when it secured and exploited *exclusive* film rights to the Story and credited Yonay on *Top Gun*. PPC's 1983 contract with Yonay was all about its exclusive ownership of his Story's copyright, but now that the copyright has reverted, PPC shrugs "what copyright?" and pretends that its derivative Sequel has nothing to do with it. PPC's mercenary arguments ignore and hand-wave away the numerous creative choices Yonay made in crafting his

cinematic portrayal, which breathed life into the technical humdrum of a navy base, birthing PPC's billion-dollar franchise. Given the numerous similarities between the Story, *Top Gun,* and its Sequel, and PPC's bad faith disavowal, summary judgment should be entered for Plaintiffs.

## II.   STATEMENT OF FACTS

The original Story written by Yonay was published on April 21, 1983 in the May 1983 issue of *California Magazine*. *See* L.R. 56-1 Statement of Uncontroverted Facts ("SUF") 1-2. *California Magazine* at the time was a bastion of "New Journalism," reflecting a subjective literary style with the expressive voice of fiction. SUF 3. The New Journalists included such luminaries as Tom Wolfe (*The Right Stuff*), Truman Capote (*In Cold Blood*) and Norman Mailer (*The Naked and the Dead*) and magazines like *Rolling Stone*, *The New Yorker*, and *Esquire*. In traditional journalism, the journalist is invisible and facts are reported objectively. In New Journalism, writers use vivid imagery and subjective expression to interpolate facts, birthing immersive stories.

So too did Yonay in writing his Story, which he chose to express through two pilots at a Naval Air Station bootcamp. SUF 76. In the subjective "New Journalism" literary style, Yonay created a very engaging cinematic portrayal of the base from the POV of the pilots by artfully curating colorful portrayals of their childhood dreams of flying, personalities, relationships and anecdotes. SUF 76, 78, 82. Mere weeks after its publication, at the enthusiastic urging of producers Jerry Bruckheimer and Don Simpson, PPC secured *exclusive* film rights to the Story from Yonay in an agreement dated May 18, 1983 ("Agreement"). SUF 5, 233-235. The Agreement, *drafted by PPC*, referred to Yonay's creation as a "wholly original" "published story," and to its copyright throughout. SUF 6-7. The Agreement required PPC to give Yonay credit on films "substantially incorporating the plot, theme, characterizations, motive and treatment of said [Story.]" SUF 9. PPC's contracts with *Top Gun's* screenwriters

(who *also* received writing credit on the Sequel) mandate that their screenplay be "based upon [the Story.]" SUF 15-18, 24. Unsurprisingly, the resulting *Top Gun* film used extensive elements of the Story including characters' traits, the mood, pace, setting, and themes and, as such, PPC duly credited Yonay's Story, as required by its 1983 Agreement. SUF 13.

On January 23, 2018, Plaintiffs availed themselves of their rights under 17 U.S.C. § 203(a) by terminating Yonay's 1983 grant to PPC of the Story's copyright, effective January 24, 2020. Plaintiffs thus recovered the U.S. copyright to the Story as of that date. SUF 19-21. But the Sequel was not completed until long after January 24, 2020. SUF 29-70. PPC filmed "pick-ups" and reshoots in February 2020 and the Sequel's editing, visual effects, ADR, foley, audio mixing and soundtrack per PPC's own schedules continued into late August 2020. SUF 29-35, 39, 53, 58, 59, 61. All told, PPC, in registering the Sequel's copyright, represented its "year of completion [as] 2022." SUF 70.

The Sequel, referred to in the industry as a "legacy sequel," closely tracks *Top Gun*, *incorporating* it directly and by reference,[1] and was hugely successful. SUF 232. But unlike *Top Gun*, PPC conspicuously failed to give Yonay credit on the Sequel—breaching its Agreement. SUF 14. Once it became known that the Sequel was not completed until well after January 24, 2020, and that PPC had ignored the reversion of its underlying Story, Plaintiffs sent PPC a cease-and-desist letter. SUF 72. In response, PPC waved them off in denial of the Sequel's obvious derivation. Rather than simply re-licensing the Story, PPC plowed ahead, releasing its derivative Sequel on May 27, 2022. SUF 231.

## III.   <u>LEGAL STANDARD</u>

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed.

---

[1] The Sequel contains stills and flashbacks to *Top Gun*, follows its central characters, takes place in the same setting, provides similar aerial combat training including exact stunts described in the Story and *Top Gun*, and explores similar themes as the Story and *Top Gun*. The Sequel even credits the same producer and the writers of *Top Gun*. SUF 23, 24, 77, 92, 167, 175.

1   R. Civ. P. 56(a). Summary judgment is appropriate where "there is no genuine

2   dispute as to any material fact and the movant is entitled to judgment as a matter

3   of law." *Id.* A disputed fact is material if, when applied to substantive law, it

4   affects the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

5   242, 248 (1986). An issue is genuine if the evidence is sufficient for a reasonable

6   jury to return a verdict for the non-moving party. *Id.* The moving party bears the

7   initial burden of establishing the absence of a genuine issue of material fact.

8   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

9   **IV.   ARGUMENT**

10   **A.   Plaintiffs Recovered The U.S. Copyright to Yonay's Story.**

11   It is undisputed that Yonay held a valid copyright in his Story. SUF 4.[2] It

12   is further undisputed that Plaintiffs' notice of termination, served on January 23,

13   2018, and recorded with the Copyright Office on January 29, 2018, complied

14   with 17 U.S.C. § 203(a) and 37 C.F.R. § 201.10. SUF 19-21. Plaintiffs thereby

15   recovered the U.S. copyright to the Story on January 24, 2020, as noticed. *Id.*

16   **B.   The Story and the Sequel are Substantially Similar.**

17   To demonstrate copyright infringement, Plaintiffs must show that they

18   own a valid copyright and that PPC copied protected aspects of it. *Feist Publ'ns,*

19   *Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). That Plaintiffs own a

20   valid copyright in the Story is undisputed. SUF 1-4, 12, 19-21. As to the second

21   prong, a plaintiff must show unlawful appropriation by showing substantial

22   similarity of protectable expression. *Skidmore v. Zeppelin*, 952 F.3d 1051 (9th

23   Cir. 2020). "In assessing whether particular works are substantially similar ...

24   [this] Circuit applies a two-part analysis: the extrinsic test and the intrinsic test."

25   *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 985 (9th Cir. 2017).

26   ───────────────

27   [2] On October 3, 1983, *California Magazine* registered its May 1983 issue in which the Story had been published (Reg. No. TX0001213463). SUF 3."[The] registration for [this] collective work covers the ... individual contributions contained within [it.]" U.S. Copyright

28   Off., *Compendium of U.S. Copyright Off. Pracs.* ("*Compendium*") § 1107.2(B) (3d ed. 2021); *see* 37 C.F.R. § 202.3; 17 U.S.C. § 101 (definition of "collective work"). On May 18, 1983, *California Magazine* assigned its copyright in the Story to Yonay. *See* SUF 4.

"The extrinsic test requires plaintiffs to show overlap of 'concrete elements based on objective criteria'" while "the intrinsic test is subjective and asks whether the ordinary, reasonable person would find … the works to be substantially similar." *Id.*

### 1.   *The Extrinsic Factors Demonstrate Substantial Similarity*

In conducting the extrinsic test, a court must objectively analyze the works' similarities in characters, plot, mood, pace, sequencing, setting, dialogue, themes and other elements. *Metcalf v. Bochco*, 294 F.3d 1069, 1073 (9th Cir. 2002). Proper analysis requires that these extrinsic factors be considered both individually *and* collectively because literary elements and their broader impact on a work rarely fit neatly into distinct buckets. *See Baxter v. MCA, Inc.*, 812 F.2d 421, 424-25 (9th Cir. 1987) ("substantial similarity of expression [is] subtle and complex"); Tob. Decl., Ex. 3 at 27, 32 ("If 'character is story,' then pacing is mood"), 34. Extrinsic analysis focuses on *shared* aspects, not on what PPC added, and similarities as to all objective criteria are *not* required. *Shaw v. Lindheim*, 919 F.2d 1353, 1357-61 (9th Cir. 1990). "It is entirely immaterial that, in many respects ... works are dissimilar ... If substantial similarity is found, the defendant will not be immunized from liability by reason of the addition in his work of different characters or additional and varied incidents[.]" 4 Nimmer on Copyright ("*Nimmer*") § 13.03[B][1][a] (citing *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 756 (9th Cir. 1978) (characters infringed, though stories differed entirely)). A comprehensive comparison of the extrinsic literary elements of the Story and Sequel reveals numerous overt similarities.

**Plot.** The human conflict that shapes the Sequel evolved out of *Top Gun*'s plot, which evolved from the Story. Like the Story, both films principally concern the pilots, their training, and the qualities which make them exceptional. All culminate with them going off to war but differ from traditional military stories in that they are *not about* war. The works are about remarkable people—

the "hotshot aces [who] have virtually revolutionized the fighter pilot business." SUF 102-103. That's why Yonay's original Story stood out.

The Story's two jocular flyers, Yogi and Possum (pilot and RIO) were reproduced in *Top Gun*'s two jocular flyers: Maverick and Goose (pilot and RIO). SUF 76-77. The Story emphasizes their grueling training: "There was more flying than they had ever had ... one-versus-one hops (student crew vs. one instructor) ... then the tough two-versus-unknown hop, in which two crews take off not knowing ... where the bogey [instructor "enemy"] will come from ... when the bogey rolls in and sends them home with a simulated shot." SUF 156. In exactly that way, Maverick trains the pilots in the Sequel, taking on single crews one-on-one, then two crews when Maverick rolls in behind them from nowhere, sending them home with a simulated shot. SUF 157.

In the Story and in *both* films, considerable time is spent showing the human side of selected fighter pilots, not only their drinking and carousing, but also how their "shit-hot" machismo boils over into competition with each other. SUF 102-103, 195-198. Both Story and Sequel spend an inordinate amount of time depicting the elite pilots' R&R to humanize them, make them more relatable, and to engage the audience's emotions. SUF 195-198. Both extensively depict the softer side of fighter jocks to examine the profundity of human beings sent off to war. SUF 195-196. Both take place on a naval air base, with weapons of war, but focus instead on the individual characters and their backstories, passions, and dreams. SUF 221-222. Both works feature "dog fights" between the pilots throughout, portrayed as fierce, but tempered by collegial team spirit. SUF 138-139. In both Story and Sequel, there are unexpected interludes on "glorious" sailing yachts, a "bullseye" is used as a metaphor for a pilot's skill, and both feature "200 push-ups" as a training tool. SUF 203-204, 110-111, 185-186. In the Story, a big brass bell is placed in the pilot's favorite bar. SUF 199. He who breaks the "house rules," must buy a

round for everyone. *Id*. The same brass bell shows up in the Sequel three times for the exact same purpose. SUF 200. In both works, these devices serve to illustrate the pilots' "frat-boy" subculture and inject levity. Tellingly, many of these similarities (e.g., the 200 push-ups, bullseye, bell, sailing yacht) appear in the Story and Sequel, but not in *Top Gun*. SUF 110-111,185-186, 203-204. Here, as in many places, the filmmakers returned to the Story for their inspiration.

In the Story's opening, Yogi and Possum are "shot down" in training and downcast and, in the Sequel, fighter crews are crestfallen when "shot down" by Maverick in training, though no parallel situation appears in *Top Gun*. SUF 124-125. The Story highlights that only the best of the best get invited back to Top Gun as instructors and in the Sequel, Maverick is invited back as an instructor. SUF 88-89. This detail, too, appears only in the Sequel, but not in *Top Gun*. *Id.*

The Story emphasizes that the F-14s "wings can sweep back for fast flying or open to the sides like an eagle's for landing or just cruising around[.]" SUF 211. In *Top Gun*, this is not highlighted, but in the Sequel, it is used as a plot device, allowing Maverick to make an impossibly short takeoff from a bombed-out runway. SUF 212. This technical fact is obviously not protectable but its selection, expression, and the use to which it is put, is. The Story describes landing a fighter jet on an aircraft carrier in the ocean as a "controlled crash ... if you're lucky." SUF 213. In a major Sequel scene Maverick makes a death-defying crash-landing on an aircraft carrier; another plot element found only in the Story and Sequel. SUF 214. These numerous specific elements featured in the Story and Sequel, but not in *Top Gun*, show clearly that PPC returned to Yonay's Story as source material for its Sequel.

**Themes.** Both Story and Sequel emphasize the sheer love of flying and the freedom that can only be found in the skies. SUF 100-101, 148-149. Both portray the tension between Naval brass seeking to restore discipline and order and the hotshot pilots who crave ingenuity. SUF 114-115. Both portray an

aviation "caste system" with elite fighter jocks at the center, using the metaphor of the bullseye and rings on a dart board. SUF 110-111. Both works convey a similar post-war nostalgia that yearns for a simpler 1950s America, old-fashioned patriotism, and traditional relations between men and women. SUF 92-93. Both works evoke the same "Western" gunslinger themes, true grit, and lone cowboy motifs. SUF 176-177. (Story: "At Mach 2 and 40,000 feet ... it's always high noon"). SUF 176. Both the Story and Sequel share strong recurring themes of "the anachronism of fighter aviation. Even in this age of remote-control, pushbutton warfare, the survival and effectiveness of the entire U.S. Pacific Fleet rests on a few dozen young men"; that success in aerial warfare comes down to the pilot, his courage, instincts and strength of character, rather than his aircraft—a theme not present in *Top Gun*. SUF 172-173. In this vein, both works *feature*, but ultimately discount, the importance of technology for success in combat, and glorify the mastery and moxie of older pilots, who fought on instinct, without the luxury of today's technology. *Id*., SUF 155. Both works feature the bonds that form in military service. SUF 195-196. The similarity in themes clearly goes well beyond the necessities of the subject. Like the Story, the Sequel charms the audience by invoking these emotional themes from a bygone era. SUF 92-93. By their very nature, such themes, their convergence, and qualitative value to both works' stories *cannot be discarded as "facts."*

**Dialogue.** In both the Story and Sequel, the characters speak in a way that is at once droll, idiomatic, techy, and charmingly unguarded in dialogue and narration, which in turn informs similar moods and tone portrayed by both works. SUF 227-228. Linguistic quips in the Story such as "It's Miller time," "shoot off their watches" and "Fight's on,"—which is used multiple times in the Sequel—help create this vibrant mood. *Id.* The Story features evocative dialogue like: "You fight like you train, so you'd better train like you're going to fight"; "I like pulling Gs. I like strapping on 25 tons of airplane and hustling around the

sky" and "How do you explain ... [that] you suddenly weigh more than 1,300? Or how if you pull too many Gs a lot of times you start to black out, … that you were in an airplane flying around and you blacked out?" SUF 134, 144, 146. Similar dialogue reverberates in the Film and its Sequel and for similar narrative purposes. *See* SUF 202 (Sequel: "You'll weigh close to two thousand pounds … fighting with everything you have just to keep from blacking out"). *Compare* SUF 122, 132 (Story: "You wish you could do it over again … but in the real world you're not going to get a second chance," "getting shot is synonymous with losing") to SUF 133 (Sequel: "What he has to teach you may very well mean the difference between life and death"). *See Patry* § 4:7 ("Calling dialogue a fact just because it is dialogue would render all interviews unprotectible, and perhaps speeches as well."). Just as Yonay selected this dialogue to raise the stakes and further his Story's narrative tension, so too did the derivative Sequel.

**Setting**. Both the Story and Sequel take place at the Naval Air Station along the beach in Southern California. SUF 94-95. Tellingly, the Sequel, set in the present, maintains this setting even though in "fact," the *actual* "Top Gun" school moved in 1996 to land-locked Fallon, NV. SUF 95. The Story not only influenced the settings of the Sequel generally, but taught the filmmakers *how* to see those settings by emphasizing, for example, the bar with the brass bell, walls with wooden plagues, or signage like "Welcome to Fightertown U.S.A." SUF 90, 189, 199. Each of these settings ties to the mood and themes of both works.

The Sequel is glaringly similar to the Story in the way both juxtapose disparate settings to engage the audience through a distinct cohesion of opposites. For example, both works bounce between intense "dog-fights" in the sky from the pilots' POV in the cockpit, to quiet moments of reflection at the base, to the classroom, to R&R at the local bar and at sea. SUF 219-220. Both portray the culture at the Naval Air Station as ultra-competitive with a rancorous edge, but also as jovial and collegiate. SUF 138-139. Both are set in their

respective present, featuring the cutting-edge tech of the day (Story: 1983; Sequel: 2022), but specifically depict the base with 1950s nostalgia. SUF 92-93.

**Characters.** Both Story and Sequel use characters to tell the story of Top Gun and explore their similar themes. The main characters chosen by Yonay for his Story (Yogi-pilot and Possum-wingman) are young, American, white men, jocular, confident, competitive, good-humored and deeply committed. SUF 77, 86. The main characters of *Top Gun* (Maverick-pilot and Goose-wingman) are the same. SUF 78. Most of the men in the Story, *Top Gun*, and its Sequel are portrayed as "men's men," more comfortable with each other than with women and more comfortable in the sky than on the ground. *See* SUF 148 (Story: "With raw sex waving in front of their eyes, these supremely healthy young males are standing in two and threes and talking about the hop."). They live in a world that is both solitary (a "single combat warrior") and communal (belonging to a "squadron," a "Wolfpack [that] will be their home and family, security blanket and confessional circle"). SUF 96. All exploit characters' playful nicknames (e.g., Story: "Yogi," "Possum," "Heater"; Sequel: "Maverick," "Rooster," "'Bob'") for comic relief and intimacy. SUF 98-99. But Maverick (just like Yogi in the Story) is essentially a loner. SUF 86 (Story: "Though Yogi would dogfight with the best of them, he was almost too serious for the Wolfpack … us[ing] those long ocean flights to improve his flying skills.").

In all works, the two main characters have similar appearances (one: good looking, dark hair; the other: wavy light brown hair, mustache). SUF 78-89. All depict its lead character and others as adrenaline-junkies, undeterred, if not invigorated by danger. SUF 146-147. Indeed, the Story emphasizes the fighter pilot's fierce denial mechanism in the face of death, and the Sequel portrays the same avoidance mechanism after a pilot's near-fatal accident. SUF 164-165. Both portray the characters as irreverent of Navy command. SUF 113-114. Both even include a similarly cheeky exchange with enemy fighters (Story: In midair,

Yogi waves to a Russian fighter, who does not wave back; Sequel: Also in mid-air, Maverick waves to an enemy pilot, who does not wave back). SUF 209-210.

Both works portray pilots as courageous cowboys, dueling with slick, almost instinctual, maneuvers, reminiscent of "Western" showdowns (Story: "Yogi and Possum ride shotgun"). SUF 176-177. The name "Maverick" itself evokes three famous Westerns. SUF 178. Both Story and Sequel portray fighter pilots as elites with strict codes of honor, but cool, often macho personalities. SUF 102-103, 120-121. The Story features a character, lauded for his combat experience, who downs "three MiGs" in a day, taking him over the "five-kill line" and making him an "ace." SUF 104. In *Top Gun*, Maverick is lauded for downing "three MiGs" in one day and in its Sequel, he shoots down two more "mak[ing] him an ace." SUF 105. Both Story and Sequel feature a "by the book" Admiral who threatens the prevailing fighter-jock culture to the dismay of its hotshot pilots. SUF 112-113.

In both Story and Sequel, the sheer love of flying is characterized as all-consuming, and as coming at the expense of personal and family relationships. SUF 148-149. In the Story, "Possum will spend more of [his] married years with Yogi than with his [own wife]" and in the Sequel, Maverick has never been married, has no children, and has difficulty maintaining relationships. SUF 79, 80, 196. The Story portrays the fighter jet as the only place for people like Yogi and similarly, in the Sequel, as the only place Maverick is at home. SUF 84-85.

**Sequence of Events/Pacing.** In both Story and Sequel, passages of idyllic flying are juxtaposed—suddenly and violently—with gut-wrenching climbs, dives and dogfights; beauty and terror, tranquility and violence springing from each other. SUF 140-141. Both works counterpose these intense aerial sequences with scenes on the ground, in the classroom, R&R at the bar (with the brass bell) and on a fancy sailboat. SUF 191-192, 199-200, 203-204. Both works freely use flashbacks and cutaways as shortcuts to fill in the character's pasts, deepen the

audience's feeling for them, and delay the flow of action to build narrative tension. SUF 23, 219-220. This rhythmic alternation of sequencing, pace, and tone keeps the reader/audience engaged, while portraying necessary details. Both works culminate with the main characters leaving Top Gun for real-world flight missions. SUF 229-230.

**Mood.** As with pacing, the mood of both Story and Sequel is continually shifting between earthbound life, where up is up, and down is down, and liberating flight. SUF 191-192. Both works contrast the ethereal beauty of the "vast blue dome of sea and sky" against jarring, unpredictable competitive action. SUF 140-141. Character informs mood as well. Fighter pilots—or as Yonay calls them, "pumped-up fighter jocks"—in the Story and Sequel are like thoroughbreds, high-strung and volatile. SUF 191-192. The mood is glorious when triumphant, then crestfallen when "shot down." SUF 124-125. Tension is built with intense time pressures and relieved by playful interactions. SUF 168-169, 196-197. In the sky, the mood is freedom from everything except the laws of physics and the constant threat of death. SUF 100-101, 134-135. On the ground, the mood is often portrayed as restless, waiting to go up again. SUF 148-149. The Story furthers its mood by expressing cinematic, rather than textbook details of fighter jets, including Yonay's filmic descriptions of "pulling G's," of "strapping on 25 tons of airplane," the exhilarating sight of afterburners kicking in, pairs of white-hot flames shooting out the back—a mood much more prevalent in the Story and Sequel than in *Top Gun*. SUF 128-129, 146-147.

Post-World War II "nostalgia" is also a prime feature of the mood (and setting) in Yonay's Story: "At night the darkened base could be mistaken for an old From Here to Eternity set, and even earlier in the day, when the base is bustling, it is enveloped in a time warp of unreality." SUF 92. Although set in the present, a very similar post-war nostalgia pervades *Top Gun* and its Sequel, harkening back to a simpler time of old-fashioned patriotism, and the quaint

treatment of male/female relations. SUF 100-101. That "nostalgia" is an essential part of both films' mood, and of the franchise's success, as its capacity to delight large audiences comes from that willing suspension of modernity in favor of a time of less polarization. SUF 93, 101.

**Totality of Similarities.** "[T]he totality of the[se] similarities" across the extrinsic factors "goes beyond the necessities of the" works' general ideas, and "extends to elements of protected expression[.]" *Shaw*, 919 F.2d at 1363; *accord Metcalf*, 294 F.3d at 1074 ("cumulative weight" of similar elements under extrinsic test). "'[N]o bright line rule exists as to what quantum of similarity is permitted before crossing into the realm of substantial similarity.' That means that, '[e]ven if a copied portion be relatively small in proportion to the entire work, if qualitatively important the finder of fact may properly find substantial similarity.'" *Hanagami v. Epic Games, Inc.*, No. 22-55890, 2023 WL 7174242 at *10 (9th Cir. Nov. 1, 2023) (quoting *Baxter,* 812 F.2d at 425 and citing *Nimmer* §13.03 and *Horgan v. MacMillan Inc.,* 789 F.2d 157 at 152-61 (2d Cir. 1986) (collecting cases finding infringement based on a few similarities)). "[N]o plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro-Goldwyn Pictures Corp.,* 81 F.2d 49, 56 (2d Cir. 1936) (L. Hand). Here, the Sequel undeniably pirates the Story's character traits, plot devices, aerial action scenes, setting, sequencing, pacing, and themes.

### 2. *Yonay's Copyrighted Story Unquestionably Comprises Protectable Expression; PPC Attacks a Strawman*

PPC's focus on the copyrightability of facts is a long-winded attack on a *strawman*. PPC attempts to convince the Court and itself that this case solely concerns whether mere facts are copyrightable and tries to swap its strawman for the correct analysis. Instead, the Court must evaluate both Yonay's creative *expression* and his *selection and arrangement* of non-fictional content. No one here argues that facts themselves are copyrightable, yet PPC's entire defense

centers on dismantling this non-issue. *See ICC Eval'n Serv., LLC v. Int'l Ass'n of Plumb'g & Mech. Offs., Inc.,* 2022 WL 3025241 at *12 (D.D.C. Apr. 27, 2022) ("Defendants try to contort th[e] fact/expression dichotomy into a categorical exception from copyright protection[.]").

The Story, while incorporating factual elements, is predominantly the original subjective expression of Yonay. Indeed, the Story was valuable to PPC precisely because of its unique expression. It goes without saying that PPC would not have rushed to exclusively license the Story if it were just a factual compilation in the public domain. Contrary to PPC's about-face here, per the 1983 Agreement *it drafted*, PPC long considered Yonay's work to be an expressive copyrightable "story." SUF 5.[3] Yet, upon losing the Story, PPC flip-flopped and renounced its long-held legal position it benefitted from for decades.

In attacking its favorite strawman, PPC focuses myopically on facts while ignoring Yonay's creative *expression* of those facts, which is what copyright is all about. *Feist,* 499 U.S. at 350-51 (1991) ("principle, known as the idea/expression or fact/expression dichotomy, applies to all works of authorship") (citing 17 U.S.C. § 102(b)). *See also* 37 C.F.R. §202.1 ("Ideas … systems or devices [are] distinguished from the particular manner in which they are expressed or described in a writing" which *is* copyrightable.). Simply calling something a fact or an idea "'does no revoke its copyright protection. This argument mis-understands or ignores the expression/idea dichotomy … codified in § 102(b).'" *ICC Eval'n Servs.,* 2022 WL 3025241 at *13 (citation omitted).

Moreover, copyright estoppel (renamed the "asserted truths doctrine" in *Corbello v. Valli*, 974 F.3d 965, 979 (9th Cir. 2020)—estopping an author who *expressly* represented her *entire work* to be factual from later proving it is fictional—does not apply. Its application is untidy. *Nimmer* § 2.11[C]. Courts,

---

[3] PPC's Agreement repeatedly acknowledged Yonay's "copyright," that it was "wholly original with the Author," and even insisted that it be appointed Yonay's attorney in-fact to secure *copyright* extensions thereof, all for PPC's *exclusive* benefit. SUF 7-8. PPC thereby prevented competitors from exploiting the Story, while PPC did so in *Top Gun* and its Sequel.

for instance, treat historical works and biographies differently because it is understood that authors take greater creative license in fictionalizing history and characters to convey a specific "flavor of the period or person depicted," just as Yonay did. *Id.* "The mere fact that the original is a factual work ... should not imply that others may freely copy it" because "authors of factual works, like authors of fiction, should be entitled to copyright protection of their protected expression." *Authors Guild v. Google*, 804 F.3d 202, 220 (2d Cir. 2015).[4]

Here, the Story includes vivid portrayals and extensive characterizations of the academy and selected pilots and instructors, in an extremely literary style. Tob. Decl., Ex. 1. Nowhere does Yonay assert that it is entirely factual. Were the doctrine to apply, it would still not reduce the copyright protection afforded the Story's cinematic expression and Yonay's selection and arrangement. *See Corbello*, 974 F.3d at 972; *De Acosta v. Brown*, 146 F.2d 408, 410 (2d Cir. 1944) ("original treatment of … historic character … entitled to protection").

PPC cynically equated Yonay's evocative, vibrant Story to a dull Senate Report on the subject. Dkt. 21-3, § II(D). Needless to say, if PPC were interested in Naval facts, it would have drawn inspiration for its blockbuster franchise from that Senate Report. But, of course, that contains none of the expressive imagery, startling action, character traits, motivations, or themes so important to the Story and PPC's derivative films. After all, only Yonay's compelling cinematic Story, not a dull factual recitation, is credited *by PPC* as having "suggested" *Top Gun* on which its Sequel so heavily relies. SUF 13.

One need only compare Yonay's Story to the school's Wikipedia page[5] or to that dry Senate Report to appreciate it and understand that "there are

---

[4] *See also* 2 William F. Patry, *Patry on Copyright* § 4:7 (Sept. 2023) ("*Patry*") ("To call something truthful does not mean it is a fact." Applying *Corbello* should *not* impose a binary fact-fiction characterization to a work and must "take a respectful approach to expressive material in non-fiction works, especially how one creatively discusses historical events.").

[5] https://en.wikipedia.org/wiki/Marine_Corps_Air_Station_Miramar

gazillions of ways" to approach the subject and a wide range of creative choices thus entitling the Story to "broad" copyright protection. *Mattel, Inc. v. MGA Ent., Inc.*, 616 F. 3d 904, 913-14 (2010). In contrast, "there are only so many ways to paint a red bouncy ball on blank canvas," so its protection is "thin." *Id.* at 914. *Compare Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1120 (9th Cir. 2018) (photo of Michael Jordan dunking a basketball received "broad" protection as there were a "much wider range of creative choices available in producing it") to *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003) (commercial photo of vodka bottle got "thin" protection as it posed few creative choices).

Nonfiction works thus require careful extrinsic analysis. *See e.g., Harper & Row v. Nation Enters.*, 471 U.S. 539, 547 (1985) ("Creation of a nonfiction work, even a compilation of pure fact, entails originality"); *Corbello v. DeVito*, 844 F. Supp. 2d 1136, 1163 (D. Nev. 2012) ("Non-fiction works are also protected—not the historical facts themselves, but the creative presentation of those facts."). Similarly, "though there can be no copyright in the news itself, copyright does protect 'the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments.'" *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 70 (2d Cir. 1999) (citations omitted). For example, the plaintiff in *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 940 (10th Cir. 2002) authored a factual memoir of his time as a prisoner in World War II. The defendant produced a TV series with a similar story. *Id.* The Tenth Circuit reversed the district court's extrinsic analysis because even though the memoir was a nonfiction work, similarities of factual plot points and dialogue still qualified as "original expression." *Id.* at 946-47.

Contrary to PPC's false construct, courts have long given copyright protection to the *expression* in even highly technical factual works. *See e.g., Honeywell Int'l, Inc. v. W. Support Grp., Inc.*, 947 F. Supp. 2d 1077, 1081-82

(D. Ariz. 2013) (finding copyrightable *aircraft* manuals, that included factual information like "procedures for checking and repairing aircraft parts").[6]

PPC further takes for granted that the Story contains *scènes à faire* and stock elements[7] simply because flying scenes and jocular hotshots may be common to the genre today. But PPC assumes too much. Proper analysis requires the fact-finder to revisit 1983, when Yonay wrote his Story, and before the 1986 Film popularized the Story's elements, to understand what the *scènes à faire* and stock elements of naval action literature were *at that time*. In 1983, before *Top Gun* popularized the Story's elements, these sort of high-tech, high-testosterone, aerial action scenes were by no means common. Tob. Decl., Ex. 3 at 39. The 1983 Story gave rise to the 1986 Film, and the tremendous success of that film commercialized many of these elements and shaped the action genre of today. *See Alfred*, 821 Fed. Appx. at 729 ("[T]he works in question are almost twenty years old and the blockbuster *Pirates of the Caribbean* film franchise may itself have shaped what are now considered pirate-movie tropes."). When viewed in the proper context, PPC's *scènes à faire* arguments fall flat.

### 3.    *Yonay's Creative Selection and Arrangement of Even Unprotected Elements Is Also Protected*

While bare facts themselves are not subject to copyright, *see e.g., Feist.*, 499 U.S. at 344-45 (phone numbers not copyrightable), an author's creative expression and/or selection and arrangement of those facts are indisputably

---

[6] *See e.g.*, *Gennie Shifter, LLC. v. Lokar, Inc.*, No. 07-CV-01121, 2010 WL 126181, at *16 (D. Colo. Jan. 12, 2010) (finding "Installation Instructions" "protectable creative expression"); *SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 611 (E.D. Va. 2005) (finding "manuals conveying a detailed procedure" copyright-protected); *Med. Educ. Dev. Servs., Inc. v. Reed Elsevier Grp., PLC*, No. 05-CV-8665, 2008 WL 4449412, at *6 (S.D.N.Y. Sept. 30, 2008) (finding nursing exam prep-book protected; rejecting argument that it was "dictated largely by the [exam] and the science of nursing").

[7] "*Scènes à faire*" encompass only the most generalized stock scenes that lack original expression. *Berkic v. Chrichton*, 761 F.2d 1289, 1294 (9th Cir. 1985). "*Scènes à faire*" is narrowly defined and entails only expressions that "are as a practical matter indispensable." *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980); *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000) (similarities cannot be disregarded as *scènes à faire* unless they meet narrow exclusion for "indispensable" "stock" elements).

- 17 -

protected. *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) ("well settled that … a combination of unprotectable elements [is] protectable under the extrinsic test"); *Rentmeester,* 883 F.3d at 1119 ("What *is* protected by copyright is the [author's] selection and arrangement of the [work's] otherwise unprotected elements."); *Hanagami,* 2023 WL 7174242 at *8 (reversing due to the failure to properly assess "selection and arrangement").

A court must therefore first assess whether a plaintiff's original selection and arrangement of all elements supports substantial similarity *without* preemptively filtering out elements as "unprotectable." *Nimmer* § 13.03 n.25. This is mandatory in any case where, as here, a plaintiff asserts "a *combination* of many different elements of similarity" as a protectable whole. *Id*. (citing *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp*., 562 F.2d 1157, 1164 (9th Cir. 1977)). Even *Cavalier v. Random House, Inc.*, 297 F.3d 815, 827 (9th Cir. 2002), widely cited for filtration, faithfully performed the *selection and arrangement* test, *reversing* summary judgement as to a substantially similar combination of independently *unprotectable* elements.

Thus, "[t]o disregard" elements as unprotected when performing the extrinsic test "is to ignore the fact that substantial similarity can be found in a combination of elements, even if those elements are individually unprotected." *Swirskey*, 376 F.3d at 848. *See e.g., Keeling v. Hars*, 809 F.3d 43, 50-51 (2d Cir. 2015) ("copyright law protects not only the individual elements themselves, but the creative choices made in selecting and arranging even uncopyrightable elements"); *Eckes v. Card Prices Update*, 736 F.2d 859, 862 (2d Cir. 1984) (baseball card catalogue protected: "[w]e have no doubt that appellants exercised selection, creativity and judgment" when selecting which cards to include).

PPC's convenient limitation of protectable "selection and arrangement" to mere "sequencing" is *wrong* on the law which protects "'[o]riginal selection, coordination and arrangement.'" *Hanagami,* 2023 WL 7174242 at *8 (citing

- 18 -

*L.A. Printex*, 679 F.3d at 849); *Metcalf*, 294 F.3d at 1074. Whereas the "sequence of events" concerns the ordering of plot points, "arrangement" looks to the "composition" of an author's selected elements. *Id*. at 1073. *Metcalf v. Bochco*, 294 F.3d 1069, 1073 (9th Cir. 2002); *Kouf v. Walt Disney Pictures & TV*, 16 F.3d 1042, 1045 (9th Cir. 1994). *See e.g., Shaw v. Lindheim*, 919 F.2d 1353, 1363 (9th Cir. 1990) (disregarding the sequencing of events and ruling with respect to "selection and arrangement" that where the main characters are both well dressed, wealthy, self-assured and have expensive tastes, "the totality of these similarities ... goes beyond the necessities of [the works].").

Here, proper analysis of the similarities between the Story and the Sequel requires detailed analysis of the creative *choices* Yonay made in selecting and arranging his Story—a work that clearly is far more original than a bunch of facts. For instance, rather than offer an encyclopedic narration of the naval base operations, Yonay focused on the personal backgrounds and idiosyncrasies of two aspiring fighter pilots to engage his audience and humanize his Story. SUF 76. The Story's Yogi and Possum remained at the center of Yonay's tale; even as it zoomed out and looked into the past, everything was intentionally organized around them. *Id.* Yonay's portrayal of Yogi and Possum's relationship became the model for Maverick and Goose at the center of *Top Gun*, and that fed events and relationships at the center of the Sequel. SUF 76-77.

The uncontroverted evidence shows that Yonay's choices and his arrangement of those choices as portrayed in the Story suggested the dramatic center and arc of both films. Yonay transported the reader into the cockpit with the characters they were now invested in, greatly heightening a shared sense of exhilaration and danger. SUF 80, 96, 168. *Top Gun* and its Sequel used the same approach. SUF 81, 97, 169. Further, Yonay's vivid, cinematic descriptions of aerial combat suggested and inspired the visual core of both films: the aerial ballet, at once lyrical and violent, with cuts to briefing rooms, frat-boy carousel,

and competition. SUF 126-127, 191, 192, 197-198. Yonay curated a rhythm of noisy, exciting scenes in the sky, and juxtaposed them against quiet, reflective scenes on the ground; a rhythm faithfully followed by the Film and its Sequel.

Yonay's creative mixture of ethereal descriptions of flying, with intense cinematic action and thoughtful moments at the base—romanticized as a place of 1950s, post-war nostalgia—compelled PPC to purchase the film rights just weeks after his Story's publication. SUF 5, 92, 100. These elements (and many more) comprise Yonay's creative selections and arrangements in crafting his Story, that were later exploited in *Top Gun* and its Sequel. That aspects may be factual or may be viewed *today* as *scènes à faire* are of no import under the "selection and arrangement" analysis. *See Metcalf,* 294 F.3d at 1073-74.

Reducing Yonay's vivid and compelling Story to a bunch of facts would be like reducing a stirring pointillist painting to a bunch of dots and colors. In recently affirming the importance of protectable selection and arrangement of individually unprotectable elements, the Ninth Circuit said it best in *Hanagami*, 2023 WL 7174242 at *9 (9th Cir. Nov. 1, 2023) (concerning choreography):

> To analogize from music to dance, reducing choreography to "poses" would be akin to reducing music to just "notes." Choreography is, by definition, a related series of dance movements and patterns organized into a coherent whole. The relationship between those movements and patterns, and the choreographer's creative approach of composing and arranging them together, is what defines the work.

So too with respect to Yonay's exciting Story. After purchasing the Story, PPC made obvious use of his protectable selection, arrangement and expression, in *Top Gun* and its unlicensed Sequel. The Sequel is derivative of Yonay's Story as it incorporates expressive elements appropriated from the Story, as well as numerous elements (even clips and stills) from the 1986 Film that was based on Yonay's Story. SUF 23, 77, 167. Indeed, PPC purchased the Story for the express purpose of producing such derivative films. Tob. Decl., Ex. 2., ¶ II(B)(2). (calling for payments to Yonay upon "commencement of … the first motion picture … based upon the [Story]"); 17 U.S.C. § 101 ("derivative

work" definition prominently includes "fictionalization, motion picture version"); Copyright Off. *Compendium,* § 709.2 ("A fictionalization is a work of fiction that recasts, transforms, or adapts … one or more preexisting works."). For all of the above reasons, Plaintiffs are entitled to summary judgment on their First and Second Claims.

## C.   **PPC's Substantial Completion Defense Has No Statutory Basis.**

Whereas PPC could continue to exploit its derivative 1986 Film adapted from the Story, it did not have the right to prepare new derivative works utilizing the Story after January 24, 2020—the effective termination date. SUF 19. The Copyright Act's narrow exception regarding prior derivative works provides:

> A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, ***but this privilege does not extend to the preparation after the termination of other derivative works*** based upon the copyrighted work covered by the terminated grant.

17 U.S.C. § 203(b)(1) (emphasis added). PPC has the burden of proof as to this statutory exemption. *Woods v. Bourne Co.*, 60 F.3d 978, 994 (2d Cir. 1995) (citing *Mills Music, Inc.*, 469 U.S. at 162). Section 203(b)(1)'s clear language reflects the express intent of Congress to limit the exception to works prepared *prior to* termination. *See* H.R. Rep. 94-1476, at 127 (1976) ("In other words, a film made from a play could continue to be licensed … after the motion picture contract had been terminated but any remake rights … would be cut off.").[8]

"The critical point in determining whether the right to continue *utilizing* a derivative work survives the termination … is whether it was 'prepared' before the termination." *Mills Music, Inc.,* 469 U.S. at 173. While the Act does not define the term "preparation," its statutory scheme and consistent usage of the term makes clear that a work is "prepared" after all non-trivial changes to it are

---

[8] *See* Mark S. Lee, *Entm't & I.P. L.* § 11:12 (Mar. 2023) ("[W]hile a [] studio can continue to distribute copies of pr[ior] works, it cannot create remakes, sequels … [after] termination."); *Clancy v. J. Ryan Enters*, No. CV 17-3371, 2021 WL 488683 (D. Md. Feb. 10, 2021).

completed. Section 106(2) gives authors the right "to prepare derivative works" which continue to be "prepared" any time non-trivial changes are made to them. 17 U.S.C. § 106; *ABS Entm't, Inc. v. CBS Corp.*, 908 F.3d 405 (9th Cir. 2018); *see Maljack Prods. v. UAV Corp.*, 964 F. Supp. 1416, 1426-28 (C.D. Cal. 1997) (technical conversion of theatrical film for television resulted in a new derivative work). PPC's invented "sufficient completion" defense ignores these principles.

Here, it is undisputed that changes and additions of a very significant nature were made to the Sequel long after January 24, 2020. SUF 29-68. Indeed, according to PPC's own registration of the Sequel with the Copyright Office, it was not completed until *2022*—two years after the effective termination date. SUF 70. After January 24, 2020, PPC was still filming reshoots and "pickups." SUF 39. As of late Summer 2020, PPC was still editing the film, recording dialogue (ADR), working on visual effects, sound design, sound mixing, the soundtrack, and color grading. SUF 29-35, 39, 53, 58, 59, 61. These important changes/additions are not "merely trivial" and are inseparable from the completed derivative Sequel. *See Blizzard Ent., Inc. v. Lilith Games (Shanghai) Co.*, No. CV 15-4084 CRB, 2017 WL 2118342, at *8 (N.D. Cal. May 16, 2017)[9] ("Movies [] almost always make up a 'unitary whole' with 'inseparable and interdependent parts,' 17 U.S.C. § 101, because the [elements] … merge into one integrated work[.]"). It is indisputable that the integrated Sequel was "prepared" well after Plaintiffs' termination.

### D.   PPC's Conduct is Inequitable and Contravenes Federal Policy.

#### 1.   *PPC Attempts to Circumvent the Copyright Act*

The 1983 Agreement (drafted by PPC) *repeatedly* acknowledges its "copyright," and that the "work is wholly original with the Author." SUF 7. PPC expressly acquired exclusive rights under copyright in the Story, such that only

---

[9] Citing *Richlin v. Metro-Goldwyn-Mayer Pics.*, Inc., 531 F.3d 962, 975 (9th Cir. 2007); *Aalmuhammed v. Lee*, 202 F.3d 1227, 1233 (9th Cir. 2000)). *See also* U.S. Copyright Off., *Compendium* § 808.3(D) (3d ed. 2021) (A motion picture, including its production … and editing, is a single, integrated work … [which] must be registered as a whole").

PPC could exploit it. SUF 5. In giving Yonay credit, PPC *admitted* that *Top Gun* "substantially incorporate[ed] the plot, theme, characterizations, motive and treatment of said [Story.]" SUF 13. As *the Sequel* incorporates these *Top Gun elements*, PPC cannot plausibly argue that it did not *utilize* the Story. After long prospering from exclusive Story rights, PPC's disingenuous "sour grapes" that it's just a bunch of "unprotectable facts" rings hollow.

PPC's two-faced stance and hardball tactics also directly flout the legislative purpose of the Act's termination provisions. 17 U.S.C. § 203(a). Section 203(a), which empowers an author or his family to recover the copyright to his works "was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985). It was "designed to 'safeguard[] authors against unremunerative transfers ... because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited.'" *Ray Charles Found. v. Robinson,* 795 F.3d 1109, 1112 (9th Cir. 2015) (quoting H.R. Rep. No. 94-1476, at 124 (1976) and citing 3 *Nimmer* § 11.07[E][4][b] (2014) (termination right is intended to protect "authors and their spouses, children, and grandchildren against unremunerative transfers and improve their bargaining position.")).

The termination right reflects a deliberate balance of competing interests resolved by Congress.[10] Yet PPC never tried to re-license the Story for a fair price, instead choosing to dismantle the Story it benefitted from for years. It did not even give Yonay screen credit for his contribution, as required by contract and common respect. PPC's shifting stance on the Story's copyrightability must not be rewarded.

---

[10] The Act gives terminated grantees, like PPC, an exclusive window of at least *two years* to reacquire a recaptured copyright. *See* 17 U.S.C. § 203(a)(4)(A), (b)(4); *Nimmer* § 11.08[A], n.6. Moreover, because the terminated grantee, retains foreign rights to the work, *Nimmer* § 11.02[B][2], such reacquisition on fair terms, reflective of a work's proven value, is the norm.

**E.**    **Plaintiffs are Entitled to Summary Judgment on Their Breach of Contract Claim.**

PPC's willful breach of the credit provision (Paragraph 7(b)) of the 1983 Agreement between Yonay and PPC entitles Plaintiffs to summary judgment on their breach of contract claim as well. Paragraph 7(b) broadly requires PPC:

> [T]o announce on the film of any motion picture photoplay that may be produced by it hereunder and substantially ***based upon*** or adapted from said work [Story] ***or any*** version or ***adaptation thereof***, substantially incorporating the plot, theme, characterizations, motive and treatment of said work [Story] ***or any*** version or ***adaptation thereof***, that said motion picture photoplay is based upon or adapted from or suggested by a work [Story] written by the Author, or words to that effect[.]

Under Paragraph 7(b), the basic contract questions are: (i) Did *Top Gun* "adapt[]" the Story?; (ii) Was *Top Gun: Maverick* "based upon" *Top Gun?*; and (iii) Did *Top Gun: Maverick* "substantially incorporate[] the [listed elements] *of said ... adaptation*" (*Top Gun*)? All are readily answered in the affirmative. *Top Gun: Maverick* was "based on" *Top Gun,* which "adapted" Yonay's Story, *Top Gun*s—purchased by PPC in the 1983 Agreement for that exact purpose (and crediting Yonay per Paragraph 7(b)). And the Sequel, which closely tracked *Top Gun*, substantially incorporated its key elements.[11] This is all uncontroverted by the facts on record. Whether the Sequel used "protectable expression" from the Story is a *copyright infringement* issue, *not* relevant to Plaintiffs' state contract claim, as Paragraph 7(b) contains no such limitation.

### 1.   *PPC's Defenses are Frivolous*

As PPC cannot refute that the Sequel easily satisfies Paragraph 7(b)'s broadly drafted requirements, it claims the Agreement imposes an *independent* condition that the film be "produced under" the agreement. Dkt. 20 at 24. PPC argues this was not met because the Sequel was not completed until long after

---

[11] Even if one were to read "substantially incorporating" as modifying "any version or adaption" preceding it, PPC was *still* required to credit Yonay. As *Top Gun*'s *screenplay* was an "adaptation" of the Story and *Top Gun* "substantially adapt[ed]" the elements of its screenplay. PPC cannot complain about Paragraph 7(b)'s broad scope, because PPC drafted it.

Plaintiffs' termination. *Id.* at 25. Its position is untenable. *First*, the phrase "produced ... hereunder and … adapted from" do not impose two distinct conditions, as the phrase is a *hendiadys*—they are part and parcel of the same thing. If the other Paragraph 7(b) requirements are met, the film is "produced under" it. The only reasonable interpretation is that the conjunctive "and" connotes that the sentence's second part is a descriptive continuation of the first.

*Second*, PPC's argument that the Sequel was not produced under the Agreement because the Yonays' terminated is frivolous and belied by PPC's own admissions. As the Copyright Act has no extra-territorial application, PPC retained its foreign rights under the Agreement to the Story and distributed the derivative Sequel worldwide. *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 72 (2d Cir. 1988). PPC's loophole logic also contradicts its assertion that the Sequel was "sufficiently completed" before January 24, 2020 (for its frivolous "prior derivative work" argument). This it cannot do. *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1410 (9th Cir. 1987) ("The party opposing summary judgment cannot create a genuine question of fact by contradicting [its] prior sworn statement."). PPC duly credited Yonay's Story on *Top Gun***,** but when served with Plaintiffs' statutory termination it conspicuously removed Yonay's credit on its clearly derivative Sequel—willfully breaching the 1983 Agreement.

## V.   <u>CONCLUSION</u>

For all the above reasons, Plaintiffs' motion for summary judgment should be granted.

DATED: November 6, 2023        Respectfully submitted,

**TOBEROFF & ASSOCIATES, P.C.**

By:  */s/ Marc Toberoff*
      Marc Toberoff

*Attorneys for Plaintiffs*