Attachment 1

Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. #318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Alex Kozinski (S.B. # 66473)
*alex@kozinski.com*
33 Marguerite Drive
Rancho Palos Verdes, CA 90275
Telephone: (310) 541-5885
Facsimile: (310) 265-4653

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SHOSH YONAY, an individual, and YUVAL YONAY, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>PARAMOUNT PICTURES CORPORATION, a Delaware corporation, and DOES 1-10,<br><br>Defendants. | Case No. 22-CV-03846-PA-GJS<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF HENRY BEAN [CORRECTED]**<br><br>[*Filed with: Declaration of Henry Bean; Declaration of Marc Toberoff*]<br><br>**Hearing Date:** January 8, 2024<br>**Hearing Time:** 1:30 P.M.<br>**Place:** Courtroom 9A<br>**Judge:** Hon. Percy Anderson |

# TABLE OF CONTENTS

*Pages*

I.   INTRODUCTION .......................................................................................... 1

II.  ARGUMENT .................................................................................................. 2

    A.   Bean's Literary Analysis Is Proper and Admissible .......................... 2

    B.   Bean Addressed Similarities and Differences in the Works .............. 7

    C.   Bean Identified Countless Specific Similarities Between the
        Works……………………………………………………………….9

    D.   PPC's Claimed "Factual Inaccuracies" Are Mere Disagreements
        with Bean's Opinions ....................................................................... 11

    E.   PPC's Disagreement with Bean's Conclusions Regarding Literary
        Elements Is Not Grounds for Exclusion ........................................... 13

    F.   Bean's Citations Are More Than Sufficient ..................................... 17

    G.   Bean's Use of the Word "Feeling Does Not Mean He Opined
        on the Intrinsic Test………………………………………………..19

III. CONCLUSION ........................................................................................... 21

ii

# TABLE OF AUTHORITIES

**CASES**

*Alfred v. Walt Disney Co.*,
   821 F. App'x 727 (9th Cir. 2020) ................................................................. 4, 21

*Authors Guild v. Google*,
   804 F.3d 202 (2d Cir. 2015) ................................................................................ 6

*Batts v. Adams*,
   No. CV 10-8123, 2011 WL 13217923 (C.D. Cal. Feb. 8, 2011) ....................... 7

*Baxter v. MCA, Inc.*,
   812 F.2d 421 (9th Cir. 1987) ............................................................................ 13

*Castle Rock Entm't, Inc. v. Carol Pub. Grp, Inc.*,
   150 F.3d 132 (2d Cir. 1998) ............................................................................. 13

*Cavalier v. Random House, Inc.*,
   297 F.3d 815 (9th Cir. 2002) ......................................................................... 3, 9

*Dolby Labs. Licensing Corp. v. Adobe Inc.*,
   No. CV 18-1553, 2019 WL 6327210 (N.D. Cal. Nov. 26, 2019) .................... 16

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991) ........................................................................................... 2

*Gable v. Nat'l Broad. Co.*,
   727 F. Supp. 2d 815 (C.D. Cal. 2010) ........................................................ 3, 20

*Hanagami v. Epic Games, Inc.*,
   85 F.4th 931 (9th Cir. 2023) ................................................................... 5, 7, 15

*Harper & Row v. Nation Enters.*,
   471 U.S. 539 (1985) ........................................................................................... 6

*Johannsongs-Publ'g, Ltd. v. Lovland*
   No. CV 18-10009, 2020 WL 2315805 (C.D. Cal. Apr. 3, 2020) ................ 5, 19

*Johannsongs-Publ'g, Ltd. v. Lovland*
   No. CV 18-10009, 2021 WL 5564626 (9th Cir. Nov. 29, 2021) ....................... 5

*Knowles v. Spin Master, Inc.*,
No. CV 18-5827, 2019 WL 4565102 (C.D. Cal. Sep. 17, 2019) ......................6

*Metcalf v. Bochco*,
294 F.3d 1069 (9th Cir. 2002) .........................................................15

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
523 F.3d 1051 (9th Cir. 2008) ..........................................................3

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
166 F.3d 65 (2d Cir. 1999)...............................................................6

*Olsen v. Nat'l Broad Co.*,
855 F.2d 1446 (9th Cir. 1988) ..........................................................7

*Rentmeester v. Nike Inc.*,
883 F.3d 1111 (9th Cir. 2018) ..........................................................6

*Russell v. Walmart Inc.*,
No. CV 19-5495, 2020 WL 9073046 (C.D. Cal. Oct. 16, 2020) ...............3, 20

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
952 F.3d 1051 (9th Cir. 2020) .........................................................15

*Swirsky v. Carey*,
376 F.3d 841 (9th Cir. 2004) ........................................................5, 7

*Twentieth-Century Fox Film Corp. v. Stonesifer*,
140 F.2d 579 (9th Cir. 1944) .........................................................13

*WMTI Productions, Inc. v. Healey*,
No. CV 20-2726, 2023 WL 5506712 (C.D. Cal. July 13, 2023) ..............4, 6, 7

*Zindel v. Fox Searchlight Pictures, Inc.*,
815 F. App'x 158 (9th Cir. 2020) ...............................................4, 20, 21

///

///

iv

**FEDERAL STATUTES, RULES AND REGULATIONS**

Fed. R. Civ. Proc. 26 ........................................................................18

Fed. R. Evid. 702 ..............................................................................1

## I.    **INTRODUCTION**

Plaintiffs Shosh and Yuval Yonay ("Plaintiffs") timely submitted the expert report and testimony of Henry Bean, in which he provides expert literary analysis identifying the numerous similarities between Ehud Yonay's ("Yonay") 1983 story, "Top Guns" ("Story"), and the 2022 film *Top Gun: Maverick* ("Sequel"). Declaration of Henry Bean ("Bean Decl.") Ex. 1 (Expert Report of Henry Bean ("Rep.")). In its motion to exclude Bean (Dkt. 54, "Mot."), Defendant Paramount Pictures Corp. ("PPC") makes a lot of noise, but ultimately puts forth no *legitimate* basis for excluding Bean.

PPC's motion suffers from numerous defects and inaccuracies. First, its motion willfully ignores the more nuanced evaluation that good literary analysis and the Ninth Circuit requires. Instead, PPC crafts a series of conveniently rigid elemental buckets to artificially constrict Yonay's Story. Next, PPC labels Bean's report as "unreliable" or "factually inaccurate," often with no supporting argument, because he simply did not come to conclusions PPC likes. But of course, this is no reason to exclude an expert under Rule 702. PPC also enlists the help of its favorite strawman to oust Bean by claiming he did not filter out all non-fictional elements. But as shown in Bean's report, he absolutely did consider and evaluate the Story in light of the fact/expression dichotomy, concluding that whereas facts themselves are *not* copyrightable, Yonay's particular expression of non-fictional content *is*. In this regard, PPC also opportunely overlooks that *no filtration* is required nor permitted when conducting the selection and arrangement analysis because it is well settled that the selection, coordination, and arrangement of even *unprotectable elements* is protectable.

PPC next attempts to challenge Bean's appraisal by comparing it with its own amateur analysis. For example, PPC argues absurdly that Bean, a seasoned and established novelist and screenwriter, does not know what a "theme" or

"mood" is because he didn't use the dictionary definitions PPC found online. The law does not permit the literary analysis of experts to be replaced by shaky arguments of lawyers, paid for merely accessing Britannica. Speaking of hired guns, unlike PPC's "rebuttal" expert James McDonald, Bean is not one. On the contrary, Bean insisted on reviewing the works to reach his own conclusions *before* agreeing to be an expert witness in this case, and even disagreed with certain similarities claimed by Plaintiffs—something quite rare for an expert in litigation. Bean's report and testimony are credible, reliable and helpful, and PPC has failed to show otherwise. For these reasons, elaborated upon below, PPC's motion should be denied.

## II.   <u>ARGUMENT</u>

### A.   **Bean's Literary Analysis is Proper and Admissible.**

Contrary to PPC's contention, Bean *did* recognize and distinguish unprotectable elements throughout his report.

> I've been informed by counsel that [PPC] argues, in essence, that the [Story] is just an amalgam of unoriginal and unprotectable facts reported by Ehud Yonay. This idea is possible only for someone who has not read the story. What Yonay has actually done as a writer is ... felt his way into the heart of the material and told it back to us so that we feel it too … Yonay's writing is highly subjective and brilliantly objective; to the extent it conveys facts, those facts are expressed with the feeling of fiction. ...

> It is worth pausing here to discuss the essential difference between mere facts and a dramatic story ... Thus, the expression and atmospherics ... are far more than mere facts ... This is a great deal more than 'mere reportage.'

Rep. 7-9.

Bean thus recognized the non-fictional nature of the Story, and that facts themselves are unprotectable, but rightly analyzed the *expression* of those facts, which is. Declaration of Marc Toberoff ("Toberoff Decl.") Ex. 1 (Deposition of Henry Bean ("Bean Dep.")) 265:16-18 ("I think, once again, you're separating,

as it were, the thing from the expression or the idea from the expression."); Bean Decl. ¶¶ 6-9; *see Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350 (1991) ("This principle, known as the idea/expression or fact/expression dichotomy, applies to all works of authorship.").

Bean also recognized that stock elements and tropes are not protected by copyright, but reasonably concluded that the similarities he noted did not fall in either of those categories. Rep. 39 ("I further do not believe that the Story contains stock elements or tropes ... In 1983, when Yonay wrote his Story, and before the 1986 Film popularized the Story's elements, these [] scenes were by no means common."); Bean Decl. ¶¶ 7, 9.

Bean considered these legal distinctions in his analysis but did not harp on them, like PPC's "rebuttal" expert James McDonald did, because it is essentially the role of the court, not an expert witness, to determine copyrightability, as that entails conclusions of law. *See Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 835 (C.D. Cal. 2010) (holding that an expert report which "appl[ies] the law to the facts ... invade[s] on the province of the judge," even when the expert is the author of leading copyright treatise, *Nimmer on Copyright*); *Russell v. Walmart Inc.*, 2020 WL 9073046, at *4 (C.D. Cal. Oct. 16, 2020) ("[T]he issue of whether an item is copyrightable is a question of law," and "'[m]atters of law are for the court's determination, not that of an expert witness.'") (citation omitted). Indeed, *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002), relied on by PPC, refers to filtration as a "court" function and does so without reference to expert opinion.

While PPC would like to use literary expert reports as legal briefs—*see, e.g.*, PPC's "rebuttal" report of James McDonald—it is well-settled that experts are not allowed to make legal conclusions nor opine on issues of law in the case. *See Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("'[A]n expert witness cannot give an opinion as to her *legal*

*conclusion,* i.e., an opinion on an ultimate issue of law … [which] is the distinct and exclusive province of the court.'") (citation omitted); *Gable*, 727 F. Supp. 2d at 835 (holding that an expert's opinion concerning "Ninth Circuit law ... is not admissible"). Accordingly, PPC's attempt to assign Bean the job of filtering out elements "within the meaning of Ninth Circuit law" (Mot. 3) exceeds the proper role of literary experts in infringement cases.

In *WMTI Productions, Inc. v. Healey*, for example, the court *denied* defendants' motion to exclude the testimony of an expert opining on the similarity between two television shows, holding that "any failure to filter out unprotected elements does not render [the expert's] opinion unreliable or unhelpful to the factfinder." 2023 WL 5506712, at *6 (C.D. Cal. July 13, 2023). This is because "[w]hich elements matter is a factual issue … for the jury to consider." *Id*. As the court rightly concluded: "Defendants are free to present their own evidence contradicting" the expert's testimony, and "are also welcome to cross examine [the expert] on these issues and argue to the factfinder that his opinion should be given little weight. But excluding his testimony wholesale is not warranted." *Id.*

Yet nonetheless, PPC makes a heavy-handed fuss that Bean did not explicitly place the similarities he identified "in the protected bucket" or "in the unprotected bucket[.]" Mot. 4. Bean's approach makes sense, however, given that he is an expert in literature and film—not copyright law. Bean Dep. 127:13-128:4, 16:23-17:1 ("I was happy to be informed about what was going on from a legal point of view, but I was really looking at it from a literary point of view or a cinematic point of view."); Bean Decl. ¶ 5; *see Zindel v. Fox Searchlight Pictures, Inc.*, 815 F. App'x 158, 159 (9th Cir. 2020) (explaining that the role of a literary expert in an infringement case is to opine on the "extent and qualitative importance" of similarities through "objective literary analysis"); *Alfred v. Walt Disney Co.*, 821 F. App'x 727, 729 (9th Cir. 2020) ("[E]xpert testimony would

- 4 -

aid in determining whether the similarities Plaintiffs identify are qualitatively significant."). Bean rightly used his knowledge, intuition, and experience as a literary scholar to compare what he believes are qualitatively significant elements of Yonay's expression, rather than attempting to make amateur legal conclusions about copyrightability.

Moreover, copyright protects the selection, coordination and arrangement of even unprotectable elements. "To disregard" elements as unprotected when performing the extrinsic test "is to ignore the fact that substantial similarity can be found in a combination of elements, even if those elements are individually unprotected." *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004); *see* Rep. 36 ("Ehud Yonay's Story, like all good writing, reflects a series of creative choices: what to write about (or not), what to emphasize or de-emphasize, how to arrange what has been selected and so on."); Bean Dep. 74:23-75:4; Bean Decl. ¶ 8 ("In doing this [selection and arrangement] analysis, I was instructed to consider all elements in the works regardless of whether each such element, standing alone, was copyright protectable.").

So, when PPC argues that the Sequel's *choice* to include for levity the brass bell rung at the pilots' favorite bar, the uncertainty of using a plane's ejection seat, to focus on the extreme gravitational forces experienced when flying jets; the upside-down "back-to-back" maneuver, "one-versus-one hops," and "two-versus-unknown" hops; among many others, amounts to mere facts, PPC erroneously fails to acknowledge that all of these elements, *when taken in the aggregate*, create a composition that is substantially similar to Yonay's Story. Mot. 5-6. It is of no import to selection and arrangement that one or more of these similarities is unprotectable on its own. *Hanagami v. Epic Games, Inc.*, 85 F.4th 931, 942-43 (9th Cir. 2023). Thus, Bean properly analyzed the works at issue.

The cases PPC relies on are inapposite. *Johannsongs-Publ'g, Ltd. v.*

*Lovland* discusses an expert report that did not filter out similarities to prior art between two musical compositions. 2020 WL 2315805, at *5-6 (C.D. Cal. Apr. 3, 2020) (*aff'd* 2021 WL 5564646 (9th Cir. Nov. 29, 2021)). But that is not what PPC argues here. Instead, PPC insists that Bean should have filtered out all non-fiction content wrongly insisting it is "not copyrightable"—which is the *exact* argument rejected by *WMTI Productions*. 2023 WL 5506712, at *6. According to PPC, Bean should be excluded because he should have filtered out "virtually all of [his] findings" just because "Yonay was writing about real students at the real Top Gun academy." Mot. 6. Not only is this not grounds for exclusion, it is also erroneous.

Contrary to PPC's false construct, a work is not unprotectable simply because it is non-fiction and contains factual material. *See Harper & Row v. Nation Enters.*, 471 U.S. 539, 547 (1985) ("Creation of a nonfiction work, even a compilation of pure fact, entails originality"); *Authors Guild v. Google*, 804 F.3d 202, 220 (2d Cir. 2015) ("[A]uthors of factual works, like authors of fiction, should be entitled to copyright protection of their protected expression."); *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 70 (2d Cir. 1999) ("[Even for news articles], copyright does protect 'the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments.'") (citation omitted).

The other case PPC cites is significantly distinguishable. *Knowles v. Spin Master, Inc.* considered whether a defendant's animated TV show infringed the plaintiff's comic book. 2019 WL 4565102, at *4 (C.D. Cal. Sept. 17, 2019). *Knowles* primarily turned on <u>access</u>, which the plaintiff failed to establish, and importantly, did not concern similarity between the "selection and arrangement" of the works in question—an indispensable part of Plaintiffs' case here. *Id*.

Again, it is well-settled that selection and arrangement analysis is done

with *no filtration* whatsoever. *See Rentmeester v. Nike Inc.*, 883 F.3d 1111, 1119 (9th Cir. 2018) ("What *is* protected by copyright is the [author's] selection and arrangement of the [work's] otherwise unprotected elements."). Accordingly, an expert cannot be excluded for failing to filtrate. *See Swirsky*, 376 F.3d at 848 ("[T]o disregard [individually unprotectable elements] is to ignore the fact that a substantial similarity can be found in a combination of elements, even if those elements are individually unprotected."); *Hanagami*, 85 F.4th at 948 (9th Cir. 2023) (reversing due to the district court's failure to properly assess "selection and arrangement"). Thus, a proper analysis by Bean necessitated that he consider unprotectable elements.

PPC is "free to present [its] own evidence contradicting [Bean's] opinion or evidence that the elements that [Bean] analyzes include *scènes à faire* or generic or stock features ... But excluding his testimony wholesale is not warranted." *WMTI Productions, Inc.*, 2023 WL 5506712, at *6. That PPC does not like or disagrees with his expert conclusions is not grounds to exclude him, and as such, its motion must be denied.

### B. Bean Addressed Similarities and Differences in the Works.

PPC argues that Bean did not address any dissimilarities between the Story and Sequel, and therefore his report and testimony should be excluded. Mot. 7-10. Not only is this wrong, but it is also irrelevant, as such a critique goes to the weight, not the admissibility of expert testimony. Indeed, the cases PPC cites state as much. In *Olsen v. Nat'l Broad Co.*, the court gave less "weight" to expert testimony which deemphasized dissimilarities between the works at issue but did *not* exclude it. 855 F.2d 1446, 1450 (9th Cir. 1988). Similarly, *Batts v. Adams* did not exclude the expert testimony at issue but merely gave the testimony less weight. 2011 WL 13217923, at n.5 (C.D. Cal. Feb. 8, 2011) ("Defendants' objections go to the weight of the evidence rather than its admissibility.").

In any event, Bean *did* assess differences between the works throughout his analysis. *See*, *e.g.*, Rep. 11 ("The relationships are not precisely parallel—Maverick and Rooster are not a team [and] don't fly together[.]"), 20 ("This theme is gentler in the Story [and] more dramatic in the Sequel[.]"), 23 ("Those exact words may not appear in either film"), 23-24 ("None of this is 'said' verbatim in the Film and Sequel, but it is *felt*[.]"), 25 ("Those words never appear in either film, yet one feels them[.]"). Bean even acknowledged that he did not fully agree with the chart of similarities prepared by Plaintiffs and attached to their Complaint. Dkt. 1 Ex. 1; Bean Dep. 133:23-136:17 (testifying there are parts of the chart he does not agree with, that "there's maybe more detail, more different little items than necessary," that the chart is "a little overdetailed," and that "there is an over-meticulousness about finding every little, tiny similarity more than seems necessary to me."). To support its contrived argument, PPC cherry-picks a snippet from Bean's deposition where he mentions "ignoring the things that are not similar," but PPC *ignores* Bean's testimony *just prior* where he states: "I wrote the report based on my understanding of the similarities *or differences* between the two." Bean Dep. 124:9-24 (emphasis added). In context, Bean was explaining that, by identifying similarities, one naturally takes dissimilarities into account by not identifying them as similarities. *Id.*; *see* Bean Decl. ¶¶ 11-12. PPC's creative recontextualizing of Bean's words ought not mislead this Court.

But PPC tries again, offering an irrelevant tributary about a film Bean wrote called *The Believer*. Because Bean referenced a *New York Times* article as one of several sources he reviewed in writing his film, PPC tries to assault Bean's reliability and methodology by arguing that Bean was more willing to find differences between his film and the *New York Times* article than the Sequel and the Story. Mot. 9-10. But this argument is nonsense. *First*, there is no legal basis, and PPC cites none, to challenge an expert's methodology by counting the

number of differences and similarities he finds when comparing two completely different sets of works. *Second*, Bean wrote *The Believer* and thus, as its originator, would naturally be deeply familiar with where his film departs from and overlaps with a story reported in a newspaper. *Third*, Bean was not offering objective expert analysis of *The Believer*, and so his answers concerning it offer no insight into his "methodology" or "reliability" as an expert in this case no matter how much PPC touts this.

## C. Bean Identified Countless Specific Similarities Between the Works.

PPC's "abstraction" argument is equally frivolous as Bean identified detailed and concrete similarities between the Story and Sequel. *Cavalier v. Random House, Inc.*, which PPC repeatedly cites, states that while "a child riding a dragon, glowing badges, star trees, checklists, and schools in the sky" are unprotectable abstract ideas, "*depictions or descriptions*" of those ideas "could be protected." 297 F.3d at 828 (emphasis added). Yonay's specific depictions and descriptions are all Bean is concerned with. For example:

> Yonay's language graphically describes this daring culture: "Strapping on 25 tons of airplane" and pulling torturous Gs at supersonic speed is what adrenaline-junky top fighter pilots love and live for. In just that vein, Maverick, in the opening sequence of the Sequel, takes an experimental jet up to Mach 10 (he was only supposed to go to 9) then pushes past 10 until it looks like the G-force will pull the skin off his face and everything goes black. Rep. 18.

> [The cockpit] is the place of freedom and of death, and Yonay's descriptions of it are not simply beautiful and lyrical, they are determinative; they shape both films. *Id.* at 25.

> In the Sequel, flight is depicted with a similar weightless fluidity [as is described in the Story,] one blue hardly differentiated from the other as glistening silver fighter jets roll and rocket through the sky *Id.* at 35.

> These are obviously not generalized "abstractions." Indeed, many of

PPC's exemplar "abstractions" are merely small phrases PPC plucked from their broader context, which its motion conveniently omits. Other examples PPC cites are simply abbreviated shorthand phrases which refer to an element of the works that Bean expanded upon in more depth elsewhere in the report, which PPC omits. For example, PPC claims the report's description of combat training as "arduous and demanding" is too general (Mot. 10) yet omits the report's detailed analysis of Yonay's expressive depictions on the very next page:

> The Story emphasizes that top fight training is grueling and repetitive: "There was more flying than they had ever had ... one-versus-one hops (one student crew against one instructor) ... then the tough two-versus-unknown hop, in which two crews take off not knowing ... where the bogey [instructor "enemy" plane] will come from ... when the bogey rolls in and sends them home with a simulated shot. Before long, the hops were running into each other, and Yogi and Possum noticed that something was happening to them. They were flying twice a day ... edge-of-the-seat, hard flying, intense, mind-bending flying ... They were being hammered into a team." In exactly that way, Maverick trains the young top pilots in the Sequel: he takes on single crews one-on-one, then two crews are flying when Maverick rolls in behind them from nowhere, sending them home with a simulated shot. This edge-of-the-seat, hard, intense, mind-bending flying continues as the squadron is being hammered into an elite team, just as expressed in the Story. Rep. 16 (ellipses in original).

Thus, while PPC focuses on Bean's reference to the overarching concept that training is "arduous and demanding," it misleadingly omits his detailed analysis of how the very same intense training scenes show up in both the Story and Sequel and how each work uses this rigor as a device to "hammer" the spotlit pilots into a fierce team. As another example, PPC claims the report's analysis of pilots being "portrayed as audacious cowboys" and "gunfighters" is too abstract. Mot. 10. Compare, however, Bean's analysis:

> The Story: The hotshot fighter crews engaging in aerial showdowns, are portrayed as audacious cowboys: [quotes Story] In both films, Maverick and some of the other pilots are portrayed as audacious cowboys with slick combat maneuvers -- the pilot equivalent of fast

draw -- engage in one-on-one showdown duels, evoking the same Western mythos.

The Story: "Really great fighter pilots are like the great gunfighters in the Old West ... They didn't have to tell anybody how great they were -- all they had to do was just stand there, and the aura was such that everybody knew. It's the same here. Everybody knows." In the Sequel, Maverick is portrayed like this throughout the Sequel as the most legendary of the top gunfighters. Cyclone says that Maverick's reputation as a great fighter pilot but troublemaker precedes [him]. Maverick arrives at the bar, he is relaxed and silent, watching the other hotshot pilots show off. That's how he was as a young hotshot pilot; but he's not like that anymore. In the last scene of the Sequel, after the mission has been[] accomplished, we see [Maverick] "just stand[ing] there" by himself, pleased with his success, at peace with himself and -- as always with the cowboy -- alone. Rep. 22.

Bean references "audacious cowboys" and "gunfighters," but then continues on to an in-depth analysis of the exact literary parallels between the Story and Sequel in terms of their usage of "Old West" motifs. There is nothing "abstract" about his analysis.

### D. PPC's Claimed "Factual Inaccuracies" Are Mere Disagreements with Bean's Opinions.

PPC mislabels its disagreements with Bean's conclusions as "factual inaccuracies" in an attempt to exclude his report. For example, PPC attacks Bean's description of a scene depicting Maverick standing by himself as "the last scene" of the Sequel, when the film includes some ancillary epilogue material following that scene. Mot. 12. This is not a "factual inaccuracy," but a disagreement concerning what constitutes a "last scene." As Bean explained in his deposition, the scene where Maverick stands alone is "not the final scene in terms of sequence, but the [] ending of the story." Bean Dep. 273:4-11. That PPC disagrees is not grounds for exclusion.

PPC complains that Bean used the wrong name of the base at which the Sequel takes place, but entirely misses his point which is that, in reality, the Top Gun school had relocated to land-locked *Fallon, Nevada* by the time the Sequel

takes place (an ironic "oversight" given that PPC keeps harping on the "facts"). This notwithstanding, the filmmakers decided to keep true to Yonay's idyllic depiction of the school "near the beach and the Pacific Ocean." Rep. 24. The name of the base does not change the similarity in settings which was obviously chosen by PPC so the Sequel would parallel Top Gun's original setting. PPC further carps that Maverick was not "taken on a beautiful sailing yacht by his love interest [Penny,]" because Penny's sailboat was actually broken. Mot. 13. First, in this picture-perfect sailing scene, the gorgeous sailboat hardly registers as broken. Notwithstanding this, PPC again willfully misses the point, which is that the Story and Sequel share similar settings and scenes where pilots unexpectedly head out sailing on the open sea. Rep. 27.

Next, PPC disagrees that the bullseye metaphor is used to portray a pilot's skill and acumen similarly in the Story and Sequel. PPC acknowledges that the bullseye *is used* as a literary device to show skill (Mot. 14 ("While Hangman's marksmanship and cockiness are shown through his hitting bullseyes ...")), but curiously, and without any real argument, conclusorily disagrees that the works' use of this metaphor is "similar." Mot. 14. PPC's disagreement with Bean's expert literary analysis does not make his report "factually inaccurate" nor does it suffice to exclude him.

PPC also takes issue with the similarities Bean identifies concerning the risk that an attempted ejection during flight will not work. Mot. 14-15. PPC argues that the unsuccessful ejection in the Story is rooted in lack of practice, while PPC infers that the unsuccessful ejection in the Sequel is due to an equipment malfunction. *Id*. But by focusing on alleged dissimilarities as PPC has done, it again misses the point made by Bean, which is that both Story and Sequel (and even *Top Gun*) use the unpredictable risk of ejection to build suspense and heighten tension. Rep. 17.

Similarly, PPC attempts to distinguish the Sequel from the Story by

pointing out that the Story metaphorically portrays landing on an aircraft carrier
as a "controlled crash," but in the Sequel, Maverick makes a literal crash landing
on an aircraft carrier. Mot. 15. PPC fusses that Bean's analysis is "wrong"
because one is a metaphor and one is literal. *Id*. But, not only is this not grounds
for exclusion, it is the opposite. Bean's analysis helps connect the dots about
how metaphors like Yonay's in the Story are used and incorporated (literally or
otherwise) into the Sequel.

Comparing and analyzing the interplay between the literary elements of
two works is the exact role experts play in infringement cases like this, and is the
exact role Bean played here. Expert analysis like Bean's is particularly important
when, as here, a court must compare dramatic works in different media, where
the comparative meaning, interplay and dramatic impact of creative expression
is even more difficult to assess. *See Twentieth-Century Fox Film Corp. v.
Stonesifer*, 140 F.2d 579, 583 (9th Cir. 1944) (noting, in finding infringement,
that the dissimilarities between the film and play result "principally from the
film's enlarged means" of "express[ion]"); *Castle Rock Entm't, Inc. v. Carol
Pub. Grp, Inc.*, 150 F.3d 132, 140 (2d Cir. 1998) ("different genres" do not
negate infringement). PPC's disagreement with Plaintiffs about how the two
works are similar, and the qualitative significance of their elements in telling a
good story, demonstrates *why* Bean's expertise is helpful.

### E.     PPC's Disagreement with Bean's *Conclusions* Regarding Literary Elements is Not Grounds for Exclusion.

PPC next tries to exclude Bean, a successful writer of screenplays and
novels, by arguing that he does not "grasp" what a plot, theme, mood, or setting
is. Not so. Rather, it is PPC that misunderstands how literary elements like plot,
theme, character, etc. intersect and intertwine to form the tapestry of a work. *See
Baxter v. MCA, Inc.*, 812 F.2d 421, 424-25 (9th Cir. 1987) ("Proper literary
analysis requires these extrinsic factors be considered both individually and

collectively because literary elements and their broader impact on a work rarely fit neatly into distinct buckets.[22]); Rep. 22-23 ("Yonay obviously chose such *dialogue* to invest the reader in the Story and to further emotional *themes* and *moods*"), 27 ("As in all works of narrative or dramatic art, it is difficult to separate *character* from *story*."), 34 ("*Mood* is a matter of *pacing ... storytelling* and, sometimes even of *character*.") (emphasis added); Bean Decl. ¶ 13. That Bean's literary analysis does not fit neatly into the ossified buckets PPC prefers—or the definitions it found on the internet (Mot. 16-18)—is not grounds for exclusion.

PPC plucks out, for example, Bean's discussion of a part in the Story where an Admiral assumed command and set out "to restore discipline and Naval decorum" which caused the "hotshot [pilots] to leave" in droves, and argues that Bean's methodology is faulty because this is not a "theme." Rep. 21; Mot. 16. PPC's grousing misses the point, which Bean explained in his deposition, that this event in the Story encapsulates a theme *within it*. Bean Dep. 214:15-216:12; Rep. 21. And that theme—the independent "hotshot vs. the system"—appears in both the Story and Sequel. *Id*.

PPC's challenge to Bean's selection and arrangement analysis similarly boils down to its disagreement with Bean's conclusions. As part of its now routine argument, PPC picks out stray words, here "problem," "overcome," and "backstor[ies,]" and attacks them as lacking "particularity," (Mot. 19-20) while completely ignoring the more than two-page analysis Bean's report devotes to selection and arrangement, which greatly expands on each of PPC's targeted words. Rep. 36-38.

PPC tries to weaponize a playful comment from Bean's deposition arguing that it shows he does not understand the selection and arrangement analysis. Mot. 19. Bean stated: "Mr. Yonay made a lot of selection and a lot of arrangement. But the first and most important piece of selection he made and did

was he decided to write about this school." Bean Dep. 74:19-75:8. Clearly, even from the text itself, Bean is simply making a clever remark. Further, in context, Bean is not even discussing selection and arrangement, he is talking about the originality of Yonay's Story, who breathed life into a subject matter no one had yet touched, and did so in a way that inspired Hollywood and generated a billion-dollar film franchise. *Id*. 75:23-76:12.

In any event, Bean's report speaks for itself and thoroughly analyzes the substantial similarity in each work's selection and arrangement. For example, Bean mentions "start[ing] up in the air. Or, rather, start[ing] inside the heads of two flyers," focusing on the relationship between two flyers as central to the Story, the "aerial ballet, alternately lyrical and violent," the choice "to take us to the briefing room," and the "rhythm of noisy, exciting scenes in the sky, juxtaposed with quiet, cerebral scenes on the ground," among many others. Rep. 36-38. When taken as a whole, the sheer volume of similar creative choices identified by Bean, even if some are unprotectable in isolation, would constitute protected copyrightable expression. *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002). The case PPC itself relies on is consistent with this well-settled proposition. *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1074-75 (9th Cir. 2020) (a "combination of unprotectable elements" is itself entitled to copyright protection); *see also Hanagami,* 85 F.4th at 943 (9th Cir. 2023) (ruling that the district court did not properly assess protected "selection and arrangement").

PPC also challenges Bean's plot analysis, which dissected the Story, *Top Gun*, and Sequel's use of the emergency eject mechanism of a fighter jet. Mot. 16; Rep. 17. Without any analysis or support, PPC simply concludes this is not an element of the works' respective plots. But, in fact, it is. The Story builds tension by emphasizing the risk to a pilot who may need to eject from his jet, *having never actually practiced it before*. Rep. 17. *Top Gun* uses ejection

malfunction as a major plot point when Maverick's RIO, Goose, attempts to eject but cannot do so successfully and is killed. *Id*. The Sequel likewise builds dramatic tension and uses the inability to eject as a plot point at the end of the film. *Id*. Clearly, by any definition, including the one PPC found online, this is a plot point. *See* Mot. 16 ("A work's 'plot' is the 'series of events that form [its] story.'") (citing *Britannica*). PPC's challenges regarding plot are baseless.

PPC's argument concerning dialogue is similarly misguided because it reduces its analysis of dialogue to word-for-word comparisons. *See*, *e.g.*, Mot. 17-18 (Bean's "report does not identify a single instance in which any of the words or spoken language appearing in the [Story] also appear in *Maverick*."). But in fact, dialogue can have a much broader, more nuanced impact on a work and PPC's failure to recognize this doomed its dialogue analysis from the jump. Indeed, if expert analysis were to focus solely on word-for-word comparisons as PPC insists, it would be unhelpful to the trier of fact because any layperson could read a story and compare the words written to those said in a movie. *Dolby Labs. Licensing Corp. v. Adobe Inc.*, 2019 WL 6327210, at *2 (N.D. Cal. Nov. 26, 2019) ("To the extent than an issue is within the sphere of a fact finder's understanding, an 'expert' cannot usurp that role."). Rather, expert analysis is needed here to understand how the dialogue impacts the works in question on a larger scale. Bean does just that, explaining, for example, how the dialogue and lingo emphasized by Yonay further themes and moods in the Story and Sequel. Rep. 22-23 ("Yonay obviously chose such dialogue to invest the reader in the Story and to further emotional themes and moods ... The Sequel, of course, has only dialogue, but it imitates as much as possible the lingo and tone of the Story, shaping and establishing its mood."). No one needs an expert, as PPC suggests, to count how many times the Sequel uses the phrase "Fight's on" from the Story—it's four times.

PPC next argues that Bean's setting analysis is off because he identifies

the similarity in the culture of the Navy bases at which the Story and Sequel take place. Mot. 18. But PPC's argument falls flat. The culture, energy, and caste system of a naval base is as much a part of the setting as its geographical coordinates. Rep. 24-27. As much as it tries to convince the Court otherwise, literary elements like setting are not so black and white. That Merriam-Webster might not define the nuances of storytelling is of no import, and in fact, is the precise reason Bean's expertise is helpful. The Ninth Circuit does not permit expert literary analysis to be replaced by arguments of counsel and a dictionary.

Yet, PPC grabs its dictionary once more to challenge Bean's mood analysis. But even by PPC's definition of mood (the "predominant emotion" evoked by a work), Bean has provided an accurate evaluation. PPC argues that Bean's analysis that both the Story and Sequel "continually shift between the mundane concerns of earthbound life ... and the clear realms of the sky, where one can move in any direction, but needs a helmet," is not mood. Mot. 19; Rep. 34. PPC is mistaken. In the context of Bean's report, it is clear that he is discussing the moods associated with these scenic descriptions, i.e., "mundane concerns of earthbound life" equals boredom, and "clear realms of the sky, where one can move in any direction, but needs a helmet" evokes intense excitement, adrenaline, danger, and freedom. Bean is talking about feeling and emotion. Indeed, elsewhere in its motion, PPC criticizes Bean for discussing "feelings" too much, misconstruing Bean's emotion analysis with intruding on the intrinsic test. *See*, *e.g.*, Mot. 16 ("Bean's repeated reference to subjective 'feelings' impermissibly intrudes on the *intrinsic* test") (emphasis original). PPC has shown no reason to exclude Bean.

## F.   Bean's Citations Are More Than Sufficient.

PPC faults Bean for not providing exact time stamps every time he mentions the Sequel, or exact page numbers from the Story, but provides no legal basis to thus exclude him. It is clear from Bean's report that he reviewed

the Story, *Top Gun*, and its legacy Sequel, as he references these works constantly throughout, always stating, in bold print, "**In the Story**," or "**In the Sequel**," to signal which work he is describing. Where he references other works that support his points, he identifies them as well. *See, e.g.*, Rep. 5 ("*The Wizard of Oz* evokes a world as vivid and precise as a particular shade of green; *Psycho* has a very different feeling, though just as precise; *The Godfather* has yet another; *Groundhog's Day* another and so on.").

Bean regularly provides direct quotes from the Story in his report, signified by quotation marks and often in italicized font, and provides detailed descriptions of the scenes he references from *Top Gun* and its Sequel. PPC cites no case requiring Bean to provide exact time stamps each time he references a literary element in the works—which makes sense given that, in many instances, it would be *impossible* to provide a time stamp when discussing elements such as overarching moods that permeate the entire works.

PPC then points to Rule 26 to say that Bean failed to disclose "the facts or data considered by [Bean] in forming" his opinions because he checked a Wikipedia page about *California Magazine* to confirm the dates it was active. But this miniscule fact, informing a mere parenthetical in Bean's report ("(1976-1991)") does not warrant the exclusion of his report. In fact, Bean did provide the sources that he *actually used* in forming his expert opinions including the Story, *Top Gun* and its Sequel, and other films and literary materials. He should not be ousted for not citing a Wikipedia page for an immaterial date. Moreover, as Bean explained, his opinions regarding *California Magazine* came from his lived experiences and decades of participation in the literary world. Bean Dep. 37:17-38:18, 78:15-79:13, 80:18-24, 295:23-25. This comprises part of Bean's experience and expertise and not "facts or data."

Other "facts or data" PPC claims Bean should have disclosed include well-known movies that feature aviation, such as *Air Force* and *Wings*. Bean

Dep. 148:24-149:4. Notably however, Bean does not reference scenes or any other aspects of these movies in his report, casting doubt on PPC's hyping of them as "sources" he relied upon. Bean also recalls watching *Flying Leathernecks* and another John Ford film *after* submitting his expert report (*Id.* at 147:21-149:18) and "gave some thought back" to *Tarnished Angels* and *The Bridges at Toko-Ri* (*Id.* at 149:22-25)—*not* that he reviewed them in preparation of his Report. *See* Bean Decl. ¶ 15 ("I did not consider these things as 'sources' to be formally listed at the beginning of my Report, given that such movies are part of my knowledge of film history.").

The sole case PPC cites is *Johannsongs-Publ'g Ltd. v. Lovland*. 2020 WL 2315805, at *6, which found as one of *many* factors that an expert comparing two music works did not include "sufficient supporting evidence—like comparative transcriptions or sheet music—for the Court to assess the validity and accuracy of her analysis." *Id.* Such reasoning doesn't fit here as PPC is not arguing that Bean should have cited the Sequel's screenplay. It is clear from Bean's direct quotations from the Story and detailed descriptions of scenes in the Sequel (and *Top Gun*) what he is referencing. Bean's citations suffice.

## G.     Bean's Use of the Word "Feeling" Does Not Mean He Opined on the Intrinsic Test.

PPC claims Bean opines on the intrinsic test for substantial similarity, though Bean does not ever purport to do so nor once mention the "intrinsic test." Rather, PPC equates Bean's opinion that plot, characters, settings, themes, and other features of dramatic works "contribute to and determine (or do not) the feeling of the derivative film" with the intrinsic test due to its use of the word "feel." This is an incorrect equation for several reasons. First, PPC does not dispute that "plot, characters, settings, [and] themes" are part of the "external, objective criteria" an expert must analyze or that such analysis, plus a comparative assessment of the work's "selection and arrangement" of elements,

1   is appropriate under the extrinsic test. Bean simply observes as an accomplished

2   screenwriter that these elements contribute to and determine the feeling that

3   resonates in films. Indeed, as mentioned, PPC's Merriam-Webster definition of

4   "mood" seeks to evaluate the "predominant emotion" evoked by a work. Bean

5   articulates the exact criteria that are relevant under the extrinsic test ("plot,

6   characters, settings, themes and so on") and compares those aspects of the works

7   with particularity. Rep. 5-6.

8        PPC then sets out to find any other convenient quotes where Bean uses the

9   word "feeling" to try and equate that with the application of the intrinsic test,

10   using completely misleading quotations from his Report. For example, PPC

11   argues that Bean opines that the Sequel "'takes its entire 'world' from the Story,'

12   which 'result[s] in what [he has] called the ultimate 'feeling' of the works, which

13   is extremely similar.'" Mot. 21-22. PPC deceptively omits the middle of that

14   quote, which actually reads: "[The Sequel] takes its entire 'world' from the

15   Story—*its focus, characters, themes, settings, mood, pace, even its nostalgia*, all

16   of which constitute and result in what I've called the ultimate 'feeling' of the

17   works, which is extremely similar." Rep. 40 (emphasis added). Again, Bean

18   describes "feeling" only in the context of comparing the external, objective

19   criteria that are part and parcel of his extrinsic test analysis.

20        Finally, PPC attacks Bean for not opining with regard to the Ninth

21   Circuit's definition of substantial similarity in preparing his report. Indeed,

22   unlike PPC's "literary" expert, Bean does *not* purport to interpret or argue Ninth

23   Circuit jurisprudence or to apply copyright law to the facts of this case—nor

24   would it be proper for him to do so. *Gable*, 727 F. Supp. 2d at 835 (holding that

25   it is not the role of a substantial similarity expert to render legal conclusions or

26   instruct the court on applicable law); *Russell*, 2020 WL 9073046, at *4 (holding

27   that opining on copyright law is for the court, not an expert witness). As a

28   literary expert in a copyright infringement case, assessing substantial similarity,

Bean rightfully fulfills his duties by "determin[ing] the extent and qualitative importance of the similarities" between the works. *Zindel*, 815 F. App'x at 160; *Alfred*, 821 F. App'x at 729.

Indeed, Bean's literary expertise *is* helpful to the fact-finder for this very reason while the "paint-by-the-numbers" report of PPC's expert, James McDonald, is not. Dkt. 59-3 (Expert Report of James McDonald) at 1. Bean's Report and testimony ring of honesty in a world where defense experts make careers charging $500 per hour to regurgitate time and again the same canned attacks on substantial similarity to reduce a plaintiff's copyrighted work to a nullity. *Id*. at 1-2. In contrast, Bean agreed to serve as an expert and wrote his report for no money, and *only* after independently assessing the works to determine whether he agreed with Plaintiffs' position. Rep. 1; Bean Dep. 15:19-16:13. Or as Bean aptly put it when asked if he "considers [himself] an advocate in this case?": "No. I'm [an] advocate only for my own position, my own beliefs." Bean Dep. 232:12-15.

## III.  **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny PPC's motion to exclude the expert report and testimony of Henry Bean.


DATED: November 22, 2023        Respectfully Submitted,

TOBEROFF & ASSOCIATES, P.C.

By:      /s/ *Marc Toberoff*
Marc Toberoff

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, Shosh and Yuval Yonay, certifies that this brief contains 6,989 words, which complies with the word limit of L.R. 11-6.1.


DATED: November 22, 2023          Respectfully Submitted,

TOBEROFF & ASSOCIATES, P.C.

By:      /s/ *Marc Toberoff*
                  Marc Toberoff

*Attorneys for Plaintiffs*